## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br>100 F Street, N.E.<br>Washington, DC 20549,<br><br>           Plaintiff,<br>      v.<br><br>KENT H. ROBERTS<br>4001 Lovers Lane Circle<br>Dallas, TX 75225,<br><br>           Defendant. | Civil Action No. |

### COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

### SUMMARY

1.     Defendant Kent H. Roberts ("Roberts"), former General Counsel, Corporate Secretary, and Executive Vice-President at McAfee, Inc., formerly known as Network Associates, Inc. ("McAfee"), engaged in a fraudulent scheme to enrich himself and others by secretly changing the dates on which stock options awards had been granted to coincide with lower closing prices of McAfee's common stock, resulting in disguised "in-the-money" option grants.  Roberts falsified company documents, including meeting minutes from the McAfee Board of Directors' Compensation Committee, to make it appear that McAfee's Compensation Committee had approved the disguised option grants on the favorable dates that Roberts had chosen.  In addition, Roberts helped to prepare and signed McAfee's 2002 and 2003 proxy statements, filed with the

Commission, which he knew, or was reckless in not knowing, contained false information and omitted material information concerning his option grant and grants to other McAfee officers, including, in particular, that Roberts had on more than one occasion circumvented McAfee's shareholder-approved options plan to improperly increase his potential stock-based compensation and the stock-based compensation of others. Roberts also made false statements concerning the true grant dates and proper exercise prices for his own stock options in stock ownership reports that he filed with the Commission.

2.    By engaging in such conduct, Roberts violated numerous provisions of the Securities Exchange Act of 1934 ("Exchange Act") and the rules promulgated thereunder, including the anti-fraud provisions, the proxy solicitation provisions, the public company internal controls provisions, and certain securities ownership reporting provisions.

3.    Unless enjoined, Roberts is likely to commit future violations of these provisions of the federal securities laws. Accordingly, the Commission seeks an Order enjoining him from doing so, requiring disgorgement of all ill-gotten gains and benefits obtained as a result of his violations and prejudgment interest thereon, and payment of civil money penalties. In addition, he should be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)].

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to Exchange Act Sections 21(d), 21(e), and 27 [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

5.      Venue is proper in this District pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa] because Roberts transacted business in this judicial district and because certain of the acts and transactions constituting the violations in this case occurred within this judicial district.

6.      Roberts, directly or indirectly, made use of the means and instrumentalities of interstate commerce in connection with the acts alleged in this complaint.

## DEFENDANT

7.      Defendant Roberts joined McAfee Associates, Inc., the predecessor to Network Associates, Inc. and, later, after a name change, McAfee, Inc., on April 13, 1998, as the Director of Legal Affairs.  From February 2000 to July 2001, Roberts served as the company's Vice President of Legal Affairs.  In January 2001, Roberts was promoted to General Counsel and Secretary of McAfee.  He was promoted in July 2001 to serve as one of McAfee's Executive Vice Presidents.  Roberts graduated cum laude from the University of Missouri Law School.  Prior to joining McAfee, Roberts practiced law in Dallas, Texas.  On May 30, 2006, McAfee announced that Roberts' employment had been terminated.

## ADDITIONAL RELEVANT PARTY

8.      McAfee, Inc., a Delaware corporation with its principal office in Santa Clara, California, is a manufacturer and worldwide supplier of computer programs and

hardware focusing on network security, anti-virus, and network management products. Prior to June 30, 2004, McAfee was known as Network Associates, Inc. From 1997 through early 2002, the company's shares traded on the Nasdaq National Market under the symbol "NETA." On February 12, 2002, the company's common stock, which is registered with the Commission pursuant to Exchange Act Section 12 [15 U.S.C. § 78l], was listed on the New York Stock Exchange, where it currently trades under the symbol "MFE."

## FACTS

### I.    McAfee's Stock Option Plan

9.      At all relevant times, McAfee awarded stock options to employees as a way to promote the long-term success of the company and align the employees' interests with the interests of the company's shareholders through increased stock ownership. McAfee typically awarded stock options to its employees in conjunction with three events: upon being hired by the company, as part of a yearly performance review, or as an award for a promotion.

10.     McAfee has several plans, all approved by its shareholders, pursuant to which stock options are awarded. All of the option grants at issue in this complaint were awarded under McAfee's 1997 Stock Incentive Plan (the "1997 Plan").

11.     The 1997 Plan provided that McAfee's Compensation Committee shall have the authority to "(a) select the Employees, Outside Directors and Consultants who are to receive Awards under the Plan, (b) determine the type, number, vesting requirements and other features and conditions of such Awards, (c) interpret the Plan and (d) make all other decisions relating to the operation of the Plan…." Option grants to

certain officers and grants of more than 15,000 shares (later increased to 25,000 shares) required the approval of the Compensation Committee.

12.    The 1997 Plan expressly stated that the exercise price of any grant to a McAfee employee or officer "shall in no event be less than 100% of the Fair Market Value of a Common Share on the date of grant."

## II.    Roberts Fraudulently Re-Dated and Re-Priced His Own 20,000-Share Option Grant

13.    On February 14, 2000, the Compensation Committee awarded Roberts an option to purchase 20,000 shares of McAfee common stock for $29.63 per share, McAfee's closing stock price on February 14.

14.    Later in 2000, after McAfee's stock price had fallen below the exercise price of Roberts' February 14 option, Roberts secretly accessed McAfee's computerized internal system for the employee stock options program and changed the option grant date for his grant from February 14, 2000, to April 14, 2000, which, in turn, lowered the exercise price for his option shares to $19.75, the closing price for McAfee's stock on April 14, 2000.

15.    Roberts was not authorized to unilaterally change the grant date or the exercise price of his option.  Roberts concealed from McAfee until May 2006 the roughly $10 per share benefit that he illicitly conferred upon himself, which had potentially increased Roberts' stock-based compensation by approximately $197,000.

16.    On or about January 10, 2002, Roberts filed a Form 3 (an "Initial Statement of Beneficial Ownership") with the Commission reporting the false exercise price of $19.75 per share, and the false expiration date of April 14, 2010, for the option.

17.    In May 2006, shortly after McAfee had begun an internal investigation into its stock option practices, Roberts confessed his misconduct to McAfee's Chief Executive Officer (the "CEO") at the time and two other members of McAfee's Board. Roberts told the CEO that he had re-priced his option because he had become disappointed after McAfee's stock price had fallen below $29.63 a share, rendering his option grant worthless. Roberts asserted that he and another now-former McAfee employee accessed McAfee's computerized internal options management system and changed the grant date for the option from February 14, 2000, to April 14, 2000, which caused the system to record a new, lower exercise price for the option shares.

18.    Prior to May 2006, the company was unaware that Roberts had re-priced his option. Shortly after Roberts confessed his misconduct, McAfee fired him.

### III.    Roberts Wrongly Re-Priced and Re-Dated a 420,000-Share Option Grant to McAfee's CEO

19.    McAfee's Compensation Committee met on January 15, 2002, and approved a grant of an option to purchase 420,000 shares of McAfee common stock to the CEO. The same day, Roberts sent an email to the CEO and McAfee's Senior Vice President of Human Resources indicating that the Board had made certain changes to the CEO's compensation for 2002. Roberts wrote in part: "[The CEO] has been granted a 420,000 share stock option at today's closing price of $27.19 which vests on January 15, 2005 (100% vesting on that date)[.]"

20.    On the following day, January 16, after the market had closed, Roberts sent a second email to the CEO and McAfee's Senior Vice President of Human Resources in which he stated: "Let's price the 420,000 option shares at today's closing price of $25.43."

21.     A week later, on January 23, 2002, the CEO wrote in an email to Roberts and McAfee's Senior Vice President of Human Resources: "On January 16 it appears that the stock price finished at $25.43 … is this the price that the new options will be set at?? Is that the low for those days after the Board Meeting??" Roberts replied on the same day: "The close on Jan 16 is the right price."

22.     Roberts prepared the minutes from the January 15, 2002 Compensation Committee meeting. The minutes falsely state: "The Committee directed that [the CEO] be granted an additional stock option for 420,000 shares on January 16, 2002, at the closing price on that date."

23.     Roberts was not authorized to unilaterally change the grant date or exercise price for the CEO's option grant. Pursuant to McAfee's shareholder approved stock option plan, Roberts' changes to the grant date required the approval of McAfee's Compensation Committee. The Compensation Committee was never told about, and did not approve, Roberts' decision to re-price this option grant.

24.     On December 29, 2006, McAfee filed with the Commission a Current Report on Form 8-K in which it disclosed that it had revised the grant date for this option to January 15, 2002, "the date on which Compensation Committee approval was obtained," and, in turn, increased the option's exercise price to $27.19 per share, the closing price of McAfee's stock on January 15, 2002.

**IV.    Roberts Prepared and Signed Proxy Statements That He Knew Contained
Materially False and Misleading Information and Omitted Material Facts
Regarding Certain Option Grants to McAfee Executives**

**A.    False Disclosures and Material Omissions Concerning
Roberts' and the CEO's Option Grants**

25.    On November 14, 2003, McAfee filed with the Commission its proxy
statement ("2003 Proxy") notifying shareholders of matters to be brought to a vote at its
annual shareholders' meeting.  Roberts helped to prepare and signed, or allowed his name
to be used to solicit, the proxy on behalf of the company.  Among the required
disclosures contained in the 2003 Proxy was information relating to executive
compensation, including, in particular, all compensation awarded in the prior three years
to McAfee's CEO and its four most highly compensated officers.

26.    The 2003 Proxy disclosed that Roberts' compensation for fiscal year 2000
included options grants to purchase 30,000 shares of McAfee common stock.  These
30,000 shares included the 20,000-share grant that Roberts received on February 14,
2000, which he later secretly re-dated and re-priced, as discussed above.  Roberts knew
or was reckless in not knowing that his fraudulent re-dating and re-pricing of these
options, which potentially increased his compensation by approximately $197,500, had
not been disclosed in the 2003 Proxy.

27.    The 2003 Proxy also listed the 420,000-share grant to the CEO, discussed
in paragraphs 19-24, above, for which Roberts had improperly changed the grant date
from January 15, 2002, to January 16, 2002, in order to reduce the exercise price for the
option.  Roberts knew or was reckless in not knowing that the 2003 Proxy contained
materially false statements and omitted material information concerning this
unauthorized re-dating and re-pricing, which resulted in $739,200 of potential additional

compensation to the CEO. Moreover, the 2003 Proxy stated that this and other option grants were "granted at an exercise price equal to the fair market value of the common stock on the date of the grant," which Roberts knew, or was reckless in not knowing, to be false.

**B.    False Disclosures Concerning an Option
        Grant to Another Senior McAfee Officer**

28.    On April 11, 2002, McAfee filed with the Commission its proxy statement ("2002 Proxy") notifying shareholders of matters to be brought to a vote at its annual shareholders' meeting. Roberts helped to prepare and signed, or allowed his name to be used to solicit, the proxy on behalf of the company. Among the required disclosures contained in the 2002 Proxy was information relating to executive compensation, including, in particular, all compensation awarded in the prior three years to McAfee's CEO and its four most highly compensated officers.

29.    Roberts knew, or was reckless in not knowing, that both McAfee's 2002 Proxy and 2003 Proxy contained materially false information and omitted material information concerning a 500,000-share option grant to a McAfee Division President. The grant date of this option, according to the proxy, was October 31, 2001, purportedly the date on which the Division President had been hired by McAfee.

30.    The McAfee Division President was not hired by McAfee until early December 2001, and continued to work at his prior employer even after October 31, 2001.

31.    McAfee's corporate policy concerning stock option grants to newly hired employees states: "The effective date of a stock option grant is the employee's date of hire, unless otherwise noted on the PAF (Personnel Action Form), but in no case will a

grant be effective before the employee's date of hire." (Emphasis added.) This policy was memorialized in a memorandum titled "Granting of Stock Options," and was included in a company manual, dated June 2002, containing McAfee's policies and procedures for granting stock options to employees.

32.     The McAfee Division President's employment agreement, which was executed by Roberts on behalf of McAfee, states that his employment "shall commence upon a date mutually agreed upon by the parties hereto that is prior to October 30, 2001." However, Roberts knew or was reckless in not knowing that the employment agreement was still in draft form as late as November 13, 2001, and the individual had not begun working for McAfee as of that date.

33.     On December 2, 2001, Roberts received an email from McAfee's CEO, concerning "Very Important Executive Promotions and Management Additions," in which the CEO wrote: "I am also very pleased to announce that [the McAfee Division President] has joined [McAfee]. . ." McAfee issued a press release on December 3, 2001, announcing the hiring of the McAfee Division President.

34.     McAfee's Compensation Committee reviewed the McAfee Division President's employment terms during its January 15, 2002 meeting. The minutes for that meeting, which Roberts prepared and signed, reflect that the committee approved an option grant to the McAfee Division President to purchase 500,000 shares of McAfee common stock with a grant date of October 30, 2001, and priced at $18.95, the closing price of McAfee's stock on that day.

35.     McAfee's 2002 Proxy and 2003 Proxy stated that the McAfee Division President "joined" McAfee "on October 30, 2001." The proxies further stated that the

Division President "holds 500,000 options that are immediately exercisable ... 25% of these shares vested on October 30, 2002, the first anniversary of [his] employment commencement...." Roberts knew or was reckless in not knowing that the McAfee Division President was not hired by and did not commence employment at McAfee until December 3, 2001, and that the 2002 Proxy and 2003 Proxy contained materially false statements relating to the pricing for this new-hire option grant.

36.    The closing price of McAfee's stock on October 30, 2001, was $18.95, and the closing price on December 3, 2001, was $22.08. The $3.13 difference in pricing resulted in approximately $1,565,000 in additional stock-based compensation to the McAfee Division President that was not disclosed by McAfee and Roberts in the company's 2002 Proxy and 2003 Proxy.

37.    Defendant Roberts' conduct resulted in violations of the proxy reporting provisions of the federal securities laws by McAfee.

### FIRST CLAIM
**Roberts Violated Exchange Act Section 10(b) and Exchange Act Rule 10b-5**
**[Anti-Fraud Provisions]**

38.    Paragraphs 1 through 37 are realleged and incorporated herein by reference.

39.    Roberts, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact, necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, transactions, practices, or courses of

business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of securities.

40.     By engaging in the conduct described above, Roberts violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5], and unless enjoined will continue to violate Section 10(b) of the Exchange Act and Rule 10b-5.

## SECOND CLAIM
### Roberts Violated Exchange Act Section 13(b)(5) and Exchange Act Rule 13b2-1
### [Internal Controls Provisions]

41.     Paragraphs 1 through 40 are realleged and incorporated herein by reference.

42.     By engaging in the conduct described above, Roberts knowingly falsified McAfee's books, records, or accounts.

43.     By engaging in the conduct described above, Roberts knowingly circumvented or failed to implement McAfee's system of internal accounting controls.

44.     By engaging in the conduct described above, Roberts directly or indirectly falsified or caused to be falsified books, records, or accounts subject to Exchange Act Section 13(b)(2)(A) [15 U.S.C. §78m(b)(2)(A)].

45.     By engaging in the conduct described above, Roberts violated Exchange Act Section 13(b)(5) [15 U.S.C. §78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. §240.13b2-1], and unless enjoined will continue to violate Section 13(b)(5) of the Exchange Act and Rule 13b2-1.

**THIRD CLAIM**
**Roberts Violated Exchange Act Section 14(a) and**
**Exchange Act Rules 14a-3 and 14a-9**
**[Proxy Reporting Provisions]**

46.    Paragraphs 1 through 45 are realleged and incorporated herein by reference.

47.    Roberts, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, knowingly, recklessly, or negligently, solicited or permitted the use of his name to solicit by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, or omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct statements in earlier communications with respect to the solicitation of the proxy for the same meeting or subject matter which was false or misleading.

48.    By engaging in the conduct described above, Roberts violated Exchange Act Section 14(a) [15 U.S.C. § 78n(a)] and Exchange Act Rules 14a-3 and 14a-9 [17 C.F.R. § 240.14a-3 and 17 C.F.R. § 240.14a-9], and unless enjoined will continue to violate Exchange Act Section 14(a) and Rules 14a-3 and 14a-9..

**FOURTH CLAIM**
**Roberts Violated Exchange Act Section 16(a) and Rule 16a-3**
**[Securities Ownership Reporting Provisions]**

49.    Paragraphs 1 through 48 are realleged and incorporated herein by reference.

50.    Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Exchange Act

Rule 16a-3 [17 C.F.R. § 240.16a-3] require officers, directors and beneficial owners of

more than ten percent of any class of equity security registered pursuant to Exchange Act

Section 12 [15 U.S.C. § 78l] to file a report with the Commission disclosing any change

of his or her beneficial ownership of those securities.

51.    On or about January 10, 2002, as an officer of McAfee, Roberts filed a

Form 3 (an "Initial Statement of Beneficial Ownership") with the Commission that

contained false and misleading statements regarding the expiration date and exercise

price for his stock option grant.

52.    By engaging in the conduct described above, Roberts violated Exchange

Act Section 16(a) [15 U.S.C. § 78p(a)] and Exchange Act Rule 16a-3 [17 C.F.R. §

240.16a-3], and unless enjoined will continue to violate Section 16(a) of the Exchange

Act and Rule 16a-3.

## FIFTH CLAIM
### Roberts Aided and Abetted McAfee's Violations of
### Exchange Act Section 14(a) and Exchange Act Rules 14a-3 and 14a-9
### [Proxy Reporting Provisions]

53.    Paragraphs 1 through 52 are realleged and incorporated herein by

reference.

54.    McAfee, has, by engaging in conduct set forth above, directly or indirectly

violated Exchange Act Section 14(a) [15 U.S.C. § 78n(a)] and Exchange Act Rules 14a-3

and 14a-9 [17 C.F.R. § 240.14a-3 and 17 C.F.R. § 240.14a-9].

55.    Roberts knew, or was reckless in not knowing, that McAfee's conduct was

unlawful, and Roberts knowingly and substantially assisted McAfee in directly or

14

indirectly violating Exchange Act Section 14(a) [15 U.S.C. § 78n(a)] and Exchange Act

Rules 14a-3 and 14a-9 [17 C.F.R. § 240.14a-3 and 17 C.F.R. § 240.14a-9].

56.     As a result of his conduct described above, pursuant to Section 20(e) of

the Exchange Act [15 U.S.C. § 78t(e)], Roberts aided and abetted McAfee's violations of

Exchange Act Section 14(a) [15 U.S.C. § 78n(a)] and Exchange Act Rules 14a-3 and

14a-9 [17 C.F.R. § 240.14a-3 and 17 C.F.R. § 240.14a-9].

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

(a)     Issue an order of permanent injunction restraining and enjoining Roberts,

and his agents, servants, employees, attorneys, and assigns, and those persons in active

concert or participation with him, and each of them, from engaging in conduct that

directly or indirectly violates Exchange Act Sections 10(b), 13(b)(5), 14(a), and 16(a) [15

U.S.C. §§ 78j(b); 78m(b)(5); 78n(a); and 78p(a)], and Exchange Act Rules 10b-5, 13b2-

1, 14a-3, 14a-9, and 16a-3 [17 C.F.R. §§ 240.10b-5; 240.13b2-1; 240.14a-3; 240.14a-9;

and 240.16a-3].

(b)     Order an accounting by Roberts of all money, property, and other assets

directly or indirectly derived from the conduct alleged herein.

(c)     Issue an order directing Roberts to disgorge, with prejudgment interest, all

ill-gotten gains resulting from his conduct alleged herein.

(d)     Issue an order directing Roberts to pay civil monetary penalties pursuant

to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

(e)     Enter an order under Section 21(d)(2) of the Exchange Act [15 U.S.C. §

78u(d)(2)] prohibiting Roberts from acting as an officer or a director of any issuer that

has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C.

§ 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15

U.S.C. § 78o(d)].

(f)     Retain jurisdiction of this action in accordance with the principles of

equity and the Federal Rules of Civil Procedure in order to implement and carry out the

terms of all orders and decrees that may be entered, or to entertain any suitable

application or motion for additional relief within the jurisdiction of this Court.

(g)     Grant such other and further relief as this Court may deem just and proper.

Dated:  February 27, 2007

Respectfully submitted,

Stephen L. Cohen (D.C. Bar No. 478601)
Yuri B. Zelinsky
Lawrence C. Renbaum (D.C. Bar #450015)
Paul G. Lane (D.C. Bar #428821)

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-4030
Telephone: (202) 551-4472 (Cohen)
Facsimile:  (202) 772-9245 (Cohen)

**JURY DEMAND**

Plaintiff demands a trial by jury as to all claims.

Stephen L. Cohen

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

U.S. Securities and Exchange Commission

## DEFENDANTS

Kent H. Roberts

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___88888___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Stephen L. Cohen, Esq.
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-4030
202-551-4472

ATTORNEYS (IF KNOWN)

Neil J. Stephens
Cooley Godward Kronish LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
650-843-5442

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

( • ) 1 U.S. Government Plaintiff
( ) 3 Federal Question (U.S. Government Not a Party)
( ) 2 U.S. Government Defendant
( ) 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ( ) 1 | ( ) 1 | Incorporated or Principal Place of Business in This State | ( ) 4 | ( ) 4 |
| Citizen of Another State | ( ) 2 | ( ) 2 | Incorporated and Principal Place of Business in Another State | ( ) 5 | ( ) 5 |
| Citizen or Subject of a Foreign Country | ( ) 3 | ( ) 3 | Foreign Nation | ( ) 6 | ( ) 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

### ( ) A. Antitrust
[ ] 410 Antitrust

### ( ) B. Personal Injury/ Malpractice
[ ] 310 Airplane
[ ] 315 Airplane Product Liability
[ ] 320 Assault, Libel & Slander
[ ] 330 Federal Employers Liability
[ ] 340 Marine
[ ] 345 Marine Product Liability
[ ] 350 Motor Vehicle
[ ] 355 Motor Vehicle Product Liability
[ ] 360 Other Personal Injury
[ ] 362 Medical Malpractice
[ ] 365 Product Liability
[ ] 368 Asbestos Product Liability

### ( ) C. Administrative Agency Review
[ ] 151 Medicare Act

Social Security:
[ ] 861 HIA ((1395ff)
[ ] 862 Black Lung (923)
[ ] 863 DIWC/DIWW (405(g)
[ ] 864 SSID Title XVI
[ ] 865 RSI (405(g)

Other Statutes
[ ] 891 Agricultural Acts
[ ] 892 Economic Stabilization Act
[ ] 893 Environmental Matters
[ ] 894 Energy Allocation Act
[ ] 890 Other Statutory Actions (If Administrative Agency is Involved)

### ( ) D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ( • ) E. General Civil (Other)    OR    ( ) F. Pro Se General Civil

**Real Property**
[ ] 210 Land Condemnation
[ ] 220 Foreclosure
[ ] 230 Rent, Lease & Ejectment
[ ] 240 Torts to Land
[ ] 245 Tort Product Liability
[ ] 290 All Other Real Property

**Personal Property**
[ ] 370 Other Fraud
[ ] 371 Truth in Lending
[ ] 380 Other Personal Property Damage
[ ] 385 Property Damage Product Liability

**Bankruptcy**
[ ] 422 Appeal 28 USC 158
[ ] 423 Withdrawal 28 USC 157

**Prisoner Petitions**
[ ] 535 Death Penalty
[ ] 540 Mandamus & Other
[ ] 550 Civil Rights
[ ] 555 Prison Condition

**Property Rights**
[ ] 820 Copyrights
[ ] 830 Patent
[ ] 840 Trademark

**Federal Tax Suits**
[ ] 870 Taxes (US plaintiff or defendant
[ ] 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
[ ] 610 Agriculture
[ ] 620 Other Food &Drug
[ ] 625 Drug Related Seizure of Property 21 USC 881
[ ] 630 Liquor Laws
[ ] 640 RR & Truck
[ ] 650 Airline Regs
[ ] 660 Occupational Safety/Health
[ ] 690 Other

**Other Statutes**
[ ] 400 State Reapportionment
[ ] 430 Banks & Banking
[ ] 450 Commerce/ICC Rates/etc.
[ ] 460 Deportation

[ ] 470 Racketeer Influenced & Corrupt Organizations
[ ] 480 Consumer Credit
[ ] 490 Cable/Satellite TV
[ ] 810 Selective Service
[X] 850 Securities/Commodities/ Exchange
[ ] 875 Customer Challenge 12 USC 3410
[ ] 900 Appeal of fee determination under equal access to Justice
[ ] 950 Constitutionality of State Statutes
[ ] 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation).<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**
◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
15 U.S.C. §§ 78j(b); 78m(b)(5); 78n(a); and 78p(a) - violations of the general antifraud and other provisions of the federal securities laws

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____ Check YES only if demanded in complaint    JURY DEMAND: YES ☒ NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☒ If yes, please complete related case form.

DATE 2/27/07    SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.