**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

SECURITIES AND EXCHANGE
COMMISSION,

            Plaintiff,

    v.

KENT H. ROBERTS,

            Defendant.

---

:

:

:

:

:

CASE NUMBER 1:07CV00407 (EGS)

## REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT'S MOTION TO TRANSFER VENUE (28 U.S.C. SECTION 1404(a))

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT pursuant to Federal Rule of Evidence 201, Defendant Kent H. Roberts ("Defendant") hereby requests, in connection with his Motion to Transfer Venue, that this Court take judicial notice of the following documents attached hereto:

1.     The Indictment filed in the United States District Court for the Northern District of California in *U.S.A. v. Roberts*, (Master File No. 07-cr-0100), filed on February 27, 2007.  A true and correct copy is attached hereto as Exhibit A;

2.     The First Amended Consolidated Verified Shareholder Derivative Complaint filed in the United States District Court for the Northern District of California in *In re McAfee, Inc. Derivative Litigation*, (Master File No. 5:06-cv-03484) filed on December 8, 2006.  A true and correct copy is attached hereto as Exhibit B.

3.     The "Order Consolidating Cases for All Purposes, Appointing Lead Counsel and Setting Scheduling for Filing of Consolidated Complaint" filed in the United States District Court for the Northern District of California in *In re McAfee, Inc. Derivative Litigation*, (Master File No. 5:06-cv-03484) dated on July 12, 2006.  A true and correct copy is attached hereto as Exhibit C.

4.     The Shareholder Derivative Complaint filed in the Superior Court of California, County of Santa Clara, *In re McAfee, Inc. Derivative Litigation*, (Master File No. 1:06-cv-064854) filed on June 2, 2006.  A true and correct copy is attached hereto as Exhibit D.

5.     The "Options Scorecard" ("Scorecard"), *Wall Street Journal*, updated as of May 11, 2007, listing companies that "have come under scrutiny for past stock-option grants and practices."  The Scorecard is regularly updated on the *Journal*'s website at

2

http://online.wsj.com/public/resources/documents/info-optionsscore06-full.html. A true and correct copy of the Options Scorecard updated through May 11, 2007 is attached hereto as Exhibit E.

6.    A true and correct copy of a study entitled "Securities Class Action Case Filings, 2006: A Year in Review," by Cornerstone Research, is attached hereto as Exhibit F.

7.    True and correct copies of the Federal Court Management Statistics (2006) for the District of Columbia and the Northern District of California, available at http://www.uscourts.gov/cgi-bin/cmsd2006.pl, are attached hereto as Exhibit G.

## I.    ARGUMENT

Under Federal Rule of Evidence 201, the Court may take judicial notice of any fact "not subject to reasonable dispute in that it is . . . (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Federal district courts have routinely taken judicial notice of court records. *See, e.g.*, *Covad Comms. Co. v. Bell Atlantic Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005) ("A court may take judicial notice of public records from other court proceedings."); *Thompson v. Sawyer*, 586 F. Supp. 635, 637 n.1 (D.D.C. 1984) (taking judicial notice of a variety of pleadings and affidavits). Therefore, it is proper for this Court to take judicial notice of Exhibits A, B, C and D.

Courts also may take judicial notice of newspaper articles. *See Agee v. Muskie*, 629 F.2d 80, 81 n.1, 90 (D.C. Cir. 1980) (taking judicial notice of facts generally known as a result of newspaper articles). Therefore, the Court may take judicial notice of Exhibit E.

Courts may take judicial notice of academic studies. *Hobson v. Hansen*, 269 F. Supp.

3

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT'S MOTION TO TRANSFER VENUE (28 U.S.C. SECTION 1404(a))**

Case No.
1:07CV00407 (EGS)

401, 483 n.134 (D.D.C. 1967) (taking judicial notice of existence of academic studies). Therefore, the Court may take judicial notice of Exhibit F.

Lastly, courts may take judicial notice of matters such as public records and reports of administrative bodies. *See Egilman v. Keller & Heckmann, LLP*, 401 F. Supp. 2d 105, 109 (D.D.C. 2005) ("[I]t is well established that courts are allowed to take judicial notice of matters in the general public record, including records and reports of administrative bodies[.]") Therefore, the Court may take judicial notice of Exhibit G.

/ / /

/ / /

4

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT'S MOTION TO TRANSFER VENUE (28 U.S.C. SECTION 1404(a))**

## II.    CONCLUSION

For the reasons stated above, Defendant respectfully requests that this Court take judicial notice of the documents listed above and attached hereto.

Dated: May 21, 2007                                  Respectfully submitted,

                                                     COOLEY GODWARD KRONISH LLP
                                                     Michael J. Klisch (DC Bar No. 429711)
                                                     1200 19th Street, NW
                                                     5th Floor
                                                     Washington, DC 20036
                                                     (202) 842-7800

                                                     COOLEY GODWARD KRONISH LLP
                                                     Stephen C. Neal (CA Bar No. 170083)
                                                     William S. Freeman (CA Bar No. 82002)
                                                     Neal J. Stephens (CA Bar No. 152071)
                                                     Shannon M. Eagan (CA Bar No. 212830)
                                                     Einat Sandman (CA Bar No. 234776)
                                                     Five Palo Alto Square
                                                     3000 El Camino Real
                                                     Palo Alto, CA 94306
                                                     (650) 843-5000


                                                     By: _____/s/_____
                                                         Michael J. Klisch (DC Bar No. 429711)

                                                     Attorneys for Defendant
                                                     KENT H. ROBERTS

753243 v1/PA

5

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT'S MOTION TO TRANSFER
VENUE (28 U.S.C. SECTION 1404(a))**

                                                                    **Case No.
                                                                    1:07CV00407 (EGS)**

# EXHIBIT A

1  | SCOTT N. SCHOOLS (SCBN 9990)
2  | United States Attorney

*FILED*
07 FEB 27 PM 1: 46
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

5
6

## E-filing

8  | UNITED STATES DISTRICT COURT
9  | NORTHERN DISTRICT OF CALIFORNIA
10 | SAN FRANCISCO DIVISION

**MHP**

11 | UNITED STATES OF AMERICA,  **CR 07 0100**
12 | Plaintiff,
13 | v.
14 | KENT H. ROBERTS,
15 | Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

VIOLATIONS: 18 U.S.C. §§ 1341, 1343,
1346 – Mail and Wire Fraud;
15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. §
240.10b-5 – False SEC Filings;
15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and
78ff and 17 C.F.R. § 240.13b2-1 – Falsifying
Books, Records, and Accounts;
18 U.S.C. § 2 – Aiding and Abetting

SAN FRANCISCO VENUE

18 | <u>I N D I C T M E N T</u>

19 | The Grand Jury charges:

20 | I. <u>BACKGROUND</u>

21 | At all times relevant to this Indictment:

22 | A. <u>The Company</u>

23 | 1. McAfee, Inc. was a Delaware corporation with its headquarters in Santa Clara,

24 | California. Prior to June 2004, McAfee, Inc. was called Networks Associates, Inc., which was

25 | also a Delaware corporation with its headquarters in Santa Clara, California. For purposes of this

26 | indictment, the term "Network Associates" or "the company" will be used to refer to both

27 | McAfee, Inc. and Networks Associates, Inc.

28 | 2. Network Associates was a provider of computer security solutions designed to

prevent intrusions on networks and protect computer systems from a variety of threats and

1    attacks.

2        3.    Network Associates was a publicly held corporation whose stock was registered

3    with the United States Securities and Exchange Commission (the "SEC") pursuant to Section

4    12(b) of the Securities and Exchange Act of 1934. Network Associates' shares originally traded

5    on the National Association of Securities Dealers Automated Quotation System ("NASDAQ")

6    under the symbol "NETA." On February 12, 2002, Network Associates' shares began trading on

7    the New York Stock Exchange ("NYSE") under the symbol "NET." After June 2004, its shares

8    began trading on the NYSE under the symbol "MFE." The NASDAQ and NYSE are national

9    securities exchanges that use the means and instrumentalities of interstate commerce and the

10   mails.

11       4.    As a public company, Network Associates was required to comply with

12   regulations of the SEC. Those regulations are designed to protect members of the investing

13   public by, among other things, ensuring that a company's financial information is accurately

14   recorded and disclosed to the public.

15       5.    Under SEC regulations, Network Associates and its officers also had a duty to:

16   (a) make and keep books, records and accounts that fairly and accurately reflected the

17   company's business transactions; (b) devise and maintain a system of internal accounting

18   controls sufficient to provide reasonable assurances that the company's transactions were

19   recorded as necessary to permit preparation of reliable financial statements; (c) file quarterly

20   reports (on Form 10-Q) and annual reports (on Form 10-K) with the SEC; and (d) file statements

21   of ownership (Forms 3, 4, and 5) which, among other things, reflect an officer's ownership of

22   Network Associates' securities.

23       6.    Network Associates' fiscal year ended on December 31. Network Associates

24   independent auditor was PricewaterhouseCoopers ("PwC").

25   B. The Defendant.

26       7.    Defendant KENT H. ROBERTS was employed as a lawyer within the legal

27   department of Network Associates. On or about May 1, 1998, ROBERTS was hired by Network

28   Associates as the Director of Legal Affairs. On or about February 14, 2000, ROBERTS was

INDICTMENT                          -2-

1    promoted to Vice President, Legal Affairs.  In or about 2001, ROBERTS became the General

2    Counsel and Secretary of Network Associates.  ROBERTS' employment was terminated

3    effective May 30, 2006.

4         8.    ROBERTS was Network Associates' corporate compliance officer regarding SEC

5    reporting rules.  Among other things, ROBERTS was responsible for assuring Network

6    Associates' compliance with various SEC reporting requirements, including the filing of SEC

7    forms (Forms 3, 4, and 5) which reflect an officer's ownership of Network Associates' securities.

8    In addition, as Secretary for the company, ROBERTS was responsible for creating and

9    maintaining the minutes of meetings of the Board of Directors of Network Associates (the

10   "Board"), including the minutes of meetings of the Compensation Committee of the Board.

11        9.    In or about 2002, ROBERTS became one of the three founding members of the

12   Ethics First Committee.  The Ethics First Committee was designed in part to remedy past

13   internal control deficiencies which had led to financial restatements by Network Associates.  The

14   Ethics First Committee was charged with investigating, among other things, any fraudulent

15   conduct reported by employees.

16        10.   ROBERTS was a lawyer licensed to practice law in Texas and Missouri.  As an

17   employee and officer of Network Associates, and as a lawyer representing Network Associates,

18   ROBERTS owed both a fiduciary duty and a duty of loyalty to act in the best interests of

19   Network Associates and its shareholders, both financially and otherwise.

20   C.  Stock Options And Relevant Accounting Rules.

21        11.   As ROBERTS knew, Network Associates used stock options to recruit and retain

22   qualified personnel.  Those stock options gave employees the right to purchase Network

23   Associates' stock in the future at a set exercise or "strike" price.

24        12.   Network Associates' public filings represented that it accounted for its stock

25   option grants in accordance with generally accepted accounting principles ("GAAP").  GAAP

26   provided that a company was not required to record any compensation expenses for an employee

27   stock option grant where, among other things, the exercise price of the grant was equal to the

28   market price of the company's stock on the date of the grant.  Such stock option grants are "at-

INDICTMENT                           -3-

1  the-money" because they have no intrinsic value on the date of the grant.  In contrast, a company

2  was required to record a compensation expense for a stock option grant where the exercise price

3  of the grant was less than the market price of the company's stock on the date of the grant.  Such

4  stock option grants are "in-the-money" because they have intrinsic value on the date of the grant.

5  Likewise, a company was required to recognize a compensation expense if it repriced an existing

6  stock option grant.

7      13.    ROBERTS knew that Network Associates would incur a compensation expense if

8  it granted in-the-money stock options or repriced an existing stock option grant with a more

9  favorable exercise price.

10                    II.  THE SCHEME TO DEFRAUD

11      14.    Beginning in or about 2000 and continuing to in or about 2006, within the

12  Northern District of California, and elsewhere, defendant KENT H. ROBERTS and others,

13  knowingly and with the intent to defraud, devised and intended to devise a scheme and artifice to

14  defraud Network Associates, its Board, its shareholders, its auditors, the public, and the SEC as

15  to a material matter, to obtain money and property for themselves and others by means of

16  materially false and fraudulent pretenses, representations, and promises, and to deprive Network

17  Associates and its shareholders of their intangible right to his honest services.

18      15.    It was part of the scheme and artifice to defraud that ROBERTS and others,

19  directly and indirectly:

20          a.    made, and caused to be made, fraudulent changes to an existing stock

21  option grant so as to reduce the exercise price of that grant without proper approval and without

22  the knowledge of Network Associates' management or Board;

23          b.    concealed and failed to disclose the fraudulent changes to the existing

24  stock option grant;

25          c.    made, and caused to be made, a false entry in Board meeting minutes that

26  purported to reflect a grant date for a stock option grant when the closing price of Network

27  Associates' stock was relatively low, when in fact the Board did not intend to make the grant

28  effective on that date;

INDICTMENT                          -4-

1          d.     made, and caused to be made, fraudulent entries into Network Associates'

2 books and records;

3          e.     filed, and caused to be filed, materially false and misleading filings with

4 the SEC.

5      16.     The object and purpose of the scheme to defraud were to grant ROBERTS and

6 others valuable in-the-money stock options while hiding the true nature and value of the stock

7 option grants from Network Associates, its Board, its shareholders, its auditors, the public, and

8 the SEC and while avoiding the recognition of a compensation expense in Network Associates'

9 financial statements.

10     A.   Roberts' Fraudulent Change To His February 2000 Promotion Grant.

11      17.     It was part of the scheme and artifice to defraud that, beginning in or about 2000,

12 ROBERTS fraudulently granted himself extra compensation by causing the grant date for his

13 stock option grant to be changed in Network Associates' books and records so that the exercise

14 price of the grant would be lower and so that it appeared that the grant was made on the new

15 fabricated grant date.

16      18.     In connection with ROBERTS' promotion to Vice President of Legal Affairs, the

17 Board granted Roberts the option to purchase 20,000 shares of Network Associates' stock. The

18 Board approved the grant on July 13, 2000. The Board minutes from the July 13, 2000 meeting

19 stated that the grant date for ROBERTS' promotion grant was February 14, 2000, which was the

20 date his promotion became effective. The strike price for the grant was $29.62, the closing price

21 for Network Associates' stock on February 14, 2000. The options would vest over a four year

22 period. They would expire after ten years.

23      19.     Network Associates used a computer system called "Transcentive" to record

24 stock option grants to employees, including the number of options issued to each employee, the

25 grant date for each grant, and the exercise price for each grant. The Transcentive system was

26 also used to generate reports relating to stock options for financial reporting purposes.

27      20.     In late 2000, after the Board approved the February 2000 promotion grant,

28 ROBERTS was concerned that the grant was "underwater," that is, the $29.62 exercise price of

INDICTMENT             -5-

1  the stock option grant was more than the market price for Network Associates' stock. According

2  to ROBERTS, he caused Network Associates' then-Controller to change the grant date and

3  exercise price for the grant in the Transcentive system so that the exercise price would be lower.

4  In particular, he caused the grant date to be changed to April 14, 2000, and he caused the

5  exercise price to be changed to $19.75, which was the closing price of Network Associates'

6  stock on the new, fabricated grant date.

7      B.  Roberts' Fraudulent Concealment Of His Altered Stock Option Grant.

8          21.    It was further part of the scheme and artifice to defraud that, beginning in or about

9  2000 and continuing to in or about May 2006, ROBERTS fraudulently concealed and failed to

10  disclose the fraudulent change he caused to be made to his February 2000 promotion grant.

11         22.    Beginning in or about February 2002, after ROBERTS caused the then-Controller

12  to alter his February 2000 promotion grant, ROBERTS began an investigation into allegations

13  that the same then-Controller had, among other things, caused the exercise price for stock

14  options granted to certain consultants to be lowered within the Transcentive system. As a result

15  of the investigation, ROBERTS recommended, and Network Associates' management agreed, to

16  remove the then-Controller from his position in the finance department.

17         23.    Beginning in or about March 2002, Network Associates retained Deloitte &

18  Touche ("D&T") to conduct an internal audit of Network Associates' stock option granting

19  practices. As ROBERTS knew, D&T determined that Network Associates was required to

20  record a compensation expense because of the then-Controller's conduct relating to stock

21  options. D&T did not discover the fraudulent changes to ROBERTS' February 2000 promotion

22  grant. As ROBERTS knew, the results of the D&T internal audit were provided to PwC, the

23  company's independent auditor.

24         24.    On or about April 30, 2002, ROBERTS participated in a conference call with the

25  SEC. ROBERTS described his investigation into the then-Controller's conduct with respect to

26  stock options, the decision to remove the then-Controller from his position in the finance

27  department, and the compensation expense that Network Associates would take for the stock

28  options that the then-Controller repriced within the Transcentive system.

INDICTMENT                      -6-

1:07CV00407 (EGS)

1    25.    ROBERTS concealed and failed to disclose to Network Associates' management,

2    its Board, D&T, PwC, and others that the then-Controller – who had been removed from his

3    position in the finance department for his conduct relating to stock options and who had caused

4    Network Associates to report a compensation expense as a result of that conduct – had changed

5    the exercise price and grant date of ROBERTS' February 2000 promotion grant.

6    26.    In May 2006, Network Associates' finance department discovered the fraudulent

7    change to ROBERTS' February 2000 promotion grant.  Network Associates terminated

8    ROBERTS' employment shortly thereafter.

9    C.  Roberts' Fraudulent Change To The Then-CEO's January 2002 Stock Option Grant.

10    27.    It was further part of the scheme and artifice to defraud that in or about 2002,

11    ROBERTS made a false entry in Board meeting minutes that purported to reflect a grant date for

12    a stock option grant to the then-Chief Executive Officer ("CEO") and Chairman of Network

13    Associates when the closing price of Network Associates' stock was relatively low, when in fact

14    the Board did not intend to make the grant effective on that date.

15    28.    On January 15, 2002, the Compensation Committee for Network Associates'

16    Board met and granted to the then-CEO the option to purchase 420,000 shares of Network

17    Associates' stock, among other things.  As ROBERTS knew, the Board intended for the grant to

18    be made on January 15, 2002 and for the exercise price for the grant to be the closing price of

19    Network Associates' stock on January 15, which was $27.19.

20    29.    On January 16, 2002, ROBERTS decided to price the then-CEO's stock option

21    grant at the closing price of Network Associates' stock on January 16, 2002, which was $25.43.

22    The stock option grant was then entered into the Transcentive system with a grant date of

23    January 16, 2002 and an exercise price of $25.43.

24    30.    ROBERTS then prepared minutes of the January 15, 2002 meeting of the

25    Compensation Committee of Network Associates' Board that included the following false

26    description of the stock option grant to the then-CEO: "The Committee directed that [the then-

27    CEO] be granted an additional stock option for 420,000 shares on January 16, 2002 at the

28    closing price on that date."

INDICTMENT                    -7-

D. The False And Misleading Filings With The SEC.

31.    It was further part of the scheme and artifice to defraud that ROBERTS made and caused to be made false and misleading filings with the SEC, including the following:

a.    On or about January 10, 2002, Network Associates filed a Form 3 with the SEC that, among other things, reported that ROBERTS was granted the option to purchase 20,000 shares of Network Associates' stock with an exercise price of $19.75 per share.

b.    On or about May 10, 2002, Network Associates filed a Form 4 with the SEC that, among other things, reported that the then-CEO was granted the option to purchase 420,000 shares of Network Associates' stock with an exercise price of $25.43 per share.

c.    On or about May 15, 2002, Network Associates filed a Form 10-Q with the SEC for the fiscal quarter ended March 31, 2002 that, among other things, reported compensation expenses associated with stock option grants and the then-Controller's conduct, but failed to disclose Roberts' conduct and compensation expenses in connection with other stock option grants, including Roberts' February 2000 grant and the then-CEO's January 2002 grant.

COUNTS ONE AND TWO:  18 U.S.C. §§ 1341, 1346 and 2 (Mail Fraud; Deprivation Of Right To Honest Services; Aiding And Abetting)

32.    Paragraphs 1 through 31 are realleged as if fully set forth here.

33.    Beginning in or about 2000, and continuing up to in or about May 2006, within the Northern District of California and elsewhere, for the purpose of executing a scheme and artifice to defraud as to a material matter, to obtain money and property for himself and others by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts, and to deprive his employer Network Associates and its shareholders of their intangible right to his honest services, defendant

KENT H. ROBERTS

did knowingly cause the following items to be delivered by a private and commercial interstate carrier and U.S. mail according to the direction thereon:

INDICTMENT                    -8-

**1:07CV00407 (EGS)**

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| ONE | January 9, 2002 | SEC Form 3 sent from Santa Clara, California to Washington D.C. reporting grant to Roberts of option to purchase 20,000 shares of Network Associates' stock with an exercise price of $19.75 per share. |
| TWO | May 9, 2002 | SEC Form 4 sent from Santa Clara, California to Washington, D.C. reporting grant to then-CEO of option to purchase 420,000 shares of Network Associates' stock with an exercise price of $25.43. |

All in violation of Title 18, United States Code, Sections 1341, 1346, and 2.

<u>COUNTS THREE</u>:  18 U.S.C. §§ 1343, 1346 and 2 (Wire Fraud; Deprivation Of Right To Honest Services; Aiding And Abetting)

34.    Paragraphs 1 through 31 are realleged as if fully set forth here.

35.    Beginning in or about 2000, and continuing up to in or about May 2006, within the Northern District of California and elsewhere, for the purpose of executing a scheme and artifice to defraud as to a material matter, to obtain money and property for himself and others by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts, and to deprive his employer Network Associates and its shareholders of their intangible right to his honest services, defendant

KENT H. ROBERTS

did knowingly transmit and cause to be transmitted, by means of a wire communication, certain signs, signals, and sounds, that is:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| THREE | April 30, 2002 | Interstate telephone conference call with the SEC including participants in Palo Alto, California and Washington, D.C. |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

///
///
///
///

INDICTMENT                                    -9-

1  COUNTS FOUR THROUGH SIX: 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, 18

2  U.S.C. § 2 (False SEC Filings; Aiding And Abetting)

3       36.   Paragraphs 1 through 31 are realleged as if fully set forth here.

4       37.   On or about the dates set forth below, in the Northern District of California and

5  elsewhere, defendant

6  KENT H. ROBERTS

7  did knowingly and willfully make and cause to be made materially false and misleading

8  statements and omissions in the following reports and documents required to be filed with the

9  SEC under the Securities and Exchange Act of 1934 and the rules and regulations promulgated

10  thereunder:

11

| Counts | Approximate Date of Filing | SEC Filing |
|---|---|---|
| FOUR | January 10, 2002 | SEC Form 3 reporting grant to Roberts of option to purchase 20,000 shares of Network Associates' stock with an exercise price of $19.75 per share, when in fact the exercise price should have been $29.62. |
| FIVE | May 10, 2002 | SEC Form 4 reporting grant to then-CEO of option to purchase 420,000 shares of Network Associates' stock with an exercise price of $25.43, when in fact the exercise price should have been $27.19. |
| SIX | May 15, 2002 | Form 10-Q for the fiscal quarter ended March 31, 2002 that, among other things, reported compensation expenses associated with stock option grants and the then-Controller's conduct, but failed to disclose Roberts' conduct and compensation expenses in connection with other stock option grants, including Roberts' February 2000 grant and the then-CEO's January 2002 grant. |

22       All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code

23  of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

24  ///

25  ///

26  ///

27  ///

28

INDICTMENT          -10-

1    COUNT SEVEN: 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and 78ff, 17 C.F.R. § 240.13b2-1, and

2    18 U.S.C. § 2 (Falsifying Books, Records, and Accounts; Aiding And Abetting)

3         38.    Paragraphs 1 through 31 are realleged as if fully set forth here.

4         39.    On or about and between January 2002 and June 2002, in the Northern District of

5    California and elsewhere, defendant

6                  KENT H. ROBERTS

7    did knowingly and willfully, directly and indirectly, falsify and cause to be falsified books,

8    records, and accounts of Network Associates as to a material matter.

9         All in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and

10   78ff; Title 17, Code of Federal Regulations, Section 240.13b2-1; and Title 18, United States

11   Code, Section 2.

12   DATED:   February 27, 2007            A TRUE BILL

13

14                                           FOREPERSON

15   SCOTT N. SCHOOLS
     United States Attorney

16

17

18   MARK L. KROTOSKI
     Chief, Criminal Division

19

20

21   (Approved as to form: _____ )
                    AUSA Christopher J. Steskal

22                  AUSA Timothy Lucey

23

24

25

26

27

28

INDICTMENT            -11-

# EXHIBIT B

1   LERACH COUGHLIN STOIA GELLER
       RUDMAN & ROBBINS LLP
2   TRAVIS E. DOWNS III (148274)
    BENNY C. GOODMAN III (211302)
3   THOMAS G. WILHELM (234980)
    655 West Broadway, Suite 1900
4   San Diego, CA  92101
    Telephone: 619/23901-1058
5   619/231-7423 (fax)
    travisd@lerachlaw.com
6   bgoodman@lerachlaw.com
    twilhelm@lerachlaw.com
7       – and –
    SHAWN A. WILLIAMS (213113)
8   100 Pine Street, Suite 2600
    San Francisco, CA  94111
9   Telephone:  415/288-4545
    415/288-4534 (fax)
10  swilliams@lerachlaw.com

11  SCHIFFRIN & BARROWAY, LLP
    ERIC L. ZAGAR
12  ROBIN WINCHESTER
    280 King of Prussia Road
13  Radnor, PA  19087
    Telephone:  610/667-7706
14  610/667-7056 (fax)
    ezagar@sbclasslaw.com
15  rwinchester@sbclasslaw.com

16  Co-Lead Counsel for Plaintiffs

17              UNITED STATES DISTRICT COURT

18            NORTHERN DISTRICT OF CALIFORNIA

19                    SAN JOSE DIVISION

20  | In re MCAFEE, INC. DERIVATIVE | ) | Master File No. 5:06-cv-03484-JF |
    | LITIGATION | ) | |
21  | ———————————————— | ) | FIRST AMENDED CONSOLIDATED |
    | | ) | VERIFIED SHAREHOLDER DERIVATIVE |
22  | This Document Relates To: | ) | COMPLAINT FOR VIOLATION OF THE |
    | | ) | FEDERAL SECURITIES LAWS AND STATE |
23  | ALL ACTIONS. | ) | LAW CLAIMS FOR BREACH OF |
    | | ) | FIDUCIARY DUTY, ABUSE OF CONTROL, |
24  | ———————————————— | | CONSTRUCTIVE FRAUD, CORPORATE |
    | | | WASTE, UNJUST ENRICHMENT, GROSS |
25  | | | MISMANAGEMENT, BREACH OF |
    | | | CONTRACT, ACTION FOR AN |
26  | | | ACCOUNTING AND VIOLATION OF |
    | | | CALIFORNIA CORPORATIONS CODE |
27

28

1:07CV00407 (EGS)

1                                  **INTRODUCTION AND OVERVIEW**

2           1.     This is a shareholder derivative action brought by Lead Plaintiffs Heavy & General

3 Laborers' Locals 472 & 172 Pension & Annuity Funds and Kenneth Dossett, shareholders of

4 McAfee, Inc., formerly known as Network Associates, Inc. and McAfee Associates, Inc. ("McAfee"

5 or the "Company"), on behalf of the Company against its Board of Directors ("Board"), including its

6 former Chairman of the Board of Directors and Chief Executive Officer ("CEO"), George Samenuk

7 ("Samenuk"), former Chief Financial Officer ("CFO") and Chief Operating Officer ("COO")

8 Stephen C. Richards ("Richards"), former General Counsel Kent Roberts ("Roberts") and other

9 current and former directors and senior executives of the Company (collectively, "defendants").

10           2.     This action seeks to remedy defendants' violations of federal and state law, including

11 breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment

12 and gross mismanagement arising out of a scheme and wrongful course of business whereby

13 defendants diverted hundreds of millions of dollars of corporate assets to themselves via the

14 manipulation of the grant dates and associated documentation of stock options granted to McAfee

15 insiders, a scheme commonly known as "backdating." Each of the defendants participated in the

16 concealment of the option backdating scheme complained of herein and/or refused to pursue the

17 Company's legal rights to require defendants to disgorge the hundreds of millions of dollars in

18 illicitly obtained incentive compensation and insider trading proceeds diverted to them.

19           3.     As Securities and Exchange Commission ("SEC") Chairman Christopher Cox

20 recently explained before Congress, options backdating is a nefarious and illegal practice by which a

21 stock option is reported as having been granted on one date, but is actually backdated weeks or

22 months to a date when the stock price was trading at a lower price. Such backdating allows

23 corporate executives and other stock option grantees to realize immediate unearned and undisclosed

24 financial gains at the expense of the corporation and its shareholders.

25           4.     As Chairman Cox further explained, backdating stock option grants undermines the

26 key purpose of option-based executive compensation, *i.e.*, to provide incentive to improve the

27 Company's performance and increase the Company's stock price. By manipulating options such

28 that they carry a strike price lower than the trading price of the stock at the time of option grant,

1   executives profit immediately upon the award of the option without doing anything to improve the

2   Corporation's business or financial condition.

3        5.     It was not until just recently that the practice of backdating came to public attention.

4   On March 18, 2006, *The Wall Street Journal* published an article describing the practice and noting

5   that executives at certain companies had received options dated on some of the days of the year with

6   the lowest stock prices for several years in a row.  According to the study cited in the article, the

7   chances against such patterns occurring by chance were "astronomical" and, in some cases, as low as

8   one in 300 billion.

9        6.     Defendants' stock option grants mirror the astronomically unlikely pattern of repeated

10   options granted on some of the lowest trading prices of the year that *The Wall Street Journal*

11   concluded that it could only be the result of backdating.  For example:

12        •     In 1997, executives received options that were purportedly granted on the day with
13             the second lowest closing price of the year.  One of the executives that received a
             grant on this day, defendant Zachary A. Nelson ("Nelson"), had not yet started
14             working at McAfee.

15        •     The next year recipients of McAfee options fared even better, receiving grants dated
             on the day that had the lowest closing price of 1998.

16        •     In 1999, one executive received a grant dated on the day that had the lowest closing
17             price of the year, others received grants with the third lowest closing price of the
             year.

18        •     In 2000, defendant Roberts received a grant reflecting the lowest closing price for the
19             first half of the year.

20        •     In 2001, several executives and the employees received grants reflecting the lowest
             closing price of the year.  One executive who started in April of 2001, defendant
21             Richards, received a grant for the lowest day of April, even though it was neither his
             hire date nor his employment start date.

22        •     Also in 2001, executives of McAfee.com, a subsidiary of McAfee, received a grant
             of stock that was purportedly granted on January 31, 2001, but bore the exercise
23             price for January 3, 2001, the lowest day of the year for McAfee.com stock.

24        •     In 2002, Arthur Matin ("Matin"), a friend of defendant Samenuk from IBM, received
             a grant dated on the day with the lowest closing price of the year.  Another,
25             defendant Roberts, received a grant reflecting the day with the lowest closing price of
             the first half of the year.  Other executives received grants dated on, or simply
26             reflecting the closing price of, the day with the lowest closing price in January.

27        7.     The Board approved these improper grants which concealed from shareholders an

28   enormous transfer of money from the Company to the individual executives.

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                   - 2 -

8.     Former SEC Chief Accountant Lynn Turner has described stock option backdating as "allowing people to place bets on a horse race after the horses have crossed the finish line . . . ."[1] And former Chairman of the SEC, Arthur Levitt, said that backdating "is ripping off shareholders in an unconscionable way" and "represents the ultimate in greed." It is also beyond dispute that backdating unequivocally violates both the federal securities laws and state corporate fiduciary laws. As former SEC Chairman Harvey Pitt recently opined:

> Many discussions of backdating options start with the observation that backdating is not, per se, illegal. That is wrong. ***Options backdating frequently involves falsification of records used to gain access to corporate assets***. That conduct violates the Foreign Corrupt Practices Act and its internal controls requirements. If corporate directors were complicit in these efforts, state law fiduciary obligations are violated. ***Backdating is not only illegal and unethical, it points to a lack of integrity in a company's internal controls***.

9.     At McAfee, between 1996-present (the "Relevant Period")defendants perpetrated one of the most egregious backdating schemes of all. They pocketed hundreds of millions of dollars in excessive compensation and illegal insider trading proceeds as a result of the backdating scheme. By contrast, McAfee has suffered tremendous damages and injuries. Among other things, defendants' scheme has: (a) diverted hundreds of millions of dollars of corporate assets to senior McAfee executives; (b) caused McAfee to issue false financial reports to shareholders, exposing it to liability for violations of securities laws; (c) subjected McAfee to substantial investigative costs and massive potential liability from regulators, including the SEC, the Department of Justice ("DOJ") and the Internal Revenue Service ("IRS"); (d) damaged McAfee's credibility with investors; and (e) subjected McAfee to the costs of restating nearly four years of financial statements.

10.     Specifically, defendants caused McAfee to make materially false statements in its shareholder reports through Company press releases, statements to the public and documents filed with the SEC. For example, due to defendants' conduct, the Company repeatedly issued false statements concerning the manner in which the Company administered its stock option and incentive compensation plans ("stock option plans"), falsely stating that the Company's stock option grants

---

[1]     All emphasis is added and citations and quotations are omitted unless otherwise noted.

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                                      - 3 -

1:07CV00407 (EGS)

1  were priced as of the grant date of the option and only became valuable if the stock price increased

2  thereafter:

> The Company believes that stock options are critical in attracting and retaining these
> key contributors. ***The Incentive Plan is intended to offer a significant incentive by
> enabling key employees to acquire options to purchase Common Stock at a price
> equal to its fair market value on the date the option is granted. The options will
> become valuable to the recipients only if the price of the Company's Common
> Stock appreciates following the grant and when such options have vested.*** By
> providing key employees with the opportunity to acquire an equity interest in the
> Company over time and because a benefit is only received through improved stock
> performance, the Company believes that stock options serve to align the interests of
> key employees closely with other stockholders.

McAfee shareholders routinely relied upon the false Proxy Statements issued by the Company and

voted for and adopted amendments to the Company's Stock Option Plan under which defendants

manipulated and backdated stock option grants in order to enrich themselves at the expense of the

Company.

11.     During the Relevant Period, the Board stated that one purpose of changes to

McAfee's Stock Incentive Plan in 1997 was to "eliminate the ability of the Company's Board of

Directors (the 'Board') to grant options thereunder with an exercise price less than the fair market

value of the Company's Common Stock on the date of grant."

12.     Additionally, defendants caused the Company to falsely state in McAfee's Form

10-Ks that under Accounting Principles Board ("APB") Opinion No. 25:

> ***The Company accounts for stock-based compensation using the intrinsic value
> method prescribed by APB Opinion No. 25,*** "Accounting for Stock Issued to
> Employees." Accordingly, compensation cost for stock options is measured as the
> excess, if any, of the quoted market price of the Company's stock at the date of the
> grant over the amount an employee must pay to acquire the stock. . . .

13.     In addition to making untrue statements about the administration of the Company's

stock option plan, defendants, by failing to appropriately account for backdated options, caused the

Company to falsely present its financial condition to shareholders and investors in its quarterly and

fiscal year financial reports.  Defendants Samenuk and Eric F. Brown ("Brown") assured

shareholders that they had investigated and reviewed the Company's internal controls processes and

financial statements and authorized their inclusion in the Company's public filings.  Indeed, each

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                                          - 4 -

1    signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), §§302 and

2    906, affirmed that:

3        [T]he financial statements, and other financial information included in this report,
         fairly present in all material respects the financial condition, results of operations and
4        cash flows of the registrant as of, and for, the periods presented in this report;

5                                    *          *          *

6            (a)      Designed such disclosure controls and procedures, or caused such
         disclosure controls and procedures to be designed under our supervision, to ensure
7        that material information relating to the registrant, including its consolidated
         subsidiaries, is made known to us by others within those entities, particularly during
8        the period in which this report is being prepared;

9            (b)      Designed such internal control over financial reporting, or caused
         such internal control over financial reporting to be designed under our supervision, to
10       provide reasonable assurance regarding the reliability of financial reporting and the
         preparation of financial statements for the external purposes in accordance with
11       generally accepted accounting principles;

12                                   *          *          *

13           5.       The registrant's other certifying officer and I have disclosed, based on
         our most recent evaluation of internal control over financial reporting, to the
14       registrant's auditors and the Audit Committee of the registrant's board of directors
         (or persons performing the equivalent functions):
15
16           (a)      All significant deficiencies and material weaknesses in the design or
         operation of internal control over financial reporting which are reasonably likely to
17       adversely affect the registrant's ability to record, process, summarize and report
         financial information; and

18           (b)      Any fraud, whether or not material, that involves management or
         other employees who have a significant role in the registrant's internal control over
19       financial reporting.

20           14.      False Sarbanes-Oxley confirmations were filed with the SEC on October 31, 2003,

21   March 9, 2004, March 31, 2005 and March 1, 2006.

22           15.      In fact, defendants knew but failed to disclose that they had engaged in a practice of

23   backdating or misdating stock option grants to themselves and to other McAfee executives in a

24   manner designed to create immediate and risk-free profits in direct contravention of the Company's

25   stated and shareholder-approved stock option plan and Proxy Statements filed with the SEC.

26   Furthermore, defendants knew that because the Company had not taken a compensation expense for

27   backdated options, McAfee's reported earnings and expenses were false and misleading and not in

28   compliance with Generally Accepted Accounting Principles ("GAAP"). Thus, by falsifying the date

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                              - 5 -

1  on which options were granted, defendants materially understated McAfee's expenses and overstated

2  its income and falsely represented that it had not incurred any expenses for option grants.

3       16.    During the Relevant Period, it was reported that McAfee's executives were becoming

4  "obsessed" with the Company's share price. McAfee executives "were getting wildly wealthy, and

5  became extremely aggressive with bookkeeping and accounting and managing sales channels." Matt

6  Murray, *The Wall Street Journal*, December 17, 2002, "Stock-Option Frenzy: What Went Wrong?"

7  Apparently, this obsession led to both the SEC investigation into channel stuffing and the regular

8  backdating of stock options to many senior executive officers and other McAfee employees.

9       17.    While at McAfee, defendants Larson and Goyal often instructed that option grants to

10  McAfee senior executives and employees be backdated.[2] After Larson and Goyal were terminated in

11  December 2000 in relation with McAfee's channel stuffing activities, Samenuk took over as CEO

12  and continued to backdate stock options.

13       18.    In 2000 and 2001, Samenuk, Roberts and Senior Vice President of Worldwide

14  Human Resources defendant Sylvia Garcia-Lechelt ("Garcia-Lechelt"), were instrumental in

15  backdating option grants to senior executives, often with the knowledge and consent of the

16  Company's most senior executives. Garcia-Lechelt was primarily responsible for administering

17  option grants to senior executives at this time. Garcia-Lechelt regularly met with Samenuk, Roberts

18  and others to discuss option granting practices.

19       19.    Defendants were highly motivated to mask the unlawful backdating and its impact on

20  the Company's financials. In fact, many of the Company executives, including defendants Samenuk,

21  Richards, Roberts, Nelson, Matin, Vernon Eugene Hodges ("Hodges"), William L. Larson

22  ("Larson"), Dennis L. Cline ("Cline"), Peter R. Watkins ("Watkins") and Prabhat K. Goyal

23  ("Goyal") took home millions in incentive bonuses substantially tied to the Company's financial

24  performance.

25

26  _____

27  [2]    At the time, McAfee was known as Network Associates.

28

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF           - 6 -

1:07CV00407 (EGS)

1    20.    More importantly, at the same time that defendants caused the Company to covertly

2  issue backdated stock options and issue false financial reports, McAfee insiders were busy unloading

3  their McAfee shares for trading proceeds, an astonishing $253 million of which represented unlawful

4  profits from the exercise and sale of backdated or misdated stock options:

5              **McAfee, Inc. Insider Sales:**
              **March 11, 1996 - Present**
6

| Name | Shares[3] | Proceeds |
|------|--------|----------|
| Bolger, John | 16,000 | $762,080 |
| Carver, David | 15,000 | $780,060 |
| Cline, Dennis | 253,175 | $7,852,813 |
| Davis, Terry | 6,736 | $124,616 |
| Denend, Leslie | 571,712 | $19,268,857 |
| Duryea, R. Terry | 327,933 | $8,161,076 |
| Gemmell, Virginia | 28,438 | $981,034 |
| Goyal, Prabhat | 208,438 | $8,119,834 |
| Harper, Edwin | 56,626 | $1,760,118 |
| Hodges, V. Gene | 636,375 | $16,781,173 |
| Kerrigan, William | 22,914 | $558,925 |
| Kortschak, Walter | 12,656 | $86,413 |
| Kreysar, Richard | 92,808 | $2,170,621 |
| Larson, William | 2,946,051 | $86,509,329 |
| Matin, Arthur | 100,000 | $1,966,000 |
| Mehta, Bakulesh | 88,420 | $2,332,391 |
| Nelson, Zachary | 69,020 | $2,554,879 |
| Poteet, Darrell | 54,692 | $1,219,987 |
| Richards, Stephen | 350,000 | $6,323,912 |
| Roberts, Kent | 270,416 | $6,836,621 |
| Saal, Harry | 5,010 | $179,525 |
| Samenuk, George | 1,682,400 | $41,680,142 |
| Stringer, John | 70,501 | $2,662,910 |
| Watkins, Peter | 543,495 | $18,531,298 |
| Weiss, Kevin M. | 150,000 | $4,201,018 |
| Woodward, Mark | 339,659 | $10,957,090 |
| **TOTAL** | **8,905,821** | **$253,276,309** |

21.    Compounding the damage from these illegal option grants, in January 2006, McAfee

entered into a consent decree with the SEC, enjoining the Company from violating numerous

provisions of the federal securities laws. The consent decree, which also included a $50 million fine,

resulted from a fraudulent scheme to overstate the Company's revenue and earnings by over $600

---

[3]    Share numbers are adjusted for splits.

1   million through "channel stuffing," in which the Company improperly recorded sales to distributors

2   as revenue, and repurchased unsold inventory through an undisclosed subsidiary.   Defendant

3   Roberts, fired in May 2006 for an improper episode related to option grants, signed the consent

4   decree on behalf of the Company.  If McAfee's illegal options backdating is determined to have

5   violated this consent order, it will result in even greater harm to the Company and its shareholders.

6        22.     Plaintiffs have not made a demand on McAfee's board because the acts complained

7   of are illegal, *ultra vires*, and have no legitimate business purpose whatsoever.  In addition, at least

8   four of the eight members of McAfee's Board at the time this lawsuit was filed were either interested

9   in the transactions complained of, or were not independent.  In particular:

10       •   Samenuk was both Chairman of the Board of Directors and CEO of McAfee. He
             realized over $23 million from options granted on highly suspect dates.  He was
11           directly involved in the options granting process, and was recently forced to resign.

12       •   Leslie Denend ("Denend"), is a former President of McAfee and Network General
             and has deep connections with McAfee's management. He was given a grant of over
13           1,000,000 shares of McAfee stock on the lowest price of the year in 1998.  He is also
             on the board of Verifone, which has done business with McAfee since 2004.
14
15       •   Robert M. Dutkowsky ("Dutkowsky") was on McAfee's Compensation Committee
             from 2001-2005, during which many option grants at McAfee were backdated.
             Dutkowsky recently announced that he would be resigning from McAfee's Board no
16           later than January 31, 2007.

17       •   Defendants Liane S. Wilson ("Wilson"), Robert W. Pangia ("Pangia"), and Denis
             O'Leary ("O'Leary") all served on McAfee's Compensation Committee during the
18           time that highly suspect grants were awarded at McAfee. Defendants Wilson and
             Pangia also served on McAfee's Audit Committee since 2002 and 2001 respectively.
19
20   **ILLEGAL BACKDATING EXPOSED – MCAFEE ADMITS TO MISDATING OPTIONS
     – WILL RESTATE FINANCIALS FOR FIVE YEARS**

21       23.     On May 16, 2006, the Center for Financial Research and Analysis ("CFRA") issued a

22   report: "Options Backdating – Which Companies Are at Risk?"  The report stated that McAfee was

23   among the "higher risk" companies reported to have granted executives stock options at exercise

24   prices and dates that matched exactly or were close to a 40-day low in the Company's stock price

25   during the period of 1997-2002.  The report also identified the risks for companies that have taken

26   part in options backdating:

27       •   SEC investigation risk – The SEC has begun informal investigations at many
             companies in recent months and has also begun to call for improved disclosure
28           around all areas of executive compensation.

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                              - 8 -

1:07CV00407 (EGS)

1

2

- Accounting restatement risk – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

3

4

- Tax/Cash implications – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

5

6

7

- Management credibility risk – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholders, the reputation of management (and the related stock premium for superior management) could take a hit.

8

9

10

11

On that same day, McAfee's stock dropped as it was mentioned in the CFRA report on companies at risk for being involved in the backdating scandal. On May 22, 2006, reports surfaced of an internal review conducted at McAfee. Then, on May 25, 2006, reports were published that McAfee was in talks with the SEC regarding its stock option practices.

12

13

24.    On May 30, 2006, the Company announced that it had fired its General Counsel, defendant Roberts, for improper conduct related to stock option grants under investigation:

14

15

SANTA CLARA, Calif., May 30/PRNewswire-FirstCall/ -- McAfee, Inc. (NYSE: MFE), today announced that its ***Board of Directors has terminated the employment of its General Counsel, Kent Roberts***. The Company had previously disclosed that it is reviewing prior practices in connection with grants of employee stock options.

16

17

18

In connection with that review, ***the Company became aware of one episode involving the General Counsel in 2000 that was improper***. ***As a result, the Board has terminated his employment***. . . . The Company has had communications on the subject of option grants with staff of both the Securities and Exchange Commission and the Justice Department.

19

20

21

22

25.    On June 9, 2006, the Company filed a Form 8-K with the SEC stating that its previously disclosed voluntary investigation into the Company's option granting practices and informal discussions with the SEC had advanced to a formal investigation by service of a subpoena on the Company by the SEC.

23

24

25

26

27

28

26.    On July 27, 2006, the Company announced that its second quarter 2006 financial results were only preliminary because its investigation, coupled with the SEC investigation, was still ongoing and that it was likely that the Company would have to restate previously reported financial results and that restatement could span several prior periods. In addition, the Company would have to delay filing its financial results for the second quarter of 2006 and that it would restate its financial results for 2003 through 2005, all as a result of its review of its options granting processes:

The second quarter results are preliminary because the Registrant (as previously disclosed) is in the process of reviewing its stock option grant practices and related accounting. *McAfee believes that, as a result of this financial results in at least one, and potentially several, prior periods, to reflect additional stock compensation and/or tax related impact.* These adjustments could also affect the preliminary results announced in the furnished July 27, 2006 press release, which are presented without taking into account any adjustments or restatements which may be required resulting from the ongoing review of stock option grants.

\* \* \*

Because of the pending review, McAfee is not in a position to timely file its Form 10-Q with the SEC for the second quarter ended June 30, 2006. McAfee will attempt to file its Form 10-Q as soon as it has sufficient certainty as to the impact of these matters on its financial statements.

27.     In a conference call on the same day hosted by McAfee, defendants Samenuk and Brown discussed the expenses associated with the Special Committee's review of the backdating/ misdating investigation and confirmed to shareholders that the expenses to the Company "will be significant."

*We think that we will indeed incur additional significant cash expenses associated with the ongoing stock option review.* What we have done to date – and it's reflected in the Q2 2006 financials – we've identified a line item labeled SEC and compliance costs. And in that, we include the cost for the ongoing stock option review external costs specifically as well as the pre-existing six-month review, which is being done pursuant to the SEC administrative order. So those expenses will be included as GAAP G&A but excluded from pro forma G&A when you look at our Q3 2006 results.

28.     In addition, Brown explained that the Company's future earnings guidance "excludes any impact from any non-cash charges that could result from our internal review of stock option grant practices." Thus, the Company has effectively admitted that its past malfeasance will not only require restatement of publicly reported financials for the past five years, but the Company's future earnings will be negatively impacted as well.

29.     On August 16, 2006, the Company announced the preliminary findings of its Special Committee delegated responsibility for investigating option grant irregularities at McAfee. The Special Committee confirmed that options granted had been improperly backdated and did not conform with APB No. 25:

*As a result of McAfee's previously announced independent review of its historical stock option grant practices and related accounting, McAfee's Special Committee of independent directors conducting this review has reached the conclusion that,* pursuant to the requirements of Accounting Principles Board

Opinion No. 25, Accounting for Stock Issued to Employees (APB 25), *the actual accounting measurement dates for certain historical stock options differ from the measurements dates previously used for such awards*. The Special Committee has not yet completed its review. As a result, the Special Committee has determined that new accounting measurement dates will apply to the affected option grants. *McAfee believes that it is more likely than not that the amount of such additional adjustments relating to prior periods will be material and that McAfee will restate its financial statements in at least one, and potentially several, prior periods*.

McAfee's authorized officers, after discussing the matter with its auditors, have concluded that its previously issued financial statements for fiscal years 2005, 2004 and 2003, including 2002 and 2001 data, which are included in the Company's Annual Report on Form 10-K for the year ended December 31, 2005, the Quarterly Reports on Form 10-Q filed with respect to each of these fiscal years and the financial statements included in the Company's Quarterly Report on Form 10Q for the first quarter of fiscal year 2006 should no longer be relied upon. In the event that a restatement of these financial statements is required, it is likely it will affect financial statements for prior periods.

\*    \*    \*

McAfee also expects that expenses arising from the Special Committee's review *any potential restatement of financial statements and related activities, which will be recorded in the periods incurred, will be significant*.

30.    On August 18, 2006, the Company announced that it had received a subpoena from the U.S. Attorney's Office regarding their termination of defendant Roberts:

McAfee, Inc. (the "Company") has received a grand jury subpoena from the U.S. Attorney's Office for the Northern District of California relating to the Company's previously disclosed termination of the employment of Kent Roberts, the Company's former general counsel, his options-related activities, and the Company's previously announced investigation. The Company is continuing to fully cooperate with the U.S. Attorney's Office.

31.    On October 11, 2006, the Company announced that, following the Special Committee report on historical stock option grant practices, defendant Samenuk "retired" and defendant Kevin Weiss ("Weiss") was fired:[4]

_____

[4]    Samenuk, apparently dismissed for his malfeasance or nonfeasance in the backdating scheme, stands to make millions more because of his departure from the Company, which has been cleverly characterized as a "retirement." *See* Samenuk Employment Agreement:

[I]f Mr. Samenuk is terminated other than for cause or resigns for good reason, he will be entitled to the following severance benefits: (i) all of Mr. Samenuk's shares of restricted stock, if any, and all stock options will become fully vested and, if applicable, any repurchase rights on his shares will lapse, (ii) eighteen monthly severance payments based on twice Mr. Samenuk's monthly base salary and targeted

1             On October 11, 2006, McAfee, Inc. ("McAfee") issued a press release announcing that George Samenuk, its Chairman of the Board and Chief Executive Officer, has retired from McAfee, that Kevin Weiss, its President, has been terminated by McAfee, that Dale L. Fuller has been appointed as Interim President and Chief Executive Officer, and that Charles J. Robel has been appointed non-executive Chairman of the Board. The foregoing personnel actions followed the presentation to the McAfee Board of Directors of the determinations by the Special Committee of independent directors regarding the previously announced investigation of McAfee's historical stock option grant practices and related accounting.

32.     On the same day, October 11, 2006, McAfee further announced that its review had concluded that instead of restating only five years of financial statements, the options backdating scheme would require restatement of ten years of false reported financials:

        Following the substantial completion of the Special Committee's previously announced internal review of McAfee's stock option grant practices, conducted with the assistance of independent counsel and forensic accountants, McAfee has determined that it will need to restate historical financial statements to record additional non-cash charges for stock-based compensation expense *over a ten year period. Based on that preliminary review, McAfee announced that it currently believes that the amount of the restatement required to record such charges is likely to be in the range of $100 to 150 million.* McAfee and its independent auditors will be reviewing recent guidance released by the Office of the Chief Accountant of the SEC and have not yet conclusively determined the exact amount of such charges, the resulting tax and accounting impact, or which specific prior periods require restatement. McAfee intends to file its restated financial results and Annual Report on Form 10-K as quickly as practicable.

## JURISDICTION AND VENUE

33.     The claims asserted herein arise under §§10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), 78n(a) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder, and under California and Delaware law for violations of breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment, gross mismanagement and breach of contract. In connection with the acts, conduct and other wrongs

_____

bonus and (iii) eighteen months of continued health and other welfare and fringe benefits.

As Samenuk was intimately involved in the backdating of stock options at McAfee, he clearly did not resign "for good cause" and should not escape with even more options through a severance agreement.

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF

1  complained of herein, defendants, directly or indirectly, used the means and instrumentalities of

2  interstate commerce, the United States mail and the facilities of a national securities market.

3      34.    This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15

4  U.S.C. §78aa, as well as 28 U.S.C. §§1331 and 1337. This Court also has supplemental jurisdiction

5  over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

6      35.    This action is not a collusive one to confer jurisdiction on a court of the United States

7  which it would not otherwise have.

8      36.    Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa,

9  as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and

10  dissemination of materially false and misleading information, occurred in substantial part in this

11  District. McAfee is located in and conducts its business in this District.

12                                    **PARTIES**

13      37.    Plaintiffs Heavy & General Laborers' Locals 472 & 172 Pension & Annuity Funds

14  and Kenneth Dossett are shareholders of McAfee and have held McAfee stock at all relevant times

15  to the events alleged herein.

16      38.    Nominal defendant McAfee is a Delaware corporation with its principal executive

17  offices located at 3965 Freedom Circle, Santa Clara, California. McAfee is a worldwide supplier of

18  computer security solutions designed to proactively prevent intrusions on networks and secure

19  computer systems and other digital devices from a large variety of known and unknown threats and

20  attacks. The Company develops, markets, distributes and supports computer security solutions for

21  large enterprises, governments, small and medium-sized business and consumers through a network

22  of qualified partners.

23      39.    While incorporated in Delaware, McAfee's business is operated from California

24  where it employs thousands of employees, sponsors numerous sporting and civic events, and owns

25  several plants and facilities. By contrast, the Company has few, if any major business operations

26  located in Delaware. During the Relevant Period, McAfee had more than 500 record shareholders of

27  its common stock.

28

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT -- Master File No. 5:06-cv-03484-JF                                    - 13 -

40. Defendant Samenuk was, at times relevant hereto, President, Chairman of the Board of Directors, and CEO of McAfee. Because of Samenuk's positions, he knew the adverse non-public information about the business of McAfee, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Samenuk participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Samenuk signed the Form 10-Ks for every year since 2001 and Sarbanes-Oxley certifications since 2003. Additionally, Samenuk's signature was required for the options grants to the highest level executives. Samenuk also decided the total number of options to be distributed by the various department vice presidents. On October 11, 2006, McAfee announced that Samenuk had "retired" from McAfee following the Special Committee's presentation of the their investigation of McAfee's historical stock option grant practices and related accounting. During the Relevant Period, McAfee paid defendant Samenuk the following amounts in salary, bonus and option grants:

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 2001 | $714,922 | $540,000 | 1,200,000 |
| 2002 | $720,000 | $900,000 | 470,000 |
| 2003 | $720,000 | $870,000 | 400,000 |
| 2004 | $773,333 | $1,075,000 | 300,000 |
| 2005 | $835,224 | $1,000,000 | 250,000 |

Samenuk exercised options for 1,335,000 shares of McAfee stock, and sold the shares for profits of $33.5 million during the Relevant Period. He also sold 75,000 option shares of stock acquired at $.01 per share for $1,875,000.

41. Defendant Richards was, at times relevant hereto, CFO, COO, and Executive Vice President ("EVP") of McAfee. Because of Richards' positions, he knew the adverse non-public information about the business of McAfee, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Defendant Richards, by his specialized

1   financial expertise, was in a unique position to understand the business of McAfee, as well as its

2   finances, markets and present and future business prospects. During the Relevant Period, Richards

3   participated in the issuance of false and/or misleading statements, including the preparation of the

4   false and/or misleading press releases and SEC filings. Richards signed the Form 10-Ks for 2002

5   and 2003 and a Sarbanes-Oxley certification in 2003. Additionally, Richards' signature was

6   required for approval of all option grants in the Finance Department up to the level of vice president.

7   McAfee paid defendant Richards the following amounts in salary, bonus and options:

8

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 2001 | $259,807 | $175,000 | 650,000 |
| 2002 | $349,999 | $455,000 | 100,000 |
| 2003 | $387,500 | $402,344 | 150,000 |
| 2004 | $412,500 | $384,688 | 150,000 |

9

10

11

12  Richards exercised options for 350,000 shares of McAfee stock, selling the shares for profits of $4.5

13  million during the Relevant Period. He also sold 50,000 shares of stock acquired at $.01 per share

14  for proceeds of $1.2 million.

15        42.     Defendant Weiss was, at times relevant hereto, the President and EVP of Worldwide

16  Sales of McAfee. Because of Weiss's position, he knew the adverse non-public information about

17  the business of McAfee, as well as its finances, markets and present and future business prospects,

18  via access to internal corporate documents, conversations and connections with other corporate

19  officers and employees, attendance at management meetings and via reports and other information

20  provided to him in connection therewith. On October 11, 2006, McAfee announced that Weiss had

21  been fired from McAfee following the Special Committee's presentation of their investigation of

22  McAfee's historical stock option grant practices and related accounting. During the Relevant Period,

23  Weiss participated in the issuance of false and/or misleading statements, including the preparation of

24  the false and/or misleading press releases and SEC filings. During the Relevant Period, McAfee

25  paid defendant Weiss the following amounts in salary and bonuses:

26

27

28

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 2002[5] | $68,958 | $56,520 | 250,000 |
| 2003 | $350,000 | $241,563 | 200,000 |
| 2004 | $441,667 | $463,750 | 100,000 |
| 2005 | $483,811 | $448,195 | 100,000 |

Weiss sold 150,000 shares of McAfee stock for proceeds of $4.2 million during the Relevant Period.

43.    Defendant Roberts was, at times relevant hereto, EVP and General Counsel of McAfee. Because of Roberts' positions, he knew the adverse non-public information about the business of McAfee, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Roberts participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Roberts signed every false Proxy Statement by order of the Board since 2001, including the Proxy Statement filed on May 25, 2006, just six days before he was fired. McAfee paid Roberts the following amounts in salary and bonuses:

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 2000 | $153,529 | $46,500 | 30,000 |
| 2001 | $229,166 | $99,147 | 150,000 |
| 2002 | $282,765 | $164,375 | 100,000 |
| 2003 | $300,000 | $157,500 | 75,000 |
| 2004 | $333,333 | $170,938 | 75,000 |
| 2005 | $364,090 | $199,800 | 55,000 |

Roberts exercised options for 270,416 shares of McAfee stock for proceeds of $4.0 million during the Relevant Period.

44.    Defendant Hodges was, at times relevant hereto, President of McAfee and of the McAfee Product Group. Because of Hodges' position, he knew the adverse non-public information about the business of McAfee, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other

---

[5]    Weiss began working at McAfee in October 2002.

1   corporate officers and employees, attendance at management meeting via reports and other

2   information provided to him in connection therewith.   During the Relevant Period, Hodges

3   participated in the issuance of false and/or misleading statements, including the preparation of the

4   false and/or misleading press releases and SEC filings.  McAfee paid Hodges the following amounts

5   in salary, bonuses and options:

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 2000 | $205,295 | $58,527 | 0 |
| 2001 | $290,000 | $108,596 | 600,000 |
| 2002 | $375,000 | $445,312 | 0 |
| 2003 | $412,500 | $345,469 | 150,000 |
| 2004 | $445,833 | $451,250 | 150,000 |
| 2005 | $506,531 | $420,000 | 125,000 |

Hodges exercised options for 606,457 shares of McAfee stock for proceeds of $10.3 million during

the Relevant Period.

45.     Defendant Brown became McAfee's CFO and COO on January 3, 2005, when

Richards retired.  Because of Brown's positions, he knew the adverse non-public information about

the business of McAfee, as well as its finances, markets and present and future business prospects,

via access to internal corporate documents, conversations and connections with other corporate

officers and employees, attendance at management meetings via reports and other information

provided to him in connection therewith.  During the Relevant Period, Brown participated in the

issuance of false and/or misleading statements, including the preparation of the false and/or

misleading press releases and SEC filings.  In 1998, McAfee paid Brown the following amounts in

salary, bonuses and options:

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 1998 | $1,051,921 | $178,850 | 240,000 |

Brown sold 581,829 shares of McAfee stock for proceeds of $15.9 million during the Relevant

Period.

46.     Defendant Denend is, and at all times relevant hereto was, a director of McAfee.

Defendant Denend served on the Company's Audit Committee, responsible for the Company's audit

practices during 1998.   Denend also served on the Company's Compensation Committee,

1   responsible for approving stock option grants between 1995-1997. Denend was also President of

2   McAfee from December 1, 1997 until April 30, 1998. Because of Denend's position, he knew the

3   adverse non-public information about the business of McAfee, as well as its finances, markets and

4   present and future business prospects, via access to internal corporate documents, conversations and

5   connections with other corporate officers and employees, attendance at Board meetings and

6   committees thereof and via reports and other information provided to him in connection therewith.

7   Denend has signed every Form 10-K during the Relevant Period. During the Relevant Period,

8   Denend participated in the issuance of false and/or misleading statements, including the preparation

9   of the false and/or misleading press releases and SEC filings. In 1998, McAfee paid Denend the

10  following amounts in salary, bonuses and options:

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 1998 | $1,051,921 | $178,850 | 240,000 |

13  Denend exercised 496,592 shares of McAfee stock for proceeds of $8.3 million during the Relevant

14  Period.

15      47.   Defendant Garcia-Lechelt was, at times relevant hereto, Manager and/or Director of

16  Human Resources and subsequently Senior Vice President, Worldwide Human Resources of

17  McAfee. Garcia-Lechelt is also a member of McAfee's Ethics First Committee which was supposed

18  to investigate allegation of unethical behavior at McAfee. Garcia-Lechelt was responsible for

19  creating some of the Personnel Action Forms ("PAFs") required to make option grants to senior

20  level executives at McAfee. From at least 2001 until 2003, Garcia-Lechelt participated directly with

21  Samenuk to determine how many options would be given to senior level executives. Beginning in at

22  least 2004, Garcia-Lechelt was a member of McAfee's SPAC, together with defendants Roberts and

23  Brown. The SPAC would approve option grants for senior management at McAfee. In these

24  capacities, Garcia-Lechelt was directly involved in the backdating of stock options to McAfee senior

25  management.

26      48.   Defendant Evan S. Collins ("Collins") was, at times relevant hereto, Finance Director

27  and Corporate Controller of McAfee. Starting in July 1999, he was the VP, CFO and Secretary of

28  McAfee.com Corporation, a majority-owned subsidiary of McAfee. Because of Collins' positions,

1    he knew the adverse non-public information about the business of McAfee, as well as its finances,

2    markets and present and future business prospects, via access to internal corporate documents,

3    conversations and connections with other corporate officers and employees, attendance at

4    management meetings and via reports and other information provided to him in connection

5    therewith. Defendant Collins, by his specialized financial expertise, was in a unique position to

6    understand the business of McAfee, as well as its finances, markets and present and future business

7    prospects. During the Relevant Period, Collins participated in the issuance of false and/or

8    misleading statements, including the preparation of the false and/or misleading press releases and

9    SEC filings. Collins signed the false Proxy Statement by order of the Board in 2000. Collins was

10    responsible for signing some of the PAFs required to make option grants to employees. From

11    sometime in 1997 or 1998 through at least mid-1999, Collins was in charge of stock administration.

12    In 1999, Collins received a grant of 10,000 options, dated April 20, 1999, with an exercise price of

13    $11.0625. Collins also had at least 20,000 options "repriced," dated for April 22, 1999, with an

14    exercise price of $11.0625. Collins exercised 30,000 options, on or about November 1, 2000, paying

15    $11.0625 for each share and selling the shares for $19.50. Collins thus gained a profit of $253,125

16    for these shares. He was later charged with securities fraud, including illegal insider trading. On

17    November 30, 2004, Collins entered into a consent decree with the SEC, agreeing to disgorge these

18    profits and all interest earned thereon.

19        49.     Defendant Larson was, at times relevant hereto, CEO and Chairman of the Board of

20    Directors, and special advisor to, McAfee. Because of Larson's positions, he knew the adverse non-

21    public information about the business of McAfee, as well as its finances, markets and present and

22    future business prospects, via access to internal corporate documents, conversations and connections

23    with other corporate officers and employees, attendance at management meetings and via reports and

24    other information provided to him in connection therewith. Defendant Larson, by his specialized

25    financial expertise, was in a unique position to understand the business of McAfee, as well as its

26    finances, markets and present and future business prospects. During the Relevant Period, Larson

27    participated in the issuance of false and/or misleading statements, including the preparation of the

28    false and/or misleading press releases and SEC filings. Larson ordered the signing of all Proxy

1  Statements between 1996 and 2000, and signed the Form 10-Ks for the same years.  McAfee paid

2  defendant Larson the following amounts in salary, bonus and options:

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 1996 | $248,260 | $151,044 | -- |
| 1997 | $286,268 | $279,600 | 800,000 |
| 1998 | $419,962 | $453,775 | 300,000 |
| 1999 | $420,000 | $366,275 | -- |
| 2000 | $420,000 | $566,266 | -- |

7  During the Relevant Period, Larson exercised over 2.5 million options, selling the shares of McAfee

8  stock for proceeds of $82.3 million.

9       50.     Defendant Cline was, at times relevant hereto, VP of International Sales and VP of

10  Worldwide Sales of McAfee.  Because of Cline's positions, he knew the adverse non-public

11  information about the business of McAfee, as well as its finances, markets and present and future

12  business prospects, via access to internal corporate documents, conversations and connections with

13  other corporate officers and employees, attendance at management meetings and via reports and

14  other information provided to him in connection therewith.  During the Relevant Period, Cline was

15  one of the managers who typically signed off on the PAFs.  Cline also sold 253,000 shares of

16  McAfee stock for $7.8 million.  McAfee paid defendant Cline the following amounts in salary,

17  bonus and options:

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 1996 | $109,503 | $99,100 | 75,000 |
| 1997 | $175,007 | $103,865 | 200,000 |

20       51.     Defendant Nelson was, at times relevant hereto, EVP and General Manager of

21  Worldwide Marketing and Alliances and Chief Strategy Officer of McAfee, and President and CEO

22  of MyCIO.com.  Because of Nelson's positions, he knew the adverse non-public information about

23  the business of McAfee, as well as its finances, markets and present and future business prospects,

24  via access to internal corporate documents, conversations and connections with other corporate

25  officers and employees, attendance at management meetings and via reports and other information

26  provided to him in connection therewith.  Nelson was one of the individuals responsible for signing

27  PAFs.  McAfee paid defendant Nelson the following amounts in salary, bonus and options:

28

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 1998 | $300,313 | $147,714 | 225,000 |
| 1999 | $300,313 | $156,434 | 200,000 |
| 2000 | $225,009 | $137,955 | -- |
| 2001 | $250,210 | $130,000 | 400,000 |

Nelson exercised 126,000 options of McAfee stock for proceeds of $1.5 million during the Relevant Period.

52.    Defendant Watkins was, at times relevant hereto, President, COO, EVP and General Manager Net Tools Secure, Vice President and General Manager of Total Virus and Defense Division of McAfee. Because of Watkins' positions, he knew the adverse non-public information about the business of McAfee, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. McAfee paid defendant Watkins the following amounts in salary, bonus and options:

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 1996 | $144,488 | $87,358 | 84,375 |
| 1997 | $191,289 | $66,577 | 300,000 |
| 1998 | $299,628 | $130,260 | 225,000 |
| 1999 | $300,312 | $167,988 | 100,000 |
| 2000 | $204,167 | $90,430 | 500,000 |
| 2001 | $250,210 | $130,000 | 400,000 |

Watkins sold McAfee stock for proceeds of $18.5 million during the Relevant Period.

53.    Defendant Matin was, at times relevant hereto, President of McAfee Product Group and President of McAfee Security. Because of Matin's positions, he knew the adverse non-public information about the business of McAfee, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. McAfee paid defendant Matin the following amounts in salary, bonus and options:

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 2001 | $53,077 (reflecting a 10/30/01 start date) | -- | 600,000 |
| 2002 | $400,000 | $249,062 | 150,000 |
| 2003 | $400,000 | $311,750 | 35,000 |

Matin sold McAfee stock for proceeds of almost $2 million during the Relevant Period.

54.     Defendant Goyal was, at times relevant hereto, CFO, VP of Finance and Administration, Treasurer and Secretary of, and special advisor to, McAfee. Because of Goyal's positions, he knew the adverse non-public information about the business of McAfee, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Defendant Goyal, by his specialized financial expertise, was in a unique position to understand the business of McAfee, as well as its finances, markets and present and future business prospects. During the Relevant Period, Goyal participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Goyal signed the false Proxy Statements by order of the Board in 1997, 1998 and 1999. Additionally, Goyal's signature was required for PAFs granting options to employees. McAfee paid defendant Goyal the following amounts in salary, bonus and options:

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 1996 | $111,591 | $45,858 | 300,000 |
| 1997 | $188,469 | $94,913 | 200,000 |
| 1998 | $300,013 | $134,107 | 225,000 |
| 1999 | $300,013 | $136,313 | 100,000 |
| 2000 | $300,013 | $190,250 | -- |

Goyal exercised 218,125 options McAfee stock for proceeds of $5.7 million during the Relevant Period.

55.     Defendant Dutkowsky was, at times relevant hereto, a director of McAfee. Defendant Dutkowsky served on the Company's Audit Committee, responsible for the Company's audit practices between 2002-2005. Dutkowsky also served on the Company's Compensation Committee, responsible for approving stock option grants between 2001-2005. Because of Dutkowsky's

1    position, he knew the adverse non-public information about the business of McAfee, as well as its

2    finances, markets and present and future business prospects, via access to internal corporate

3    documents, conversations and connections with other corporate officers and employees, attendance

4    at Board meetings and committees thereof and via reports and other information provided to him in

5    connection therewith. During the Relevant Period, Dutkowsky participated in the issuance of false

6    and/or misleading statements, including the preparation of the false and/or misleading press releases

7    and SEC filings. Dutkowsky signed the Form 10-Ks and ordered the signing of the Proxy

8    Statements for every year since 2001. As a member of the Audit Committee, defendant Dutkowsky

9    caused or allowed the dissemination of the improper public statements described herein. On October

10   4, 2006, McAfee announced that Dutkowsky intended to resign from the Board by no later than

11   January 31, 2007.

12        56.    Defendant O'Leary is, and was at times relevant hereto, a director of McAfee.

13   Defendant O'Leary also served on the Company's Compensation Committee, responsible for the

14   approval of stock option grants from 2002-2005. Because of O'Leary's position, he knew the

15   adverse non-public information about the business of McAfee, as well as its finances, markets and

16   present and future business prospects, via access to internal corporate documents, conversations and

17   connections with other corporate officers and employees, attendance at Board meetings and

18   committees thereof and via reports and other information provided to him in connection therewith.

19   As a member of the Compensation Committee, defendant O'Leary controlled the other defendants'

20   stock option awards. During the Relevant Period, O'Leary participated in the issuance of false

21   and/or misleading statements, including the preparation of the false and/or misleading press releases

22   and SEC filings. O'Leary signed the Form 10-Ks and ordered the signing of the Proxy Statements

23   for every year since 2003.

24        57.    Defendant Pangia was, at times relevant hereto, a director of McAfee. Defendant

25   Pangia also served on the Company's Compensation Committee, responsible for approving stock

26   option grants between 2002-2005. Defendant Pangia also served on the Company's Audit

27   Committee, responsible for the Company's audit practices between 2001-2005. Pangia was a

28   signatory on Form 10-Ks filed with the SEC during the Relevant Period. Because of Pangia's

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                    - 23 -

**1:07CV00407 (EGS)**

1    position, he knew the adverse non-public information about the business of McAfee, as well as its

2    finances, markets and present and future business prospects, via access to internal corporate

3    documents, conversations and connections with other corporate officers and employees, attendance

4    at Board meetings and committees thereof and via reports and other information provided to him in

5    connection therewith. During the Relevant Period, Pangia participated in the issuance of false and/or

6    misleading statements, including the preparation of the false and/or misleading press releases and

7    SEC filings. Pangia signed the Form 10-Ks and ordered the signing of the Proxy Statements for

8    every year since 2001. As a member of the Audit Committee, defendant Pangia caused or allowed

9    the dissemination of the improper public statements described herein.

10        58.    Defendant Robert B. Bucknam ("Bucknam") is, and at times relevant hereto was, a

11    director of McAfee. Because of Bucknam's position, he knew the adverse non-public information

12    about the business of McAfee, as well as its finances, markets and present and future business

13    prospects, via access to internal corporate documents, conversations and connections with other

14    corporate officers and employees, attendance at Board meetings and committees thereof and via

15    reports and other information provided to him in connection therewith. During the Relevant Period,

16    Bucknam participated in the issuance of false and/or misleading statements, including the

17    preparation of the false and/or misleading press releases and SEC filings. Bucknam signed the Form

18    10-Ks and ordered the signing of the Proxy Statements for every year since 2003.

19        59.    Defendant Dale L. Fuller ("Fuller") was, at times relevant hereto, a director of

20    McAfee. Fuller is currently interim CEO and President of McAfee. Because of Fuller's position, he

21    knew the adverse non-public information about the business of McAfee, as well as its finances,

22    markets and present and future business prospects, via access to internal corporate documents,

23    conversations and connections with other corporate officers and employees, attendance at Board

24    meetings and committees thereof and via reports and other information provided to him in

25    connection therewith. During the Relevant Period, Fuller participated in the issuance of false and/or

26    misleading statements, including the preparation of the false and/or misleading press releases and

27    SEC filings. Fuller signed the Form 10-Ks and ordered the signing of the Proxy Statements for

28    every year since 2006.

1    60.    Defendant Wilson is, and at times relevant hereto was, a director of McAfee.

2  Defendant Wilson also served on the Company's Audit Committee, responsible for the Company's

3  audit practices between 2002-2005. Defendant Wilson also served on the Company's Compensation

4  Committee, responsible for approving stock option grants between 2002-2003. Because of Wilson's

5  position, she knew the adverse non-public information about the business of McAfee, as well as its

6  finances, markets and present and future business prospects, via access to internal corporate

7  documents, conversations and connections with other corporate officers and employees, attendance

8  at Board meetings and committees thereof and via reports and other information provided to her in

9  connection therewith. During the Relevant Period, Wilson participated in the issuance of false

10  and/or misleading statements, including the preparation of the false and/or misleading press releases

11  and SEC filings. Wilson signed the Form 10-Ks and ordered the signing of the Proxy Statements for

12  every year since 2002.

13    61.    Defendant Virginia Gemmell ("Gemmell") was, at times relevant hereto, a member of

14  the Company's Board and served on the Company's Compensation Committee responsible for

15  reviewing and approving stock option grants between 1996 and 2001. Because of Gemmell's

16  position, she knew the adverse non-public information about the business of McAfee, as well as its

17  finances, markets and present and future business prospects, via access to internal corporate

18  documents, conversations and connections with other corporate officers and employees, attendance

19  at management meetings and via reports and other information provided to him in connection

20  therewith. During the Relevant Period, Gemmell participated in the issuance of false and/or

21  misleading statements, including the preparation of the false and/or misleading press releases and

22  SEC filings and signed the Form 10-Ks during the Relevant Period.

23    62.    Defendant Edwin Harper ("Harper") was at times during the relevant period a

24  member of the Company's Board and served on the Company's Audit Committee responsible for the

25  Company's accounting practices between 1995 and 2001. Harper also served on the Company's

26  Compensation Committee responsible for reviewing and approving stock option grants between

27  1997 and 2001. Because of Harper's position, he knew the adverse non-public information about the

28  business of McAfee, as well as its finances, markets and present and future business prospects, via

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT -- Master File No. 5:06-cv-03484-JF                                      - 25 -

1   access to internal corporate documents, conversations and connections with other corporate officers

2   and employees, attendance at management meetings and via reports and other information provided

3   to him in connection therewith.  During the Relevant Period, Harper participated in the issuance of

4   false and/or misleading statements, including the preparation of SEC filings and signed the Form

5   10-Ks during the Relevant Period.

6        63.    The charts below illustrate the members of both the Audit Committee and the

7   Compensation Committee during the Relevant Period.

### McAfee, Inc.

Audit Committee (At Issuance of Annual Proxy)

| Director Name | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Chambers | M | | | | | | | | | | |
| Harper | M | M | M | M | M | M | | | | | |
| Kortschak | M | | | | | | | | | | |
| Bolger | | | M | | | | | | | | |
| Saal | | | | M | | | | | | | |
| *Denend | | | | | M | | | | | | |
| Gemmell | | | | | M | M | | | | | |
| Torresi | | | | | | M | | | | | |
| *Pangia | | | | | | M | M | M | M | M | M |
| *Wilson | | | | | | | M | M | M | M | M |
| *Dutkowsky | | | | | | | M | M | M | M | M |

M = Member; C= Chairman of Committee; *= Board Member as of April 2006

*Effective April 30, 1998, Mr. Bolger resigned from the Board of Directors.
*Mr. Denend joined the committee on April 30, 1998.
*Mr. Torresi was added to the committee in March 2000.
*Mr. Pangia was added to the committee in April 2001.
*Ms. Wilson and Mr. Dutkowsky were added to the committee in April 2002.

1

2

3

4

5

6

7

8

9

10

11

12

13

| Director Name | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Chambers | M | | | | | | | | | | |
| *Denend | M | M | | | | | M | | | | |
| Kortschak | M | | | | | | | | | | |
| Gemmell | | | M | M | M | M | | | | | |
| Harper | | | M | M | M | M | | | | | |
| *Dutkowsky | | | | | | M | M | M | M | M | M |
| *Pangia | | | | | | | M | M | M | M | M |
| *O'Leary | | | | | | | | M | M | M | M |

**McAfee, Inc.**

Compensation Committee (At Issuance of Annual Proxy)

M = Member; C = Chairman of Committee; * = Board Member as of April 2006

*Mr. Dutkowsky joined the committee in April 2001

*Mr. Denend and Mr. Pangia joined (and rejoined) the committee in April 2002

*Ms. Wilson and Pangia joined the committee in 2002. In July 2003, Ms. Wilson resigned from the committee and Mr. O'Leary joined

**DEFENDANTS WERE CONTROL PERSONS
WITH FIDUCIARY DUTIES TO MCAFEE**

14

15    64.    Each officer and director of McAfee named herein owed the Company and McAfee

16  shareholders the duty to exercise the highest degree of good faith, honesty, loyalty and diligence in

17  the management and administration of the affairs of the Company, as well as in the use and

18  preservation of its property and assets. The conduct of McAfee's directors and officers complained

19  of herein involves knowing, intentional and culpable violations of their obligations as officers and

20  directors of McAfee. Furthermore, the misconduct of McAfee's officers has been ratified by

21  McAfee's Board, which enabled defendants to backdate stock options to themselves and their

22  colleagues, as well as refused to take any legal action on behalf of the Company against defendants.

23    65.    By reason of their positions as officers, directors and fiduciaries of McAfee and

24  because of their ability to control the business and corporate affairs of the Company, defendants

25  owed McAfee and its shareholders fiduciary obligations of good faith, honesty and loyalty, and were

26  required to use their ability to control and manage McAfee in a fair, just, honest and equitable

27  manner, and to act in furtherance of the best interests of McAfee so as to benefit McAfee and not in

28  furtherance of their personal interest or benefit. In addition, as officers and/or directors of a publicly

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                        - 27 -

1   held Company, defendants had a duty to refrain from utilizing their control over McAfee to divert

2   assets to themselves via improper and/or unlawful practices.  Defendants also had a duty to promptly

3   disseminate accurate and truthful information with respect to the Company's operations, earnings

4   and compensation practices.

5          66.     Because of their positions of control and authority as directors or officers of McAfee,

6   each of the defendants was able to and did, directly and indirectly, control the wrongful acts

7   complained of herein.  Because of their positions with McAfee, each of the defendants was aware of

8   these wrongful acts, had access to adverse non-public information and was required to disclose these

9   facts promptly and accurately but failed to do so.

10         67.     Between 1996 and 2005, defendants repeated in Proxy Statements that the stock

11  option grants made during that period carried an exercise price that was ***not less than*** the fair market

12  value of McAfee stock on the date granted, as calculated by the public trading price of the stock at

13  the market's close on that date.  However, defendants concealed until 2006 that the stock option

14  grants were repeatedly and consciously ***backdated*** to ensure that the strike price associated with the

15  option grants was at or near the lowest trading price for that fiscal period.  Due to defendants'

16  breaches of their fiduciary duties in the administration of the Stock Option Plans, Plaintiffs seek to

17  have the directors' and officers' plans voided and gains from those plans returned to the Company.

18  In the alternative, Plaintiffs seek to have all of the unexercised options granted to defendants

19  cancelled, the financial gains obtained via the exercise of such options returned to the Company and

20  to have defendants revise the Company's financial statements to reflect the truth concerning these

21  option grants.

22         68.     To discharge their duties, McAfee's officers and directors were required to exercise

23  reasonable and prudent supervision over the management, policies, practices and controls of the

24  business and financial affairs of the Company.  By virtue of such duties, the officers and directors of

25  McAfee were required, among other things, to:

26             (a)     Manage, conduct, supervise and direct the business affairs of McAfee in

27  accordance with all applicable law (including federal and state laws, government rules and

28  regulations and the charter and bylaws of McAfee);

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                                    - 28 -

1:07CV00407 (EGS)

1          (b)     Neither engage in self-dealing nor knowingly permit any officer, director or

2    employee of McAfee to engage in self-dealing;

3          (c)     Neither violate nor knowingly permit any officer, director or employee of

4    McAfee to violate applicable laws, rules and regulations;

5          (d)     Remain informed as to the status of McAfee's operations, including its

6    practices in relation to the cost of allowing the pervasive backdating and improperly accounting for

7    such, and upon receipt of notice or information of imprudent or unsound practices, to make a

8    reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices

9    and make such disclosures as are necessary to comply with the U.S. federal securities laws and their

10   duty of candor to the Company's shareholders;

11         (e)     Prudently protect the Company's assets, including taking all necessary steps

12   to recover corporate assets (cash, stock options) improperly paid to Company executives and

13   directors together with the related costs (professional fees) proximately caused by the illegal conduct

14   described herein;

15         (f)     Establish and maintain systematic and accurate records and reports of the

16   business and affairs of McAfee and procedures for the reporting of the business and affairs to the

17   Board and to periodically investigate, or cause independent investigation to be made of, said reports

18   and records;

19         (g)     Maintain and implement an adequate, functioning system of internal legal,

20   financial and accounting controls, such that McAfee's financial statements – including its expenses,

21   accounting for stock option grants and other financial information – would be accurate and the

22   actions of its directors would be in accordance with all applicable laws;

23         (h)     Exercise control and supervision over McAfee's public reports and trading in

24   McAfee stock by the officers and employees of McAfee; and

25         (i)     Supervise the preparation and filing of any financial reports or other

26   information required by law from McAfee and to examine and evaluate any reports of examinations,

27   audits or other financial information concerning the financial affairs of McAfee and to make full and

28

1    accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set

2    forth above.

3        69.    Each defendant, by virtue of his or her position as a director and/or officer, owed to

4    the Company the fiduciary duties of loyalty, good faith and the exercise and diligence in the

5    management and administration of the affairs of the Company, as well as in the use and preservation

6    of its property and assets.  The conduct of the defendants complained of herein involves a knowing

7    and culpable violation of their obligations as directors and/or officers of McAfee, the absence of

8    good faith on their part, and a reckless disregard for their duties to the Company and its shareholders

9    which defendants were aware or should have been aware posed a risk of serious injury to the

10   Company.  The conduct of the defendants who were also officers and/or directors of the Company

11   during the Relevant Period has been ratified by the Defendants who comprised McAfee's entire

12   Board during the Relevant Period.

13       70.    Defendants breached their duties of loyalty and good faith by allowing or by

14   themselves causing the Company to misrepresent its financial results and prospects, as detailed

15   herein *infra*, and by failing to prevent the defendants from taking such illegal actions.  In addition, as

16   a result of defendants' illegal actions and course of conduct during the Relevant Period, the

17   Company is now the subject of an SEC investigation into the Company's prior option granting

18   practices.  As a result, McAfee has expended and will continue to expend significant sums of money.

19   Such expenditures include, but are not limited to:

20           (a)    Improvidently paid executive compensation;

21           (b)    Increased capital costs as a result of the loss of market capitalization and the

22   Company's damaged reputation in the investment community;

23           (c)    Costs incurred to carry out internal investigations, including legal fees paid to

24   outside counsel; and

25           (d)    Incurring possible IRS penalties for improperly reporting compensation.

26       71.    Through their fiduciary duties of good faith, honesty and loyalty, defendants owed to

27   McAfee a duty to ensure that the Company's financial reporting fairly presented, in all material

28   respects, the operations and financial condition of the Company.  In order to adequately carry out

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                           - 30 -

**1:07CV00407 (EGS)**

1   these duties, it is necessary for the defendants to know and understand the material non-public

2   information to be either disclosed or omitted from the Company's public statements. This material

3   non-public information included the problems McAfee faced because of its deficient internal

4   controls. Furthermore, all of the members of the Audit Committee during the Relevant Period, had a

5   special duty to know and understand this material information as set out in the Audit Committee's

6   charter, which provides that the Audit Committee is responsible for reviewing, in conjunction with

7   management, the Company's policies generally with respect to the Company's earnings press

8   releases and with respect to financial information and earnings guidance provided to analysts and

9   rating agencies. Defendants Samenuk, Richards, Weiss, Roberts, Hodges and Brown, as officers of

10  McAfee, had ample opportunity to discuss this material information with their fellow officers at

11  management meetings and via internal corporate documents and reports. Moreover, defendants

12  Samenuk, Denend, Fuller, Pangia, Bucknam, Dutkowsky, O'Leary and Wilson, as directors of

13  McAfee, had ample opportunity to discuss this material information with fellow directors at any of

14  the scores of Board meetings that occurred during the Relevant Period as well as at committee

15  meetings of the Board. Despite these duties, defendants negligently, recklessly, and/or intentionally

16  caused or allowed, by their actions or inactions, the misleading statements to be disseminated by

17  McAfee to the investing public and the Company's shareholders during the Relevant Period.

18      72.    These actions have irreparably damaged McAfee's corporate image and goodwill.

19  For at least the foreseeable future, McAfee will suffer from what is known as the "liar's discount," a

20  term applied to the stocks of companies who have been implicated in illegal behavior and have

21  misled the investing public, such that McAfee's ability to raise equity capital or debt on favorable

22  terms in the future is now impaired.

23              **AIDING AND ABETTING AND CONCERTED ACTION**

24      73.    In committing the wrongful acts alleged herein, defendants have pursued or joined in

25  the pursuit of a common course of conduct and acted in concert with one another in furtherance of

26  their common plan. The purpose and effect of defendants' common course of conduct was, among

27  other things, to disguise defendants' violations of law, breaches of fiduciary duty, abuse of control,

28  gross mismanagement, corporate waste and unjust enrichment, to conceal adverse information

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                    - 31 -

1:07CV00407 (EGS)

1 concerning the Company's operation and financial condition and to artificially inflate the price of

2 McAfee common stock so they could dispose of millions of dollars of their own McAfee stock, and

3 enhance their executive and directorial positions and receive the substantial compensation they

4 obtained as a result thereof.

5   74. Defendants accomplished their common enterprise and/or common course of conduct

6 by causing the Company to purposefully and/or recklessly engage in the options backdating scheme

7 alleged herein and misrepresent McAfee's financial results. Each of the defendants was a direct,

8 necessary, and substantial participant in the common enterprise and/or common course of conduct

9 complained of herein.

10   75. Each of the defendants aided and abetted and rendered substantial assistance in the

11 wrongs complained of herein. In taking such actions to substantially assist the commission of the

12 wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing,

13 substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall

14 contribution to and furtherance of the wrongdoing.

15           **FACTUAL ALLEGATIONS**

16   76. McAfee is a worldwide supplier of computer security solutions designed to

17 proactively prevent intrusions on networks and secure computer systems and other digital devices

18 from a large variety of known and unknown threats and attacks. The Company develops, markets,

19 distributes and supports computer security solutions for large enterprises, governments, small and

20 medium-sized business and consumers through a network of qualified partners.

21   77. In the mid-1990s, as the internet took off and the need for online security exploded,

22 McAfee grew dramatically. Its net revenues increased from $21 million in 1992 (the year it went

23 public) to $990 million in 1998, ultimately peaking in 2001 at well over a billion dollars. Similarly,

24 its employee base grew from 40 employees in 1993 to 1,530 in 1998 and over 3,000 in 2003. This

25 explosion in growth caused increasing demand for "the very limited number of skilled and

26 experienced employees." Therefore, according to the Board, granting stock options was "critical in

27 attracting and retaining these key contributors."

28

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF     - 32 -

**1:07CV00407 (EGS)**

1   78. A stock option is the right to purchase a share of stock at a set price, called the

2 "exercise price" on a future date after the option vests. Thus, the lower exercise price, the better for

3 the recipient of the option. An option is "in the money" when the trading price is higher than the

4 option's exercise price. The option is "at the money" when the trading price is equal to the exercise

5 price, and the option is "underwater" or "out of the money" when trading at a price lower than the

6 exercise price.

7   79. In 1997, in a Proxy Statement signed by order of the Board, the Board sought to have

8 a new Stock Incentive Plan (the "1997 Plan") approved by the shareholders. The Board, in seeking

9 shareholder approval, explained its purpose for granting stock options: "[S]tock options and other

10 forms of stock compensation serve to align the long-term interests of the plan's participants and the

11 stockholders and are an important factor in attracting, motivating and retaining qualified personnel

12 essential to the success of the Company."

13   80. The Board went on to say:

14  The Incentive Plan is intended to offer a significant incentive by enabling key
  employees to acquire options to purchase Common Stock at a price equal to its fair
15  market value on the date the option is granted. ***The options will become valuable to
  the recipients only if the price of the Company's Common Stock appreciates
16  following the grant*** and when such options have vested. By providing key
  employees with the opportunity to acquire an equity interest in the Company over
17  time and because ***a benefit is only received through improved stock performance***,
  the Company believes that stock options serve to align the interests of key employees
18  closely with other stockholders.

19 McAfee shareholders approved the 1997 Plan on June 5, 1997. This plan was effective throughout

20 the remainder of the Relevant Period.

21   81. According to McAfee's Report on Form 10-K for 1997 signed by Larson, Denend,

22 Goyal, Bolger, Gemmell, Harper and Saal, one purpose of adopting the 1997 Plan was to:

23  [E]liminate the ability of the Company's Board of Directors (the "Board") to grant
  options thereunder with an exercise price less than the fair market value of the
24  Company's Common Stock on the date of grant.

25   82. According to its terms, under the 1997 Plan, incentive stock options granted under the

26 1997 Plan were required to have an exercise price of "[no] less than 100% of the Fair Market Value

27 of a Common Share on the date of the grant . . . ." The Company proxies stated that the Fair Market

28 Value was what the market price determined, whenever possible, "based on the prices reported in

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF     - 33 -

1  *The Wall Street Journal*." Throughout the Relevant Period, McAfee represented (falsely) in Proxy

2  Statements that "all options were granted at an exercise price equal to the fair market value of the

3  Common Stock on the date of the grant." However, during the Relevant Period, McAfee's options

4  granted to its employees and highest paid executives had exercise prices lower than the fair market

5  value on the day the grants were actually made.

6        83.     Up until at least 2003, all option grants had to be approved by the Board.  McAfee

7  granted stock options to employees at the time of hiring.  The Company also reportedly made "merit

8  grants," which included grants made when an employee was promoted or after the employee's

9  annual review.  The annual reviews reportedly took place in February or March for the prior year

10  and raises were made retroactive to January.  The Compensation Committee determined the options

11  to be granted to the executives.  Option grants to other employees, as well as consultants, were

12  determined and approved by a committee consisting of two or more directors appointed by the

13  Board.

14                 **SUSPICIOUS OPTION GRANTS DURING THE RELEVANT PERIOD**

15        84.     Throughout the Relevant Period, defendants caused the Company to issue stock

16  options that were dated suspiciously to coincide with the lowest closing price of the Company's

17  stock during the period in which they were granted.  Of the publicly reported option grants – those

18  grants made to the most highly compensated executives – most of the grants made between 1996 and

19  2002 reflect grant dates of days where McAfee stock was at one of the lowest prices of the year.

20        85.     The first questionable option grants is the grant made to defendant Goyal at the

21  beginning of his employment.  Goyal came to work for McAfee in March 1996.  His Employment

22  Agreement was signed on March 18, 1996 and the 200,000 options he was granted at his hiring

23  vested on the anniversary of the grant: March 18.  However, the expiration date of the options and

24  exercise price of the options show that the options were backdated to March 4, 1996, when the stock

25  had a closing price of $12.87, $6.13 lower than the closing price on March 18, 1996.

26

27

28

McAfee
March 1, 1996 - April 1, 1996

86.    In 1997, McAfee's four highest-paid executives received option grants at prices which rank near the lowest closing price of the year for McAfee stock as follows:

| Name | Number of Options | Exercise Price | Purported Grant Date |
|---|---|---|---|
| William Larson | 800,000 | $26.67 | 3/20/1997 |
| Prabhat Goyal | 200,000 | $26.67 | 3/20/1997 |
| Dennis Cline | 200,000 | $26.67 | 3/20/1997 |
| Peter Watkins | 200,000 | $26.67 | 3/20/1997 |

87.    These defendants together were granted 1.4 million stock options on March 20, 1997, the second lowest closing price of the year, according to Form 4s filed with the SEC by defendant Nelson, who was not included in the disclosure in the Proxy Statement. Nelson also received at least 50,000 options on March 20, 1997, yet his employment did not begin until six days later. Defendant Nelson has realized at least $925,404 in profits on these suspicious options.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



16    88.    In 1998, McAfee's six highest-paid executives received option grants as follows:

| Name | Number of Options | Exercise Price | Purported Grant Date |
|------|-------------------|----------------|----------------------|
| William Larson | 300,000 | $31.333 | 1/12/1998 |
| Prabhat Goyal | 225,000 | $31.333 | 1/12/1998 |
| Peter Watkins | 225,000 | $31.333 | 1/12/1998 |
| Zachary Nelson | 225,000 | $31.333 | 1/12/1998 |
| Leslie Denend | 240,000 | $31.333 | 1/12/1998 |
| John Stringer | 225,000 | $31.333 | 1/12/1998 |

22    89.    In addition to the above referenced defendants, defendant Cline also received an

option grant on January 12, 1998, at one of the lowest closing prices of the year, and the single

lowest trading day for the first three quarters of 1998.

25

26

27

28

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                    - 36 -

1:07CV00407 (EGS)



90.    In 1999, McAfee's four highest-paid executives received McAfee option grants as follows:

| Name | Number of Options | Exercise Price | Purported Grant Date |
|------|------|------|------|
| Evan Collins | 10,000 | $11.06 | 4/20/1999 |
| Prabhat Goyal | 100,000 | $12.25 | 5/5/1999 |
| Peter Watkins | 100,000 | $12.25 | 5/5/1999 |
| Zachary Nelson | 200,000 | $12.25 | 5/5/1999 |

91.    Defendants Collins, Roberts and Hodges received options dated for one of the three days of the year (April 20-22, 1999) with the lowest closing price. Goyal, Watkins, and Nelson received options dated for a day with the third lowest closing price of the year.[6]

_____

[6]    On March 31, 1999, defendant Samenuk announced to all employees that their options would be "repriced" – i.e., the exercise price of the options would be lowered – because the stock price had not been increasing as hoped and many of the employees' options were under water. The options were not repriced for March 31, 1999, however. Instead, as with so many grants, defendants chose a day with a particularly low closing price: April 22, 1999, one of the three days that shared the lowest



**McAfee**

January 4, 1999 - December 31, 1999

92.    In 2000, defendants Hodges and Roberts also received suspicious option grants. On April 14, 2000 Roberts received an option grant for 30,000 shares. This was the lowest closing price for McAfee stock during the first half of 2000.

---

closing price of the year. This instance of manipulating – which directly cost the Company approximately $20.4 million – was made without seeking shareholder approval. The size of the charge shows how important the difference a few days can be. This charge was due to the difference between the closing price on April 22, 1999 and the closing price on the day – April 28, 1999 or earlier, that the repricing offer was accepted by each employee. Moreover, it went against the stated purpose of the Stock Incentive Plan, by disaligning the interests of the employees from the interests of the shareholders. On this occasion, employees were ***rewarded*** for the falling stock price by being given the right to purchase stock at a lower price because the stock price had fallen; shareholders were simply left with stock that they purchased at a higher price.



McAfee Inc.
January 3, 2000 to June 30, 2000

| Name | Number of Options | Exercise Price | Purported Grant Date |
|---|---|---|---|
| George Samenuk | 1,200,000 | $4.9375 | 1/3/2001 |
| Stephen Richards | 600,000 | $6.00 | 4/4/2001 |
| Gene Hodges | 300,000 | $4.1875 | 1/2/2001 |
| Zachary Nelson | 400,000 | $4.1875 | 1/2/2001 |

94.     Hodges and Nelson both received options on the day of the year with the lowest closing price, and Samenuk received options on the day of the year with the third lowest closing price. Richards received grants near the lowest closing price of the year.

95.     Defendants Richards' April 4, 2001 stock option grant was dated for the ninth lowest day of the year, but the lowest of the months he worked for McAfee. The grant was purportedly made on the date his employment began, yet his employment agreement states that his employment began on April 10, 2001, when closing stock price was $7.45. The day of the grant was not April 10, 2001, however. Instead, the purported grant date was April 4, 2001, *the day with the lowest closing*

1  *price – $6.00 – for all the months of 2001 that Richards worked*. This difference of $1.45 between

2  the grant date price and the start date price, multiplied by 600,000 options, means that upon the grant

3  is an instant risk free profit of $870,000 at the cost of the Company. Richards has realized at least

4  $362,500 of this unlawful profit by exercising at least 250,000 of the 600,000 illegally backdated

5  shares.



**McAfee**

January 2, 2001 - December 31, 2001

21  96.    In 2002, four of McAfee's highest-paid executives received option grants as follows:

| Name | Number of Options | Exercise Price | Purported Grant Date |
|------|-------------------|----------------|----------------------|
| George Samenuk | 420,000 | $25.43 | 1/16/2002 |
| Stephen Richards | 100,000 | $25.43 | 1/15/2002 |
| Arthur Matin | 150,000 | $8.45 | 10/8/2002 |
| Kent Roberts | 100,000 | $16.29 | 5/6/2002 |

27  97.    Matin received a grant dated October 8, 2002, the day with the lowest closing price of the

28  year. January 16, 2002, the date of Samenuk's purported grant, had the lowest closing stock

1   price of that month.  January 15, 2002, the date of Richards' purported grant, had a significantly

2   higher closing price ($27.19 up $1.76), than the closing price on January 16, 2003.  However,

3   according to McAfee's November 14, 2003 Proxy Statement, Richards' option grant was

4   nonetheless given the lower, January 16, 2002 exercise price.  On May 6, 2002, Roberts received

5   options with the lowest price for the first half of the year.



**McAfee**

January 2, 2002 - December 31, 2002

**McAfee Sought and Received Shareholders' Approval
Through the Issue of False and Misleading Proxy Statements**

22      98.      Throughout the Relevant Period, McAfee filed Proxy Statements with the SEC that

23   stated: "all options were granted at an exercise price equal to the fair market value of the common

24   stock on the date of grant."

**McAfee's False 1997 14-A Proxy Statement**

26      99.      On April 24, 1997, McAfee filed a Form 14-A Proxy Statement with the SEC.  In its

27   1997 Proxy Statement, McAfee's Board presented a new Stock Incentive Plan to the shareholders

28   for approval.  One stated purpose of this new plan was to eliminate the ability of the Board to grant

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT -- Master File No. 5:06-cv-03484-JF                                              - 41 -

1  options at less than fair market value. The Board, including defendants Larson and Denend, made

2  the following representations about its stock option grants to employees:

3      The Incentive Plan is intended to offer a significant incentive by enabling key
       employees to acquire options to purchase Common Stock at a price equal to its fair
4      market value on the date the option is granted. *The options will become valuable to
       the recipients only if the price of the Company's Common Stock appreciates
5      following the grant and when such options have vested.* By providing key
       employees with the opportunity to acquire an equity interest in the Company over
6      time and because a benefit is only received through improved stock performance, the
       Company believes that stock options serve to align the interests of key employees
7      closely with other stockholders.

8      100.    This statement was false when made. First, defendants knew but failed to disclose

9  that defendants had manipulated many of the grant dates by choosing dates where, in fact, the

10  exercise price of the stock options granted was less than the fair market value of the common stock

11  on the date the option was granted. For example, in 1997, Watkins and defendants Larson, Goyal,

12  Cline and Nelson each received options with the purported grant date of March 20, 1997 and

13  exercise price of $40.00.[7] Approval of the Board or a committee thereof was required to make these

14  grants and was obtained by defendants.

15      101.    Second, the backdated options were "in the money" at the time they were actually

16  granted. Thus, the stock price did not have to appreciate for the options to become valuable or for a

17  benefit to be received.

18      102.    Third, because there was no need for the stock price to appreciate for the options to

19  have value, the interests of the employees receiving backdated options were not closely aligned with

20  those of other stockholders. The recipients of stock options had an interest in the stock not going

21  down, but would benefit if the stock merely remained flat and they remained employed until the

22  stock options vested.

23      103.    The April 24, 1997 Proxy Statement also falsely stated "[t]he exercise price of an ISO

24  [incentive stock option] must be equal to or greater than the fair market value of the Common Stock

25

26  _____

27  [7]    Amount is unadjusted for stock split.

28

1   on the date of grant." As discussed above, the exercise price of the options was less than the fair

2   market value of the common stock on the day that the options were actually granted.

3         104.   McAfee's 1997 Proxy Statement stated that Larson was awarded no stock options in

4   1996. This was false, because, as acknowledged in McAfee's 1999 Proxy Statement, Larson was, in

5   fact, awarded 1,771,875 options in 1996.

6         105.   The Company's April 24, 1997 Proxy Statement also describes the Company's

7   Compensation Committee, its members, and their responsibilities:

8         The Compensation Committee's function is to review and approve salary levels and
          stock option grants. During the year ended December 31, 1996, the members of the
9        Compensation Committee were Ms. Gemmell and Messrs. Chambers, Denend and
          Kortschak. The current members of the Compensation Committee are Ms. Gemmell
10       and Mr. Denend. During the year ended December 31, 1996, the Compensation
          Committee held four (4) meetings.
11

12         106.   The Company's April 24, 1997 Proxy Statement describes the Company's Audit

13   Committee, its members, and their responsibilities:

14         The Audit Committee's function is to review with the Company's independent
          accountants and management the annual financial statements and independent
          accountants' opinion, review the scope and results of the examination of the
15       Company's financial statements by the independent accountants, approve all
          professional services and related fees performed by the independent accountants,
16       recommend the retention of the independent accountants to the Board, subject to
          ratification by the stockholders, and periodically review the Company's accounting
17       policies and internal accounting and financial controls. During the year ended
          December 31, 1996, the members of the Audit Committee were Messrs. Bolger,
18       Chambers, Harper and Kortschak. The current members of the Audit Committee are
          Messrs. Bolger and Harper. During the year ended December 31, 1996, the Audit
19       Committee held four (4) meetings.

20         107.   The 1997 Proxy Statement was signed by defendant Goyal by order of the Board.

21              **McAfee's False 1998 14-A Proxy Statement**

22         108.   The Company's April 30, 1998 Proxy Statement describes the Company's

23   Compensation Committee, its members and responsibilities:

24         The Compensation Committee's function is to review and approve salary and stock
          option grants. During the year ended December 31, 1997, the members of the
25       Compensation Committee were Ms. Gemmell, Mr. Denend and Mr. Harper. The
          current members of the Compensation Committee are Ms. Gemmell and Mr. Harper.
26       During the year ended December 31, 1997, the Compensation Committee held four
          (4) meetings.
27

28         109.   The April 30, 1998 Proxy Statement again falsely represented that:

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                       - 43 -

The Incentive Plan is intended to offer a significant incentive by enabling key employees to acquire options to purchase Common Stock at a price equal to its fair market value on the date the option is granted. ***The options will become valuable to the recipients only if the price of the Company's Common Stock appreciates following the grant and when such options have vested.*** By providing key employees with the opportunity to acquire an equity interest in the Company over time and because a benefit is only received through improved stock performance, the Company believes that stock options serve to align the interests of key employees closely with other stockholders.

110.   Additionally, the 1998 Proxy Statement repeated that "[t]he exercise price of an ISO [incentive stock option] must be equal to or greater than the fair market value of the Common Stock on the date of grant." This was false, because, as discussed above, the exercise price of the options were less than the fair market value of the common stock on the day that the options were actually granted.

111.   McAfee's 1998 Proxy Statement again stated that Larson was awarded no stock options in 1996. This was false, because, as acknowledged in McAfee's 1999 Proxy Statement, Larson was, in fact, awarded 1,771,875 options in 1996.

112.   The Company's 1998 Proxy Statement also states the following about the Company's Audit Committee, its members, and their responsibilities:

The Audit Committee's function is to review with the Company's independent accountants and management the annual financial statements and independent accountants' opinion, review the scope and results of the examination of the Company's financial statements by the independent accountants, approve all professional services and related fees performed by the independent accountants, recommend the retention of the independent accountants to the Board, subject to ratification by the stockholders, and periodically review the Company's accounting policies and internal accounting and financial controls. During the year ended December 31, 1997, the members of the Audit Committee were Messrs. Harper and Bolger. The current members of the Audit Committee are Mr. Harper and Dr. Saal. Effective April 30, 1998, Mr. Bolger resigned from the Board of Directors. During the year ended December 31, 1997, the Audit Committee held four (4) meetings.

113.   The April 30, 1998 Proxy Statement was signed by defendant Goyal by order of the Board.

**McAfee's False 1999, 2000, 2001 and 2002 14-A Proxy Statements**

114.   As it did in 1997 and 1998, the Board stated in its Form 14-A Proxy Statements filed with the SEC on May 17, 1999, May 5, 2000, May 1, 2001 and April 11, 2002, that all options were granted at an exercise price equal to the fair market value of the common stock on the date of the

1   grant. Each Proxy Statement falsely reiterated that "[t]he exercise price of an ISO [incentive stock

2   option] must be equal to or greater than the fair market value of the Common Stock on the date of

3   grant." These statements were false, because, as discussed above, defendants knew but failed to

4   disclose that due to the backdating of the options, the exercise price of the options was less than the

5   fair market value of the common stock on the day that the options were actually granted.

6       115.    The Company's May 17, 1999 Proxy Statement states the following about the

7   Company's Compensation Committee and its responsibilities:

8       THE COMPENSATION COMMITTEE reviews and approves executive salary
        levels and stock option grants.  The Compensation Committee held two meetings
9       during 1998.

10      Members: Virginia Gemmell and Edwin Harper.

11      116.    The Company's May 17, 1999 Proxy Statement states the following about the

12  Company's Audit Committee, its members, and their responsibilities:

13      THE AUDIT COMMITTEE recommends the appointment of the independent
        auditors, reviews the scope and results of their examinations and approves all of their
14      professional services and related fees.  It also periodically reviews our accounting
        policies and internal accounting and financial controls.  The Audit Committee held
15      three meetings during 1998.

16      Members: John Bolger (to April 30, 1998), Edwin Harper and Leslie Denend (from
        April 30, 1998).
17

18      117.    The May 17, 1999 Proxy Statement was signed by defendant Goyal by order of the

19  Board.

20      118.    The Company's April 24, 2000 Proxy Statement made the following statements about

21  the Compensation Committee, its members and responsibilities:

22      THE COMPENSATION COMMITTEE reviews and approves executive salary
        levels and stock option grants.  The Compensation Committee held four meetings
23      during 1999.

24      Members: Virginia Gemmell and Edwin Harper.

25      119.    The Company's April 24, 2000 Proxy Statement states the following about the

26  Company's Audit Committee, its members, and their responsibilities:

27      THE AUDIT COMMITTEE reviews, acts and reports to our Board of Directors on
        various auditing and accounting matters, including the appointment of our
28      independent accountants, the scope of our annual audits, fees to be paid to the

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                    - 45 -

1    independent accountants, the performance of our independent accountants and our
     accounting practices. The Audit Committee held three meetings during 1999.

2    Members: Edwin Harper, Virginia Gemmell, Enzo Torresi. Mr. Torresi was added to
3    our Audit Committee in March 2000.

4        120.    The April 24, 2000 Proxy Statement was signed by defendant Goyal by order of the

5    Board.

6        121.    The Company's May 1, 2001 Proxy Statement described the duties of the

7    Compensation Committee of the Board and its members as follows:

8        THE COMPENSATION COMMITTEE reviews and approves executive salary
         levels and stock option grants. The Compensation Committee held three meetings
9        during 2000.

10       In 2000, Virginia Gemmell and Edwin Harper were members of the Compensation
         Committee. Robert Dutkowsky was added to our Compensation Committee in April
11       2001.

12       122.    The Company's May 1, 2001 Proxy Statement states the following about the

13   Company's Audit Committee, its members, and their responsibilities:

14       THE AUDIT COMMITTEE reviews, acts and reports to our Board of Directors on
         various auditing and accounting matters, including the appointment of our
15       independent accountants, the scope of our annual audits, fees to be paid to the
         independent accountants, the performance of our independent accountants and our
16       accounting practices. The Audit Committee held four meetings during 2000. In
         2000, Edwin Harper, Virginia Gemmell, and Enzo Torresi were members of the audit
17       committee. Mr. Torresi will leave the audit committee at the end of his term as a
         Class III Director. Robert Pangia was added to our Audit Committee in April 2001.
18
19       123.    The May 1, 2001 Proxy Statement was signed by defendant Roberts by order of the

20   Board.

21       124.    The Company's April 11, 2002 Proxy Statement states the following about the

22   Company's Compensation Committee, its members, and their responsibilities:

23       During 2001, the compensation committee of the board of directors consisted of Mr.
         Dutkowsky, Ms. Gemmell and Mr. Harper, none of whom served as our employee or
24       officer at any time. The compensation committee is responsible for setting and
         administering policies governing compensation of executive officers, including the
25       annual Executive Bonus Plan, the 2000 Nonstatutory Stock Option Plan and the 1997
         Stock Incentive Plan. In addition, the compensation committee reviews
26       compensation levels of other management level employees, evaluates the
         performance of management and reviews other compensation-related issues.

27       125.    The Company's April 11, 2002 Proxy Statement states that Pangia, Gemmell and

28   Harper were the members of the Audit Committee in 2001.

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                    - 46 -

1:07CV00407 (EGS)

1        126.   The April 11, 2002 Proxy Statement was signed by defendant Roberts by order of the

2    Board.

3    **McAfee's 2003 False 14-A Proxy Statement**

4        127.   On November 14, 2003, the Company filed its Form 14-A Proxy Statement with the

5    SEC.  The Proxy Statement purported to, among other things, describe the Board's practices for

6    determining appropriate levels of compensation for executives, including option grants pursuant to

7    its 1997 stock incentive program.  The Proxy Statement falsely stated that options were granted to

8    executives and employees at market price:

9        We believe that stock options are an important factor in attracting, motivating, and
10   retaining qualified personnel who are essential to our success. The 1997 Stock
     Incentive Plan is intended to offer a significant incentive by allowing employees to
     purchase our common stock. ***With limited exceptions, options to purchase our***
11   ***common stock are granted under our 1997 Stock Incentive Plan at a price equal to***
     ***the fair market value on the date stock options are granted***. Other than in limited
12   cases, options granted under the 1997 Stock Incentive Plan only become valuable if
     the price of our common stock increases over time and as the options vest.
13
         128.   The Company's November 14, 2003 Proxy Statement states the following about the
14
     Compensation Committee and its duties and responsibilities:
15
         The Compensation Committee reviews and approves executive salary levels and
16   stock option grants.  The Compensation Committee held 4 meetings during 2002.
     Mr. Dutkowsky, Mr. O'Leary and Mr. Pangia are members of our compensation
17   committee. Ms. Wilson and Mr. Pangia joined our compensation committee in 2002.
     In July 2003, Ms. Wilson resigned from the compensation committee and Mr.
18   O'Leary joined the compensation committee.

19       129.   The Company's November 14, 2003 Proxy Statement states the following about the

20   Company's Audit Committee, its members, and their responsibilities:

21       The Audit Committee reviews, acts and reports to our board of directors on various
     auditing and accounting matters, including the appointment of our independent
22   accountants, the scope of our annual audits, fees to be paid to the independent
     accountants, the approval of services to be performed by our independent
23   accountants, the performance of our independent accountants and our accounting
     practices. The audit committee held 6 meetings during 2002. Mr. Dutkowsky, Ms.
24   Wilson and Mr. Pangia are members of our audit committee. Ms. Wilson and Mr.
     Dutkowsky joined the audit committee in 2002.
25
         130.   The November 14, 2003 Proxy Statement was signed by defendant Roberts by order
26
     of the Board.
27

28

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                    - 47 -

1:07CV00407 **(EGS)**

1        **McAfee's 2004 False 14-A Proxy Statement**

2        131.    On April 9, 2004, the Company filed its Form 14-A Proxy Statement with the SEC.

3    The 2004 Proxy Statement purported to, among other things, describe the Company's practices of

4    determining appropriate levels of compensation for executives, including option grants pursuant to

5    its 1997 stock incentive program.  As explained in the 2004 Proxy Statement, stock options granted

6    to employees were valued as follows:

7            Options may include nonstatutory stock options ("NSOs") as well as incentive stock
             options ("ISOs") intended to qualify for special tax treatment.  The term of an option
8            cannot exceed 10 years.  ***The exercise price of an ISO must be equal to or greater
             than the fair market value of the common stock on the date of grant***, while the
9            exercise price of an NSO must be equal to or greater than 85% of fair market value.
             As of March 31, 2004, the closing price of the company's common stock on the New
10           York Stock Exchange was $18.00 per share.

11       132.    The Company's April 9, 2004 Proxy Statement states the following regarding the

12   Compensation Committee, its members and responsibilities:

13           The Compensation Committee reviews and approves executive salary levels and
             stock option grants.  The compensation committee held 4 meetings during 2003.  Mr.
14           Dutkowsky, Mr. O'Leary and Mr. Pangia are members of our compensation
             committee.  Mr. O'Leary joined our compensation committee in 2003.  Each member
15           of our compensation committee is "independent" as defined under the New York
             Stock Exchange corporate governance standards.
16
17       133.    The Company's April 9, 2004 Proxy Statement states the following about the

18   Company's Audit Committee, its members, and their responsibilities:

19           The Audit Committee reviews, acts and reports to our board of directors on various
             auditing and accounting matters, including the appointment of our independent
20           accountants, the scope of our annual audits, fees to be paid to the independent
             accountants, the approval of services to be performed by our independent
21           accountants, the performance of our independent accountants and our accounting
             practices.  The audit committee held 5 meetings during 2003.  Mr. Dutkowsky, Ms.
22           Wilson and Mr. Pangia are members of our audit committee.  Mr. Pangia is the audit
             committee "financial expert" (as is currently defined under the SEC rules
23           implementing Section 407 of the Sarbanes-Oxley Act of 2002).

24       134.    The April 9, 2004 Proxy Statement was signed by defendant Roberts by order of the

25   Board.

26       **MCAFEE'S FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP**

27       135.    As a result of defendants' improper backdating of stock options, defendants caused

28   McAfee to violate GAAP, SEC regulations and IRS rules and regulations.

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT -- Master File No. 5:06-cv-03484-JF                                   - 48 -

1    136.    McAfee's financial results for 1996-2005 were included in reports filed with the SEC

2    and in other shareholder reports.  In these reports, defendants represented that McAfee's financial

3    results were presented in a fair manner and in accordance with GAAP.

4    137.    Defendants' representations were false and misleading as to the financial information

5    reported, as such financial information was not prepared in conformity with GAAP, nor was the

6    financial information "a fair presentation" of the Company's financial condition and operations,

7    causing the financial results to be presented in violation of GAAP and SEC rules.

8    138.    GAAP consists of those principles recognized by the accounting profession as the

9    conventions, rules, and procedures necessary to define accepted accounting practice at the particular

10    time.  Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17

11    C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared

12    in compliance with GAAP, are presumed to be misleading and inaccurate.

13    139.    During the Relevant Period, defendants caused the Company to understate its

14    compensation expense by not properly accounting for its stock options under GAAP and thus

15    overstated the Company's net earnings.

16    140.    Under well-settled accounting principles in effect throughout the Relevant Period,

17    McAfee did not need to record an expense for options granted to employees at the current market

18    price ("at the money").  The Company was, however, required to record an expense in its financial

19    statements for any options granted below the current market price ("in the money").  In order to

20    provide McAfee executives and employees with far more lucrative "in the money" options, while

21    avoiding having to inform shareholders about millions of dollars incurred by the Company in

22    compensation expenses (and without paying the IRS millions of dollars in employment taxes),

23    defendants systematically falsified Company records to create the false appearance that options had

24    been granted at the market price on an earlier date.

25

26

27

28

141.    Throughout the Relevant Period, McAfee accounted for stock options using the intrinsic method described in APB No. 25, "Accounting for Stock Issued to Employees."[8]  Under APB No. 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date."  An option that is in-the-money on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option.  Options that are at-the-money or out-of-the-money on the measurement date need not be expensed.  Excluding non-employee directors, APB No. 25 required employers to record compensation expenses on options granted to non-employees irrespective of whether they were in-the-money or not on the date of grant.

### McAfee's Forthcoming Restatement Is an Admission of Falsity

142.    As stated herein, the fact that McAfee revised and restated downward its net income is an admission that the financial statements originally issued were false when they were reported and that the misstatements were material.

143.    Pursuant to GAAP, as set forth in APB Opinion No. 20, the type of restatements and revisions announced by McAfee were to correct for material errors in previously issued financial statements.  APB No. 20, ¶¶7-13.  The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs.  APB No. 20, ¶14.  Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements.  McAfee's restatements and revisions were not due to a

---

[8]    APB No. 25 was later superseded by Statement of Financial Accounting Standards (SFAS) No. 123, *Share-Based Payment*. SFAS No. 123 went into effect for large publicly traded companies for all interim or annual reporting periods that began after June 15, 2005.  Under SFAS No. 123, companies are required to account for their stock option grants using the fair market value method rather than the intrinsic value method. The new method requires a company to expense all employee stock options when granted.

1  change in reporting entity or a change in accounting principle, but rather to errors in previously

2  issued financial statements. Thus, the restatements and revisions were an admission by McAfee that

3  its previously issued financial results and its public statements regarding those results were false and

4  misleading.

5  **McAfee's GAAP Violations Were Material**

6      144.    McAfee's false and misleading Relevant Period statements and omissions regarding

7  its accounting were material, particularly in light of SEC guidance on materiality. SEC Staff

8  Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality.[9]

9  Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood

10  that a reasonable person would consider it important." It also stresses that materiality requires

11  qualitative, as well as quantitative, considerations. For example, if a known misstatement would

12  cause a significant market reaction that reaction should be taken into account in determining the

13  materiality of the misstatement.

14      145.    SAB Topic 1M further states:

15      Among the considerations that may well render material a quantitatively
16  small misstatement of a financial statement item are –

       *     *     *

17

18      whether the misstatement masks a change in earnings or other trends

19      whether the misstatement hides a failure to meet analysts' consensus
    expectations for the enterprise

20         *     *     *

21      whether the misstatement concerns a segment or other portion of the
22  registrant's business that has been identified as playing a significant role in the
registrant's operations or profitability.

23

24  [9]    SAB Topic 1M, Materiality, represents the codification of certain SABs, including SAB
25  No. 99, Materiality, as of May 9, 2003. SAB No. 99 was effective August 12, 1999. On September
13, 2006, the SEC issued SAB 108 – new guidance for determining materiality of past errors. This
26  new standard is effective for financial statements for fiscal years ending after November 15, 2006.
Under SAB 108, the fundamental principles surrounding materiality remain consistent with
27  materiality under the prior guidance. However, this new guidance requires companies to evaluate
known errors to a finer degree than in the past.

28

1   146.   SAB Topic 1M also says that an intentional misstatement of even immaterial items

2   may be illegal and constitute fraudulent financial reporting.

3   147.   McAfee's misstatements, by its own admissions, satisfy these criteria and thus were

4   material from both a quantitative and qualitative perspective.

5   **McAfee's Financial Statements Violated Fundamental Concepts of GAAP**

6   148.   Due to these accounting improprieties, the Company presented its financial results

7   and statements in a manner that violated GAAP, which are described by the following statements:

8          (a)   The principle that interim financial reporting should be based upon the same

9   accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

10         (b)   The principle that financial reporting should provide information that is useful

11   to existing and potential investors and creditors and other users in making rational investment, credit

12   and similar decisions (FASB Statement of Concepts No. 1, ¶34);

13         (c)   The principle that financial reporting should provide information about the

14   economic resources of an enterprise, the claims to those resources, and the effects of transactions,

15   events and circumstances that change resources and claims to those resources (Financial Accounting

16   Standards Board ("FASB") Statement of Concepts No. 1, ¶40);

17         (d)   The principle that financial reporting should provide information about how

18   management of an enterprise has discharged its stewardship responsibility to stockholders for the use

19   of enterprise resources entrusted to it.  To the extent that management offers securities of the

20   enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective

21   investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

22         (e)   The principle that financial reporting should be reliable in that it represents

23   what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

24         (f)   The principle of completeness, which means that nothing is left out of the

25   information that may be necessary to insure that it validly represents underlying events and

26   conditions (FASB Statement of Concepts No. 2, ¶79); and

27

28

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                              - 52 -

**1:07CV00407 (EGS)**

1       (g)    The principle that conservatism be used as a prudent reaction to uncertainty to

2  try to ensure that uncertainties and risks inherent in business situations are adequately considered

3  (FASB Statement of Concepts No. 2, ¶¶95, 97).

4       149.    Further, the undisclosed adverse information concealed by defendants during the

5  Relevant Period is the type of information which, because of SEC regulations, regulations of the

6  national stock exchanges and customary business practice, is expected by investors and securities

7  analysts to be disclosed and is known by corporate officials and their legal and financial advisors to

8  be the type of information which is expected to be and must be disclosed.

9                **Violations of the SEC Regulations**

10       150.    During the Relevant Period, defendants caused McAfee to violate SEC regulations by

11  failing to disclose that the Company's senior executives had been granted backdated stock options.

12       151.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer

13  must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303]. Item

14  402(b) and (c) require a company to provide both a Summary Compensation Table and an

15  Option/SAR Grants table identifying the compensation of the named executive officers – the

16  Company's CEO and its next four most highly paid executives. Item 402 requires particularized

17  disclosures involving a company's stock option grants in the last fiscal year. In the summary

18  compensation table, the issuer must identify in a column "other annual compensation" received by

19  the named executives that is not properly categorized as salary or bonus, including any "[a]bove

20  market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to

21  the officer during the period. Item 402(b)(2)(iii)(C)(2). In the option grant table, the issuer must

22  identify in a column "[t]he per-share exercise or base price of the options . . . . *If such exercise or*

23  *base price is less than the market price of the underlying security on the date of grant, a separate,*

24  *adjoining column shall be added showing market price on the date of grant*. . . ." Item

25  402(c)(2)(iv).

26       152.    Defendants caused McAfee to violate SEC regulations by failing to disclose that the

27  Company's named executive officers had been granted options with exercise prices below the

28  market value on the date the Board or Compensation Committee approved the grant.

**Violations of IRS Rules and Regulations**

153.    During the Relevant Period, defendants further caused McAfee to violate IRS rules and regulations due to its improper accounting for the backdated stock options. As a result, the Company's tax liabilities were understated exposing McAfee to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

154.    Defendants caused the Company to violate IRS Code §162(m) which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based." In order for compensation to be performance-based, the Compensation Committee must have set pre-established and objective performance goals. The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant. Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

155.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance. This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What [162[m]] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

156.    Defendants caused McAfee to violate IRS Code §162(m) by providing backdated options to the Company's named executive officers which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant. As a result all of the income resulting from the exercise of the options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

157.    Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and employees upon the

1   exercise of McAfee's stock options by improperly accounting for its Nonqualified Stock Options

2   ("NSOs") as Incentive Stock Options ("ISOs").

3        158.   ISOs are a form of equity compensation that may be provided to a company's

4   employees. ISOs are required to be granted at an exercise price that is no less than the fair market

5   value of the stock on the date of the grant and are entitled to preferential tax treatment as they are not

6   subject to income tax upon exercise of the options but only upon sale of the stock (except for the

7   possible imposition of alternative minimum tax on the option spread at the time of exercise). Stock

8   options that do not qualify as ISOs are considered to be NSOs. NSOs are not entitled to preferential

9   treatment as they are subject to income tax and FICA withholding upon exercise. As a result, a

10   company that fails to withhold income tax and/or FICA upon the exercise of NSOs by its employees

11   would be liable for the amount of the income tax and FICA that the company failed to withhold upon

12   exercise of the options, in addition to interest and penalties.

13        159.   By improperly treating its backdated options as ISOs, defendants failed to provide

14   proper income tax and FICA withholdings upon the exercise of its options by its executives and

15   employees in violation of IRS rules and regulations.

16        160.   The chart below illustrates McAfee's false and misleading annual financial results

17   which overstate Company earnings as a result of understating Company expenses:

| Fiscal Year | Reported Earnings (Loss) | Reported Basic Earnings (Loss) Per Share |
|---|---|---|
| 1996 | $64.11 million | $0.85 |
| 1997 | $10.64 million | $0.61 |
| 1998 | $36.44 million | $0.87 |
| 1999 | ($156.88 million) | ($1.27) |
| 2000 | ($123.93 million) | ($0.90) |
| 2001 | $83.25 million | $0.33 |
| 2002 | $128.31 million | $1.18 |
| 2003 | $70.24 million | $0.74 |
| 2004 | $5.32 million | $0.17 |
| 2005 | $138.83 million | $1.22 |

        161.   Meanwhile, defendants were causing the Company to grant them millions of stock

options, many of which were backdated or misdated. The Company's executives received a

significant number of stock options as compensation during the Relevant Period.

1

**The False 1997 Form 10-K**

2      162.    On February 17, 1998, the Company filed its 1997 Form 10-K with the SEC. The

3  1997 Form 10-K included McAfee's 1997 financial statements, which were materially false and

4  misleading and presented in violation of GAAP, due to improper accounting for the backdated stock

5  options. As a result, McAfee's compensation expense was understated and its net earnings were

6  overstated.

7      163.    In addition, the 1997 10-K included the following representation that one purpose of

8  the 1997 changes to the Stock Incentive Plan was to:

9          (b) eliminate the ability of the Company's Board of Directors (the "Board") to grant
           options thereunder with an exercise price less than the fair market value of the
10         Company's Common Stock on the date of grant.

11     164.    As discussed above this was false. Defendants knew but failed to disclose that even

12  under the 1997 Stock Incentive Plan, stock options were routinely granted with an exercise price less

13  than that of the date on which the options were actually granted.

14     165.    Additionally, the Company knowingly and falsely represented in the 10-K that:

15         *The Company accounts for stock-based compensation using the intrinsic value
           method prescribed by APB Opinion No. 25*, "Accounting for Stock Issued to
16         Employees." Accordingly, compensation cost for stock options is measured as the
           excess, if any, of the quoted market price of the Company's stock at the date of the
17         grant over the amount an employee must pay to acquire the stock. The Company has
           adopted the disclosure-only provisions of Statement of Financial Accounting
18         Standards No. 123, "Accounting for Stock-Based Compensation."

19     166.    As discussed above at ¶29, the Company has already admitted that it did not properly

20  apply APB 25.

21     167.    The February 17, 1998 Form 10-K was signed by Larson, Denend, Goyal, Bolger,

22  Gemmell, Harper and Saal.

23

**The False 1998 Form 10-K**

24     168.    On April 15, 1999, the Company filed its 1998 Form 10-K with the SEC. The 1998

25  Form 10-K included McAfee's 1998 financial statements, which were materially false and

26  misleading and presented in violation of GAAP, due to improper accounting for the backdated stock

27  options. As a result, McAfee's compensation expense was understated and its net earnings were

28  overstated.

169.    In addition, in the 1998 10-K, the Company made the following false and misleading

representations regarding the 1997 Plan:

> *The plan provides for an option price no less than 100% of the fair market value of the Company's common stock on the date of grant for incentive stock options* granted to employees and officers (including directors who are also employees) or 85% of the fair market value on the date of grant for all others. The options may be exercisable immediately, or over time, generally vest 25% one year after commencing employment or from date of grant and vest thereafter in monthly increments over three years. All options under the option plan expire ten years after grant.

170.    This statement was false when made. Defendants knew but failed to disclose that

many options were granted at a price lower than that of the day they were actually granted. The

1998 Form 10-K informed shareholders that during the fiscal year members of the Compensation

Committee of the Board were responsible for approving stock options issued to Company

executives:

> "THE COMPENSATION COMMITTEE reviews and approves executive salary levels and stock option grants. The Compensation Committee held two meetings during 1998. Members: Virginia Gemmell and Edwin Harper."

171.    With respect to options granted to directors, the Form 10-K stated:

> COMPENSATION OF DIRECTORS . . . . Under our Stock Option Plan for Outside Directors, non-employee directors are automatically granted an option to purchase 37,500 shares of our common stock, when they first become a director. Each year after the initial grant, they are entitled to receive an additional option grant to purchase up 15,000 shares of our common stock. . . . *All options are granted at the fair market value on the date of grant.*

172.    The Company again indicated that it had "elected to continue accounting for [stock

incentive] plans in accordance with APB No. 25."

173.    The April 15, 1999 Form 10-K was signed by Larson, Goyal, Denend, Gemmell and

Harper.

### The False 1998 Form 10-K/A

174.    On or about April 15, 1999, McAfee filed an amendment to its 1998 Form 10-K.

This amendment again indicated that in 1997, a proposal to change the Stock Incentive Plan had

been presented for the shareholders' approval to "eliminate the ability of the Company's Board of

Directors (the 'Board') to grant options thereunder with an exercise price less than the fair market

value of the Company's Common Stock on the date of grant." For the same reasons discussed above, this statement was false.

175.     The Amended 10-K also reiterated the false and misleading statement regarding the 1997 Plan:

> *The plan provides for an option price no less than 100% of the fair market value of the Company's common stock on the date of grant for incentive stock options* granted to employees and officers (including directors who are also employees) or 85% of the fair market value on the date of grant for all others.

176.     The April 15, 1999 Amendment to Form 10-K was signed by Larson, Goyal, Denend, Gemmell and Harper.

### The False 1999 Form 10-K

177.     On March 30, 2000, the Company filed its 1999 Form 10-K with the SEC. The 1999 Form 10-K included McAfee's 1999 financial statements, which were materially false and misleading and presented in violation of GAAP, due to knowing and improper accounting for the backdated stock options. As a result, McAfee's compensation expense was understated and its net earnings were overstated.

178.     The 1999 Form 10-K was signed by Larson, Goyal, Denend, Gemmell, Harper and Torresi.

### The False 2000 Form 10-K

179.     On April 2, 2001, the Company filed its 2000 Form 10-K with the SEC. The 2000 Form 10-K included McAfee's 2000 financial statements, which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, McAfee's compensation expense was understated and its net earnings were overstated.

180.     The April 2, 2001 Form 10-K was signed by Samenuk, Davis, Denend, Gemmell, Harper and Torresi.

### The False 2001 Form 10-K

181.     On February 8, 2002, the Company filed its 2001 Form 10-K with the SEC. The 2001 Form 10-K included McAfee's 2001 financial statements, which were materially false and

1  misleading and presented in violation of GAAP, due to its improper accounting for the backdated

2  stock options. As a result, McAfee's compensation expense was understated and its net earnings

3  were overstated.

4        182. The Form 10-K included the same knowingly false and misleading statement that

5  "[t]he McAfee Plan provides for an option price no less than 100% of the fair market value of

6  McAfee.com's common stock on the date of grant for incentive stock options granted to employees

7  and officers."

8        183. The 2001 Form 10-K was signed by Samenuk, Richards, Harper, Denend, Gemmell,

9  Dutkowsky and Pangia.

10               **The False 2002 Form 10-K**

11        184. On October 31, 2003, the Company filed its 2002 Form 10-K with the SEC. The

12  2002 Form 10-K included McAfee's 2002 financial statements, which were materially false and

13  misleading and presented in violation of GAAP, due to improper accounting for the backdated stock

14  options. As a result, McAfee's compensation expense was understated and its net earnings were

15  overstated.

16        185. The Form 10-K included the same knowingly false and misleading statement that

17  "[t]he McAfee Plan provided for an option price no less than 100% of the fair market value of

18  McAfee.com's common stock on the date of grant for incentive stock options granted to employees

19  and officers."

20        186. The October 31, 2003 Form 10-K was signed by Samenuk, Richards, Bucknam,

21  Denend, Dutkowsky, O'Leary, Pangia and Wilson.

22         **The False 2003 Amendments to the 2000 Form 10-K**

23        187. On October 31, 2003, the Company filed it's Form 10-K/A for the year 2000. In the

24  2003 Form 10-K/A, defendants knowingly and falsely stated that it accounted for stock-based

25  compensation in accordance with APB No. 25.

26        188. The Form 10-K/A stated: "Other than options granted with exercise prices of $0.01

27  per share, all options were granted at an exercise price equal to the fair market value of the common

28  stock on the date of grant."

1     189.    The October 31, 2003 Amendment to the 2000 Form 10-K was signed by Samenuk,

2  Richards, Bucknam, Denend, Dutkowsky, O'Leary, Pangia and Wilson.

3                     **The False 2003 Form 10-K**

4     190.    On March 9, 2004, the Company filed its 2003 Form 10-K with the SEC. The 2003

5  Form 10-K included McAfee's 2003 financial statements, which were materially false and

6  misleading and presented in violation of GAAP, due to improper accounting for the backdated stock

7  options. As a result, McAfee's compensation expense was understated and its net earnings were

8  overstated.

9     191.    The Form 10-K included the same knowingly false and misleading statement that

10  "[t]he McAfee Plan provides for an option price no less than 100% of the fair market value of

11  McAfee.com's common stock on the date of grant for incentive stock options granted to employees

12  and officers."

13     192.    The 2003 Form 10-K was signed by Samenuk, Richards, Bucknam, Denend,

14  Dutkowsky, O'Leary, Pangia and Wilson.

15                     **The False 2004 Form 10-K**

16     193.    On March 31, 2005, the Company filed its 2004 Form 10-K with the SEC. The 2004

17  Form 10-K included McAfee's 2004 financial statements, which were materially false and

18  misleading and presented in violation of GAAP, due to improper accounting for the backdated stock

19  options. As a result, McAfee's compensation expense was understated and its net earnings were

20  overstated.

21     194.    The Form 10-K also falsely stated that McAfee accounted for stock-based

22  compensation in accordance with APB No. 25.

23     195.    The Company expanded on what it meant by accounting for stock-based

24  compensation under APB No. 25:

25        Accordingly, with respect to fixed-plan awards, the Company measures the excess, if
           any, of the market value of its common stock on the date of the award over the
26        exercise price of options granted as deferred compensation expense (intrinsic
           method) and recognizes any such excess over the vesting period using the straight-
27        line method.

28

1        196.    Defendants knew or deliberately disregarded that this statement was false, because

2  the Company was backdating options to a date with a lower closing price and the options therefore

3  had an exercise price lower than the market value of the stock on the actual day of the grant.

4  McAfee has admitted that it will have to restate its financial results back to 2001 because "the actual

5  accounting measurement dates for certain historical stock options differ from the measurements

6  dates previously used for such awards."

7        197.    The 2004 Form 10-K was signed by Samenuk, Richards, Bucknam, Denend,

8  Dutkowsky, O'Leary, Pangia and Wilson.  It was certified by Samenuk and Brown.

9                              **The False 2005 Form 10-K**

10       198.    On March 1, 2006, the Company filed its 2005 Form 10-K with the SEC.[10] The 2005

11  Form 10-K included McAfee's 2005 financial statements, which were knowingly materially false

12  and misleading and presented in violation of GAAP, due to its improper accounting for the

13  backdated stock options.  As a result, McAfee's compensation expense was understated and its net

14  earnings were overstated.

15       199.    The March 1, 2006 Form 10-K was signed by Samenuk, Bucknam, Brown, Denend,

16  Dutkowsky, Fuller, O'Leary, Pangia and Wilson.  It was certified by Samenuk and Brown.

17

18

---

19  [10]    In McAfee's March 1, 2006 10-K, the Company incorporated by reference the following

20  documents: Form 8-K filed on July 16, 2004; Form 10-Q for the quarter ended September 30, 2004, filed on November 8, 2004; Form S-4 filed on March 25, 1998; Form 10-K for the year ended

21  December 31, 2002, filed on October 31, 2003; Form 10-Q for the quarter ended September 30, 1996, filed on November 14, 1996; Form 8-A filed on October 22, 1998; S-3 filed on November 9,

22  2001; S-3, filed on February 11, 1998; S-8 filed on July 27, 2005; Form 10-K for the year ended December 31, 2000, filed on April 2, 2001; Form 10-K for the year ended December 31, 2001, filed

23  on February 8, 2002; Form 10-Q for the quarter ended March 31, 2001, filed on May 15, 2001; Form 10-Q for the quarter ended September 30, 2001, filed on November 13, 2001; Form 10-K for the

24  year ended December 31, 2001, filed on February 8, 2002; Form 10-Q for the quarter ended September 30, 2002, filed on November 12, 2002; Form S-8 filed on November 5, 2003; Form 10-K

25  for the year ended December 31, 2003, filed on March 9, 2004; Form 10-Q for the quarter ended March 31, 2004, filed on May 10, 2004; Form 8-K filed on September 7, 2004; Form 10-Q for the

26  quarter ended June 30, 2004, filed on August 9, 2004; Form 10-Q for the quarter ended September 30, 2004, filed on November 8, 2004; Form 8-K filed on December 14, 2004; Form 10-K/A for the

27  year ended December 31, 2004, filed on May 24, 2005; Form 8-K filed on April 22, 2005; and Form 8-K filed on April 26, 2005.

28

1       200.    During the Relevant Period, defendants caused McAfee's shares to trade at artificially

2   inflated levels by issuing a series of materially false and misleading statements regarding the

3   Company's financial statements, business and prospects. Specifically, defendants caused or allowed

4   McAfee to issue statements that failed to disclose or misstated that: (a) the Company had inadequate

5   internal controls that prevented it from issuing accurate financial reports and projections; (b) because

6   of improperly recorded stock-based compensation expenses the Company's financial results violated

7   GAAP; and (c) the Company's public disclosures presented an inflated view of McAfee's earnings.

8       201.    The 1997-2005 Proxy Statements concealed defendants' option backdating scheme.

9   Thus, the Company's shareholders remained unaware of defendants' wrongdoing when voting on

10  proxy proposals between 1997 and 2006. In fact, it was not until the CFRA published a study on at-

11  risk companies for stock option backdating that shareholders learned that the Proxy Statements

12  which they had relied upon for nearly a decade were false and misleading. Defendants have been

13  unjustly enriched at the expense of McAfee, which has received and will receive less money from

14  defendants when they exercise their options at prices substantially lower than they would have if the

15  options had not been backdated.

16      202.    Each dollar diverted to defendants via the option backdating scheme has come at the

17  expense of the Company. For example, if Richards' 600,000 options granted in 2001 had not been

18  manipulated, but rather had a strike price of $7.45, the day he started working for McAfee, instead of

19  the $6.00 strike price – which was the trading low for the year at any time after February 23, 2001,

20  when Richards exercised those options – the Company would have received an additional $870,000

21  from this single options grant.

22                          **COMPANY REVELATIONS AND ADMISSIONS**

23      203.    Contrary to McAfee's public representations that stock options bore an exercise price

24  equal to the fair market value of the stock on the date of the grant, McAfee was manipulating the

25  dates of the option grants so that they would bear a date with an exercise price lower than that of the

26  common stock on the actual date of the grant.

27

28

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                    - 62 -

204.    On May 25, 2006, McAfee announced that it was conducting an internal investigation of its options-granting practices in the late 1990s and early 2000s.  McAfee also acknowledged that it was in dialogue with the SEC on an informal basis.

205.    On May 30, 2006, McAfee announced that it had fired its general counsel, defendant Roberts, as a result of the internal review.  Roberts was purportedly fired in connection with "one episode involving the General Counsel in 2000 that was improper."

206.    On June 9, 2006, McAfee filed a Form 8-K admitting that it had received a subpoena from the SEC related to the options-granting practices.

207.    On July 27, 2006, McAfee announced that the Special Committee carrying out the review had concluded that "the actual accounting measurement dates for certain historical stock options differ from the measurement dates previously used for such awards."  McAfee stated that it would adjust the measurement dates and that it was "more likely than not that the amount of such additional adjustments relating to prior periods will be material and that McAfee will restate its financial statements in at least one, and potentially several, prior periods."  The Company then admitted that, as a result, its previously issued quarterly and annual financial statements for fiscal years 2003 through the first quarter of 2006 "should no longer be relied upon."  The Company later amended its 8-K to state that the data from 2002 and 2001 included in its later financial statements should also no longer be relied upon.  Although the review was not complete, the Company warned that it expected that "expenses arising from the Special Committee's review, any potential restatement of financial statements and related activities, which will be recorded in the periods incurred, will be significant."

208.    On August 10, 2006, McAfee admitted that, because of the ongoing review of the options-granting process, the Company would not timely file its Form 10-Q for the quarter ended June 30, 2006.  The Company admitted that it would likely restate its financial results for "at least one, and potentially several, prior periods, to reflect additional stock compensation and/or tax related impact."  McAfee also admitted on July 27, 2006 in a conference call with analysts that the Company was "evaluating the impact of [the options-granting] matter on its Sarbanes-Oxley §302

1    internal control certification over financial reporting and its reports thereon for the years 2004 and

2    2005."

3            209.    On July 27, 2006, McAfee issued a Form 8-K with the SEC admitting that its review

4    of historical stock option grants had uncovered that indeed the grant date and record dates of options

5    granted during the Relevant Period were inconsistent and that its financial statements were likely in

6    violation of GAAP and Accounting Principles Board Opinion No. 25. The Form 8-K also revealed

7    that the necessary adjustments to its financial would in fact be material, therefore requiring a

8    restatement of financial results for 2003, 2004 and 2005.

9            As a result of McAfee's previously announced independent review of its historical
        stock option grant practices and related accounting, McAfee's Special Committee of
10       independent directors conducting this review has reached the conclusion that,
        pursuant to the requirements of Accounting Principles Board Opinion No. 25,
11       Accounting for Stock Issued to Employees (APB 25), the actual accounting
        measurement dates for certain historical stock options differ from the measurement
12       dates previously used for such awards.  The Special Committee has not yet
        completed its review.  As a result, the Special Committee has determined that new
13       accounting measurement dates will apply to the affected option grants.  McAfee
        believes that it is more likely than not that the amount of such additional adjustments
14       relating to prior periods will be material and that McAfee will restate its financial
        statements in at least one, and potentially several, prior periods.
15
        McAfee has concluded that its previously issued financial statements for the fiscal
16       years 2003, 2004, 2005, which are included in the Company's Annual Report on
        Form 10-K for the year ended December 31, 2005, the Quarterly Reports on Form
17       10-Q filed with respect to each of these fiscal years and the financial statements
        included in the Company's Quarterly Report on Form 10-Q for the first quarter of
18       fiscal year 2006, should no longer be relied upon.  In addition, in the event that a
        restatement of these financial statements is required, it likely will affect financial
19       statements for prior periods.

20           210.    On August 18, 2006, McAfee acknowledged that it had received a grand jury

21   subpoena from the United States Attorney's office regarding the termination of Roberts and the

22   investigation of options backdating.

23           211.    On October 11, 2006, the Company announced that, following the Special Committee

24   report on historical stock option grant practices, defendant Samenuk has retired and defendant Weiss

25   has been fired:

26           On October 11, 2006, McAfee, Inc. ("McAfee") issued a press release
        announcing that George Samenuk, its Chairman of the Board and Chief Executive
27       Officer, has retired from McAfee, that Kevin Weiss, its President, has been
        terminated by McAfee, that Dale L. Fuller has been appointed as Interim President
28       and Chief Executive Officer, and that Charles J. Robel has been appointed non-

1    executive Chairman of the Board.  The foregoing personnel actions followed the
2    presentation to the McAfee Board of Directors of the determinations by the Special
3    Committee of independent directors regarding the previously announced
     investigation of McAfee's historical stock option grant practices and related
     accounting.

4        212.    On the same day, October 11, 2006, McAfee further announced that its review had

5    concluded that the options backdating scheme would require restatement of ten years of false

6    reported financials:

7        Following the substantial completion of the Special Committee's previously
     announced internal review of McAfee's stock option grant practices, conducted with
8    the assistance of independent counsel and forensic accountants, McAfee has
     determined that it will need to restate historical financial statements to record
9    additional non-cash charges for stock-based compensation expense over a ten year
     period.  Based on that preliminary review, McAfee announced that it currently
10   believes that the amount of the restatement required to record such charges is likely
     to be in the range of $100 to 150 million.  McAfee and its independent auditors will
11   be reviewing recent guidance released by the Office of the Chief Accountant of the
     SEC and have not yet conclusively determined the exact amount of such charges, the
12   resulting tax and accounting impact, or which specific prior periods require
     restatement.  McAfee intends to file its restated financial results and Annual Report
13   on Form 10-K as quickly as practicable.

14       213.    On October 26, 2006, the Company issued a press release announcing that its

15   preliminary results for the third quarter fiscal 2006 again stating that it expects that the restatement

16   related to its stock option investigation will range between $100-$150 million.  In addition, because

17   of the restatement, the Company is still unable to timely file its Form 10-Q for the third quarter.

18   **TOLLING OF THE STATUTE OF LIMITATIONS**

19       214.    The Counts alleged herein are timely.  As an initial matter, defendants wrongfully

20   concealed their manipulation of the Stock Option Plans, through strategic timing and fraudulent

21   backdating, by issuing false and misleading Proxy Statements, by falsely reassuring McAfee's public

22   investors that McAfee's option grants were being administered by a committee of independent

23   directors, and by failing to disclose that backdated options were, in fact, actually issued on dates

24   other than those disclosed, and that strategically timed option grants were issued based on the

25   manipulation of insider information that ensured that the true fair market value of the Company's

26   stock was, in fact, higher than the publicly traded price on the date of the option grant.

27

28

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT -- Master File No. 5:06-cv-03484-JF

1:07CV00407 (EGS)

215.    McAfee's shareholders and the investing public had no reason to know of defendants' breach of their fiduciary duties until May 2006, when the CFRA published its report detailing the option practices of McAfee and other companies.

216.    Finally, as fiduciaries of McAfee and its public shareholders, defendants cannot rely on any limitations defense where they withheld from McAfee's public shareholders the facts that give rise to the claims asserted herein, *i.e.*, that the McAfee Board had abdicated its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option grant dates had been manipulated to maximize the profit for the grant recipients and, accordingly, to maximize the costs for the Company.

## DEMAND FUTILITY

217.    The current Board consists of defendants Bucknam, Denend, Dutkowsky, O'Leary, Pangia and Fuller, as well as non-defendant Chuck Robel.  Lead Plaintiffs did not make a demand upon the Board of McAfee at the time of suit to institute this action.  Based upon the facts set forth throughout this Complaint, applicable law and the longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the McAfee Board to institute this action against the officers and members of the McAfee Board is excused as futile.

218.    Prior demand upon a board of directors is excused if Plaintiffs allege facts that, if true, raise a reasonable doubt that: (a) the challenged transaction was the product of a valid business judgment; or (b) a majority of the directors are disinterested and independent.  If either prong of this test is satisfied, demand is excused.

219.    By reason of their corporate positions and their ability to control the business and corporate affairs of McAfee at all relevant times, the directors of McAfee owed McAfee and its stockholders fiduciary duties of candor, fidelity, trust, and loyalty, and are and were required to use their ability to control McAfee in a fair, just and equitable manner, as well as to act in furtherance of the best interests of McAfee and its stockholders.  In addition, the directors owed McAfee the fiduciary duty to exercise due care and diligence in the management and administration of the affairs of McAfee and in the use and prevention of its property and assets.  In violation of their fiduciary duties, defendants approved of and/or caused McAfee to issue illegally backdated stock options to

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF

- 66 -

1    many of its employees for a period beginning in at least 1996 and continuing until no earlier than

2    2002.

3                    **A Majority of McAfee's Directors Are Not Independent and Disinterested**

4            220.    In addition to the fact that backdating stock options is not protected by the business

5    judgment rule, demand is excused because Plaintiffs can show a reasonable doubt that the majority

6    of directors were not disinterested or independent at the time that this action was filed.

7            221.    A majority of McAfee's Board are interested and/or incapable of independently

8    evaluating the claims in this lawsuit. Of the eight members of the Board at the time this action was

9    filed, at least five of them have significant conflicts which creates a reasonable doubt as to their

10   independence or disinterestedness, thus making a demand on the Board futile and useless. In

11   particular:

12           (a)     Defendant Samenuk was both Chairman of the Board of Directors and CEO of

13   McAfee. Because of these dual roles, Samenuk was incapable of exercising independent judgment

14   regarding this action. Further, Samenuk was a participant in, and direct beneficiary of, the illegal

15   options backdating scheme. On January 2, 2001, Samenuk received options to purchase 1,200,000

16   shares of McAfee stock. On this date, McAfee stock was trading at the third lowest price of year.

17   On January 16, 2002, Samenuk received options to purchase 420,000 shares of McAfee stock. On

18   this date, McAfee stock was trading at the second lowest price for the month. To date, Samenuk has

19   realized **_profits of over $33.5 million from options granted on highly suspect dates_**. He also

20   continues to hold a significant number of unexercised options from highly suspect grant dates. In

21   addition, from at least 2001-2003, Samenuk, and defendant Garcia-Lechelt met to determine the

22   stock option awards for senior McAfee executives. In this capacity, Samenuk was directly

23   responsible for manipulating the grant date of certain stock options. There can be no doubt that

24   these conflicts make Samenuk interested in these transactions, and completely incapable of

25   exercising independent judgment regarding this lawsuit. On October 11, 2006, McAfee announced

26   that Samenuk had "retired" from McAfee following the Special Committee's presentation of the

27   their investigation of McAfee's historical stock option grant practices and related accounting;

28

1        (b)     Defendant Denend has been a director of McAfee since June 1995. He was

2 President of McAfee from December 1997 to April 1998, and was President and CEO of Network

3 General from June 1993 until December 1997. Further, Denend served on McAfee's Audit

4 Committee during 1998, as well as the Compensation Committee from 1995-1999, and again in

5 2002. While Denend was President of McAfee, several senior executives, including himself, were

6 given options to purchase over 1,000,000 shares of McAfee stock. Certain of these options bore date

7 of January 12, 1998 – the lowest stock price of the year. Denend is interested in the transactions in

8 question because in his role as president and director he either knew or was reckless in not knowing

9 that option grant dates were being backdated. Denend is also incapable of exercising independent

10 judgment because of his multiple connections with McAfee executives. As a former president of the

11 Company, Denend has inextricable links with McAfee's management that make it impossible for

12 him to exercise independent judgment regarding these transactions. Denend's independence is

13 further called into question by his position on the board of directors of Verifone, Inc. Verifone has

14 been a business partner of McAfee's since at least 2004. Denend has been sued on multiple

15 occasions while serving on various boards of directors. In 1991, he was as named defendant in civil

16 litigation against 3Com. In 1992, he was a named defendant in a securities fraud prosecution against

17 Vitalink Communications. In 2001, he was a named defendant in numerous federal securities fraud

18 cases against Adaptive Broadband. He was a named defendant in numerous state civil cases filed

19 against the officers and directors of Rational Software. Last, he was also a named defendant in

20 previous securities fraud cases against McAfee, which involved deliberate revenue inflation and led

21 to McAfee signing a consent order with the SEC in 2006. The aggregate of these facts make it clear

22 that Denend could not have evaluated a demand made on the Company in a disinterested and

23 independent manner had one been made in March 2006;

24        (c)     Defendant Dutkowsky has been a director of McAfee since April 2001 and the

25 lead independent director since March 2004. On October 4, 2006, McAfee announced that

26 Dutkowsky intended to resign from the Board by no later than January 31, 2007. He served on the

27 Audit Committee from 2002-2005, and on the Compensation Committee from April 2001-2005.

28 Dutkowsky was on the Compensation Committee during the time that at least three publicly reported

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF

- 68 -

**1:07CV00407 (EGS)**

1   and highly suspect grants were given at McAfee. As chair of the Compensation Committee,

2   Dutkowsky was directly responsible for supervising the administration of stock grants given under

3   McAfee's Stock Plans and their 2000 Non-Statutory Stock Plan during this period. In that capacity,

4   Dutkowsky knew or was reckless in not knowing that McAfee was backdating stock option grants on

5   a consistent basis. Further, Dutkowsky's professional relationships with other Board members,

6   particularly CEO Samenuk, also make him unable to objectively evaluate this claim. While recently

7   removed from McAfee's Proxy Statements, Dutkowsky spent the majority of his professional career

8   at IBM – during the same time that Samenuk worked there. During this time, they likely developed

9   a close professional relationship as they both worked as senior executives in IBM's operations in

10  Asia. This relationship is particularly problematic as Dutkowsky is supposed to be acting as the lead

11  independent director on McAfee's Board. Instead, Dutkowsky is beholden to Samenuk and

12  McAfee's officers, and would not vote for litigation that would subject them, and indeed himself, to

13  liability in this action. Because of these connections, and because Dutkowsky either participated in

14  the backdating of options, or completely abdicated his duties in failing to discovery the conduct, he

15  is interested in this litigation and cannot be expected to exercise independent judgment;

16          (d)     Defendant Pangia has been a director of the Company since April 2001. He

17  served as a member of the Audit Committee from 2001-2005 and now chairs that committee. He has

18  also served on the Compensation Committee since April 2002. Pangia was on the Compensation

19  Committee during the time that at least one highly suspect grant was given at McAfee. In that

20  capacity, Pangia knew or was reckless in not knowing that McAfee was backdating stock option

21  grants on a consistent basis. Because Pangia either participated in this fraud, or was complicit in

22  allowing it to occur, he cannot be expected to exercise independent judgment regarding these

23  transactions; and

24          (e)     Defendant Wilson has been a director of the Company since 2002. She was

25  on the Compensation Committee from 2002-July 2003 – during the time that at least one highly

26  suspect grant was given at McAfee. She has been on the Audit Committee since 2002. She has been

27  on the Governance and Nominations Committee since 2003, which she now chairs. As a member of

28  the Governance and Nominations Committee, Wilson was responsible for developing and

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT -- Master File No. 5:06-cv-03484-JF                                    - 69 -

1  recommending to the Board the governance principles applicable to the Company and for overseeing

2  the evaluation of the Board and management. Wilson clearly abdicated these responsibilities as she

3  allowed the backdating of stock options to occur on her watch, and would be incapable of exercising

4  independent judgment regarding these transactions.

5      222.    Furthermore, demand would be a futile and useless act for the following additional

6  reasons:

7      (a)    A majority of the current McAfee Board participated in or approved many of

8  the acts and omissions or were on notice of and/or recklessly disregarded the wrongs complained of

9  herein;

10      (b)    McAfee's Board ultimately had to approve all option grants. Some of the

11  directors themselves received options by virtue of their employment at McAfee that were likely

12  backdated.

13      (c)    Regardless of whether any individual director received a backdated grant, all

14  of McAfee's directors benefited from the option backdating because it allowed McAfee to overstate

15  its profits and understate its compensation expenses for the years in question. Thus, every time the

16  directors exercised McAfee stock options – backdated or not – they were doing so with knowledge

17  that McAfee's stock price was illegally overstated because of their approval of, or acquiescence to,

18  these fraudulent practices. They have thus benefited from the wrongdoing herein alleged and are

19  incapable of exercising independent objective judgment in deciding whether to bring this action.

20      (d)    Directors who were the members of McAfee's Compensation Committee of

21  the Board are interested and not capable of exercising independent judgment regarding these

22  transactions because this committee was directly responsible for supervising the administration of

23  stock grants given under McAfee's 1997 Stock Plan and their 2000 Non-Statutory Stock Plan during

24  this period. As such, they were either aware that option grant dates were been manipulated, or

25  abdicated their responsibilities to ensure that such conduct was not occurring and therefore are

26  substantially likely to be held liable for the misconduct complained of herein. These directors

27  cannot be expected to vigorously pursue litigation that is based on conduct they approved, or duties

28  they abdicated;

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                          - 70 -

1          (e)    Directors who were members of McAfee's Audit Committee of the Board are

2    also interested and not capable of exercising independent judgment regarding these transactions.

3    The Audit Committee reviews, acts and reports to McAfee's Board on various auditing and

4    accounting matters. Amongst other things, the Audit Committee is responsible for ensuring the

5    quality and integrity of McAfee's financial statements, and the adequacy and effectiveness of the

6    Company's accounting and financial controls. The members of the Audit Committee either failed to

7    exercise due care in ensuring that McAfee had sufficient financial controls to prevent this kind of

8    conduct, or knowingly consented to the granting of illegal and backdated stock options, and

9    therefore are substantially likely to be held liable for the misconduct complained of herein. In either

10   respect, the members of the Audit Committee cannot be expected to vigorously pursue litigation

11   related to stock option backdating, because it was only through inadequate and ineffective

12   accounting and financial controls that this conduct could have occurred.

13         223.    Because Plaintiffs can show a reasonable doubt that a majority of McAfee's directors

14   at the time of suit were disinterested and independent at the time of suit, and because the challenged

15   transaction was clearly not the product of a valid business judgment, a demand upon McAfee's

16   Board would be futile and is excused.

17   **Options Backdating Is Not the Product of Business Judgment Because It Is Ultra Vires,**
     **Illegal, and Contrary to the Stated Purpose of the Stock Option Plans**

18

19         224.    The practice of granting illegal and backdated stock options is not protected by the

20   business judgment rule because it is ultra vires. The Stock Option Plans under which these options

21   were purportedly given, and the Proxy Statements disclosing grants to senior executives during this

22   time period, all represented and required that the stock grants in question be priced based on the fair

23   market value of McAfee stock on the day of the grant. The fair market value was to be determined

24   by reference to the stock prices published in *The Wall Street Journal* on the day of the grant.

25         225.    However, contrary to this limited authority given to the Board by McAfee's Stock

26   Option Plans, and contrary to McAfee's representations in the proxy filings, many of McAfee's

27   option grants between 1997 and 2002 were priced at a date earlier than the actual date on which they

28   were granted. Because granting options using manipulated grant dates to lower the strike price of

1 the options is not permitted by the Stock Option Plans, this conduct is *ultra vires* and void on its

2 face. *Ultra vires* acts are not protected by the business judgment rule, and thus demand is excused.

3      226.    Additionally, defendants' conduct caused McAfee to issue materially false financial

4 reports and proxy reports for the entirety of the period in question, in violation of numerous

5 provisions of the federal securities laws. Each Defendant violated §10(b) and Rule 10b-5 of the

6 Exchange Act by participating this fraudulent scheme. Each defendant violated §14(a) of the

7 Exchange Act by issuing false and misleading Proxy Statements from 1997 to 2005. And each

8 Defendant violated §20(a) of the Exchange Act by being controlling persons of McAfee and

9 engaging in the purchase and/or sale of McAfee stock while in the possession of material non-public

10 information regarding McAfee's backdating scheme. Demand is excused because these are illegal

11 acts that are not protected by the business judgment rule.

12      227.    Even if stock option backdating was not illegal, *ultra vires*, and void, there would be

13 no plausible argument that backdating stock options was a valid exercise of business judgment. As

14 represented in McAfee's Proxy Statements, the stated purpose of McAfee's Stock Option Plans is to

15 encourage the productivity of McAfee employees by providing compensation that is proportional to

16 gains in McAfee's stock price. However, by granting options with backdated strike prices,

17 defendants undermined the purpose of the Stock Option Plans by awarding employees compensation

18 that had intrinsic value regardless of gains in McAfee's stock price. In effect, this practice was

19 nothing more than secret handouts to executives and employees at the expense of unsuspecting

20 shareholders and the market at large.

21      228.    Defendants could have achieved the stated purpose of attracting and retaining

22 qualified employees by granting those employees additional options under their incentive plans, or

23 by granting options at a price less than the fair market value on the day of the grant and simply

24 disclosing and expensing these grants. Instead, defendants intentionally concealed the backdating of

25 these grants and illegally reported these grants in their financial disclosures to improve their bottom

26 line.

27      229.    The practice of backdating stock options could not have been a valid exercise of

28 business judgment because it has subjected McAfee to potentially massive liability. McAfee has

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF

1  disclosed that they will likely have to restate financial statements for at least one, and possibly

2  several, past periods. The Company's practices are being investigated by the SEC and DOJ. The

3  Company will likely suffer tax liabilities for the additional compensation they will have to expense,

4  and they have tarnished their reputation in the investment community through this deliberate and

5  calculated conduct.

6      230.    Further, the alleged conduct is likely in violation of the consent order that McAfee

7  signed with the SEC on January 4, 2006. This consent order, which alleged that McAfee violated

8  federal securities laws in connection with its overstatement of revenues between 1998 and 2000,

9  enjoined McAfee from violating the antifraud, books and records, internal controls, and periodic

10  reporting provisions of the federal securities laws. If this present conduct is found to violate this

11  consent order, McAfee could be subject to even greater repercussions. There is simply no legitimate

12  business justification for illegal conduct that results in such dire consequences.

13      231.    The acts complained of herein constitute violations of law and breaches of the

14  fiduciary duties owed by McAfee's Board and these acts are incapable of ratification;

15          (a)    In order to bring this action for breaching their fiduciary duties, the members

16  of the McAfee Board would have been required to sue themselves and/or their fellow directors and

17  allies in the top ranks of the Company, who are their good friends and with whom they have

18  entangling financial alliances, interests and dependencies, which they would not do. Therefore,

19  defendants would not be able to vigorously prosecute any such action;

20          (b)    The composition of McAfee's Board is designed to (and does) make them

21  dependent on and deferential to the top officers of the Company and Chairman of the Board who as a

22  practical matter control and dominate the process by which directors are selected for nomination or

23  renomination to the Board;

24          (c)    If McAfee's current and past officers and directors are protected against

25  personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this

26  Complaint by directors' and officers' liability insurance, they caused the Company to purchase that

27  insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of

28  McAfee. However, due to certain changes in the language of directors' and officers' liability

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT ~ Master File No. 5:06-cv-03484-JF

1:07CV00407 (EGS)

1    insurance policies in the past several years, the directors' and officers' liability insurance policies

2    covering defendants in this case contain provisions which eliminate coverage for any action brought

3    directly by McAfee against these defendants, known as, *inter alia*, the "insured versus insured

4    exclusion." As a result, if these directors were to sue themselves or certain of the officers of

5    McAfee, there would be no directors' and officers' insurance protection and thus, this is a further

6    reason why they would not bring such a suit. On the other hand, if the suit is brought derivatively, as

7    this action is brought, such insurance coverage exists and will provide a basis for the Company to

8    effectuate a recovery. If there is no directors' and officers' liability insurance at all, then defendants

9    will not cause McAfee to sue them, since they will face a large uninsured liability;

10        232.    Plaintiffs have not made any demand on shareholders of McAfee to institute this

11    action since such demand would be a futile and useless act for the following reasons:

12            (a)    McAfee is a publicly traded Company with approximately 159 million shares

13    outstanding, and thousands of shareholders;

14            (b)    Making demand on such a number of shareholders would be impossible for

15    Plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders;

16    and

17            (c)    Making demand on all shareholders would force Plaintiffs to incur huge

18    expenses, assuming all shareholders could be individually identified.

19                                  **COUNT I**
        **Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

20                              **Against All Defendants**

21        233.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

22    above, as though fully set forth herein.

23        234.    Throughout the Relevant Period, defendants individually and in concert, directly and

24    indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails,

25    engaged and participated in a continuous course of conduct designed to divert hundreds of millions

26    of dollars to defendants via improper option grants.

27        235.    Defendants employed devices, schemes and artifices to defraud while in possession of

28    material, adverse non-public information and engaged in acts, practices and a course of conduct that

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                                    - 74 -

1   included the making of, or participation in the making of, untrue and/or misleading statements of

2   material facts and/or omitting to state material facts necessary in order to make the statements made

3   about McAfee not misleading.

4        236.     Defendants, as top executive officers and directors of the Company, are liable as

5   direct participants in the wrongs complained of herein.  Through their positions of control and

6   authority as officers of the Company, each of the defendants was able to and did control the conduct

7   complained of herein and the content of the public statements disseminated by McAfee.

8        237.     Defendants acted with scienter throughout the Relevant Period, in that they either had

9   actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or

10  acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true

11  facts, even though such facts were available to them.  Defendants were among the senior

12  management of the Company, and were therefore directly responsible for the false and misleading

13  statements and/or omissions disseminated to the public through press releases, news reports and

14  filings with the SEC.

15       238.     Each of the defendants participated in a scheme to defraud with the purpose and

16  effect of defrauding McAfee, which relied on defendants' fraud in granting them options to purchase

17  McAfee common stock.

18       239.     By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and

19  Rule 10b-5 promulgated thereunder, and caused McAfee to sustain damages, as alleged herein.

20                                     **COUNT II**
                            **Violations of Section 14(a) of the Exchange Act**
21                                **Against All Defendants**

22       240.     Plaintiffs incorporate by reference and reallege each and every allegation set forth

23  above, as though fully set forth herein.

24       241.     Rule 14-A-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no

25  Proxy Statement shall contain "any statement which, at the time and in the light of the circumstances

26  under which it is made, is false or misleading with respect to any material fact, or which omits to

27  state any material fact necessary in order to make the statements therein not false or misleading."

28  17 C.F.R. §240.14-A-9.

1     242.    The 1997-2005 Proxy Statements violated §14(a) and Rule 14-A-9 because they

2    omitted material facts, including the fact that defendants were causing McAfee to engage in an

3    option backdating scheme, a fact which defendants were aware of and participated in from at least

4    1997.

5     243.    In the exercise of reasonable care, defendants should have known that the Proxy

6    Statements were materially false and misleading.

7     244.    The misrepresentations and omissions in the Proxy Statements were material to

8    Plaintiffs in voting on each Proxy Statement.  The Proxy Statements were an essential link in the

9    accomplishment of the continuation of defendants' unlawful stock option backdating scheme, as

10    revelations of the truth would have immediately thwarted a continuation of shareholders'

11    endorsement of the directors' positions, the executive officers' compensation and the Company's

12    compensation policies, and amendments to the Company's Stock Option Plans.

13     245.    The Company was damaged as a result of the material misrepresentations and

14    omissions in the Proxy Statements, because, among other things, the Company awarded hundreds of

15    thousands of stock options pursuant to plans that were invalidly approved by shareholders.

16                       **COUNT III**
**Violations of Section 20(a) of the Exchange Act**

17                           **Against All Defendants**

18     246.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

19    above, as though fully set forth herein.

20     247.    Plaintiffs bring this claim against defendants Samenuk, Richards, Weiss, Roberts,

21    Brown, Denend, Dutkowsky, O'Leary, Pangia, Bucknam, Wilson and Fuller.

22     248.    The defendants named in this Count, by virtue of their positions with McAfee and

23    their specific acts, were, at the time of the wrongs alleged herein, controlling persons of McAfee

24    within the meaning of §20(a) of the Exchange Act.  They had the power and influence and exercised

25    the same to cause McAfee to engage in the illegal conduct and practices complained of herein.

26

27

28

**COUNT IV**
**Accounting**

249.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

250.     At all relevant times, defendants, as directors and/or officers of McAfee, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

251.     In breach of their fiduciary duties owed to McAfee and its shareholders, defendants caused McAfee, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of McAfee.  By this wrongdoing, defendants breached their fiduciary duties owed to McAfee and its shareholders.

252.     Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to defendants.

253.     As a result of defendants' misconduct, McAfee has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

254.     Plaintiffs demand an accounting be made of all stock option grants made to defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to the defendants, as well as the disposition of any proceeds received by the defendants via sale or other exercise of backdated stock option grants received by the defendants.

**COUNT V**
**Breach of Fiduciary Duty and/or Aiding and Abetting**
**Against All Defendants**

255.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

256.     Each of the defendants agreed to and did participate with Denend, Hodges and Richards and the other defendants and/or aided and abetted one another in a deliberate course of

1  action designed to divert corporate assets in breach of fiduciary duties defendants owed to the

2  Company.

3         257.    Defendants have violated fiduciary duties of care, loyalty, good faith, candor and

4  independence owed to McAfee and its public shareholders, have engaged in unlawful self-dealing

5  and have acted to put their personal interests and/or their colleagues' interests ahead of the interests

6  of McAfee and its shareholders.

7         258.    As demonstrated by the allegations above, defendants failed to exercise the care

8  required, and breached their duties of loyalty, good faith, candor and independence owed to McAfee

9  and its public shareholders, and they failed to disclose material information and/or made material

10 misrepresentations to shareholders regarding defendants' option backdating scheme.

11        259.    By reason of the foregoing acts, practices and course of conduct, defendants have

12 failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward

13 McAfee and its public shareholders.

14        260.    As a proximate result of defendants' conduct, in concert with Denend, Hodges and

15 Richards, McAfee has been injured and is entitled to damages.

16                                    **COUNT VI**
                                   **Abuse of Control**
17                               **Against All Defendants**

18        261.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

19 above, as though fully set forth herein.

20        262.    Defendants employed the alleged scheme for the purpose of maintaining and

21 entrenching themselves in their positions of power, prestige and profit at, and control over, McAfee,

22 and to continue to receive the substantial benefits, salaries and emoluments associated with their

23 positions at McAfee. As a part of this scheme, defendants actively made and/or participated in the

24 making of or aided and abetted the making of, misrepresentations regarding McAfee.

25        263.    Defendants' conduct constituted an abuse of their ability to control and influence

26 McAfee.

27        264.    By reason of the foregoing, McAfee has been damaged.

28

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF                                    - 78 -

**1:07CV00407 (EGS)**

**COUNT VII**
**Gross Mismanagement**
**Against All Defendants**

265.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

266.     Defendants had a duty to McAfee and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of McAfee.

267.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of McAfee in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, defendants breached their duties of due care, diligence and candor in the management and administration of McAfee's affairs and in the use and preservation of McAfee's assets.

268.     During the course of the discharge of their duties, defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet defendants caused McAfee to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to McAfee, thus breaching their duties to the Company.  As a result, defendants grossly mismanaged McAfee.

269.     By reason of the foregoing, McAfee has been damaged.

**COUNT VIII**
**Constructive Fraud**
**Against All Defendants**

270.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

271.     As corporate fiduciaries, defendants owed to McAfee and its shareholders a duty of candor and full accurate disclosure regarding the true state of McAfee's business and assets and their conduct with regard thereto.

272.     As a result of the conduct complained of, defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from McAfee's

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT – Master File No. 5:06-cv-03484-JF

1:07CV00407 (EGS)

1   shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of

2   McAfee. Thus they have committed constructive fraud and violated their duty of candor.

3         273.    By reason of the foregoing, McAfee has been damaged.

**COUNT IX**
**Corporate Waste**
**Against All Defendants**

4

5

6         274.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

7   above, as though fully set forth herein.

8         275.    By failing to properly consider the interests of the Company and its public

9   shareholders, by failing to conduct proper supervision, by giving away millions of dollars to

10  defendants via the option backdating scheme, defendants have caused McAfee to waste valuable

11  corporate assets.

12        276.    As a result of defendants' corporate waste, they are liable to the Company.

**COUNT X**
**Unjust Enrichment**
**Against All Defendants**

13

14

15        277.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

16  above, as though fully set forth herein.

17        278.    As a result of the conduct described above, defendants will be and have been unjustly

18  enriched at the expense of McAfee, in the form of unjustified salaries, benefits, bonuses, stock

19  option grants and other emoluments of office.

20        279.    Certain defendants also obtained severance benefits that were not earned or justified

21  but were instead paid as part of a scheme to cover up defendants' complicity in the scheme.

22        280.    All the payments and benefits provided to defendants were at the expense of McAfee.

23  The Company received no benefit from these payments. McAfee was damaged by such payments.

24        281.    Certain of the defendants sold McAfee stock for a profit during the period of

25  deception, misusing confidential non-public corporate information. These defendants should be

26  required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense

27  of McAfee. A constructive trust for the benefit of the Company should be imposed thereon.

28

1

**COUNT XI**
**For Rescission**
**Against All Defendants**

2

3   282. Plaintiffs incorporate by reference and reallege each and every allegation contained

4 above as though fully set forth herein.

5   283. As a result of the acts alleged herein, the stock option contracts between the

6 Defendants and McAfee entered into during the Relevant Period were obtained through defendants'

7 fraud, deceit and abuse of control.  Further, the backdated stock options were illegal grants and thus

8 invalid as they were not authorized in accordance with the terms of the publicly filed contracts

9 regarding Defendants' employment agreements and the Company's stock option plan which was

10 also approved by McAfee shareholders and filed with the SEC.

11   284. All contracts which provide for stock option grants between the Defendants and

12 McAfee and were entered into during the Relevant Period should, therefore, be rescinded, with all

13 sums paid under such contracts returned to the Company, and all such executory contracts cancelled

14 and declared void.

15

**COUNT XII**
**For Breach of Contract**
**Against Defendants Samenuk and Richards**

16

17   285. Plaintiffs incorporate by reference and reallege each and every allegation set forth

18 above, as though fully set forth herein.

19   286. As a result of the backdating of options granted to them, defendants Samenuk and

20 Richards have breached their employment agreements with McAfee and violated the Stock Option

21 Plans, all of which provide that the exercise price of all of the stock options would be no less than

22 the fair market value of the Company's common stock, measured by the publicly traded closing

23 price for McAfee stock, on the date of the grant.

24   287. McAfee and its shareholders have been damaged by defendants Samenuk's and

25 Richards' breach of contract.

26

27

28

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT -- Master File No. 5:06-cv-03484-JF          - 81 -

**1:07CV00407 (EGS)**

**COUNT XIII**
**Violation of California Corporations Code Section 25402**
**Against the Insider Selling Defendants**

288.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

289.    At the time that the Insider Selling Defendants sold their McAfee common stock as set forth herein, by reason of their high executive and/or directorial positions with McAfee, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of McAfee's and option backdating improper accounting and false financial statements.

290.    At the time of such sales, that information was not generally available to the public or the securities markets.  Had such information been generally available, it would have significantly reduced the market price of McAfee shares at that time.

291.    The Insider Selling Defendants, and each of them, had actual knowledge of material, adverse non-public information and thus sold their McAfee common stock in California in violation of California Corporations Code §25402.

292.    Pursuant to California Corporations Code §25502.5, the Insider Selling Defendants, and each of them, are liable to McAfee for damages in an amount up to three times the difference between the price at which McAfee common stock was sold by these defendants, and each of them, and the market value which McAfee common stock would have had at the time of the sale if the information known to these defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

**COUNT XIV**
**For Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information**
**Against the Insider Selling Defendants**

293.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

294.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold McAfee common stock on the basis of such information.

1    295.    The information described above was proprietary non-public information concerning

2    the Company's financial condition and future business prospects.  It was a proprietary asset

3    belonging to the Company, which the Insider Selling Defendants used for their own benefit when

4    they sold McAfee common stock.

5    296.    At the time of their stock sales, the Insider Selling Defendants knew that the

6    Company's net income was materially overstated.  The Insider Selling Defendants' sales of McAfee

7    common stock while in possession and control of this material adverse non-public information was a

8    breach of their fiduciary duties of loyalty and good faith.

9    297.    Since the use of the Company's proprietary information for its own gain constitutes a

10    breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition

11    of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

12    **PRAYER FOR RELIEF**

13    WHEREFORE, Plaintiffs demand judgment as follows:

14    A.    Awarding money damages against all defendants, jointly and severally, for all losses

15    and damages suffered as a result of the acts and transactions complained of herein, together with pre-

16    judgment interest, to ensure defendants do not participate therein or benefit thereby;

17    B.    Directing all defendants to account for all damages caused by them and all profits and

18    special benefits and unjust enrichment they have obtained as a result of their unlawful conduct,

19    including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and

20    imposing a constructive trust thereon;

21    C.    Directing McAfee to take all necessary actions to reform and improve its corporate

22    governance and internal control procedures to comply with applicable law, including, but not limited

23    to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or

24    Articles of Incorporation and taking such other action as may be necessary to place before

25    shareholders for a vote adoption of the following Corporate Governance Policies:

26    (i)    A proposal requiring that the office of CEO of McAfee and Chairman

27    of the McAfee Board be permanently held by separate individuals and that the Chairman of the

28    McAfee Board meets rigorous "independent" standards;

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT -- Master File No. 5:06-cv-03484-JF                                          - 83 -

**1:07CV00407 (EGS)**

1          (ii)    A proposal to strengthen the McAfee Board's supervision of

2   operations and develop and implement procedures for greater shareholder input into the policies and

3   guidelines of the Board;

4          (iii)Approp    riately test and then strengthen the internal audit and control

5   functions;

6          (iv)    Rotate independent auditing firms every five years;

7          (v)    Control and limit insider stock selling and the terms and timing of

8   stock option grants; and

9          (vi)    Reform executive compensation.

10      D.    Ordering the imposition of a constructive trust over defendants' stock options and any

11  proceeds derived therefrom;

12      E.    Awarding punitive damages;

13      F.    Awarding costs and disbursements of this action, including reasonable attorneys',

14  accountants', and experts' fees; and

15      G.    Granting such other and further relief as this Court may deem just and proper.

16                              **JURY DEMAND**

17      Plaintiffs demand a trial by jury.

18  DATED: December 8, 2006                    LERACH COUGHLIN STOIA GELLER
                                                  RUDMAN & ROBBINS LLP
19                                             SHAWN A. WILLIAMS

20

21
                                               _____/s/_____
22                                             SHAWN A. WILLIAMS

23                                             100 Pine Street, Suite 2600
                                               San Francisco, CA  94111
24                                             Telephone:  415/288-4545
                                               415/288-4534 (fax)
25
                                               LERACH COUGHLIN STOIA GELLER
26                                               RUDMAN & ROBBINS LLP
                                               TRAVIS E. DOWNS III
27                                             BENNY C. GOODMAN III
                                               THOMAS G. WILHELM
28                                             655 West Broadway, Suite 1900

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT -- Master File No. 5:06-cv-03484-JF                                    - 84 -

1
San Diego, CA  92101
Telephone:  619/231-1058
2
619/231-7423 (fax)

3
SCHIFFRIN & BARROWAY, LLP
ERIC L. ZAGAR
4
ROBIN WINCHESTER
280 King of Prussia Road
5
Radnor, PA  19087
Telephone:  610/667-7706
6
610/667-7056 (fax)

7
Co-Lead Counsel for Plaintiffs

8
T:\CasesSF\McAfee Derivative\CPT00037165_AMD.doc

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT -- Master File No. 5:06-cv-03484-JF                                              - 85 -

1

**VERIFICATION**

2      I, SHAWN A. WILLIAMS, hereby declare as follows:

3      1.     I am a member of the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins,

4 LLP, one of the counsel of record for plaintiffs in the above-entitled action. I have read the

5 foregoing complaint and know the contents thereof. I am informed and believe the matters therein

6 are true and on that ground allege that the matters stated therein are true.

7      2.     I make this Verification because plaintiffs are absent from the County of San

8 Francisco where I maintain my office.

9      Executed this 8th day of December, 2006 at San Francisco, California.

10

11                                           /s/

                                   SHAWN A. WILLIAMS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on December 8, 2006, I electronically filed the foregoing with the Clerk

3  of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5  mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6  participants indicated on the attached Manual Notice List.

7

8                                                    /s/
                                        SHAWN A. WILLIAMS

9                                      LERACH COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
10                                     100 Pine Street, 26th Floor
                                       San Francisco, CA  94111
11                                     Telephone:  415/288-4545
                                       415/288-4534 (fax)
12                                     E-mail:ShawnW@lerachlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

1  LERACH COUGHLIN STOIA GELLER
       RUDMAN & ROBBINS LLP
2  WILLIAM S. LERACH (68581)
   DARREN J. ROBBINS (168593)
3  TRAVIS E. DOWNS III (148274)
   655 West Broadway, Suite 1900
4  San Diego, CA  92101
   Telephone: 619/231-1058
5  619/231-7423 (fax)                          **E-filed
   billl@lerachlaw.com                          7/13/06**
6  darrenr@lerachlaw.com
   travisd@lerachlaw.com
7
   SCHIFFRIN & BARROWAY, LLP
8  ERIC L. ZAGAR
   SEAN M. HANDLER
9  280 King of Prussia Road
   Radnor, PA  19087
10 Telephone: 610/667-7706
   610/667-7056 (fax)
11
   [Proposed] Co-Lead Counsel for Plaintiffs
12
                 UNITED STATES DISTRICT COURT
13
               NORTHERN DISTRICT OF CALIFORNIA
14
                      SAN JOSE DIVISION
15
   KENNETH DOSSETT, Derivatively on Behalf )  No. 5:06-cv-03484-JF
16 of Nominal Defendant McAFEE, INC.,       )
                                            )  STIPULATION AND [~~PROPOSED~~] ORDER
17                             Plaintiff,    )  CONSOLIDATING CASES FOR ALL
                                            )  PURPOSES, APPOINTING LEAD
18       vs.                                )  PLAINTIFFS AND CO-LEAD COUNSEL,
                                            )  AND SETTING SCHEDULE FOR FILING
19 DENNIS L. CLINE, et al.,                 )  OF CONSOLIDATED COMPLAINT
                                            )
20                            Defendants,    )
                                            )
21       – and –                            )
                                            )
22 McAFEE, INC.,                            )
                                            )
23                   Nominal Defendant.      )
   _____ )
24
   [Caption continued on following page.]
25
26
27
28

1:07CV00407 (EGS)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HEAVY & GENERAL LABORERS'          )    No. 5:06-cv-03620-JF
LOCALS 472 & 172 PENSION & ANNUITY )
FUNDS, Derivatively on Behalf of McAFEE, )
INC.,                              )
                                   )
                          Plaintiff, )
                                   )
        vs.                        )
                                   )
GEORGE SAMENUK, et al.,            )
                                   )
                        Defendants, )
                                   )
        – and –                    )
                                   )
McAFEE, INC., a Delaware corporation, )
                                   )
                Nominal Defendant.  )
                                   )

1:07CV00407 (EGS)

1    WHEREAS, there are two related shareholder derivative actions on behalf of nominal

2    defendant McAfee, Inc. pending before this Court:

| Abbreviated Case Name | Case Number | Date Filed |
|---|---|---|
| *Dossett v. Cline, et al.* | 5:06-cv-03484-JF | 05/31/06 |
| *Heavy & General Laborers' Locals 472 & 172 Pension & Annuity Funds v. Samenuk, et al.* | 5:06-cv-03620-JF | 06/07/06 |

6    WHEREAS, the two related *McAfee* shareholder derivative actions arise out of the same

7    transactions and occurrences and involve the same or substantially similar issues of law and fact,

8    and, therefore, should be consolidated for all purposes under Federal Rule of Civil Procedure 42(a);

9    and

10    WHEREAS, defendants take no position as to the appointment of the Heavy & General

11    Laborers' Local 472 & 172 Pension & Annuity Funds and Kenneth Dossett as Lead Plaintiffs and

12    Lerach Coughlin Stoia Geller Rudman & Robbins LLP and Schiffrin & Barroway, LLP as Lead

13    Counsel.

14    THEREFORE, IT IS STIPULATED AND AGREED by plaintiffs and defendants, through

15    their respective counsel of record, as follows:

16    **I.    CONSOLIDATION OF ACTIONS**

17    1.    The following actions are hereby consolidated for all purposes, including pretrial

18    proceedings, trial and appeal:

| Abbreviated Case Name | Case Number | Date Filed |
|---|---|---|
| *Dossett v. Cline, et al.* | 5:06-cv-03484-JF | 05/31/06 |
| *Heavy & General Laborers' Locals 472 & 172 Pension & Annuity Funds v. Samenuk, et al.* | 5:06-cv-03620-JF | 06/07/06 |

22    2.    The caption of these consolidated actions shall be "*In re McAfee, Inc. Derivative*

23    *Litigation*" and the files of these consolidated actions shall be maintained in one file under Master

24    File No. 5:06-cv-03484-JF.  Any other actions now pending or later filed in this Court which arise

25    out of or are related to the same facts as alleged in the above-identified cases shall be consolidated

26    for all purposes, if and when they are brought to the Court's attention.

27

28

STIP & [PROPOSED] ORDER CONSOL CASES, APPOINTING LEAD PLTFS & CO-LEAD
COUNSEL, & SETTING SCHEDULE FOR FILING OF CONS COMPLAINT - 5:06-cv-03484-JF          - 1 -

1:07CV00407 (EGS)

1       3.      Every pleading filed in the consolidated actions, or in any separate action included

2   herein, shall bear the following caption:

3                      UNITED STATES DISTRICT COURT

4                NORTHERN DISTRICT OF CALIFORNIA

5                       SAN JOSE DIVISION

6   In re MCAFEE, INC. DERIVATIVE     )     Master File No. 5:06-cv-03484-JF
    LITIGATION                    )

7   _____  )
                                )

8   This Document Relates To:       )
   _____  )

9

10       4.      When a pleading is intended to be applicable to all actions governed by this Order,

the words "All Actions" shall appear immediately after the words "This Document Relates To:" in

11

the caption set out above. When a pleading is intended to be applicable to only some, but not all, of

12

the consolidated actions, this Court's docket number for each individual action to which the pleading

13

is intended to be applicable and the abbreviated case name of said action shall appear immediately

14

after the words "This Document Relates To:" in the caption described above (*e.g.*, "No. 5:06-cv-

15

03484-JF, *Dossett v. Cline, et al.*").

16

       5.      A Master Docket and a Master File hereby are established for the above consolidated

17

proceedings and for all other related cases filed in or transferred to this Court. Separate dockets shall

18

continue to be maintained for each of the individual actions hereby consolidated, and entries shall be

19

made in the docket of each individual case in accordance with the regular procedures of the clerk of

20

this Court, except as modified by this Order.

21

       6.      When a pleading is filed and the caption shows that it is applicable to "All Actions,"

22

the clerk shall file such pleading in the Master File and note such filing on the Master Docket. No

23

further copies need be filed, and no other docket entries need be made.

24

       7.      When a pleading is filed and the caption shows that it is to be applicable to fewer than

25

all of the consolidated actions, the clerk will file such pleading in the Master File only but shall

26

docket such filing on the Master Docket and the docket of each applicable action.

27

28

STIP & [PROPOSED] ORDER CONSOL CASES, APPOINTING LEAD PLTFS & CO-LEAD
COUNSEL, & SETTING SCHEDULE FOR FILING OF CONS COMPLAINT - 5:06-cv-03484-JF    - 2 -

1        8.     When a case which properly belongs as part of *In re McAfee, Inc. Derivative*

2   *Litigation* is filed in this Court or transferred to this Court from another court and assigned to Judge

3   Fogel, the clerk of this Court shall:

4        (a)     Place a copy of this Order in the separate file for such action;

5
         (b)     Mail to the attorneys for the plaintiff(s) in the newly-filed or transferred case a
6
    copy of this Order and direct that this Order be served upon or mailed to any new defendant(s) or
7
    their counsel in the newly-filed or transferred case; and
8
         (c)     Make an appropriate entry on the Master Docket. This Court requests the
9
    assistance of counsel in calling to the attention of the clerk of this Court the filing or transfer of any
10
    case which properly might be consolidated as part of *In re McAfee, Inc. Derivative Litigation*.
11
## II.    APPOINTMENT OF LEAD DERIVATIVE PLAINTIFFS AND CO-LEAD
12              DERIVATIVE COUNSEL

13       9.     Plaintiffs, Heavy & General Laborers' Locals 472 & 172 Pension & Annuity Funds

14  and Kenneth Dossett, shall be appointed Lead Plaintiffs.

15       10.     The law firms of Lerach Coughlin Stoia Geller Rudman & Robbins LLP and

16  Schiffrin & Barroway, LLP shall be appointed Co-Lead Counsel for plaintiffs in the consolidated

17  *McAfee* shareholder derivative actions.[1]

18       11.     Co-Lead Counsel shall have authority to speak for plaintiffs in matters regarding

19  pretrial and trial procedure and settlement negotiations, and shall make all work assignments in such

20  manner as to facilitate the orderly and efficient prosecution of this litigation and to avoid duplicative

21  or unproductive effort.

22       12.     Co-Lead Counsel shall be responsible for coordination of all activities and

23  appearances on behalf of plaintiffs and for the dissemination of notices and orders of this Court. No

24

25  _____

26  [1]     Defendants take no position as to the appointment of the Heavy & General Laborers' Local
27  472 & 172 Pension & Annuity Funds and Kenneth Dossett as Lead Plaintiffs and Lerach Coughlin
    Stoia Geller Rudman & Robbins LLP and Schiffrin & Barroway, LLP as Lead Counsel.
28

STIP & [PROPOSED] ORDER CONSOL CASES, APPOINTING LEAD PLTFS & CO-LEAD
COUNSEL, & SETTING SCHEDULE FOR FILING OF CONS COMPLAINT - 5:06-cv-03484-JF    - 3 -

1:07CV00407 (EGS)

1    motion, request for discovery or other pretrial proceedings shall be initiated or filed by plaintiffs

2    except through Co-Lead Counsel.

3         13.    Co-Lead Counsel also shall be available and responsible for communications to and

4    from this Court. Co-Lead Counsel shall be responsible for the creation and maintenance of a master

5    service list of all parties and their respective counsel.

6         14.    Defendants' counsel may rely upon all agreements made with Co-Lead Counsel, or

7    other duly authorized representatives of plaintiffs, and such agreements shall be binding on

8    plaintiffs.

9    **III.    SCHEDULE**

10        15.    Plaintiffs shall no later than 60 days from the entry of this Order file and serve a

11   Consolidated Complaint which will supersede all existing complaints filed in these actions.

12   Defendants need not respond to any of the pre-existing complaints. Service, pursuant to Rule 4 of

13   the Federal Rules of Civil Procedure, of any of the pre-existing complaints on any of the defendants,

14   or their counsel, shall constitute sufficient service on that defendant. Service shall be effected with

15   respect to any defendant named in any of the consolidated actions by serving the Consolidated

16   Complaint on that defendant's counsel.

17        16.    Each defendant shall answer or otherwise respond to the Consolidated Complaint no

18   later than 45 days from the date of service. In the event that defendants file and serve any motion

19   directed at the Consolidated Complaint, plaintiffs shall file and serve their opposition within 45 days

20   after the service of defendants' motion. If defendants file and serve a reply to plaintiffs' opposition,

21   they will do so within 15 days after service of the opposition.

22        IT IS SO STIPULATED.

23   DATED: July 10, 2006              LERACH COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
24                                     WILLIAM S. LERACH
                                       DARREN J. ROBBINS
25                                     TRAVIS E. DOWNS III

26

27                                     _____
                                            s/ TRAVIS E. DOWNS III
                                            TRAVIS E. DOWNS III
28

STIP & [PROPOSED] ORDER CONSOL CASES, APPOINTING LEAD PLTFS & CO-LEAD
COUNSEL, & SETTING SCHEDULE FOR FILING OF CONS COMPLAINT - 5:06-cv-03484-JF    - 4 -

1:07CV00407 (EGS)

1

2                              655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058

3                              619/231-7423 (fax)

4       *I, Travis E. Downs III, am the ECF user whose ID and password are being used to file this*
*STIPULATION AND [PROPOSED] ORDER. In compliance with General Order 45, X.B., I hereby*

5   *attest that Sean M. Handler has concurred in this filing.*

6

7   DATED: July 10, 2006              SCHIFFRIN & BARROWAY, LLP
ERIC L. ZAGAR
SEAN M. HANDLER

8

9                                      s/ SEAN M. HANDLER

10                                       SEAN M. HANDLER

11                            280 King of Prussia Road
Radnor, PA 19087

12                            Telephone: 610/667-7706
610/667-7056 (fax)

13

14                            [Proposed] Co-Lead Counsel for Plaintiffs

15                            GREEN WELLING, LLP
ROBERT S. GREEN

16                            595 Market Street, Suite 2750
San Francisco, CA 94105

17                            Telephone: 415/477-6700
415/477-6710 (fax)

18                            Attorneys for Plaintiffs

19       *I, Travis E. Downs III, am the ECF user whose ID and password are being used to file this*
*STIPULATION AND [PROPOSED] ORDER. In compliance with General Order 45, X.B., I hereby*

20   *attest that Gregory L. Watts has concurred in this filing.*

21

22   DATED: July 10, 2006              WILSON SONSINI GOODRICH & ROSATI
BORIS FELDMAN

23                            NINA F. LOCKER
GREGORY L. WATTS

24

25                                  s/ GREGORY L. WATTS

26                                    GREGORY L. WATTS

27

28

STIP & [PROPOSED] ORDER CONSOL CASES, APPOINTING LEAD PLTFS & CO-LEAD
COUNSEL, & SETTING SCHEDULE FOR FILING OF CONS COMPLAINT - 5:06-cv-03484-JF    - 5 -

1:07CV00407 (EGS)

1

2       650 Page Mill Road
        Palo Alto, CA  94304
3       Telephone:  650/493-9300
        650/493-6811 (fax)

4       Counsel for Nominal Defendant McAfee, Inc.
        and Individual Defendants George Samenuk, Eric
5       F. Brown, Kevin Weiss, Leslie G. Denend,
        Robert M. Cutkowsky, Denis O'Leary, Robert
6       W. Pangia, Robert B. Bucknam, Liane Wilson,
        and Dale L. Fullers

7
                        *       *       *
8

9                           **O R D E R**

10      PURSUANT TO STIPULATION, IT IS SO ORDERED.

11      DATED: _____7/12/06_____    _____

12                                          THE HONORABLE JEREMY FOGEL
                                            UNITED STATES DISTRICT JUDGE
13
        S.\CasesSD\McAfee Derivative\STP00032444.doc
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIP & [PROPOSED] ORDER CONSOL CASES, APPOINTING LEAD PLTFS & CO-LEAD
COUNSEL, & SETTING SCHEDULE FOR FILING OF CONS COMPLAINT - 5:06-cv-03484-JF          - 6 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 10, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

                    s/ TRAVIS E. DOWNS III
                    TRAVIS E. DOWNS III

                    LERACH COUGHLIN STOIA GELLER
                         RUDMAN & ROBBINS LLP
                    655 West Broadway, Suite 1900
                    San Diego, CA  92101
                    Telephone:  619/231-1058
                    619/231-7423 (fax)
                    E-mail:  Travisd@lerachlaw.com

# EXHIBIT D

1 | ROBBINS UMEDA & FINK LLP
   | BRIAN J. ROBBINS (190264)
2 | MARC M. UMEDA (197847)
   | KELLY M. MCINTYRE (212360)
3 | 610 West Ash Street, Suite 1800
4 | San Diego, CA 92101
   | Telephone: 619/525-3990
5 | Facsimile: 619/525-3991

6 | GARDY & NOTIS
7 | MARK C. GARDY
   | 440 Sylvan Avenue, Suite 110
8 | Englewood Cliffs, NJ 07632
   | Telephone: 201/567-7377
9 | Facsimile: 201/567-7337

10 | Attorneys for Plaintiff

11

12 |            SUPERIOR COURT OF THE STATE OF CALIFORNIA

13 |                     COUNTY OF SANTA CLARA

14

15 | FRED GREENBERG, Derivatively On Behalf )   Case No.
    | of McAFEE, INC.,                       )
16 |                                )   SHAREHOLDER DERIVATIVE
    |              Plaintiff,         )   COMPLAINT FOR BREACH OF
17 |     -v-                       )   FIDUCIARY DUTY, ABUSE OF
    |                              )   CONTROL, GROSS MISMANAGEMENT,
18 | GEORGE SAMENUK, LESLIE G. DENEND, )   WASTE OF CORPORATE ASSETS, AND
    | ROBERT B. BUCKNAM, ROBERT      )   UNJUST ENRICHMENT
19 | DUTKOWSKY, DALE L. FULLER, DENIS J. )
    | O'LEARY, ROBERT PANGIA, LIANE    )
20 | WILSON, KENT H. ROBERTS and DOES 1- )
    | 25, inclusive,                    )
21 |                                )
22 |            Defendants,     )
23 |   -and-                      )
    |                                )
24 |                                )
    | McAFEE, INC., a Delaware corporation,   )
25 |                                )
26 |          Nominal Defendant.    )   DEMAND FOR JURY TRIAL
    | _____ )
27

28

SHAREHOLDER DERIVATIVE COMPLAINT

1:07CV00407 (EGS)

1    Plaintiff, by her attorneys, submits this Shareholder Derivative Complaint (the "Complaint")

2    against the defendants named herein.

3                    **NATURE AND SUMMARY OF THE ACTION**

4    1.    This is a shareholder derivative action brought by a shareholder of McAfee, Inc.

5    ("McAfee" or the "Company"), on behalf of the Company against certain of its officers and directors

6    seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse

7    of control, gross mismanagement, waste of corporate assets, and unjust enrichment that have caused

8    substantial losses to McAfee and other damages, such as to its reputation and goodwill.

9    2.    Dating back to at least 2000, defendants have caused or allowed McAfee executives

10   to manipulate their stock option grant dates so as to illegally maximize their stock profits.

11   Specifically, certain McAfee executives changed their respective stock option grant dates to take

12   advantage of lower exercise prices then the price on the actual grant date.  The price of McAfee

13   shares on the reported option-grant date, therefore, was lower than the share price on the actual day

14   options were issued thus providing defendants with more favorably priced options.

15   3.    Further, the backdating of these stock options brought an instant paper gain to these

16   executives because the options were priced below the stock's fair market value when they were

17   actually awarded.  Under Generally Accepted Accounting Principles ("GAAP"), this instant paper

18   gain was equivalent to paying extra compensation and was thus a cost to McAfee.  These costs were

19   not properly recorded.  In turn, since these costs were not properly recorded, McAfee's profits were

20   overstated.  Thus, a restatement of McAfee's past financial results will be necessary.

21   4.    In a recent article published by *The Wall Street Journal*, Arthur Levitt, a former

22   chairman of the U.S. Securities and Exchange Commission ("SEC") was quoted as stating that stock

23   option backdating "*represents the ultimate in Greed.*"  Further, Levitt stated, "*It is stealing, in*

24   *effect.  It is ripping off shareholders in an unconscionable way.*"

25   5.    On May 5, 2006, President George W. Bush stated in an interview on the Kudlow &

26   Company show airing on CNBC that "*overcompensating or trying to backdate things is bad for*

27   *America, and there ought to be consequences when people don't tell the truth and are not*

28   *transparent.*"

1:07CV00407 (EGS)

From:OFFICE                    619+525+3991              06/02/2006 13:47    #018 P.008/026

6.      As a result of the defendants' improprieties, the Company will need to expend significant sums of money including the following:

        a.      Costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

        b.      Costs incurred from directing manpower to correct McAfee's defective internal controls; and

        c.      Costs incurred from directing manpower to restate approximately 12 years of McAfee's financial results.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over all causes of action asserted herein pursuant to the California Constitution, Article VI, §10, because this case is a cause not given by statute to other trial courts, as this derivative action is brought pursuant to §800 of the California Corporations Code to remedy defendants' violations of law.

8.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this County, or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this Court because one or more of the defendants either resides in or maintains executive offices in this County, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to McAfee occurred in this County, and defendants have received substantial compensation in this County by doing business here and engaging in numerous activities that had an effect in this County.

## THE PARTIES

10.     Plaintiff Fred Greenberg is and was at times relevant hereto, a shareholder of McAfee.

11.     Nominal defendant McAfee is a corporation organized and existing under the laws of

- 2 -

SHAREHOLDER DERIVATIVE COMPLAINT

1:07CV00407 (EGS)

1   the state of Delaware with its headquarters located at 3965 Freedom Circle, Santa Clara, California

2   95054. McAfee is a computer security company whose products include anti-virus, anti-spyware,

3   anti-spam, intrusion prevention, secure messaging, web filtering and vulnerability management

4   software and systems.

5        12.    Defendant George Samenuk ("Samenuk") has been a director of McAfee and the

6   Company's Chief Executive Officer ("CEO") since January 2001. In April 2001, Samenuk was

7   named Chairman of the Board of Directors (the "Board"). Because of Samenuk's positions, he knew

8   or should have known that McAfee executives were improperly backdating stock option grants to

9   maximize their personal profits, via access to internal corporate documents, conversations and

10   connections with other corporate officers and employees, attendance at management and Board

11   meetings and committees thereof and via reports and other information provided to him in

12   connection therewith. McAfee paid Samenuk the following compensation during the past three

13   years:

| Defendant | Fiscal Year | Salary | Bonus | Other Compensation | Stock Options |
|-----------|-------------|--------|-------|--------------------|---------------|
| Samenuk | 2005 | $835,224 | $1,000,000 | $36,555 | 250,000 |
| | 2004 | $733,333 | $1,075,000 | $30,718 | 300,000 |
| | 2003 | $720,000 | $870,000 | $31,597 | 400,000 |

17        13.    Defendant Leslie G. Denend ("Denend") has been a director of McAfee since June

18   1995. Denend was President of McAfee from December 1997 to April 1998, and from June 1993 to

19   December 1997, Denend was Chief Executive Officer and President of Network General

20   Corporation, which merged with McAfee Associates to form McAfee. Denend is a member of the

21   Company's Nominating Committee. Because of Denend's position, he knew or should have known

22   that McAfee executives were improperly backdating stock option grants to maximize their personal

23   profits, via access to internal corporate documents, conversations and connections with other

24   corporate officers and employees, attendance at management and Board meetings and committees

25   thereof and via reports and other information provided to him in connection therewith.

26        14.    Defendant Robert B. Bucknam ("Bucknam") has been a director of McAfee since

27   May 2003. Bucknam is a member of the Company's Nominating Committee. Because of

28   Bucknam's position, he knew or should have known that McAfee executives were improperly

1:07CV00407 (EGS)

1   backdating stock option grants to maximize their personal profits, via access to internal corporate

2   documents, conversations and connections with other corporate officers and employees, attendance

3   at management and Board meetings and committees thereof and via reports and other information

4   provided to him in connection therewith.

5       15.    Defendant Robert Dutkowsky ("Dutkowsky") has been a director of McAfee since

6   April 2001, and lead independent director since March 2004.  Dutkowsky is a member of the

7   Company's Compensation Committee and Audit Committee.  Because of Dutkowsky's position, he

8   knew or should have known that McAfee executives were improperly backdating stock option grants

9   to maximize their personal profits, via access to internal corporate documents, conversations and

10  connections with other corporate officers and employees, attendance at management and Board

11  meetings and committees thereof and via reports and other information provided to him in

12  connection therewith.

13      16.    Defendant Dale L. Fuller ("Fuller") has been a director of McAfee since January

14  2006.  Because of Fuller's position, he knew or should have known that McAfee executives were

15  improperly backdating stock option grants to maximize their personal profits, via access to internal

16  corporate documents, conversations and connections with other corporate officers and employees,

17  attendance at management and Board meetings and committees thereof and via reports and other

18  information provided to him in connection therewith.

19      17.    Defendant Denis J. O'Leary ("O'Leary") has been a director of McAfee since July

20  2003.  O'Leary is a member of the Company's Compensation Committee and Nominating

21  Committee.  Because of O'Leary's position, he knew or should have known that McAfee executives

22  were improperly backdating stock option grants to maximize their personal profits, via access to

23  internal corporate documents, conversations and connections with other corporate officers and

24  employees, attendance at management and Board meetings and committees thereof and via reports

25  and other information provided to him in connection therewith.

26      18.    Defendant Robert Pangia ("Pangia") has been a director of McAfee since April 2001.

27  Pangia is a member of the Company's Compensation Committee and Audit Committee.  Because of

28  Pangia's position, he knew or should have known that McAfee executives were improperly

1  backdating stock option grants to maximize their personal profits, via access to internal corporate

2  documents, conversations and connections with other corporate officers and employees, attendance

3  at management and Board meetings and committees thereof and via reports and other information

4  provided to him in connection therewith.

5      19.    Defendant Liane Wilson (Wilson") has been a director of McAfee since April 2002.

6  Wilson is a member of the Company's Audit Committee and Nominating Committee. Because of

7  Wilson's position, she knew or should have known that McAfee executives were improperly

8  backdating stock option grants to maximize their personal profits, via access to internal corporate

9  documents, conversations and connections with other corporate officers and employees, attendance

10  at management and Board meetings and committees thereof and via reports and other information

11  provided to her in connection therewith.

12      20.    Defendant Kent H. Roberts ("Roberts") was, until May 30, 2006, McAfee's General

13  Counsel. Because of Robert's position, he knew or should have known that McAfee executives were

14  improperly backdating stock option grants to maximize their personal profits, via access to internal

15  corporate documents, conversations and connections with other corporate officers and employees,

16  attendance at management and Board meetings and committees thereof and via reports and other

17  information provided to him in connection therewith.

18      21.    Defendants Samenuk, Denend, Bucknam, Dutkowsky, Fuller, O'Leary, Pangia and

19  Wilson are referred to herein as the "Director Defendants." Defendants Samenuk and Roberts are

20  referred to herein as the "Officer Defendants." Collectively, the Director Defendants and the Officer

21  Defendants are referred to herein as the "Individual Defendants."

22      22.    The true names and capacities of defendants sued herein under California Code of

23  Civil Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiffs, who

24  therefore sue these defendants by such fictitious names. Plaintiffs will seek to amend this Complaint

25  and include these Doe defendants' true names and capacities when they are ascertained. Each of the

26  fictitiously named defendants is responsible in some manner for the conduct alleged herein and for

27  the injuries suffered by the Company as a result of defendants' wanton and illegal conduct.

28

SHAREHOLDER DERIVATIVE COMPLAINT

1:07CV00407 (EGS)

### DUTIES OF THE INDIVIDUAL DEFENDANTS

23.    By reason of their positions as officers, directors and/or fiduciaries of McAfee and because of their ability to control the business and corporate affairs of McAfee, the Individual Defendants owed McAfee and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage McAfee in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of McAfee and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

24.    Each director and officer of the Company owes to McAfee and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the compensation paid to its executives and employees.  These disclosures necessarily include the value of stock options granted to the Company's executives including defendants Samenuk and Roberts.

25.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of McAfee, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as the Company's disclosures of its financial results including expenses related to stock option grants.  Because of their advisory, executive, managerial and directorial positions with McAfee, each of the Individual Defendants had access to adverse, non-public information about the financial condition and improper representations of McAfee.

26.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of McAfee, and was at all times acting within the course and scope of such agency.

27.    To discharge their duties, the officers and directors of McAfee were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of McAfee were required to, among other things:

1:07CV00407 (EGS)

1         a.      Ensure that the Company complied with its legal obligations and

2 requirements, including acting only within the scope of its legal authority and disseminating truthful

3 and accurate statements to the SEC and the investing public;

4         b.      Conduct the affairs of the Company in an efficient, business like manner so as

5 to make it possible to provide accurate disclosures of the Company's financials and to avoid wasting

6 the Company's assets;

7         c.      Properly and accurately guide investors and analysts as to the true financial

8 condition of the Company at any given time, including making accurate statements about the

9 Company's financial results, and ensuring that the Company maintained an adequate system of

10 internal controls such that the Company's financial reporting would be true and accurate at all times;

11         d.      Remain informed as McAfee's internal controls, and, upon receipt of notice or

12 information of imprudent or unsound conditions or practices, to make reasonable inquiry in

13 connection therewith, and to take steps to correct such conditions or practices and make such

14 disclosures as necessary to comply with federal and state securities laws; and

15         e.      Ensure that the Company was operated in a diligent, honest and prudent

16 manner in compliance with all applicable federal, state and local laws, rules and regulations.

17         28.      Each Individual Defendant, by virtue of his or her position as a director and/or

18 officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and

19 the exercise of due care and diligence in the management and administration of the affairs of the

20 Company, as well as in the use and preservation of its property and assets. The conduct of the

21 Individual Defendants complained of herein involves a knowing and culpable violation of their

22 obligations as directors and officers of McAfee, the absence of good faith on their part, and a

23 reckless disregard for their duties to the Company and its shareholders that the Individual

24 Defendants were aware or should have been aware posed a risk of serious injury to the Company.

25         29.      The Individual Defendants breached their duties of loyalty and good faith by allowing

26 defendants to cause or by themselves causing the Company to misrepresent its financial results, as

27 detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such improper

28

1  actions. In addition, as a result of defendants' improprieties, McAfee shall expend significant sums

2  of money, which include, but are not limited to:

3          a.     Costs incurred to carry out internal investigations, including legal fees paid to

4  outside counsel, accounting firms and consultants;

5          b.     Costs incurred from directing manpower to correct McAfee's defective

6  internal controls; and

7          c.     Costs incurred from directing manpower to restate approximately twelve years

8  of McAfee's financial results.

9                **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

10         30.    In committing the wrongful acts alleged herein, the Individual Defendants have

11  pursued, or joined in the pursuit of a common course of conduct, and have acted in concert with and

12  conspired with one another in furtherance of their common plan or design. In addition to the

13  wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further

14  aided and abetted and/or assisted each other in breach of their respective duties.

15         31.    During all times relevant hereto, the Individual Defendants collectively and

16  individually initiated a course of conduct that was designed to and did: (i) conceal the fact that

17  Company executives were improperly backdating their stock option grants; (ii) conceal the fact that

18  as a result of the improperly backdated stock option grants, the Company's financial statements were

19  inaccurate; (iii) maintain the Individual Defendants' executive and directorial positions at McAfee

20  and the profits, power and prestige that the Individual Defendants enjoyed as a result of these

21  positions; and (iv) deceive the shareholders of McAfee, regarding the level of compensation being

22  paid to the Company's executives and the Company's financial condition. In furtherance of this plan,

23  conspiracy and course of conduct, the Individual Defendants collectively and individually took the

24  actions set forth herein.

25         32.    The Individual Defendants engaged in a conspiracy, common enterprise and/or

26  common course of conduct. During this time the Individual Defendants caused the Company to

27  conceal the true fact that McAfee was misrepresenting its financial results and that McAfee

28  executives were improperly backdating their stock option grants.

33.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment.

34.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

35.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### SUBSTANTIVE ALLEGATIONS

36.     Dating back to at least 2000, the Individual Defendants have caused or allowed McAfee executives, including defendant Roberts, to manipulate stock option grant dates so as to illegally maximize stock option profits. Specifically, Company executives, including defendant Roberts, changed their respective stock option grant dates to take advantage of lower exercise prices than the price on the actual grant date. The price of McAfee shares on the reported option-grant date, therefore, was lower than the share price on the actual day options were issued thus providing defendants with more favorably priced options.

37.     Further, the backdating of options granted to Roberts as well as other Company executives brought an instant paper gain to these executives because the options were priced below the stock's fair market value when they were actually awarded. Under GAAP, this instant paper gain was equivalent to extra compensation and was thus a cost to McAfee. Accordingly, since McAfee failed to include the costs associated with this extra compensation in its financial results, its profits were overstated during the fiscal periods in which the options were granted.

- 9 -

1:07CV00407 (EGS)

From:OFFICE                          619+525+3991          06/02/2006 13:50      #018 P.016/026

38.    On May 25, 2006, McAfee disclosed that the SEC was in contact with McAfee regarding McAfee's stock option grant practices in the late 1990s and early 2000s.

39.    Among the improper stock option grants under scrutiny were stock options received by Roberts, dated April 14, 2000, to buy 20,000 shares at $19.75, a deep low in the company's stock price, as McAfee shares quickly rose to more than $25 that month.

40.    On May 30, McAfee announced that it had fired Roberts, but otherwise taken no action against Roberts with respect to the improper stock option grants.

41.    The Individual Defendants, as fiduciaries of the Company, knew or should have known that these illegal stock option backdating practices were ongoing for at least seven years. The Individual Defendants, however, failed to take necessary action to correct these improper practices.

42.    As a result of the back-dating of options, McAfee executives, including Roberts, has been unjustly enriched at the expense of McAfee, which has received and will receive less money from these executives when they exercise their options at prices substantially lower than they would have if the options had not been back-dated.

43.    This practice of back-dating stock options also comes at the direct expense of the Company, which dollar for dollar receives money when the options are exercised, but also may have resulted in the overstatement of McAfee's profits between 2000 and 2005. This is because options priced below the stock's fair market value when they are awarded bring the recipient an instant paper gain. Under accounting rules, that is the equivalent of additional compensation and must be treated as a cost to the Company.

44.    The Individual Defendants had a fiduciary duty to act with the utmost due care, loyalty and good faith. Nonetheless, the Individual Defendants either expressly authorized the practice of back-dating options or, in conscious abrogation of their fiduciary duties, permitted such practice to occur repeatedly.

45.    In addition, defendants Dutkowsky, O'Leary and Pangia, at times relevant hereto, have served on the Compensation Committee which was responsible for overseeing the details of McAfee's compensation, employee benefit and stock option plans. The Compensation Committee also was responsible for negotiating and administering McAfee's employment arrangement with

SHAREHOLDER DERIVATIVE COMPLAINT

1:07CV00407 (EGS)

1    Roberts, supervising incentive compensation programs for McAfee's employees and reviewing and

2    monitoring director compensation programs.  Nonetheless, these defendants either expressly

3    authorized the practice of back-dating options or, in conscious abrogation of their fiduciary duties,

4    permitted such practice to occur repeatedly over the years.

5         46.    As set forth above, the Director Defendants had a fiduciary duty to act with the

6    utmost due care, loyalty and good faith in the management and oversight of McAfee.  As such, the

7    Director Defendants had a duty to disclose their practice of back-dating options for McAfee

8    executives.  In violation of that duty, the Director Defendants concealed the fact that the options

9    granted to McAfee executives were back-dated and made affirmative misrepresentations to the

10   contrary.  As discussed herein, the Director Defendants caused the Company to misrepresent, in

11   public, SEC filings that the stock options were priced at no less than the fair market value of the

12   stock on the date of the grant, thereby affirmatively concealing the claims set forth herein.  The

13   shareholder approved stock options plans and employment agreements were exhibits that were

14   incorporated by reference each year in McAfee's Annual Reports on SEC Form 10-K. The Director

15   Defendants' misrepresentations about their stock option pricing practices were known to be false or

16   were made in reckless disregard of its truth or falsity, and the concealment could not have been

17   discovered through reasonable diligence by the typical shareholder.

18              **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

19        47.    Plaintiff brings this action derivatively in the right and for the benefit of McAfee to

20   redress injuries suffered, and to be suffered, by McAfee as a direct result of the breaches of fiduciary

21   duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as

22   well as the aiding and abetting thereof, by the Director Defendants.  McAfee is named as a nominal

23   defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this

24   Court that it would not otherwise have.

25        48.    Plaintiff will adequately and fairly represent the interests of McAfee in enforcing and

26   prosecuting its rights.

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

1:07CV00407 (EGS)

49.    Plaintiff is and was an owner of the stock of McAfee during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

50.    The current Board of McAfee consists of the following eight individuals: defendants Samenuk, Denend, Bucknam, Dutkowsky, Fuller, O'Leary, Pangia, and Wilson. Plaintiff has not made any demand on the present Board of McAfee to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

a.    The Board is responsible for approving the compensation awarded to McAfee's executive officers including defendant Roberts. This compensation includes the stock options that were secretly backdated by McAfee executives. Therefore, the entire Board is liable for failing to fulfill its fiduciary duties to McAfee in approving the option grants as dated. The Board should have been on notice that McAfee's executives were backdating their options due to the fact that these options were being repeatedly granted at the Company's lowest closing price for the respective month in which the options were granted. Accordingly, there is reason to doubt that defendants Samenuk, Denend, Bucknam, Dutkowsky, Fuller, O'Leary, Pangia, and Wilson are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duty to McAfee. Thus, demand is futile as to defendants Samenuk, Denend, Bucknam, Dutkowsky, Fuller, O'Leary, Pangia, and Wilson;

b.    The Compensation Committee of the Board is specifically responsible under its charter for overseeing McAfee's compensation, employee benefit and stock option plans. This equity compensation necessarily includes the improperly backdated stock options that were granted to McAfee executives. This responsibility, although held by the Board, is delegated to the Compensation Committee. At relevant times, as members of the Compensation Committee, defendants Dutkowsky, O'Leary and Pangia authorized and enabled, or through conscious abdication of duty, permitted McAfee's executives to back-date or otherwise manipulate stock options issued to them. By such actions, defendants Dutkowsky, O'Leary and Pangia breached their fiduciary duties to McAfee. The back-dating of stock options was in direct violation of the stock option plans and the employment agreements. Accordingly, defendants Dutkowsky, O'Leary and Pangia are

- 12 -
SHAREHOLDER DERIVATIVE COMPLAINT

1:07CV00407 (EGS)

1  conflicted and face a substantial likelihood of liability for their breaches of fiduciary duty to

2  McAfee;

3         c.      The Audit Committee of the Board is responsible by its charter for: (i)

4  evaluating the performance, responsibilities, budget and staffing of the Company's internal audit

5  function; (ii) reviewing the internal audit plan; and (iii) reviewing with management, the internal

6  auditors and the independent auditors the Company's annual and quarterly financial statements. The

7  Audit Committee is comprised of defendants Dutkowsky, Pangia and Wilson. These defendants are

8  responsible as members of the Audit Committee for insuring that McAfee's internal controls were

9  adequate and that the Company's quarterly and annual financial statements were accurate. McAfee's

10  internal controls, however, were deficient as evidenced by its executives' improper backdating of

11  stock option grants. As a result of the improper option backdating, the Company's financials were

12  rendered inaccurate because those financials did not account for the true amount of compensation

13  being granted to McAfee's executives. Accordingly, defendants Dutkowsky, Pangia and Wilson are

14  conflicted and face a substantial likelihood of liability for their breaches of fiduciary duty to

15  McAfee;

16         d.      The principal professional occupation of defendant Samenuk is his

17  employment with McAfee, pursuant to which he received and continues to receive substantial

18  monetary compensations and other benefits. Specifically, defendant Samenuk is paid the following

19  compensation:

20

| Defendant | Fiscal Year | Salary | Bonus | Other Compensation | Stock Options |
|---|---|---|---|---|---|
| Samenuk | 2005 | $835,224 | $1,000,000 | $36,555 | 250,000 |
| | 2004 | $733,333 | $1,075,000 | $30,718 | 300,000 |
| | 2003 | $720,000 | $870,000 | $31,597 | 400,000 |

23  Accordingly, defendant Samenuk lacks independence from defendants Dutkowsky, O'Leary and

24  Pangia, defendants who are not disinterested and/or independent and who exert influence over

25  defendant Samenuk's compensation by virtue of their positions as members of the Compensation

26  Committee. The Compensation Committee has the authority to review and approve Samenuk's base

27  salary, bonus and equity compensation. This lack of independence renders defendant Samenuk

28  incapable of impartially considering a demand to commence and vigorously prosecute this action;

1          e.      Defendant Samenuk is liable to McAfee for the undeserved compensation that

2    he received as a result of the stock options that he backdated or otherwise manipulated.

3    Accordingly, there is a reasonable doubt that defendant Samenuk is disinterested because he faces a

4    substantial likelihood of liability in connection with his improperly dated McAfee stock options.

5    Thus, demand is futile as to defendant Samenuk;

6          f.      The Nominating Committee consists of defendants Denend, Bucknam,

7    O'Leary and Wilson.  The Nominating and Corporate Governance Committee's duties include

8    identifying and nominating individuals to be proposed for election as directors at each Annual

9    Meeting of Shareholders, conducting the director and Board evaluation process, evaluating the

10   categorical standards which the Board uses to determine director independence, and monitoring and

11   evaluating corporate governance.  Defendants Dutkowsky, Fuller and Pangia are beholden to

12   defendants Denend, Bucknam, O'Leary and Wilson because defendants Denend, Bucknam, O'Leary

13   and Wilson are responsible for identifying and evaluating these individuals for selection to the Board

14   and all the perquisites and benefits that flow therefrom.  However, as O'Leary and Wilson are each

15   members of the Audit Committee or Compensation Committee and therefore directly implicated in

16   the illegal back-dating of options and face a substantial likelihood of liability for their breaches of

17   fiduciary duty to McAfee, Dutkowsky, Fuller and Pangia are conflicted and demand upon these

18   defendants is futile;

19         g.      Each of the key officers and directors knew of and/or directly benefited from

20   the wrongdoing complained of herein;

21         h.      The Director Defendants, as more fully detailed herein, participated in,

22   approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to

23   conceal or disguise those wrongs from McAfee's stockholders or recklessly and/or negligently

24   disregarded the wrongs complained of herein, and are therefore not disinterested parties;

25         i.      In order to bring this suit, all of the directors of McAfee would be forced to

26   sue themselves and persons with whom they have extensive business and personal entanglements,

27   which they will not do, thereby excusing demand;

28

- 14 -
SHAREHOLDER DERIVATIVE COMPLAINT

1:07CV00407 (EGS)

1            j.     The acts complained of constitute violations of the fiduciary duties owed by

2    McAfee's officers and directors and these acts are incapable of ratification;

3            k.     McAfee has been and will continue to be exposed to significant losses due to

4    the wrongdoing complained of herein, yet the Director Defendants and current Board have not filed

5    any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt

6    to recover for McAfee any part of the damages McAfee suffered and will suffer thereby; and

7            l.     If McAfee's current and past officers and directors are protected against

8    personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty

9    alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to

10   purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the

11   stockholders of McAfee. However, due to certain changes in the language of directors' and officers'

12   liability insurance policies in the past few years, the directors' and officers' liability insurance

13   policies covering the defendants in this case contain provisions that eliminate coverage for any

14   action brought directly by McAfee against these defendants, known as, inter alia, the "insured versus

15   insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of

16   McAfee, there would be no directors' and officers' insurance protection and thus, this is a further

17   reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as

18   this action is brought, such insurance coverage exists and will provide a basis for the Company to

19   effectuate recovery. If there is no directors' and officers' liability insurance at all then the current

20   directors will not cause McAfee to sue them, since they will face a large uninsured liability.

21       51.    Moreover, despite the Director Defendants having knowledge of the claims and

22   causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for

23   McAfee for any of the wrongdoing alleged by plaintiff herein.

24       52.    A true and correct copy of this Complaint was delivered to McAfee prior to its being

25   filed with this Court.

26

27

28

From:OFFICE                619+525+3991              06/09/2006 13:52    #018 P.022/026

### FIRST CAUSE OF ACTION

**Against All Defendants for Breach of Fiduciary Duty for Approving Improperly Dated Stock Option Grants to McAfee's Executive Officers**

53.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

54.    The Individual Defendants owed and owe McAfee fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe McAfee the highest obligation of good faith, fair dealing, loyalty and due care.

55.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

56.    Each of the Individual Defendants had actual or constructive knowledge that they had caused or allowed the improper backdating of stock option grants and the corresponding issuance of inaccurate financial results that did not properly account for the stock option grants and failed to correct or prevent these improprieties. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

57.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, McAfee has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

58.    Defendant Roberts is also liable for the unreported compensation that he received as a result of their improper backdating of stock option grants.

59.    Plaintiff, on behalf of McAfee, has no adequate remedy at law.

### SECOND CAUSE OF ACTION

**Against All Defendants for Abuse of Control**

60.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

61.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence McAfee, for which they are legally responsible.

- 16 -

1:07CV00407 (EGS)

1    62.    As a direct and proximate result of the Individual Defendants' abuse of control,

2  McAfee has sustained significant damages.

3    63.    As a result of the misconduct alleged herein, the Individual Defendants are liable to

4  the Company.

5    64.    Plaintiff, on behalf of McAfee, has no adequate remedy at law.

6                    **THIRD CAUSE OF ACTION**

7            **Against All Defendants for Gross Mismanagement**

8    65.    Plaintiff incorporates by reference and realleges each and every allegation contained

9  above, as though fully set forth herein.

10    66.    By their actions alleged herein, the Individual Defendants, either directly or through

11  aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

12  to prudently managing the assets and business of McAfee in a manner consistent with the operations

13  of a publicly held corporation.

14    67.    As a direct and proximate result of the Individual Defendants' gross mismanagement

15  and breaches of duty alleged herein, McAfee has sustained significant damages.

16    68.    As a result of the misconduct and breaches of duty alleged herein, the Individual

17  Defendants are liable to the Company.

18    69.    Plaintiff, on behalf of McAfee, has no adequate remedy at law.

19                    **FOURTH CAUSE OF ACTION**

20            **Against All Defendants for Waste of Corporate Assets**

21    70.    Plaintiff incorporates by reference and realleges each and every allegation contained

22  above, as though fully set forth herein.

23    71.    As a result of the improprieties alleged herein, and by failing to properly consider the

24  interests of the Company and its public shareholders by failing to conduct proper supervision,

25  defendants have caused McAfee to waste valuable corporate assets and incur costs to conduct

26  investigations, hire outside counsel, accounting firms and consultants, and to direct manpower to the

27  task of restating McAfee's past financials to correct for the improperly backdated stock option

28  grants.

1:07CV00407 (EGS)

From:OFFICE                     619+525+3991          06/02/2006 13:52   #018 P.024/026

72.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

73.     Plaintiff, on behalf of McAfee, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against All Defendants for Unjust Enrichment

74.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

75.     By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of McAfee.

76.     Plaintiff, as a shareholder and representative of McAfee, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Directing McAfee to seek the dismissal of any directors who authorized the manipulation of stock option grants that were not publicly disclosed in the Company's public filings or statements;

C.      Requiring the disgorgement from McAfee directors, officers or employees of undisclosed compensation that these individuals received as the result of the manipulation of stock options granted to these individuals. The amount disgorged should equal the difference between McAfee's share price on the actual grant date and the reported grant date multiplied by the number of options granted;

D.      Directing McAfee to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect McAfee and its

1:07CV00407 (EGS)

From:OFFICE                    619+525+3991              06/07/2006 13:52    #018 P.025/028

1   shareholders from a repeat of the damaging events described herein, including, but not limited to,

2   putting forward for shareholder vote resolutions for amendments to the companies' By-Laws or

3   Articles of Incorporation and taking such other action as may be necessary to place before

4   shareholders for a vote the following Corporate Governance Policies:

5          1.      a proposal to strengthen the Boards' supervision of operations and develop and

6   implement procedures for greater shareholder input into the policies and guidelines of the Board;

7          2.      a proposal to ensure that all stock options granted to executive and non-

8   executive employees are properly awarded, valued and administered;

9          3.      a provision to permit the shareholders of McAfee to nominate at least three

10  candidates for election to the Board;

11         4.      a proposal to prohibit the manipulation of the exercise price or grant date of

12  stock options granted to McAfee's directors, executive officers or employees without the express

13  authorization of a Compensation Committee composed of outside directors;

14         5.      appropriately test and then strengthen the internal audit and control functions;

15  and

16         E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state

17  statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust

18  on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to

19  assure that plaintiff on behalf of McAfee has an effective remedy;

20         F.      Awarding to McAfee restitution from the defendants, and each of them, and ordering

21  disgorgement of all profits, benefits and other compensation obtained by the defendants;

22         G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable

23  attorneys' fees, accountants' and experts' fees, costs, and expenses; and

24         H.      Granting such other and further relief as the Court deems just and proper.

25

26

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

1:07CV00407 (EGS)

From:OFFICE                        619+525+3991              06/02/2006 13:53    #018 P.026/026

1

**JURY DEMAND**

2          Plaintiff demands a trial by jury.

3    DATED: June 2, 2006                    ROBBINS UMEDA & FINK, LLP
                                            BRIAN J. ROBBINS
4                                           MARC M. UMEDA
                                            KELLY M. MCINTYRE
5

6

7                                          _____
                                            BRIAN J. ROBBINS
8                                           610 West Ash Street, Suite 1800
                                            San Diego, CA 92101
9                                           Telephone: 619/525-3990
                                            Facsimile: 619/525-3991
10

11                                          GARDY & NOTIS
                                            MARK C. GARDY
12                                          440 Sylvan Avenue, Suite 110
                                            Englewood Cliffs, NJ  07632
13                                          Telephone: 201/567-7377
                                            Facsimile: 201/567-7337
14

15
                                            Attorneys for Plaintiffs
16

17

18

19

20

21

22

23

24

25

26

27
     G:\Cases\McAfee\Complaints\Greenberg der cpt.doc
28

- 20 -
SHAREHOLDER DERIVATIVE COMPLAINT

1:07CV00407 (EGS)

# EXHIBIT E

# THE WALL STREET JOURNAL. ONLINE

Online Journal Subscribers LOG

Free Dow Jones Sites

- Home
- News
- Technology
- Markets
- Personal Journal
- Opinion
- Weekend & Leisure

Today's Print Edition
U.S. | Europe | Asia
Past Editions
Features
Portfolio
Columnists
In-Depth Reports
Discussions
Company Research
Markets Data Center
Video Center
Site Map
Corrections
My Online Journal
Personalize My News
E-Mail Setup
My Account/Billing
RSS Feeds
Customer Service
The Online Journal
The Print Edition
Contact Us
Help
Subscribe

**Article Search**
Advanced Search

**Quotes & Research**
Enter Symbol

PERFECT PAYDAY

## Options Scorecard

As of (Wednesday, May 11, 2007)

Here's a continuously updated look at companies that have come under scrutiny for past stock-option grants and practices. Write to Journal editors at newseditors@wsj.com.

*Note: This list contains companies that have disclosed government probes, misdated options, restatements and/or executive departures. Some companies that have undertaken or disclosed internal probes but no further news may not be included.*

See list by company | See a list of corporate officials

Updated May 11, 2007 -- RED TEXT indicates most recent updates. A green check represents an SEC or Justice Department investigation that has been concluded with no punitive action.

| Company | SEC | Justice Dept. | Exec./ director departures | Restate-ments/ Charges | Comments |
|---|---|---|---|---|---|
| Activision | X | X | X | X | The Santa Monica, Calif., videogame company said on July 28 that the SEC has asked the company for documents related to its stock-option grants as part of an informal inquiry. The company also said its board has appointed a special subcommittee of independent directors to conduct an internal review of the company's historical stock-option grant practices. On Oct. 25 the company said it appears likely that actual measurement dates for certain historical stock-option grants will be found to differ from the recorded grant dates for such awards. As a result, it is possible that Activision will be required to record additional stock-based compensation expense related to stock-option grants. (Headlines) |
| Affiliated Computer Services | X | X | X | X | The Dallas technology outsourcer acknowledged May 10, after a preliminary internal probe, that it had issued executive stock options that carried "effective dates" preceding the written approval of the grants. ACS said it plans a charge of as much as $32 million to rectify its accounting related to the grants. It is being examined by the Securities and Exchange Commission. On Aug. 7, the company announced that investors should no longer rely on its prior disclosures about the findings of its continuing internal probe. It had previously said a preliminary review suggested no intentional backdating occurred and any charges were likely to be minor. On Nov. 27, 2006, CEO and President Mark A. King and Chief Financial Officer Warren D. Edwards signed separation agreements with ACS that will allow them to remain with the company during a transition period ending June 30, 2007. Noncash compensation costs related to backdating will be about $51 million, plus additional tax-related expenses. (Headlines) (Options chart) |
| Affymetrix | X |  |  | X | The maker of gene-testing devices said on Aug 1 that an internal probe has uncovered "certain documentation lapses" in its stock options grant processes from 1997 through 1999, including one instance when the option grant date should have been recorded differently. But Affymetrix said the review hasn't indicated a pattern of inappropriate options dating. On Aug. 9, the company filed with the SEC to delay the submission of its second-quarter report because of a restatement to its financial statements for some options granted between 1997 and 1999. The company said it would restate its financial statements for 2005 and first quarter of 2006. (Headlines) |

VIEW CHART

BARRON'S Online

1:07CV00407 (EGS)

The San Jose, Calif., software company on Oct. 26 said it expects to record noncash charges on

WSJ.com - PERFECT PAYDAY

The page

The page you are loc might be experiencin your browser setting

Please try the followi

- Click the 🔄 R
- If you typed t that it is spell
- To check you then click **Int Settings.** Th local area net provider (ISP

  See if your In You can set Y automatically network admi

  1. Click t **Optio**
  2. On th Select
  3. Select **OK.**

- Some sites re menu and the what strength

  If you are try Security setti then click **Int** the Security s TLS 1.0, PCT

- Click the ⬅ B

**Agile Software**

**Alkermes**

**Altera**

**American Tower**

**Amkor Technology**

**Analog Devices**

**Apollo Group**

---

options dating, cutting into its net and operating income, with "material" results for some periods going back to 2000 after completing its stock-option backdating review. (Headlines)

The Cambridge, Mass., biotechnology company disclosed on August 10 that it is being investigated by the SEC for alleged options backdating. The company also said it will restate several years of past results to adjust accounting for two option grants in 2000 and 2005. (Headlines)

On June 21, 2006, Altera said its special committee has reached a preliminary conclusion that actual measurement dates for certain option grants issued between 1996 and 2000 differed from the recorded grant dates, and that it expects to restate its financial statements for the fiscal years ended 1996 through 2005. The San Jose, Calif., programmable-chip maker said on May 25 that the SEC and the U.S. attorney in Northern California are looking into its stock-option grants. On May 8, 2006, Altera said its board ordered an independent review of "historical stock-option practices and related accounting." The special probe followed a management review sparked by media reports that raised questions about options practices at other companies. Altera said. On Oct. 16, 2006, the company said it completed its internal probe, found misdated options, sees restatement adjustments totalling $47.6 million pretax, and said its CFO was retiring. On Feb. 20, 2007 the company said the SEC ended its probe of the company's stock-options practices and won't recommend any enforcement action. (Headlines)

The operator of communications towers said May 23 it had received a subpoena from federal prosecutors about its stock-option practices. It previously disclosed an SEC informal probe. On July 28, American Tower announced that an internal review has reached a preliminary conclusion that the actual measurement dates of certain stock-option grants likely differ from the recorded grant dates. As a result, the company expects to record additional noncash charges. On Oct. 23, the company said it will restate 2005 results as well as those from the first quarter of 2006 because the actual dates of certain stock option grants "likely differ" from the recorded dates. (Headlines)

On Aug. 16, the Chandler, Ariz., provider of semiconductor assembly and test services said it has identified occasions on which the measurement date used for option awards granted to certain employees was different from the actual grant date. It plans to restate results from fiscal 1998 through the first quarter of 2006. On Sept. 15, the company said the SEC was probing its stock-option practices. On Oct. 6, the company said it found evidence of intentional manipulation of stock option pricing by one former executive and some evidence that two other former executives "may have been aware of, or participated in, this conduct." It is recording extra noncash stock-based compensation expense of $106 million, after tax, for the period January 1998 to June 30, 2006. (Headlines)

Analog Devices said May 24 it had received a subpoena from the U.S. Attorney for the Southern District of New York requesting records related to stock options. The Norwood, Mass., semiconductor maker said the request is for records dating from the year 2000 to the present. Analog Devices reached a tentative settlement with the SEC in November 2005 related to grants. The company said it believes the options being investigated by the U.S. Attorney are the same ones looked at by the SEC. (Headlines)

On June 19, the Phoenix education provider received a subpoena from the U.S. attorney for the Southern District of New York relating to stock-option grants. Apollo said June 9 its board will hire an outside firm to review its stock-option practices, following a brokerage report that raised questions about whether the for-profit educational firm had backdated some past options grants. The report, from a Lehman Brothers analyst, called the company's historical options-granting practices "highly questionable." On July 10, the company disclosed that it had received a letter from the SEC about an informal investigation into the company's stock-option grants. On Nov. 3, the company said it will likely have to restate past results as a result of problems with past grants. Its financial chief resigned citing personal reasons. On Dec. 14, the company a review found the company misdated certain stock option grants and that it found that some former officers may have covered errors in the grant approval process. The company added that it may face "significant tax liability" for prior years because it misapplied IRS rules. (Headlines)

On Aug. 3, 2006, the Cupertino, Calif., computer maker said it will delay filing quarterly results and will likely restate past results after discovering more "irregularities" as part of an internal probe of stock-option grants going as far back to 1997. In June, Apple said "one of the grants in question" was made to CEO Steve Jobs. On Oct. 4, the company said its internal investigation had found Jobs

**Apple Inc.**

VIEW CHART

was aware of options backdating but didn't benefit from the practice. Director Fred Anderson, who served as the company's chief financial officer from 1996 until 2004, resigned from its board of directors. U.S. prosecutors are investigating Apple's options practices. Apple said Dec. 29, 2006 that CEO Jobs had recommended the selection of some favorable stock-option grant dates, but didn't personally benefit. It also said it will restate financial data going back to 2002 and take an $84 million charge. On April 24 2007, the SEC filed civil charges against Apple's former general counsel, Nancy Heinen, and former CFO Fred Anderson for their alleged involvement in backdating of stock options at Apple. Mr. Anderson settled the charge with the SEC without admitting wrongdoing. (Options chart) (Headlines)

**Applied Micro Circuits**

The Sunnyvale, Calif., semiconductor company disclosed on June 27 that it received a subpoena from the U.S. attorney for the Northern District of California related to its stock-option practices. On June 12, Applied Micro said the SEC notified it of an informal inquiry into past stock option grants. On May 31, Applied Micro said its audit committee is reviewing its historical stock-option grant practices, characterizing the review as voluntary and adding that it was initiated in response to recent industry issues involving stock options. On Aug. 3, the U.S. Attorney's Office for the Northern District of California doesn't intend to continue its investigation of the company's option-granting practices, and that it is withdrawing its subpoena, but that it has received a subpoena from the U.S. Attorney's Office for the Southern District of California relating to its past options grants. On Sept. 14, the company said its audit committee has concluded that Applied should have used different measurement dates for computing costs for certain stock option grants, and the company now expects to recognize up to $200 million in compensation expense beginning in fiscal year 1998, primarily relating to options awarded during fiscal years 2000 through 2002. On Jan. 10, 2007, Applied said it completed its investigation and the net restatement adjustment from the investigation was $74.3 million, affecting fiscal years 1999 through first quarter of 2004, comprised of $95.2 million of stock-based compensation offset by $20.9 million of tax benefits. (Headlines)

**Applied Signal Technology**

The Sunnyvale, Calif., company telecom-equipment maker said On Jan. 16, 2007 that it found accounting and dating problems with stock options issued to new officer employees and in a 1999 annual grant, and would restate its past results for its fiscal years from 2000 through 2005. Applied Signal expects a decrease in retained earnings for the year ended Oct. 31, 2004 by at least $1 million and as much as $1.7 million. (Headlines)

**ArthroCare**

On Aug. 23, the Austin, Texas, medical-device maker said it has received correspondence from the SEC requesting certain documents and information related to its option grant practices. The company said prior to receiving the request, it did an internal review of all equity compensation activities since its February 1996 IPO, and said it "believes that there have been no unusual patterns in the timing or pricing of its equity awards and that there is specifically no evidence of backdating of option awards. (Headlines)

**Aspen Technology**

The Cambridge, Mass., software company said Sept. 6 that subcommittee of independent directors reviewing the company's stock-option practices has found accounting errors related to certain options granted during and before fiscal 2004. The company said previously issued financial statements will require restatement and should not be relied upon. (Headlines)

**Asyst Technologies**

The Fremont, Calif.-based semiconductor manufacturing equipment maker on June 13 announced a delay in its annual filing, while a special committee of independent directors conducts an inquiry into past stock option grants and practices. Asyst disclosed that it received a letter dated June 7 from the SEC requesting documents relating to stock options granted from 1997 to the present. Asyst said it is cooperating in the SEC's inquiry. Asyst said June 28 it received a grand jury subpoena from the U.S. District Court for the Northern District of California requesting documents related to stock-option grants. On Oct. 9, the company said it had completed its options probe and would restate several years of financial results because of wrongly dated grants. The company said a committee of independent directors concluded that "none of the incorrect measurement dates was the result of fraud" and found no evidence to raise concerns about "the integrity of current management." On Feb 6, 2007, the company said the SEC ended its probe without recommending any enforcement action. (Headlines)

**Atmel**

On Aug. 15, the San Jose, Calif. maker of semiconductor components said it received an informal request for information from the San Francisco office of the SEC over past stock-option grants. In July, the company initiated an internal review of its past stock-option grants, and the review is continuing. On Oct. 30, Atmel said its independent review found that certain of the company's stock-

**Autodesk**

On Aug. 17, 2006, the San Rafael, Calif., design-software company didn't release full results for the second quarter as it said it is conducting a voluntary internal review of its past practices for granting stock options. On Sept. 5, Autodesk said it faces an informal SEC probe into its options practices. On Oct. 6, the company said it had discovered measurement dates for certain option grants differed from the recorded grant dates. Autodesk expects to record additional noncash stock-based compensation expense related to the grants, but said it isn't yet able to determine the amount of the charges. (Headlines)

**Barnes & Noble**

The New York bookseller said on July 12 that its board's audit committee will conduct a review of the company's stock-option practices after a shareholder filed a lawsuit alleging that the company improperly backdated dozens of options grants to executives. Barnes & Noble said there was "no merit" to the suit. On July 21, the company said the SEC is conducting an informal inquiry into its options practices. The company said Aug. 29 that it has received a subpoena from the U.S. Attorney's Office for the Southern District of New York related to its options practices. On April 4, 2007, the company said its special committee found "numerous instances" of improper backdating but no intent to defraud. Barnes & Noble will take a $23 million charge. (Headlines)

**Bed, Bath & Beyond**

The retailer said on Oct. 10 that a review had found deficiencies in the grant procedures for stock options and that the SEC was conducting a probe following an earlier notification by the company of potential problems. It said it didn't plan to restate results since it doesn't believe the errors to be material in any particular period. It said it will take an $8 million charge this year relating to revised measurement dates. (Headlines)

**BEA Systems**

The company said on Aug. 16, 2006, that its board is reviewing past option grants with the assistance of outside legal counsel. The company said it may be forced to change its accounting of past option grants, which could have a negative impact on past results. The company said on Feb. 14, 2007, that it plans to restate its financial statements from its 1998 through 2007 fiscal years, after a review of its historic stock option grant practices. The San Jose developer of transaction-and message-management software said the review found most options granted between June 1997 and June 2006 were dated incorrectly. Among other findings, the review also found some members of senior management appear to have chosen grant dates with the benefit of hindsight in a number of grants, most made before 2003. (Headlines)

**Biomet**

The Warsaw, Ind., maker of orthopedic devices on Dec. 18 formed a special committee to investigate stock-option grants from 1996 to the present to determine whether it had any claims arising out of any inappropriate stock-option backdating. Biomet said it appears that a substantial number of stock-option grants were issued as of dates other than when the grants were actually made to take advantage of a lower stock price on the date of the issue. Biomet also said it appears that some members of senior management were aware of the practice. The company said correcting errors in the stock-option grants may have a material effect of historical and current financial statements, but said it wasn't able to say past or current financial statements shouldn't be relied upon. (Headlines)

**Black Box**

On Nov. 17, 2006, Black Box said it received a letter of informal inquiry from the SEC, requesting documents related to the company's stock-option practices since January 1997. The Pittsburgh-based provider of network infrastructure services and products plans to cooperate fully with the SEC in this matter. On March 20, 2007, the company said it expects additional noncash, pretax charges for stock-based compensation expense of about $63 million, and will also need to restate previous financial statements. (Headlines)

**Blue Coat Systems**

The Sunnyvale, Calif., Internet security services company announced Aug. 3 that it was informed by the SEC of an informal inquiry into its stock-option practices. On Sept. 11 Blue Coat said it will take additional and material non-cash stock-based compensation expenses relating to stock-option award dates. The company said the actual measurement dates of certain stock options granted primarily from fiscal 2000 to 2004 differ from the recorded grant dates of the awards. (Headlines)

**Boston**

The Bedford, Mass., software company said July 21 that the SEC staff contacted it by telephone regarding an informal inquiry related to option grants made between 1998 and 2002. The board has retained outside counsel to help review its historical option grants practices. The company said it

# WSJ.com - PERFECT PAYDAY

**Communications Group** ▸ VIEW CHART

may need to record additional noncash charges for stock-based compensation expense related to those prior periods. On October 12, Boston Communications said Karen Walker, chief financial officer, has resigned in connection with option-granting issues. EY Snowden, chief executive officer and president, will no longer serve in those roles, moving instead to the non-executive chairman position. Alan Bouffard will accelerate his retirement and leave the general counsel position immediately. The company also said it will need to restate certain past results to record additional as yet undetermined non-cash charges for stock-based compensation expenses. (Headlines) (Options chart)

**Broadcom**

On July 14, 2006, the Irvine, Calif., chip maker said it expects to record additional non-cash stock-based compensation expense of more than $750 million, as it corrects accounting for past stock-option grants. The company believes that substantially all of that expense will be recorded in the years 2000-2003. On June 12, the company said it had been notified that it will receive an informal request from the staff of the SEC regarding its option granting practices. Broadcom said it had started an internal review May 18 amid media reports about options practices. On Sept. 8, the company said compensation expenses it records related to historical stock option grants will be at least double its previous estimate, "and could be substantially more," after additional accounting issues were identified. It said it has been informally contacted by the U.S. Attorney's Office of Central California. Broadcom said on Sept. 19 that William J. Ruehle, who had served as CFO since 1997, "decided to accelerate his retirement as a result of" its internal options review. On Dec. 18 the company approved the findings and recommendations of its audit committee's review of its stock options. Broadcom expects to file an amended annual report for 2005 and the first quarter of 2007. It added that the SEC told the company it has issued a formal order of investigation. The audit committee found each of the option grants made since May 2003 has complied with prevailing accounting rules and isn't subject to restatement. On Jan. 23, 2007, Broadcom said in a filing that The company, in recording $2.24 billion in extra expenses, noted 68 instances in which it couldn't find contemporaneous paperwork to document grant-approval meetings, and 18 cases when grant dates were selected after the fact. (Headlines)

**Brocade Communications Systems**

The Journal reported on June 18 that federal prosecutors have warned Gregory Reyes, the former CEO of the San Jose, Calif., storage-networking firm, that he could face criminal charges related to stock-options-timing practices. The SEC has warned that he could face civil charges. Mr. Reyes stepped down as CEO in January 2005, at the same time the company announced it would restate income for prior years due to improper accounting for past options grants. The Brocade case, which predated the recent explosion in options-related probes, has been under investigation by the SEC and the U.S. Attorney for the Northern District of California for at least a year. On July 20, prosecutors accused Reyes of backdating options he doled out as a "committee of one" to hundreds of employees, in the first criminal charges filed in the backdating probes. Stephanie Jensen, a former human-resources director, is accused of helping Reyes with the scheme. (Headlines)

**Brooks Automation** ▸ VIEW CHART

The Chelmsford, Mass., maker of semiconductor gear said in late April that it has begun a review of options grants. On May 12 it said it received notice of an informal SEC review; later it said two board members resigned; and on May 22 it said it had received a Justice Department subpoena. On July 31 Brooks Automation said two former outside directors and its former chief executive signed a "false" document permitting the CEO to exercise an expired stock option for millions of dollars in profit. The disclosure came as the company restated several years of earnings to account for options-related accounting problems. (Headlines) (Options chart)

**CA**

On June 29, the software maker formerly known as Computer Associates announced it would delay the filing of its annual report after uncovering problems with its stock-options program. In a statement, the company said an internal review found that some options were given to employees as much as two years after they were approved by the board. CA said delays could force the company to restate results for past periods. On Aug. 1 the company released its restatement, resulting in a total increase in noncash compensation of $342 million for the 10-year period from 1996 through 2006, on a pretax basis. (Headlines)

The Bethpage, N.Y., cable-TV company said Aug. 8 that a review has determined that the date and exercise price assigned to a number of its stock option and stock-appreciation rights, or SAR, grants during the 1997-2002 period didn't correspond to the actual grant date and the closing price of the company's common stock on that day. The company disclosed Aug. 16 that the SEC and the U.S.

**Cablevision** ✗

Attorney's office were conducting investigations. On Sept. 21, the company said it backdated options between 1997 and 2002. In practically all cases the share price was lower, "sometimes substantially lower," on the option award than it was the actual date the option was granted, the company said.

The company's review identified modifications made to outstanding stock-option grants, "principally extensions of expiration dates" that weren't accounted for properly. Also, two awards of options and one modification were incorrectly accounted for as having been granted to employees. One of these two awards was to the company's former compensation consultant (which was cancelled in 2003) and the other award related to Vice Chairman Mike Lustgarten whose 1999 death occurred after the stated grant date of the award and before the actual grant date. (Headlines)

**Caremark Rx.** ✗

Caremark Rx. said May 18 it had received a grand-jury subpoena from the Justice Department and a letter of informal inquiry from the SEC regarding option grants. The SEC is also requesting documents about the company's relocation program. Caremark said it intends to cooperate fully. (Headlines)

**CEC Entertainment** ✗

On Aug. 11, the operator of Chuck E. Cheese restaurants said it has been notified that the SEC is conducting an informal inquiry into the company's historical stock-option granting practices. On Oct. 31, the company said its audit committee has found that its stock-option granting process "often" resulted in measurement dates that differed from the recorded dates for the awards. Noting that the probe found no evidence of fraud, the company said additional non-cash stock-based compensation expense should have been recorded, and it estimates an aggregate of related pretax charges of $10 million to $35 million. (Headlines)

**Ceradyne** ✗

The Costa Mesa, Calif.-based maker of ceramic body-armor plates said on Aug. 4 that it has found inconsistencies in its stock option grants between 1997 and 2003, as the measurement dates made for accounting purposes and the actual recorded dates differed on some grants. As a result, the company recorded a charge of $1.5 million pertaining to the years 1997 to 2005 and the first six months of 2006. But since the review hasn't been completed, the charge "may be modified or significantly changed," it said. On Oct. 24, the company disclosed that the SEC has informally requested information about its internal review. (Headlines)

**The Cheesecake Factory** ✗

On July 19, the Calabasas Hills, Calif., restaurant operator announced that the Audit Committee of its Board of Directors, which is comprised solely of independent directors, is reviewing the company's practices relating to its stock-option grants. The company said this voluntary review was initiated in response to recent media and Wall Street reports regarding the option granting practices at numerous publicly traded companies, and is being conducted with the assistance of special outside legal counsel. On Aug. 3, the company said the SEC has made an informal inquiry into its previous stock-option granting practices. On Aug. 15, the company said the board's investigation continues and indicated needed adjustments "would likely be material ... resulting in a restatement of the Company's previously issued consolidated financial statements." (Headlines)

**Children's Place** ✗

On Aug. 24, the retailer's outside counsel began an investigation into its stock option practices. On Sept. 7, the company said the investigation found instances in which company records didn't correctly reflect the legal grant date for granted stock options. The report concluded that, except for one occasion in 2001, as to which the report was inconclusive, the errors were unintentional. (Headlines)

**Chordiant Software** ✓

The enterprise software company on July 25, 2006, announced that it has been contacted by the SEC regarding an inquiry relating to its past stock option grant practices. A day earlier, Chordiant said the audit committee of the its board of directors is in the process of conducting an independent review of options practices and related accounting. On Feb. 14, the company said the SEC ended its probe of the company's stock-options practices and won't recommend any enforcement action. (Headlines)

**Cirrus Logic** ✗

The Austin, Texas, circuit developer said on Oct. 24, 2006 that the company has found information that "raises potential questions" about the measurement dates used to account for certain stock-option grants. A special board committee will conduct a more detailed review of option grants, and has engaged independent outside counsel. On Oct. 30, 2006 the company said the SEC is informally investigating past stock-option practices. On March 18, 2007 the company released the results of its internal probe, announcing CEO and President David D. French resigned over his role in backdating options. The company also plans to restate its financial statements for 2001 through 2006 and for the first quarter of fiscal year 2007. It plans a noncash stock-based compensation expense in the range

**Clorox**

On August 2, the Oakland, Calif., consumer-products maker said it took a $25 million pretax charge in its just-completed fourth quarter after an internal review of its options grants identified "unintentional errors" in accounting for them. (Headlines)

**CNET Networks**

The San Francisco operator of Web sites on May 22 appointed a special committee of independent directors to investigate option grants and their timing. On May 24, the company said it had received a letter indicating the SEC had launched an informal investigation. On June 27, CNET announced it has received a grand jury document subpoena from the U.S. attorney for the Northern District of California requesting records on its option grants. The company said on July 10 that it expects to restate financial statements for 2003, 2004 and 2005 to correct errors related to accounting for stock-based compensation. Based on the continuing review by the special committee, CNET may also restate its financial statements for earlier years and its operating results for the first quarter of 2006 On Oct. 11, co-founder and Chief Executive Shelby Bonnie resigned as chairman and CEO after an internal probe found evidence of backdating (Headlines)

**Computer Sciences**

On June 29, the El Segundo, Calif., computer-services company said the SEC made an informal request for information related to its stock-option grants and practices. CSC said it plans to fully cooperate in the matter. On Aug. 1 the company said the U.S. Attorney's Office in the Eastern District of New York is looking into the company's stock-option grant policies. (Headlines)

**Converse Technology**  ► VIEW CHART

The maker of telecom software said May 4 that it received a subpoena from the U.S. attorney's office for the Eastern District of New York, indicating a criminal investigation of stock-option-granting practices. CEO Kobi Alexander, as well as the company's CFO and senior general counsel, resigned just days earlier. In April, the company said some option-grant dates used in its accounting "differed" from the actual grant dates, and that it would restate more than five years of financial results. On Aug. 9, the former CEO, CFO and general counsel were charged with criminal fraud. On Sept. 27, Alexander, who failed to show up in court and was declared a fugitive by the FBI, was found in Namibia, and was set to be extradited to the U.S. On Oct. 24, ex-CFO Kreinberg pleaded guilty to securities-fraud charges in a federal court, making him the first person to plead guilty in the backdating scandal. On Nov. 2, 2006 former general counsel William F. Sorin pleaded guilty to a conspiracy charge. On Jan. 10, 2007, it was announced that Sorin will pay $3 million to settle an SEC lawsuit over stock-option grants. (Headlines) (Options chart)

**Corinthian Colleges**

The Santa Ana, Calif. operator of for-profit schools said on July 12 that it has voluntarily established a special committee of independent directors to review option grants and it will "take any action deemed appropriate." The panel will review option grants dating back to 1999 when the company held its initial public offering. On Aug. 18, Corinthian said the SEC is conducting an informal inquiry into the company's practices, procedures and disclosures related to its option grants. (Headlines)

**Costco Wholesale**

Costco said March 19, 2007 that a federal grand jury had issued a subpoena over stock-option granting practices, following an internal investigation that found "imprecisions" with stock grants last year. The probe had identified problems with the dates of certain grants, but found no evidence of fraud, concealment or "intentional deviation from generally accepted accounting principles." the company said. The company took a $46.4 million charge in the second quarter to remedy income tax problems related to the options grants. (Headlines)

**Crown Castle International**

The Houston wireless infrastructure operator said on Aug. 4 that the SEC is conducting an informal inquiry into various accounting matters, including whether past company option grants were backdated. The company said it began an internal review of its equity-based compensation practices. It said it hasn't found any inappropriate actions related to option grants, but said that for certain stock options, granted primarily from 1998 through 2001, "the proper measurement date for accounting purposes differs from the measurement date used by Crown Castle." (Headlines)

**Cyberonics**

The Houston medical-device maker disclosed on June 27 that it received a subpoena on Monday from the U.S. Attorney's Office for the Southern District of New York, requesting documents relating to its stock options grants. On June 8, a stock analyst at SunTrust Robinson Humphrey questioned a June 15, 2004, stock option grant, asserting it was made in the evening, following a vote that day by an FDA advisory panel recommending approval of a Cyberonics medical device. The potential value of the option surged on June 16, when Cyberonics shares rose 78%. On June 9, the Journal reported that the SEC has launched an informal investigation. Cyberonics has denied wrongdoing. On Nov. 20, 2006, the company announced the resignation of its CEO and CFO on the same day it

WSJ.com - PERFECT PAYDAY

| Company | Marks | Description |
|---|---|---|
| Dean Foods | ✓ | The The Dallas food and beverage company said on Nov. 1, 2006 that the SEC is conducting an informal inquiry into the company's stock-option practices. On May 10, 2007, Dean said the SEC closed its informal inquiry on stock option granting practices without any recommended enforcement action. (Headlines) |
| Delta Petroleum | ✗ ✗ | The Denver natural-gas and oil producer said on June 19 said it received a subpoena from the U.S. attorney for the Southern District of New York requesting records dating to 1996 related to the granting of stock options. Delta announced May 22 it would conduct an internal review of historical stock-option practices and related accounting. On July 6, the company disclosed that it is the subject of an SEC probe. (Headlines) |
| Dot Hill Systems | ✗ | The California-based provider of storage systems on Aug. 10 said it has identified certain miscellaneous discrepancies relating to its option-grant practices from fiscal 2000 through 2003. Dot Hill said it believes that the cumulative impact of the discrepancies is an understatement of compensation expense of less than $500,000, based on a preliminary review. (Headlines) |
| Electronic Arts | ✗ | Electronic Arts said Sept. 20, 2006 it has received an informal SEC inquiry requesting certain documents and information relating to the game company's stock-option grant practices from Jan. 1, 1997 to the present. (Headlines) |
| Emcore | ✗ | The Somerset, N.J., maker of semiconductor components disclosed on Nov 6 that it is reviewing its historical stock-option-grant practices. The company said its review isn't yet complete, but that it expects to record noncash charges for stock based compensation expense of $24 million, mainly affecting fiscal years 2000 through 2003. Emcore also said its financial statements dating back to fiscal 2000 are no longer reliable. (Headlines) |
| Endocare | ✗ ✗ | The Irvine, Calif., medical device company said on August 8 that it received a subpoena August 1 from the SEC requesting more information on the company's stock-option-granting practices. The company said its management conducted an internal review of its historical stock-option practices and identified several rants made between 1997 and 2002 for which the actual measurement dates appeared to differ from the recorded grant dates. Endocare said its management concluded the potential accounting impact of any date discrepancies didn't require restatements of past financial reports. (Headlines) |
| Engineered Support Systems | ✗ ✗ ✗ | Parsippany, N.J., military contractor DRS announced on June 12 that it has been advised by the SEC and the U.S. Attorney's office that each is investigating possible backdating of option grants at recently acquired ESSI, prior to DRS's acquisition of the company, a supplier of logistics and maintenance support. DRS said the U.S. Attorney's office has advised DRS that it considers DRS to be a witness, not a subject or target of its investigation. On Feb. 6, 2007, the SEC filed civil charges against two former executives ESSI, accusing them of participating in a six-year options backdating scheme in which they granted in-the-money options to themselves and other executives. Steven Landmann, the former controller, agreed to settle the charges by paying $886,557 and accepting a bar on serving as an officer or director of a public company and a ban on practicing before the SEC as an accountant. Ex-CFO Gary Gerhardt hasn't settled with the SEC. (Headlines) |
| EPlus | ✗ ✗ | The Herndon, Va., provider of information technology services said on Aug. 11 that it will restate its fiscal 2004 and fiscal 2005 financial results to reflect stock-option grants. The aggregate amount of stock-based compensation expense to be recorded from April 1, 1997, to March 31, 2006, is presently estimated to be approximately $3 million, which represents approximately 2% of the company's cumulative earnings before taxes over the nine-year period. (Headlines) |
| Equinix | ✓ ✓ | The Foster City, Calif., telecom company said on June 12 that it received an informal inquiry from the SEC relating to stock-option grants and pricing. Equinix said the SEC probe comes after it initiated an independent inquiry following the release of a Center for Financial Research and Analysis report that highlighted a questionable 2001 grant. On June 29, the company announced that it received a grand jury subpoena from the U.S. Attorney for the Northern District of California, requesting documents relating to its stock option grants and practices. The company said on Aug. 15 that the internal audit found no "intentional misconduct" regarding stock options, and therefore no restatement is necessary. On Dec. 6, the company said received formal notification than an investigation of its stock option granting practices by the SEC has been terminated. On January 17, 2007 Equinix said the U.S. Attorney's Office for the Northern District of California has withdrawn a grand jury subpoena. (Headlines) |

5/18/2007

WSJ.com - PERFECT PAYDAY

**Extreme Networks**

On Sept. 15, the Santa Clara, Calif., networking equipment company said it is the subject of an informal SEC probe of its stock-option grants. The company's board has appointed a special committee to review its past stock option grant practices and its accounting for option grants. (Headlines)

**Foundry Networks**

The San Jose, Calif., network-equipment maker said on June 27 that it received options-related subpoenas from the U.S. attorney for the Northern District of California related to the company's granting of stock options from 1995 through the present. Foundry also said it is the subject of an SEC probe. (Headlines)

**Forrester Research**

The Cambridge, Mass., technology-research firm said Dec. 19, 2006 that Warren Hadley, chief financial officer and treasurer, has resigned due to irregularities uncovered by an internal investigation related to a grant of 5,000 options made to Hadley in 1999. (Headlines)

**F5 Networks**

The Seattle computer-networking company said May 22 it received a grand-jury subpoena from the U.S. District Court for the Eastern District of New York requesting documents related to the granting of stock options from 1995 through the present, as well as an SEC notice of an informal inquiry into similar matters. On Oct. 25 the company said a special board committee has found that the recorded grant dates for certain stock options granted during fiscal 1999 through 2004 should not be relied upon as the measurement date for accounting purposes. F5 said it may be required to record additional noncash stock-based compensation expenses of up to $30 million, to restate financial results for fiscal 1999 through 2005, and to amend results for the first half of fiscal 2006. (Headlines)

**Gap**

On Sept. 7, the San Francisco apparel retailer said that it has reviewed its stock-option practices over 10 years and discovered unrecorded compensation expenses of less than $5 million. Gap said the amount isn't material to its historical financial statements and will be recorded as an additional compensation expense in the fiscal third quarter once the final figure is determined. Gap said that it had identified no backdating in connection with grants to employees at or above the level of vice president. (Headlines)

**Getty Images**

On Nov. 9, the Seattle visual-content company said the division of enforcement of the SEC had notified Getty that it is conducting an informal inquiry to investigate the company's stock-option grant practices. The company said it is cooperating fully with the SEC in the matter and has launched an internal probe. (Headlines)

**Hansen Natural**

The Corona, Calif., drink distributor said on Oct. 31 that the SEC requested that the company voluntarily provide documents and information about its past stock grants. The news came after Hansen Natural was listed in a recent report by independent proxy advisory firm, Glass Lewis & Co., as an example of a company where grants to insiders were disclosed late, and the stock price rose materially from the purported grant date to the disclosure date. (Headlines)

**HCC Insurance Holdings**

On Nov. 17, 2006, HCC said the board investigation of grants since 1995 found incorrect measurement dates for certain grants covering a "significant" amount of employees. The cumulative pretax financial impact of additional noncash charges is unlikely to exceed $37 million, and the Houston-based insurer said it plans to continue cooperating with the SEC's informal inquiry. HCC said Stephen Way resigned as CEO. Way, who founded the company, will serve as the non-executive chairman. Also, Chris Martin resigned as general counsel. On Dec. 27, 2006, the company said Way mispriced options in an effort to retain talent and "provide employees with the best option price." (Headlines)

**HealthSouth**
VIEW CHART

Former CEO Richard Scrushy repeatedly received stock options dated at low points in the company's stock price, a Journal review of securities filings showed, raising questions about the company's options-granting practices. Mr. Scrushy denies any backdating occured, and the company said it has "left the investigation of criminal and possible criminal activities at HealthSouth to the relevant authorities. The new management and the new board continue to cooperate thoroughly in these matters." (Headlines) (Options chart)

**Home Depot**

The Atlanta home-improvement giant said June 23 that the SEC had initiated an informal inquiry into its option-grant practices.On June 16, the company said that in five instances prior to December 2000, the date of the meeting or resolution approving an option grant was later than that used to determine the exercise price. The company estimates that the unrecorded expense over the affected period was not more than $10 million. As a result, Home Depot said it doesn't plan to restate any prior financial statements. On Sept. 6, Home Depot said the Office of the U.S. Attorney for the Southern District of New York has also requested information on options. On Dec. 6, 2006, Home

| Company | SEC | Justice Dept. | Exec./director departures | Restatements/Charges | Comments |
|---|---|---|---|---|---|
| | | | | | Depot said an internal investigation found that it routinely backdated stock options for 20 years starting in 1981 and as a result it understated compensation expense by $200 million. (Headlines) |
| IBasis | × | | | | On Oct. 20, 2006, the Burlington, Mass., voice-over-IP company said it found options that were acounted for improperly and expects to record noncash charges in the range of $10 million to $20 million for stock-based compensation over the period from December 1999 to April 2006. The company also said it has received a letter of informal inquiry from the SEC. The company said that as a result of the determinations of its special committee, the company has terminated the employment of Jonathan D. Draluck, the company's general counsel. (Headlines) |
| Insight Enterprises | × | | | × | The Tempe, Ariz., information technology services company said on Oct. 31 that it received an informal inquiry from the SEC seeking information and documents related to its stock-option grant practices from Jan. 1, 1996, to the present. (Headlines) |
| Integrated Silicon Solution | | | | × | The Santa Clara, Calif. semiconductor company said on Oct. 23 that a committee of independent directors found the company should restate its financial statements for various periods since the company's IPO in February 1995 due to improper dating of stock-option grants. The specific periods to be restated have not yet been determined. (Headlines) |
| Intuit | ✓ | × | | | The Mountain View, Calif., software maker disclosed on June 9 that it was the subject of an informal SEC probe of its stock options. Intuit said it launched an internal review earlier in the wake of a report that said options granted in May 2000 carried a moderate risk of backdating. On June 29, Intuit said it has received a subpoena from the U.S. Attorney for the Northern District of California seeking documents concerning the company's practices. On Aug. 16, Intuit said a review of its stock-option-granting practices uncovered no evidence of fraud or intentional wrongdoing, and that the company doesn't anticipate having to restate results. On Oct. 30, the company said the SEC closed its investigation into the software maker's stock-option accounting practices without taking any punitive action. (Headlines) |
| J2 Global | | | | × | On Aug. 11, the Los Angeles messaging-services company said its board decided that in addition to an existing internal review, it would establish a special committee of outside directors for an independent investigation. J2 said it believes it may need to restate past results but that any additional compensation expense that may need to be recorded would not exceed about $2.1 million. (Headlines) |
| Jabil Circuit | × | × | | | The St. Petersburg, Fla., maker of circuit boards and computer components said June 21 it received a subpoena from the U.S. attorney's office for the Southern District of New York requesting information related to an inquiry about how it accounted for stock-option grants in past years. On May 3, Jabil Circuit said two preliminary internal reviews determined that the company didn't backdate stock-options grants. The SEC is conducting an informal inquiry, and Jabil said a special board committee would also be looking into the matter. (Headlines) (Options chart) |
| Juniper Networks | × | | × | × | Juniper Networks said May 22 it received a request for information from the office of the U.S. Attorney for the Eastern District of New York, relating to the company's granting of stock options. The Sunnyvale, Calif. company said it is responding to the request and it intends to cooperate fully. The Juniper board's audit committee is reviewing its historical stock-option practices. On July 19, the company said it will record additional noncash charges for stock-based compensation expenses, but added it didn't know if this would result in any restatements. On Aug. 10, the company said it needs to restate historical financial results to record additional noncash charges for expenses related to option grants. (Headlines) |
| KB Home | × | | × | × | On Aug. 23, the home builder said it has begun a review of several past stock-option grants to Bruce Karatz, the home builder's CEO, that were dated at unusually low price points. On Aug. 24, the company announced Chairman and CEO Bruce Karatz agreed to leave the company and forfeit about $13 million in gains from the backdating as part of an agreement with the company. An internal investigation found that he backdated his own option grants to increase his pay. Also departing are Richard B. Hirst, executive vice president and chief legal officer, and Gary A. Ray, the head of human resources. On Feb. 13, 2007, the company said it understated stock-based compensation expense by more than |

WSJ.com - PERFECT PAYDAY

**King Pharmaceuticals**

$36 million between 1999 and 2005. As a result of the investigation, stock-based compensation expense and related income tax reduced net income by $41.1 million for the years ended Nov. 30, 1999, through 2005. (Options chart) (Headlines)

The Bristol, Tenn., pharmaceutical company said on Nov. 10 that a review of its option grants found that the company used "incorrect" and "favorable" dates for a series of options granted to its employees in 2000 and 2001. King said the review "concluded that there was no fraud or manipulation of financial results with the intent to mislead investors." The company added that it will record an expense of $3.59 million in its third-quarter results to account for understatements of compensation for the 2000-2006 period. (Headlines)

**Keithley**

The Cleveland maker of measurement instruments said Sept. 14 it received notice that the SEC is conducting an informal inquiry into its option-grant practices and has requested documents and information. (Headlines)

On May 30, 2006, KLA said it received a notice from the SEC of an informal inquiry relating to stock-option grants, after disclosing on May 22 that U.S. prosecutors had requested data on grants. On May 24, the semiconductor-equipment maker said its board of directors had appointed a special committee to run an internal investigation of "past stock option grants, the timing of such grants and related accounting and documentation." In 2001, the semiconductor-equipment maker granted its top executives, including Chairman Ken Levy, two batches of stock options. They arrived on unusually fortunate days for the executives: The first dated at the share price's first-half low, the second at its second-half low. On June 20, 2006, KLA said a special board committee has reached a preliminary conclusion that the actual measurement dates for financial accounting purposes of certain grants issued in prior years likely differ from the recorded grant dates. On Oct. 16, KLA said it expects to record total additional non-cash charges for stock-based compensation expenses of no more than $400 million, following the completion of its internal probe. It said its general counsel resigned and that it terminated its employment agreement with its former CEO. On Feb. 9, 2007, the company announced that the SEC had informed the company that it was now subject of a formal probe. (Headlines) (Options chart)

**KLA-Tencor**

**KOS Pharmaceuticals**

The Cranbury, N.J., drug developer said Aug. 8 that it expects to restate financial statements from 2001 through the first quarter of 2006 based on a continuing internal review of stock-option grants. It also said that the Southeast Regional Office of the SEC sent it a request for documents relating to the grant and exercise of options during the period from 1997 to the present. (Headlines)

**Linear Technology**

The Milpitas, Calif., chip maker disclosed on June 15 that the SEC, as part of an informal inquiry, requested information on past stock-option grants. Linear Technology reported on May 24 that back dating. The company denies the allegations. The company said June 28 the U.S. attorney's office for the Northern District of California has requested information about the company's option grants. On Sept. 8, the company said that it received an "information document request" from the IRS regarding the company's stock-option granting practices. (Headlines)

**L-3 Communications Holdings**

The New York defense contractor "is actively looking into" the timing of stock-option grants made since it went public in 1998, a company spokesman said on June 1, 2006. No one has alleged wrongdoing by the company, but several Wall Street analysts have said its stock options have produced unusually high returns. (Headlines)

**Macrovision**

On June 13, the Santa Clara, Calif., software company disclosed that the SEC requested information regarding stock-option grants to its senior management, directors and employees for the period since 1997. Macrovision also said it began an internal review. On June 28, the company said it received a subpoena from the U.S. attorney's office requesting information on the company's processes for granting stock options. On Nov. 2, 2006, the company said that the SEC has notified it that it terminated its investigation without recommending that enforcement action be taken. On Feb. 13, 2007, the company said the U.S. attorney's office has withdrawn its subpoena in connection with its stock-option review, and that the company believes its work with the agencies on the options matter is finished. (Headlines) (Options chart)

**Marvell Technology Group**

On July 5, Marvell said SEC officials have requested documents and that it has also received a grand jury subpoena from the U.S. Attorney's Office in Northern California for similar information. On Oct. 2, the company said it found errors with past option grants and said it will need to restate results. (Headlines) (Options chart)

WSJ.com – PERFECT PAYDAY

**Maxim Integrated Products**

The Sunnyvale, Calif.-based maker of analog and mixed-signal integrated circuits said on June 7 that the SEC is conducting an informal inquiry of its stock-option grants and practices. On July 3, the company announced that it received a subpoena from the U.S. attorney for the Northern District of California asking for documents relating to option grants. (Headlines)

**McAfee Inc.**

On May 30, McAfee ended the employment of General Counsel Kent Roberts after an internal review of the company's employee stock options revealed an improper grant involving Roberts in 2000. McAfee announced on May 25 it is in informal talks with the SEC in connection with its stock-options practices. On June 9, McAfee disclosed it received a document subpoena pursuant to a formal SEC investigation.On July 27, McAfee said findings from a review of its practices and accounting for stock-option grants will force it to restate prior results for at least one, and possibly several, past periods. On Aug. 18, the company said it received a grand jury subpoena from the U.S. attorney's office for the Northern District of California relating to the termination of Roberts. On Oct. 11, the company said George Samenuk has resigned as the company's chairman and chief executive in the wake of findings of a stock-options probe. The board terminated the employment of Kevin Weiss as president. (Headlines)

**Meade Instruments**
▶ VIEW CHART

On June 13 the Irvine, Calif., optical-products maker disclosed that it received a notice of informal inquiry from the SEC following a May 22 Journal report that highlighted questionable stock-option grants. Between 1998 and 2002, its founder received six option grants. Two were dated at yearly-low closing prices. Another tied for a quarterly low. Immediately after one particularly well-timed grant, dated March 3, 2000, shares more than tripled over the next 20 trading days. The Journal's statistical analysis indicates that the likelihood of a pattern as favorable, or more favorable – without regard to share price – is about one in 800,000. The company's general counsel said he believed all options were granted properly. (Headlines) (Options chart)

**Medarex**

On May 24, the biopharmaceutical company said it had received a letter of informal inquiry from the SEC that said requested documents "related to Medarex's stock option grants and practices." On June 15, Medarex said it received a grand jury subpoena from the U.S. attorney's office in New Jersey. On August 18, the company declared that it plans to restate its financial results for 2000 through the first fiscal quarter of 2006 following the company's review of its historical stock option grant practices. (Headlines)

**Mercury Interactive**

Mercury Interactive disclosed that on May 15, a special board committee determined that the company's former CEO, who left in November 2005, "should be treated as having been terminated for cause." The committee concluded there was a "material breach" of fiduciary obligations, based on "actions and omissions in connection with option grants, option exercises and loans to him." Mercury had previously acknowledged "misdating" options, and has had its stock delisted by the Nasdaq Stock Market and has said it will have to restate financial results. On July 3, 2006, Mercury said that the SEC staff told Mercury that it may recommend that the SEC begin civil enforcement proceedings against three Mercury directors alleging the directors knew or should have known about the manipulation of option grant dates. On July 25, Hewlett-Packard said it will pay $4.5 billion to buy Mercury Interactive, despite the company's expectations to "continue to incur significant expense" to deal with options problems. (Headlines)

**Michaels Stores**

On June 14, the Irving, Texas, operator of arts-and-crafts stores said it understated compensation expenses by as much as $60 million between 1990 and 2001 because of stock options dating problems. On June 15, the company received a request from the SEC for it to retain documents for future production to the SEC. The company said it received a grand jury subpoena June 16 issued by the U.S. District Court for the Southern District of New York requesting documents relating to options grants during the period 1996 to the present. The company said Sept. 7 that a report from the company audit committee's independent legal counsel didn't support a conclusion that there had been intentional misconduct. Michaels said Sept. 7 that the U.S. Attorney for the Southern District of New York had withdrawn its grand jury subpoena in connection with the transfer of the matter to the Fraud Section of the Department of Justice. Michaels also said it received a grand jury subpoena issued by the U.S. District Court for the Northern District of Texas requesting options-related documents, which it believes are related to the transfer of the case. (Headlines)

WSJ.com - PERFECT PAYDAY

Page 13 of 21

| Company | SEC | Justice Dept. | Exec./ director departures | Restate- ments/ Charges | Comments |
|---|---|---|---|---|---|
| **Microsoft** | | | | | The Journal reported June 16 that the Redmond, Wash., software giant awarded options at monthly lows each July from 1992 to 1999, with varying dates. The software giant also routinely issued options to new employees at the stock's lowest closing price in the 30 days after they joined. In 1999 Microsoft took a charge for the practice and ended it. (Headlines) |
| **Microtune** | | | | X | The Plano, Texas, maker of radio frequency products for broadband communications applications said on Sept. 20 that its audit committee has reached the preliminary conclusion that the actual accounting measurement data for certain past stock option grants differed from the stated dates of the grants previously used for its accounting purposes. The company said the difference in the measurement dates will result in "non-cash, stock-based compensation charges that were not recorded in the appropriate period." (Headlines) |
| **Mips Technologies** | X | | | | On Sept. 19 the Mountain View, Calif., developer of computer processors said the SEC has recently requested that the company provide it with certain information relating to stock-option practices. The company had previously announced that it launched a voluntary internal review of historical stock-based compensation practices. On Oct. 25, the company said the probe has found the company didn't use the correct measurement dates to calculate compensation costs for certain stock-option grants in its financial statements. As a result, the company has determined that it will have to restate results. MIPS added that so far there is no evidence of intentional misconduct by current management. (Headlines) |
| **Molex** | X | X | | | The Lisle, Ill., maker of electronic components said on Aug. 2 that some of its executives will voluntarily pay the company $685,000 to cover gains from "misdated" stock options. CEO Martin Slark said the errors arose because the person responsible for the option-plan administration plugged the wrong dates into a computer system, sometimes being a few days off. The company said it informed the SEC about the matter. On Oct. 5, the company said it received a subpoena from the office of the U.S. Attorney for the Northern District of Illinois relating to its stock-option practices. The company said on Oct. 31 it faces an informal inquiry into its option granting processes by the SEC. (Headlines) |
| **Monster Worldwide** ◢▶ VIEW CHART | X | | X | X | The New York job-search company received a a subpoena from the U.S. Attorney for the Southern District of New York on June 12 relating to its option grants. Monster's securities filings show it made seven options grants between 1997 and 2001 to James J. Treacy, who became its No. 2 executive before leaving the company in 2002. One was dated at the stock's lowest closing price of 1997, and three others carried the lowest closing prices of various quarters. Other senior executives and employees also received grants with some of those dates. The company is conducting an internal review. On June 14, Monster said it had been notified of an informal SEC probe. On July 11, Monster said it may need to restate financial results for 2005 and prior years to record additional stock-based compensation charges. In a short statement on Sept. 19, Monster said longtime general counsel Myron Olesnyckyj was suspended "effective immediately." On Oct. 9, the company said Chairman and CEO Andrew McKelvey resigned both positions, citing in part the demands of coping with the options probe. On Oct. 30, Monster said McKelvey has resigned from the board and had declined to be interviewed by a board committee that is reviewing grants. The company said on Dec. 13 that former officials "intentionally" backdated option grants during a six-year period. Monster lowered nine years of reported net income by $272 million to account for the backdating. On Feb. 15, 2007, Myron Olesnyckyj, the former general counsel of Monster Worldwide, pleaded guilty to two criminal charges related to backdating stock options. (Headlines) |
| **msystems** | X | | | X | The Israeli flash-memory company said on June 1 that it has begun on its own initiative an internal review of stock-option grants without offering any further details. Msystems subsequently canceled a secondary share offering. On July 3, the company announced its board concluded that the actual measurement dates of certain past stock-option grants differ from the previously recorded measurement dates. The company said it intends to restate its financial statements for 2001 to 2005 and take charges in the first quarter of 2006. Also, the SEC is conducting an informal inquiry into the company's grants. On July 30, Sandisk agreed to buy msystems, which recently shortened its name from M-Systems Flash Disk Pioneers, for stock valued at about $1.55 billion. (Headlines) |

On Dec. 27, 2006 a Wall Street Journal article pointed out fortunate grant dates for the Houston oil-

WSJ.com - PERFECT PAYDAY

**Nabors Industries**

service company's option grants. A few days later the company launched an internal probe. On March 1, 2007, Nabors said an internal review found it had misdated a number of past stock-option grants. >On May 9, 2007, the company said the SEC plans to end a probe of stock-option granting practices and will recommend no enforcement action at this time. (Headlines)

**Newpark Resources**

The Metairie, La., provider of fluids management and services said on June 29 that a review of past stock option grants has shown that some of the options granted prior to June 2003 were dated on a day other than when it was approved, and the exercise price was determined in advance of their approval. The company will restate earnings and estimates its related reduction in pretax income for 2003 through 2005 to be less than $2 million. The company's former CEO and CFO were terminated (Headlines)

**Novell**

On Aug. 29, the Waltham, Mass., software maker disclosed that it has begun a "self-initiated, voluntary review" of the company's historical stock-based compensation practices and related potential accounting impact. Based on preliminary findings, the company said its board's audit committee has engaged independent outside legal counsel to conduct the review. (Headlines)

**Novellus Systems**

On May 23, the maker of chip-manufacturing gear reacted strongly to being named in a Merrill Lynch report regarding options pricing. Novellus said it had reviewed its process of granting options and hadn't found any irregularities. (Headlines)

**Nvidia**

On Aug. 10, the Santa Clara, Calif., video chip maker said the audit committee of its board is conducting a voluntary review of the company's stock option practices since its IPO in 1999. The audit committee reached a preliminary conclusion that incorrect dates were used for financial accounting purposes for grants in certain prior periods and it may record additional noncash stock-based compensation expense related to stock option grants. On Nov. 1, the company said it expects to restate its previously issued financial statements for fiscal years 2004 through 2006 and its latest first quarter, which ended April 30, to correct errors in accounting for its stock-based compensation. The company said the net impact of the restatement will be combined noncash charges of less than $150 million. (Headlines)

**Nyfix**

Nyfix, a Stamford, Conn., provider of financial trading and communication technologies, in mid-May said it received a grand jury subpoena from the U.S. Attorney's Office for the Southern District of New York. The subpoena calls for the production of all documents referring to, relating to or involving the granting of stock options for the time period from 2000 to the present. Nyfix said it intends to cooperate fully. (Headlines)

**Openwave Systems**

The provider of open software for the communications industry said May 22, 2006 it received a letter of informal inquiry from the SEC. The Redwood City, Calif., company said the SEC seeks documents related to Openwave's stock-option and stock-option practices. On July 5, Openwave disclosed that U.S. attorneys for the Northern District of California and the Southern District of New York issued it subpoenas tied to its past options practices. On Oct. 4, OpenWave said it found measurement dates for certain grants differed from the recorded grant dates and will likely cause the company to restate its results. The company said a special committee hasn't found evidence of any option-grant fraud or manipulation. (Headlines)

**Pediatrix**

The Fort Lauderdale, Fla, provider of pediatric services said Dec. 6, 2006 that its audit committee expects to conclude that there were deficiencies in its options-granting process, including instances of grant backdating. It estimates it may have to recognize additional compensation expense of about $28 million, in the aggregate, on a pretax basis for the 1995 through 2006 period. Lawrence Mullen, who has served as the company's chief financial officer and chief operating officer, resigned from the board. The company said Mullen had a "significant" role in the administration of a company's stock options program. The company said it is cooperating with an informal SEC investigation. (Headlines)

**Pixar**

Disney disclosed on Nov. 9 that it had received government inquiries about past stock-option grants at its recently acquired Pixar Animation Studios. The the Burbank, Calif. media giant said it has begun an independent review of Pixar's option grants after inquiries from the SEC and the Justice Department. Disney said March 16, 2007 that it concluded that options at Pixar were backdated before its acquisition of the company, but said no one now associated with Disney committed "any intentional or deliberate acts of misconduct." The statement appeared to indicate that Steve Jobs, a Disney director and Pixar's founder, won't be faulted by Disney. (Headlines)

The Santa Clara, Calif., Internet-networking chip maker said its audit committee completed a review of its stock-option-award practices. The audit committee concluded that, while the company used

**PMC-Sierra**

incorrect accounting measurement dates for certain stock-option grants awarded primarily during the years 1998-2001, "those errors were not the product of any deliberate misconduct by the company's executives, staff, or members of its board of directors." On Nov. 9, the company disclosed that the SEC has begun an informal inquiry into its past stock-option-granting practices. (Headlines)

**Power Integrations**

On May 24, San Jose, Calif., chip maker said the SEC and the U.S. Attorney's Office for the Northern District of California were investigating its stock-option practices. Chairman Howard Earhart resigned May 5, as the company said it probably will need to restate nearly seven years of financial results because of options problems. On July 31 the company said the Nasdaq will delist its shares because the company won't become current in its SEC filings by the Aug. 2 deadline. Power Integrations cited new information on how it accounts for stock option grant dates for the filing delay. (Headlines)

**Progress Software**

The Bedford, Mass., maker of application infrastructure software on June 19 delayed its earnings figures due to a voluntary review of its stock-option grants since the beginning of fiscal 1996. Progress said the review, being carried out by its audit committee along with outside legal counsel, was in response to recent media attention and investor inquiries. Progress said June 27 that it has received written notice that the Boston office of the SEC is conducting an informal inquiry into the company's options practices from Dec. 1, 1995 through Nov. 30, 2002. (Headlines)

**Quest Software**

On May 22, the Aliso Viejo, Calif., software maker said its board had formed a special committee to investigate historical stock-option practices and related accounting. Quest said it began this investigation following the release of a third-party report about the timing and pricing of stock-option grants. On June 1, Quest said it had received noticed of an informal SEC inquiry into past options grants. On July 5, Quest said that it will restate more than five years of financial statements after an internal investigation found that "many" stock options to employees were wrongly dated. On Nov. 24, the company said it accepted the resignation of M. Brinkley Morse, senior vice president, corporate development, after he declined to be interviews in the options probe. (Headlines)

**QuickLogic**

The Sunnyvale, Calif., maker of programmable logic devices said on Aug. 7, 2006 that it received an informal inquiry from the SEC requesting documents and information relating to its stock-option grants. The company said it received notice of the inquiry last week following its disclosure to the SEC that it is conducting an internal review of its stock-option practices and related accounting. On March 23, 2007, the company said that the SEC's informal inquiry has been terminated and that no enforcement action has been recommended. (Headlines)

**Rambus**

The Los Altos, Calif., maker of technology that speeds up memory chips, said on May 30 that the audit committee of its board has begun an internal investigation of the timing of past options grants and other potentially related issues. The committee expects to focus primarily on options issued in or before 2003 and will be assisted by outside legal and accounting experts. On June 27, Rambus announced that the board's audit committee reached a preliminary conclusion that the actual measurement dates for certain grants issued in prior years differed from the recorded grant dates. On July 19, the company said it plans to restate financial statements dating back to 2003 and incur "significant" costs to correct errors related to its stock-option accounting. Shares of Rambus plunged on the news. On Aug. 15, the company said former CEO Geoff Tate plans to resign from the board, in the wake of improper stock-options dating at the company. On Oct. 19, the company said improper past stock options would result in charges of more than $200 million. (Headlines)

**Redback Networks**

On June 30, the Sunnyvale, Calif., high-speed Internet networking company said it received an informal request from the U.S. Securities and Exchange Commission for information related to historical stock-option grants. The company said it was also subpoenaed by the U.S. Attorney for the Northern District of California related to stock-option grants. (Headlines)

**Renal Care** ▶ VIEW CHART

German dialysis company Fresenius Medical Care said on June 2 that its U.S. subsidiary Renal Care Group was subpoenaed by the U.S. government for information about its stock-option grants. A Journal report had pointed out grants made between 1997 and 2002 preceded sharp run-ups. Fresenius bought Renal Care in a $3.5 billion deal that closed in early 2006. (Headlines)

**Restoration Hardware**

On Aug. 28, the company said it would record $700,000 in stock option expenses and a $600,000 charge related to the company's review of past stock-option practices. The firm said it determined it had misdated the accounting of some of its previously granted stock options, mainly from 2002 to 2004. The company added that the accounting errors were not material to the results of previously reported periods or the current fiscal year. (Headlines)

WSJ.com - PERFECT PAYDAY

**Research In Motion** ✗ ✗

On Sept. 28, 2006, the Waterloo, Ontario, maker of BlackBerry devices said that it has started a voluntary internal review of stock-option practices. The review identified errors that could reduce past earnings by as much as $45 million. On Oct. 13, the company said it has found another accounting error, requiring adjustment to prior results, relating to a "net settlement" feature in the company's stock-option plan prior to February 2002. On Oct. 27, the company said that it is subject to an informal SEC inquiry. (Headlines)

**RSA Security** ✗ ✗ ✗

The software maker announced on June 13 that it got a document subpoena from the U.S. Attorney for the Southern District of New York regarding stock-option grants from 1996 to the present. Earlier, Bedford, Mass.-based RSA received a letter of inquiry and document request from the SEC. RSA said the SEC staff noted that the letter shouldn't be construed as an indication that any violation of law has occurred. RSA said it intends to cooperate fully with the SEC in this matter. (Headlines)

**SafeNet** ✗ ✗ ✗ ✗

SafeNet said in May 2006 it has received a subpoena from the Office of the U.S. Attorney for the Southern District of New York related to the company's granting of stock options. SafeNet also said it received a letter of informal inquiry from the SEC requesting information related to the company's stock-option grants and certain accounting policies and practices. The Baltimore information-security company said it will cooperate fully with both requests. On July 26, the company said it plans to restate results from the fourth quarter of 2002, with further restatements possible. On Sept. 18, the company said it will restate its prior financial statements for the periods from 2000 through March 31, 2006 to correctly account for stock-option grants that were awarded with improper dates. On Oct. 18, 2006 the company said its chairman and CEO, and acting CFO, were stepping down as a result of the probe. (Headlines)

**Sapient** ✗ ✗ ✗

Sapient said on Oct. 17, 2006 that co-founder Jerry A. Greenberg stepped down as CEO and Susan D. Cooke resigned as acting chief financial officer. The consulting company said it planned to record noncash charges because of findings from its investigation into stock-based compensation practices. Sapient's audit committee identified options grants awarded principally from 1997 through 2001 that had incorrect measurement dates and weren't appropriately accounted for. (Headlines)

**Sanmina-SCI** ✗ ✗ ✗

On June 9, the SEC requested information regarding the San Jose, Calif., electronic contract manufacturer's stock-option grants since 1997. Sanmina-SCI, which noted it plans to fully cooperate with the SEC's request, said it has already initiated an internal inquiry concerning grants to its executive officers. On Aug. 14, the company said it has delayed the filing of its 10-Q for the quarter ended July 1 after discovering what may be discrepancies in its accounting for stock options, although it stressed that its initial findings aren't conclusive. The company said on Sept. 13 that it will restate its financial results for periods as far back as 2002, and will incur additional, material charges in those periods because of errors in accounting for past stock-option grants. On Oct. 12, the company said a U.S. grand jury is probing its stock-option grant practices, adding that its own internal probe found that most option grants to executives and employees weren't correctly dated or accounted for since 1997. Sanmina-SCI said it plans to restate its historical results and record noncash compensation charges. The company's four-month investigation found that a former executive and a current manager improperly dated or accounted stock options from 1997 to 2006. The current executive, who the company declined to disclose, has resigned. (Headlines)

**Semtech** ✗ ✗ ✗

Semtech said on June 14 that it won't be able to file its quarterly report for the period ended April 30 in time. It also said it got a subpoena from the U.S. attorney in Manhattan for options-related information. On May 22, the Camarillo, Calif., semiconductor supplier declared that it had received a letter of informal inquiry from the SEC, and that it is cooperating fully. The company said the SEC is seeking information related to stock options granted since Jan. 1, 1997. On July 20, the company announced that it will restate its financial results for fiscal years 2002 through 2006 to record additional "material" stock-compensation expense after an internal inquiry found problems with the granting of stock options. (Headlines)

**Sepracor** ✗ ✗

The Marlborough, Mass, pharmaceutical company said on June 2 that it received a letter of inquiry from the SEC requesting documents related to stock-option grants and stock-option practices. Sepracor says it has created a special committee to oversee a review. On Aug. 10, the company said it will restate financial results for the past three years because of discrepancies in employee stock options grants that inflated their value. (Headlines)

**Sharper Image** ✗

On Sept. 7, the San Francisco gadget retailer said it began a probe into its stock-option practices. The board formed a special committee and is conducting the stock-option review with assistance of

http://online.wsj.com/public/resources/documents/info-optionsscore06-full.html    5/18/2007

**Sigma Designs**

independent legal counsel and independent accounting experts On Sept. 18, the company said it will restate results for three fiscal years and two quarters due to options. (Headlines)

**Silicon Image**

On July 26, the Milpitas, Calif., technology company reported that the SEC had begun an inquiry into its options granting practices. (Headlines)

**Sonus Networks**

The Sunnyvale, Calif., semiconductor maker said on Oct. 31 that it received notice that the SEC is informally investigating the company's option-granting practices from Jan. 1, 2004 through the present. The company, which voluntarily began an internal review of its option-granting practices, said it plans to cooperate fully with the SEC. (Headlines)

The Chelmsford, Mass. telecom-equipment maker said on Nov. 6 that its audit committee reached a preliminary conclusion that appropriate measurement dates of certain stock-option grants, primarily in fiscal 2000 to 2003, differ from the recorded grant dates. Additional noncash charges for stock-based compensation expense will be material, and Sonus said financial statements for fiscal 2000 through 2005, and the first two quarters of 2006, should no longer be relied upon. (Headlines)

**Stolt-Nielsen**

The London-based shipping concern said in an annual report filed on June 1 with the SEC that it backdated stock-option grants for executives and employees in 2003 and 2004, and it took a charge to correct the accounting for the awards. On July 6, the company said it is the subject of an inquiry by the SEC over its stock-option plan. (Headlines)

**Sunrise Telecom**

On Sept. 20, the San Jose, Calif., telecom-equipment maker said an internal review determined that it used an incorrect measurement date to account for stock options granted in January 2001. The company said the review didn't find any evidence of deliberate misconduct. Sunrise Telecom will restate results for the fiscal years 2001 through 2005. The total noncash compensation charge for those periods is expected to be approximately $6 million. The SEC notified the company that it is the subject of an informal inquiry. (Headlines)

**Sun-Times Media**

The Chicago newspaper publisher, formerly Hollinger International, said on Nov. 8 that said it is conducting an investigation into stock option awards to executives and key employees through 2003 when the company ceased granting stock options. The company said it has discovered that some stock options issued between 1999 and 2002 had been "misdated," but that it sees no material impact from the options issue. Sun-Times said its probe is continuing and that if the misdating is found to be intentional, it may restate its reports. (Headlines)

**Sycamore Networks**

The Chelmsford, Mass., optical gear firm said May 23 that it was informed that the SEC has started formal investigation related to certain stock options granted by the company during calendar years 1999 through 2001 that were erroneously accounted for under GAAP. The company said it had previously instituted and completed an independent investigation into this matter and subsequently restated financial results for fiscal years 2000 through 2004 and for the first two quarters of fiscal 2005. Sycamore announced May 30 that the U.S. attorney's office for the District of Massachusetts issued a grand jury subpoena seeking documents related to option grants. It said July 11 that an employee filed suit alleging wrongful termination. The suit includes an internal memo that shows keeping their actions hidden from auditors. On Sept. 19, Sycamore said it plans additional restatements from 2003 through 2005 to record additional non-cash charges for stock-based compensation expenses. (Text of suit) (Text of internal memo) (Headlines)

**Take-Two Interactive Software**

The New York entertainment software company disclosed on July 10, 2006 that the SEC opened an informal investigation into stock-option grants dating back to January 1997. Take-Two said it plans to fully cooperate and also is conducting its own investigation. The company said on Aug. 31 that it has received additional grand-jury subpoenas requesting documents regarding stock options, compensation and expenses. On Dec. 11, the company said an independent investigation found improprieties in the process, and it will need to restate its historical financial results to record charges for compensation expense related to option grants. On Jan. 21, 2007, the company accused former Chairman and Chief Executive Ryan Brant of backdating stock options spanning a six-year period. On Feb. 14, 2007, Mr. Brant pleaded guilty to a false filing charge, agreeing to pay $7.3 million in disgorgement, interest and penalties in connection with the New York criminal case and a SEC civil probe. Brant agreed to settle the SEC probe without admitting or denying wrongdoing. (Headlines)

The Agoura Hills, Calif., videogame software company disclosed on Aug. 7, 2006 that it has received an informal inquiry from the SEC requesting certain documents and information relating to the company's stock-option grant practices from 1996 to the present. On Jan. 19, 2007, the announced it

is recording extra noncash stock-based compensation expense and related tax effects of $2.2 million for fiscal year 2006 ended March 31, 2006, $1.4 million for fiscal 2005, and $1.8 million for fiscal 2004. (Headlines)

**THQ**

**Trident Microsystems** 

According to a WSJ analysis, grants at the Sunnyvale, Calif., chip maker have preceded sharp run-ups. Each of seven grants between 1995 and 2001 to Chief Executive Frank Lin were dated ahead of a double-digit rise in share price over the next 20 trading days. Trident said it has referred the matter to its audit committee for review. It added that during 2004, the company received and responded to an SEC inquiry regarding its stock option grants to executive officers for a period from 2000 to 2004. Trident said June 16 it has received a subpoena from the U.S. Attorney's office in New York; it also said that on May 26 its board set up a special committee to examine past grants from 1995 to 2004. On Sept. 11, the company said certain stock-option grants may have differed from the recorded grant dates, possibly resulting in additional charges. Based on preliminary findings, the company expects it will "likely" have to restate financials "for at least some periods." On Nov. 20, Trident said a special committee found the company used incorrect measurement dates when accounting for option grants. Also, Frank Lin resigned as CEO and chairman, effective Nov. 15. The company expects to record noncash charges of $40 million to $50 million in periods between 1994 and 2006. (Headlines) (Options chart)

**Ulticom**

The publicly traded Comverse subsidiary said on April 17 that it would delay filing financial results because of changes involving options grants. On August 9, the SEC filed civil charges against three former executives of Comverse for backdating. Among other allegations, the regulator says former Comverse CFO David Kreinberg initiated a backdating scheme at Ulticom. On Sept. 6, Ulticom said that it received an subpoena related to the SEC's investigation of majority owner Comverse Technology's stock-option practices. (Headlines)

**UnitedHealth**  

On May 11, the Minnetonka, Minn., health insurer acknowledged problems with the way it administered its stock-option grants and warned that it might have to restate past results, lose some valuable tax deductions and take charges that could reduce the past three years' net earnings by $286 million. In addition, the company said it was the subject of an "informal" SEC inquiry into its practices. Federal prosecutors in Manhattan have begun a criminal probe. UnitedHealth also said the IRS had made a request for documents. On June 7, Minnesota Attorney General Mike Hatch said he plans to investigate the health insurer concerning its stock-option grants. On Oct. 15, the company said Chairman and CEO McGuire was departing, as was the company's general counsel. On Nov. 8, the company said it would have to take charges related to its backdated stock options that will be "significantly greater" than its previous estimates and expects the charges to impact more than 10 years of previously reported results. n Dec. 26, 2006, the company said the SEC investigation was now a formal probe. (Headlines) (Options chart)

**Valeant Pharmaceuticals**

The Costa Mesa, Calif., pharmaceutical company said on Sept. 11 that the SEC was looking into historical stock-option grants. On Oct. 23, the company said it will likely have to restate at least some of its financial statements as far back as 1997 because of improper accounting for stock-option grants. (Headlines)

**Verint**

The publicly traded Comverse subsidiary said on April 17 that it would delay filing financial results because of changes involving options grants. On July 20, the SEC asked Verint to provide documents and information related to a stock-option grants investigation into Comverse. (Headlines)

**VeriSign**

The Mountain View, Calif., company disclosed on June 27 that it received a subpoena from the U.S. Attorney for the Northern District of California requesting documents related to the company's stock-option grants and practices. VeriSign said it also received an informal inquiry from the SEC, requesting documents related to its stock option grants. (Headlines)

**Vitesse Semiconductor**  

In late April, the Camarillo, Calif., chip maker suspended its CEO, CFO and an executive vice president, saying the decision was related to the "integrity of documents" involving its stock-option program. Later, Vitesse said its board had discovered additional accounting issues that called into question more than three years of financial results, delayed its next quarterly report and hired a turnaround firm. In May, it terminated the CEO, CFO and the executive vice president whom it had previously placed on leave. (Headlines) (Options chart)

The Lake Forest, Calif., hard disk-drive maker said on July 27 that it would conduct an internal review of past stock-option grants. The review includes grants doled out from its 1998 fiscal year to the present. The company said preliminary findings suggested there may have been discrepancies







**Western Digital**

over dates for stock options that were granted between 1999 and 2003. On Oct. 24, the company said an internal investigation found that its 1999 annual employee option grant was intentionally backdated at a lower price by four independent board members. While the actions of the four directors was improper, the special committee didn't find that their actions were illegal. The company said it would file its delayed annual report for the year ended June 30 as soon as it could determine whether it needed to restate its past results to correct the errors. (Headlines)

**Wind River**

The Alameda, Calif., software maker said Sept. 11 it was delaying its quarterly filing due to an internal options probe. It hasn't yet concluded whether the accounting-measurement dates used for certain grants are correct, nor has it concluded whether differences would result in material non-cash compensation and related charges. (Headlines)

**Witness Systems**    ✕

The Roswell, Ga., software maker said on Aug. 9 that it identified discrepancies in the dates of stock-option grants issued from the company's February 2000 IPO through August 2002, when the Sarbanes-Oxley Act became effective. Witness Systems said it expects to record additional noncash charges of about $10 million for stock-based compensation costs in prior periods. The company said Oct. 30 that the SEC is conducting an informal inquiry of the company and is seeking information about the company's grant practices from February 2000 to the present. On Dec. 7, 2006, Witness said a board committee found mistakes in measurement dates of some grants. The company said no evidence of fraud or intentional misrepresentation was found. David Gould stepped down as CEO and chairman and will resign from the board. (Headlines)

**Xilinx**    ✓

The San Jose, Calif. chip company said June 23 that the SEC is making an informal probe into its 'practices, procedures and disclosures' related to its stock options grants. On July 25, Xilinx reported earnings, including a $1.5 million charge to cover what the company termed "minor differences between approval documentation and certain recorded stock option grant dates." On Aug. 16, the company said it has finished its investigation of its stock-options grants, finding no fraud but taking an additional $700,000 charge in its first fiscal quarter. On Nov. 30, 2006, Xilinx announced that the SEC has formally notified Xilinx that its investigation has been terminated and that no enforcement action has been recommended. (Headlines)

**Zoran**    ✕

The Sunnyvale, Calif., company disclosed on July 3, 2006 that it has received a notice of informal inquiry from the SEC requesting documents related to the company's stock option grants. It also received a grand jury subpoena from the U.S. attorney for the Northern District of California. On Feb. 20, 2007 the company said it plans to restate financial statements dating back to Jan. 1, 1997, to correct its accounting of some stock-option grants. It expects to record additional noncash charges of $12 million to $15 million for the period from 1997 through 2005. (Headlines)

Explanation: "SEC" indicates SEC contact or probe disclosed; "Justice Dept." indicates subpoena from U.S. attorney; "Exec./director departures" refers to departures attributed to grants examinations; "Restatements/charge" applies to situations where a company has said it will restate earnings and/or take a charge to earnings, beyond delaying filing. Companies listed but not checked have disclosed internal probes but no further news and/or have been identified by WSJ reporting as having grants that may need to be scrutinized for possible backdating. *Chart sources: WSJ, Dow Jones Newswires, SEC filings, the companies*

**Write to the Online Journal's editors at newseditors@wsj.com**

Return To Top

Subscribe   Log In   Take a Tour   Contact Us   Help   E-Mail Setup   Customer Service: Online | Print

Privacy Policy   Subscriber Agreement   Mobile Devices   RSS Feeds

News Licensing   Advertising   About Dow Jones

Copyright © 2007 Dow Jones & Company, Inc. All Rights Reserved

1:07CV00407 (EGS)

Case 1:07-cv-00407-EGS     Document 8-2     Filed 05/21/2007     Page 154 of 182

5/18/2007

**DOW JONES**

1:07CV00407 (EGS)

Case 1:07-cv-00407-EGS     Document 8-2     Filed 05/21/2007     Page 155 of 182

1:07CV00407 (EGS)

# EXHIBIT F

# CORNERSTONE RESEARCH

www.cornerstone.com
securities.cornerstone.com

## Securities
## Class Action
## Case Filings

# 2006: A Year in Review

---

**Research Sample**

- The Stanford Law School Securities Class Action Clearinghouse in cooperation with Cornerstone Research identified companies named as defendants in class action securities fraud filings from January 1, 1996 through December 18, 2006.
- The sample contains 2,461 federal class action filings, including 313 "IPO Allocation" filings, 66 "Analyst" filings and 44 "Mutual Fund" filings.

© 2007 by Cornerstone Research. All rights reserved.

CORNERSTONE RESEARCH

**Overview**

Class action securities fraud filings plunged to a record low in 2006, a year characterized by a strong stock market that exhibited lower volatility, and an increased focus on corporate controls. The 110 class actions filings ["filings"] in 2006 represent the smallest number of filings in a calendar year since the adoption of the Public Securities Litigation Reform Act ["PSLRA"] in 1995. Filings are down by 38 percent from the 178 filed in 2005 and are 43 percent lower than the ten-year historical average of 193.[1] The decline from historical average is statistically significant. This sharp decline in the number of companies sued in class action securities litigation began in the second half of 2005 and has now continued for 18 months.

The losses in total market capitalization associated with 2006 filings also declined substantially from already reduced levels observed in 2005. If market capitalization losses are measured as of the last day of the class period, typically the day on which the alleged fraud is disclosed (Disclosure Dollar Loss), the losses decreased by 44 percent from $93 billion in 2005 to $52 billion in 2006. If market capitalization losses are instead measured by the largest capitalization decline experienced during the class period (Maximum Dollar Loss) then losses decreased by 19 percent from $362 billion in 2005 to $294 billion in 2006.[2]

These dramatic declines are even starker when options backdating claims are excluded from the sample on the theory that these cases are unlikely to be repeated. Excluding the 22 options backdating cases (2 in 2005 and 20 in 2006) suggests a "core" litigation rate of 90 companies sued in 2006 (a 49 percent decline from the 2005 and 53 percent below the historic average), with Disclosure Dollar Losses of $42 billion (a 54 percent decline from 2005 and 66 percent below the historic average), and Maximum Dollar Losses of $198 billion (a 43 percent decline from 2005 and 71 percent below the historical average).

The lower level of litigation activity that first manifested itself in the second half of 2005 could be related to a combination of three factors. First, more vigorous enforcement activity by the SEC and the Department of Justice, combined with heightened sensitivity following high publicity filings and settlements such as Enron and WorldCom, along with the passage of the Sarbanes-Oxley Act of 2002, may have caused corporations to engage in less risky behavior, thereby reducing the number of filings and the dollars at issue in the claims that are filed. Second, U.S. stock prices have generally increased and volatility has remained low in 2005 and early 2006. Because volatility is an important determinant of the likelihood of securities litigation, lower volatility tends to be associated with a lower number of filings. Third, the dramatic boom and bust of U.S. equities in the late 1990s – early 2000s is now sufficiently far in the past that the large majority of lawsuits relating to that period are behind us.

**1**

---

[1]  2006 filings are those identified as of 12/18/2006 and include cases filed up to 12/11/2006. There are typically very few cases filed during the remainder of the year.

[2]  Maximum Dollar Loss and Disclosure Dollar Loss are defined in the "Market Capitalization Declines" section.

© 2007 by Cornerstone Research. All rights reserved.

CORNERSTONE RESEARCH

**Overview**
*continued*

Consistent with the decline in investor losses, there was also a sharp decline in the incidence of large dollar value claims. There was 1 "mega" Disclosure Dollar Loss [DDL] filing with a DDL of $5 billion or more in 2006, compared to 5 such filings in 2005. In 2006, there were 8 "mega" Maximum Dollar Loss [MDL] filings with an MDL of at least $10 billion, of which 4 were options backdating-related filings. There were 9 "mega" MDL filings in 2005, only 1 of which was an option backdating-related filing.

Finally, the overall distribution of the types of complaint allegations in 2006 remained similar to the distribution observed in 2005, with the exception that the share of cases alleging GAAP violations increased from 44 percent to 68 percent, and that the incidence of option backdating litigation helped increase the "Other" classification of accounting allegations from 37 percent in 2005 to 63 percent in 2006.

2

| Complaint Filings Box Score | | | |
|---|---|---|---|
| | Average (1996 – 2005) | 2005 | 2006 |
| Class Action Filings | 193 | 178 | 110 |
| Disclosure Dollar Loss ($ Billions) | $124 | $93 | $52 |
| Maximum Dollar Loss ($ Billions) | $680 | $362 | $294 |

Exhibit 1

**1:07CV00407 (EGS)**

© 2007 by Cornerstone Research. All rights reserved.

CORNERSTONE RESEARCH

**Number of Filings[3]**

In order to examine the trends and events in securities litigation over time, the Stanford Law School Class Action Clearinghouse in cooperation with Cornerstone Research has developed several litigation activity indices. The first group of indices measures the level of securities class action activity based solely on the number of filings. The Class Action Filings Index (CAF Index™) tracks a simple count of new cases, and the Filings per Issuer Index (FPI Index™) tracks filings related to companies listed on the NYSE, Nasdaq, and Amex as a percentage of all companies listed on these exchanges at the start of the year.

The CAF Index™ tracks the number of filings throughout the calendar year. Excluding IPO Allocation, Analyst, and Mutual Fund filings, the number of Traditional filings decreased by 38 percent from 178 in 2005 to 110 in 2006 (see Exhibit 2). The CAF Index™ demonstrates the fluctuations in litigation activity over time, with low activity in 1996 (possibly caused by the fact that plaintiff counsel accelerated filings into 1995 in order to avoid the new provisions of the PSLRA) and with the highest activity in 1998. The 110 cases filed in 2006 represent the lowest yearly activity thus far in our sample. The decline in filing activity is even greater when options backdating cases are removed; this results in a "core" litigation rate of only 90 cases in 2006.

3



**CAF Index™ – Number of Class Action Filings
1996 – 2006**

1996 – 2005 Average (193)

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 112 | 174 | 240 | 208 | 214 | 179 | 226 | 186 | 211 | 178 / 176 | 110 / 90 |
| 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |

Note: 2005 and 2006 figures include options backdating cases (represented by shaded area).

Exhibit 2

---

3   **Classification of Filings**

A new type of class action filing occurred during each year from 2001 – 2003. First, in 2001 there were over 300 "IPO Allocation" filings with allegations related to the share allocation in an initial public offering. Second, in 2002 there were a number of "Analyst" filings with allegations that defendants, primarily investment banks and individual analysts at these banks, had issued research reports and ratings that were neither independent nor objective. Third, starting in the second half of 2003, there were "Mutual Fund" filings that contained allegations related to market timing, lack of disclosure, and the breach of fiduciary duty by mutual fund companies and other financial intermediaries. In addition to mutual fund market timing cases, there were new mutual fund cases filed in 2004 and 2005 with allegations related to incentives and sales practices of the mutual funds' financial advisors. In total, the number of "atypical" cases declined in 2005, with only 3 filings, all Mutual Fund, occurring during the year. In 2006, there was only one atypical case, a Mutual Fund filing. As a result of the atypical filings in 2001–2006, we sort filings in this report into four categories: "IPO Allocation," "Analyst," "Mutual Fund," and "Traditional" filings. The IPO Allocation, Analyst, and Mutual Fund filings can be considered distinct types of class action lawsuits, having characteristics unlike the Traditional securities class action filings. Therefore, we consider the Traditional litigation to be a more appropriate measure of ongoing activity and we emphasize this measure in the comparisons provided throughout the report. Our indices and exhibits exclude IPO Allocation, Analyst, and Mutual Fund filings.

© 2007 by Cornerstone Research. All rights reserved.

CORNERSTONE RESEARCH

**Number of Filings**
*continued*

The Filings per Issuer Index (FPI Index™) also shows a decrease in litigation activity in 2006 relative to 2005 (see Exhibit 3). Of all the companies listed on the NYSE, Nasdaq, and Amex at the start of the year, only 1.5 percent were defendants in Traditional class action lawsuits filed in 2006, compared to 2.4 percent in 2005 and the 2.2 percent annual average for the 1996 – 2005 period. Despite the lower number of filings in 1996 compared to 2006, the FPI Index™ is higher in 2006 because the total number of companies listed on the NYSE, Nasdaq, and Amex exchanges has decreased by 25% since 1996.

4



Exhibit 3

**1:07CV00407 (EGS)**

© 2007 by Cornerstone Research. All rights reserved.

CORNERSTONE RESEARCH

**Market Capitalization Declines**

To measure the relative size of class action filings, our second group of indices tracks market capitalization declines during class periods. By reviewing measures of filing activity that distinguish between filings that involve multi-billion dollar market value declines (e.g., WorldCom) and filings that reflect much smaller market value declines, we can develop a more refined understanding of the intensity of class action activity. Specifically, for each filing we calculate two measures of decline in the defendant firm's market capitalization: "Maximum Dollar Loss" and "Disclosure Dollar Loss." These measures reveal a dramatic falloff in securities class action activity in 2003 through 2006 relative to 2001 and 2002.

The first measure, Disclosure Dollar Loss, is calculated as the decrease in the market capitalization of the defendant firm from the trading day immediately preceding the end of class period to the trading day immediately following the end of the class period. Disclosure Dollar Loss should not be considered a measure of liability; it only represents an estimate of the impact of the market-, industry-, and firm-specific information revealed at the end of the class period, including information unrelated to the litigation. The second measure, Maximum Dollar Loss, is calculated as the dollar value decrease in the market capitalization of the defendant firm from the trading day on which the defendant firm's market capitalization reached its maximum during the class period to the trading day immediately following the end of the class period. As with Disclosure Dollar Loss, Maximum Dollar Loss does not measure potential liability; rather, it provides an indication of the loss in market value irrespective of the cause.

We measure losses using both simple dollar totals and totals relative to the size of the overall stock market. The Disclosure Dollar Loss Index (DDL Index™) tracks the running sum of Disclosure Dollar Loss for all class action lawsuits filed year-to-date.

The DDL Index™ shows a large decrease in disclosure losses in 2006 from earlier years (see Exhibits 4 and 5). Total DDL for 2006 was $52 billion, representing a decrease of 44 percent relative to 2005 and a decrease of 58 percent relative to the 1996 – 2005 average. Disclosure losses in 2006 were much lower than the levels reached in 2000 to 2002.

Similar to the DDL Index™, the Disclosure Percent Loss Index (DPL Index™) tracks the running sum of DDL as a percentage of the Wilshire 5000.[4] The DPL Index™ also shows a decrease in disclosure losses in 2006 compared to 2005 and smaller losses than the historical averages (see Exhibit 5). The total DDL in 2006 represented 0.4 percent of the capitalization of the Wilshire 5000, compared to 0.8 percent of the capitalization of the Wilshire 5000 in 2005 and, on average, 1.1 percent of the capitalization of the Wilshire 5000 during 1996 – 2005.

**5**

**1:07CV00407 (EGS)**

[4]  Please see securities.cornerstone.com for complete details on the DPL Index™ calculation

© 2007 by Cornerstone Research. All rights reserved.

CORNERSTONE RESEARCH

**Market Capitalization Declines** *continued*

6



Exhibit 4



Exhibit 5

© 2007 by Cornerstone Research. All rights reserved.

**1:07CV00407 (EGS)**

CORNERSTONE RESEARCH

**Market Capitalization Declines** *continued*

As shown in Exhibit 6, Disclosure Dollar Losses in 2006 were lower than those in 2005, and much lower than the levels reached in 2000 to 2002. This decrease is the result of a combination of fewer filings and lower average DDL for cases filed in 2006 relative to 1996 – 2005. We discuss statistics for typical filings later in the report.

7



Disclosure Dollar Loss
1996 – 2006
*Dollars in Billions*

Note: 2005 and 2006 figures include options backdating cases (represented by shaded area).

Exhibit 6

© 2007 by Cornerstone Research. All rights reserved.

CORNERSTONE RESEARCH

**Market Capitalization Declines** *continued*

The Maximum Dollar Loss Index (MDL Index™) tracks the aggregate MDL for all class action law-suits filed year-to-date. The Maximum Percent Loss Index (MPL Index™) tracks the MDL as a percentage of the Wilshire 5000.[5]

8



Exhibit 7

[5] Please see securities.cornerstone.com for complete details on the MPL Index™ calculation.

© 2007 by Cornerstone Research. All rights reserved.

**1:07CV00407 (EGS)**

CORNERSTONE RESEARCH

**Market Capitalization Declines** *continued*

Similar to the DDL Index™, the MDL Index™ shows a decrease in market value declines for companies subject to class action filings in 2006 compared to 2005 and is dramatically lower when compared to historical averages and 2001 and 2002 (see Exhibit 7). The total MDL decreased 19 percent in 2006 relative to 2005 and was 57 percent lower than the 1996 – 2005 average. Compared to 2001 and 2002, the total MDL in 2006 decreased 80 percent and 86 percent, respectively. As in the case of Disclosure Dollar Losses, the falloff from 1996 – 2005 levels is the result of a combination of fewer filings and lower average MDL for cases filed in 2006 relative to 1996 – 2005.

A closer look at annual data reveals that the MDL Index™ was significantly higher in 2001 and 2002 than in previous years (see Exhibit 7). Many of the cases filed between 2000 and 2002 were related to the boom and bust of U.S. equities in the late 1990s–early 2000s. It is likely that most high profile securities class action cases related to the boom and bust had already been filed by the end of 2002. Not surprisingly, the number of case filings and the market capitalization losses underlying those filings went down in 2003 – 2006. In addition, as explained above, the lower number of filings and associated market capitalization losses may in part be a result of improvements in corporate governance following high profile filings such as Enron and WorldCom and the passage of the Sarbanes-Oxley Act of 2002.

The continued low levels of stock market volatility in 2006 may be yet another reason for the lower number of securities class action filings. Because volatility is an important determinant of the likelihood of securities litigation, lower volatility tends to be associated with a lower number of filings.

9



Exhibit 8

© 2007 by Cornerstone Research. All rights reserved

CORNERSTONE RESEARCH

**Market Capitalization Declines** *continued*

The MPL Index™ shows a similar decline. The MDL for all filings in 2006 represented 2.5 percent of the Wilshire 5000 during the class periods (see Exhibit 9). This compares to 3.2 percent for filings in 2005 and 5.7 percent for cases filed during 1996 – 2005.



10



Exhibit 9

© 2007 by Cornerstone Research. All rights reserved.

CORNERSTONE RESEARCH

**Market Capitalization Declines** *continued*

Clearly, market capitalization declines over extended periods of time may be driven by market and industry factors. To the extent that these declines are unrelated to specific allegations in class action complaints, indices based on aggregate losses during class periods would not be representative of potential defendant exposure to class action activity. This is especially relevant for the post-*Dura* securities litigation environment.[6]

Exhibit 10 provides a more detailed look at the typical filing. The size of Disclosure Dollar Losses of the median filing in 2006 was lower than 2005 and even further below historical averages. The DDL of the average filing decreased 13 percent, from $595 million in 2005 to $519 million in 2006, and decreased 24 percent from the historical average of $683 million. The median DDL of $111 million for 2006 decreased 28 percent from 2005 with a median DDL of $154 million, but increased 10 percent from the historical median of $101 million. The median MDL in 2006 was $0.4 billion, compared to $0.5 billion in 2005 and $0.6 million during 1996 – 2005. The MDL of the average filing increased 26 percent, from $2.3 billion in 2005 to $2.9 billion in 2006, and declined 22 percent from the historical average of $3.7 billion.

**11**

|  | Filings Comparison | | |
|---|---|---|---|
|  | Average (1996 – 2005) | 2005 | 2006 |
| Class Action Filings | 193 | 178 | 110 |
| **Disclosure Dollar Loss** | | | |
| Total ($ Millions) | $123,650 | $92,748 | $52,398 |
| Average ($ Millions) | $683 | $595 | $519 |
| Median ($ Millions) | $101 | $154 | $111 |
| **Maximum Dollar Loss** | | | |
| Total ($ Billions) | $680 | $362 | $294 |
| Average ($ Billions) | $3.7 | $2.3 | $2.9 |
| Median ($ Billions) | $0.6 | $0.5 | $0.4 |

Exhibit 10

[6] In April 2005, the Supreme Court ruled that plaintiffs in a securities class action case are required to establish a causal connection between alleged wrongdoing and subsequent shareholder losses. Plaintiffs therefore cannot merely allege that a stock price was inflated by fraud at the time they purchased their shares. Instead, they must allege and prove that the losses they ultimately suffered were caused by the fraud and not by other intervening factors, such as a general decline in the stock market, or a sector-specific stock price decline. The Supreme Court's decision reversed a holding by the Ninth Circuit Court of Appeals that, had it survived review, could have materially increased the volume of securities fraud litigation by allowing plaintiffs to file weaker claims alleging only a remote connection to the plaintiffs' actual losses. The decision in *Dura* also clearly calls into question plaintiff-style damage calculations that seek to measure damages as the simple difference between inflation at the time of purchase and inflation as of the date of the corrective disclosure without taking into account the influence of other non-fraud factors on the issuer's stock price. *Dura* thereby also underscores the value of careful economic analysis in identifying the portions of a stock price decline that are caused by factors other than the fraud and that therefore cannot support the award of damages.

© 2007 by Cornerstone Research. All rights reserved

**Mega Filings**

Analysis of "mega" filings offers additional evidence of the decrease in litigation activity from 2005 to 2006.

*Disclosure Dollar Loss*

In 2006 there was only 1 "mega" DDL filing, i.e. a filing with a DDL of $5 billion or more. This 1 filing is responsible for 36 percent of the total DDL in 2006. In contrast, there were 5 "mega" DDL filings responsible for 44 percent of the total DDL in 2005.

*Maximum Dollar Loss*

In 2006 there were 8 "mega" MDL filings, i.e. filings with an MDL of $10 billion or more. These 8 filings were responsible for 67 percent of the total MDL in 2006. This compares with 9 "mega" MDL filings responsible for 58 percent of the total MDL in 2005. Options backdating cases contributed 4 "mega" MDL filings in 2006 and 1 in 2005, representing 18% and 3% of the total MDL, respectively.

There were 54 "mega" DDL filings and 132 "mega" MDL filings during 1996 – 2006. Of these, 27 "mega" DDL filings and 73 "mega" MDL filings were concentrated in 2000–2002. These findings are consistent with our earlier observation that many securities lawsuits related to the boom and bust of U.S. equities at the turn of the century were filed during 2000–2002.

12

© 2007 by Cornerstone Research. All rights reserved.

**1:07CV00407 (EGS)**

CORNERSTONE RESEARCH

**Exchange**

The years 2005 and 2006 were characterized by similar patterns in the numbers of securities class action filings for companies listed on Nasdaq versus the NYSE and Amex. In 2006, cases were filed against 49 firms whose stocks traded on the NYSE/Amex, compared to 58 firms whose stocks traded on Nasdaq. In 2005, cases were filed against 75 firms whose stocks traded on the NYSE/Amex compared to 86 firms whose stocks traded on Nasdaq.[7] Overall, during 1996 – 2006, with the exception of 2001, there have been more class action filings against Nasdaq firms than against NYSE/Amex firms.

The total MDL was actually higher for Nasdaq firms than NYSE and Amex in 2006, as seen only in 2001. This finding is surprising since the typical firm listed on NYSE and Amex is bigger than the typical firm listed on Nasdaq. Specifically,

- The total DDL for NYSE/Amex firms in 2006 was $41 billion compared to $11 billion for Nasdaq firms.
- The midpoint (median) DDL for NYSE/Amex firms in 2006 was $204 million compared to $62 million for Nasdaq firms.
- The total MDL for NYSE/Amex firms in 2006 was $144 billion compared to $150 billion for Nasdaq firms.
- The median MDL for NYSE/Amex firms in 2006 was $0.6 billion compared to $0.4 billion for Nasdaq firms. The Nasdaq median MDL was close to the 1996 – 2005 average, while the NYSE/Amex median MDL was 46 percent lower.

**13**

| Filings by Exchange Listing | | | | | |
|---|---|---|---|---|---|
| | Average (1996 – 2005) | | 2005 | | 2006 | |
| | NYSE/Amex | Nasdaq | NYSE/Amex | Nasdaq | NYSE/Amex | Nasdaq |
| Class Action Filings | 71 | 98 | 75 | 86 | 49 | 58 |
| Filings per Issuer | 1.96% | 2.26% | 2.11% | 2.69% | 1.38% | 1.81% |
| Disclosure Dollar Loss | | | | | | |
| Total ($ Millions) | $86,945 | $35,024 | $65,455 | $26,253 | $41,409 | $10,951 |
| Average ($ Millions) | $1,283 | $350 | $977 | $313 | $920 | $203 |
| Median ($ Millions) | $238 | $77 | $310 | $118 | $204 | $62 |
| Maximum Dollar Loss | | | | | | |
| Total ($ Billions) | $406 | $257 | $291 | $62 | $144 | $150 |
| Average ($ Billions) | $5.6 | $2.6 | $4.3 | $0.7 | $3.2 | $2.8 |
| Median ($ Billions) | $1.1 | $0.4 | $1.0 | $0.4 | $0.6 | $0.4 |

Exhibit 11

[7]  3 filings in 2006 and 17 filings in 2005 were for companies not listed on the NYSE, Amex, or Nasdaq.

© 2007 by Cornerstone Research. All rights reserved.

CORNERSTONE RESEARCH

**Exchange**
*continued*

NYSE/Amex firms contributed a higher percentage of the annual MDL and annual DDL in every year since the adoption of the PSLRA, except for 2001 and 2006. In 2001, there were twice as many cases filed against companies listed on the Nasdaq as there were against companies listed on the NYSE/Amex (110 to 55). Also in 2001, the total DDL for Nasdaq firms was $118 billion versus $79 billion for NYSE/Amex firms, while the total MDL for Nasdaq firms was $1,135 billion versus $345 billion for NYSE/Amex firms.

In 2006, compared to previous years, the total and average MDL were much higher for Nasdaq firms because 6 out of the top 10 MDL filings were against companies listed on the Nasdaq.

This change from historic patterns is attributable to the presence of option backdating cases which are more prevalent among Nasdaq issuers than among NYSE and Amex firms. Of the 20 options backdating cases in 2006, 16 involved companies listed on Nasdaq. Both of the options backdating cases in 2005 involved companies listed on Nasdaq. Removing these 22 cases from our sample reverses the split of cases and results in a higher number of cases filed against NYSE/Amex firms compared to Nasdaq firms: 45 versus 42, respectively. In addition, the removal of these cases reverses the unusual split of total MDL and results in a more typical higher MDL for cases filed against NYSE/Amex firms compared to Nasdaq firms: $125 million versus $73 million, respectively. The dramatic decline in MDL for cases filed against Nasdaq firms is due to the reduction in the number of such cases, as well as the decline in average MDL to $1.9 billion from $2.8 billion, as a result of the removal of the options backdating cases.

**14**

© 2007 by Cornerstone Research. All rights reserved.

CORNERSTONE RESEARCH

Circuit[8]

The top four circuits in terms of the number of 2006 filings were the Second Circuit (New York) with 31 filings, Ninth Circuit (California) with 25 filings, and Third Circuit (Delaware/Pennsylvania) and Eleventh Circuit (Florida/Georgia/Alabama) with 11 filings each (see Exhibit 12). The top circuits in number of filings in 2005 were the Second Circuit with 42 filings, Ninth Circuit with 39 filings and Third Circuit (Delaware/Pennsylvania/New Jersey) with 18 filings (see Exhibit 12).

During 1996 – 2005, the Ninth Circuit had the greatest average number of class action filings with 50 per year. This is 28 percent higher than the next highest average number of class action filings (the Second Circuit with 39). Many Ninth Circuit filings were against Internet-related companies that were most affected by the boom and the bust of U.S. equities at the turn of the century. Progressively fewer cases were filed in the Ninth Circuit in 2002 and 2003 after the decline of the Nasdaq stock market, where most of these companies traded. In 2004, there was a resurgence of filing activity in the Ninth Circuit, with many filings against technology companies, especially software firms. In 2005, there was again a decline in filings in the Ninth Circuit, with many fewer filings associated with technology- and Internet-related issuers. In 2006, Ninth Circuit filings declined in a comparable proportion to the decline in all filings. In contrast, the Sixth (Kentucky/Tennessee/Ohio/Michigan), Seventh (Wisconsin/Illinois/Indiana), and Tenth Circuits (Colorado/Kansas/Oklahoma/New Mexico/Utah/Wyoming) experienced disproportionate slowdowns. The Eleventh Circuit actually was the only circuit that had an increased number of filings in 2006.

More than half (11 out of the 20) of the options backdating cases in 2006 were filed in the Ninth Circuit. Both of the options backdating cases filed in 2005 were filed in the Ninth Circuit. Of these 13 options backdating cases filed in the Ninth Circuit, all but 1 was filed in California and 8 were filed in the Northern District of California. In terms of ranking by the number of options backdating cases, the First Circuit came a distant second, with only 3 of such cases.

15

### Filings by Court Circuit
*Dollars in Billions*

| Circuit | Class Actions Filings | | | Disclosure Dollar Loss | | | Maximum Dollar Loss | | |
|---|---|---|---|---|---|---|---|---|---|
| | Average 1996 – 2005 | 2005 | 2006 | Average 1996 – 2005 | 2005 | 2006 | Average 1996 – 2005 | 2005 | 2006 |
| 1 | 11 | 10 | 6 | $7 | $18 | $1 | $25 | $64 | $2 |
| 2 | 39 | 42 | 31 | $27 | $30 | $26 | $192 | $157 | $54 |
| 3 | 17 | 18 | 11 | $23 | $10 | $1 | $81 | $27 | $5 |
| 4 | 7 | 7 | 4 | $3 | $3 | $0 | $18 | $5 | $2 |
| 5 | 15 | 12 | 6 | $10 | $1 | $2 | $47 | $4 | $58 |
| 6 | 10 | 11 | 4 | $10 | $4 | $1 | $40 | $11 | $2 |
| 7 | 10 | 9 | 2 | $6 | $4 | $0 | $28 | $16 | $1 |
| 8 | 8 | 11 | 6 | $3 | $3 | $6 | $12 | $7 | $23 |
| 9 | 50 | 39 | 25 | $22 | $9 | $7 | $180 | $30 | $98 |
| 10 | 7 | 8 | 3 | $3 | $2 | $0 | $14 | $7 | $1 |
| 11 | 19 | 10 | 11 | $7 | $8 | $8 | $29 | $36 | $45 |
| 12 | 1 | 1 | 1 | $3 | $0 | $0 | $12 | $1 | $2 |
| Total | 193 | 178 | 110 | $124 | $93 | $52 | $680 | $362 | $294 |

Exhibit 12

[8] Circuit information corresponds to the first identified complaint.

© 2007 by Cornerstone Research. All rights reserved.

CORNERSTONE RESEARCH

**Circuit**
*continued*

The circuits with the highest levels of DDL in 2006 were the Second Circuit with $26 billion, the Eleventh Circuit with $8 billion, and the Ninth Circuit with $7 billion. In 2006, the Second, Eleventh, and Ninth Circuits represented a larger proportion of DDL compared to 2005. The circuits with the highest levels of DDL in 2005 were the Second Circuit with $30 billion, the First Circuit (Massachusetts/ Maine/ New Hampshire/Rhode Island) with $18 billion, and the Third Circuit with $10 billion. Historically, the Second, Third, and Ninth Circuits have had the largest DDL.

When the circuits are ranked by MDL, the top three circuits in 2006 were the Ninth Circuit with $98 billion, the Fifth Circuit (Texas/Louisiana/Mississippi) with $58 billion, and the Second Circuit with $54 billion. The Ninth Circuit filings in 2006 were dominated by four of the eight "mega" MDL filings (three of which were options backdating cases), while the Second Circuit and Fifth Circuit each contributed one "mega" MDL filing. In 2006, the Fifth and Ninth Circuits represented a larger proportion of MDL compared to 2005, due to the effect of these "mega" filings. The top three circuits by MDL in 2005 were the Second Circuit with $157 billion, the First Circuit with $64 billion, and the Eleventh Circuit with $36 billion. The Second Circuit contributed three out of the top five "mega" MDL filings in 2005. Historically, the Second, Third, and Ninth Circuits have experienced the largest MDL.

16

© 2007 by Cornerstone Research. All rights reserved.

**1:07CV00407 (EGS)**

CORNERSTONE RESEARCH

**Industry** [9]

As in 2005, Consumer Non-Cyclicals experienced the largest number of filings in 2006.[10] In 2006, the Technology sector had the second largest number of filings, compared to the Consumer Cyclical sector in 2005.[11] During 1996 – 2005, Consumer Non-Cyclical and Communications had the highest average number of filings with 45 and 38 filings per year, respectively.

Consumer Non-Cyclical also had the highest DDL in 2006, representing 65 percent of the total, and Consumer Cyclical and Technology in distant second and third positions. Filings in Consumer Non-Cyclical and Communications represented the greatest DDL during 1996 – 2005. In 2006 compared to 2005, DDL in Technology and Communications sectors combined declined 68 percent, almost double the 36 percent decline in DDL in all other sectors.

Technology, Consumer Non-Cyclical, and Consumer Cyclical sectors had the highest MDL in 2006. These three sectors together accounted for 87 percent of the total MDL. The Technology sector alone accounted for 46 percent of the MDL, largely due to 5 of the top 10 MDL cases being in the Technology sector. Of these 5 cases in the Technology sector, 3 are options backdating cases. During 1996 – 2005, Communications (which includes, under Bloomberg's classification, most Internet-related companies) was the biggest contributor to the MDL Index™. Compared to 2005, MDL in Technology and Communications sectors combined increased 131 percent in 2006, while MDL in all other sectors declined 53 percent.

**17**

### Filings by Industry
*Dollars in Billions*

| Industry | Class Actions Filings | | | Disclosure Dollar Loss | | | Maximum Dollar Loss | | |
|---|---|---|---|---|---|---|---|---|---|
| | Average 1996 – 2005 | 2005 | 2006 | Average 1996 – 2005 | 2005 | 2006 | Average 1996 – 2005 | 2005 | 2006 |
| Consumer Non-Cyclical | 45 | 51 | 36 | $36 | $45 | $34 | $133 | $198 | $82 |
| Technology | 32 | 20 | 21 | $20 | $18 | $5 | $95 | $49 | $135 |
| Communications | 38 | 26 | 13 | $29 | $4 | $2 | $244 | $18 | $21 |
| Industrial | 18 | 14 | 13 | $9 | $4 | $2 | $32 | $15 | $8 |
| Consumer Cyclical | 25 | 32 | 13 | $8 | $8 | $6 | $55 | $45 | $38 |
| Finance | 24 | 27 | 10 | $16 | $11 | $3 | $80 | $29 | $10 |
| Energy | 4 | 4 | 3 | $4 | $0 | $0 | $20 | $1 | $1 |
| Basic Materials | 3 | 3 | 1 | $1 | $1 | $0 | $5 | $7 | $0 |
| Utilities | 4 | 1 | 0 | $2 | $0 | $0 | $15 | $0 | $0 |
| Total | 193 | 178 | 110 | $124 | $93 | $52 | $680 | $362 | $294 |

Exhibit 13

---

[9]  For the purposes of this analysis, we use the sector classifications provided by Bloomberg. According to Bloomberg, "sector" is the broadest classification that represents the general economic activities of a company. Bloomberg divides companies into 10 sectors: Basic Materials, Communications, Consumer Cyclical, Consumer Non-Cyclical, Diversified, Energy, Financial, Industrial, Technology, and Utilities.

[10]  The Consumer Non-Cyclical sector includes agriculture, beverages, biotechnology, commercial services, cosmetics/personal care, food, healthcare-products, healthcare-services, household products/wares, and pharmaceuticals.

[11]  The Consumer Cyclical sector includes airlines, apparel, auto manufacturers, auto parts and equipment, distribution/wholesale, entertainment, food service, home builders, home furnishings, housewares, leisure time, lodging, office furnishings, retail, and storage/warehousing. The Technology sector includes computers, office/business equipment, semiconductors, and software.

© 2007 by Cornerstone Research. All rights reserved.

CORNERSTONE RESEARCH

**New Developments**

*Reversal of Class Certification in the IPO Allocation Litigation*

In a decision with implications that reach far beyond class action securities fraud litigation, a panel of the United States Court of Appeals for the Second Circuit vacated an order granting class action certification in the IPO allocation litigation. The court ruled that plaintiffs seeking certification have the burden of establishing that each element of the class certification test has been satisfied, and that it is insufficient for the plaintiffs simply to make "some showing" with regard to each of these elements, as had been approved by the lower court. Because the lower court had applied an improper standard, the certification order was vacated and the case was remanded for further consideration, but with observations suggesting that plaintiffs would have great difficulty in certifying a class. The opinion suggests that there will be substantial additional litigation over the question of class certification in a large number of securities fraud cases, particularly those involving initial public offerings and securities that trade in markets that are arguably not efficient.

**18**

*The Milberg Weiss Indictment*

On May 18, 2006 a federal grand jury named the law firm of Milberg Weiss Bershad & Schulman and two of its senior partners in an indictment on charges of conspiracy, racketeering, mail fraud, money laundering, filing false tax returns, and obstruction of justice.[12] Because there are no material barriers to entry in the plaintiff class action sector, and because there is a large supply of firms and lawyers with the ability and incentive to pursue class action securities fraud litigation, this indictment does not appear to explain the decline in class action securities fraud activity.

*Backdating of Stock Options*

Executive compensation has come under increasing scrutiny in 2006 due to widening SEC investigations regarding stock option grant practices. These practices allegedly involved backdating the stock option grants to take advantage of temporary drops in stock prices to increase the value of option compensation. To date, 22 securities class actions lawsuits with options backdating allegation have been filed. As previously indicated, 20 of these were filed in 2006 and they increased the number of companies sued by 22 percent from 90 to 110; increased the total Disclosure Dollar Loss by 24% from $42 billion to $52 billion; and increased the total Maximum Dollar Loss by 48 percent from $198 billion to $294 billion. The 2 cases with options backdating claims filed in 2005 increased the number of companies sued by 1 percent from 176 to 178; had no sizeable impact on DDL; but increased the MDL by 4 percent from $349 billion to $362 billion.

---

[12] "Milberg Indicted On Charges Firm Paid Kickbacks," the *Wall Street Journal*, May 19, 2006.

© 2007 by Cornerstone Research. All rights reserved.

CORNERSTONE RESEARCH

**Classification of Complaints**[13]

In addition to the level of filing activity, this report tracks the content of class action complaints. While the mix of allegations in 2006 is largely similar, in percentage terms, with those filed in 2005, a comparison of Traditional class action cases filed in 2006 with those filed in 2005 suggests some changes in the pattern of allegations made.

- In the "2005 Year in Review" we noted marked increases in the percentage of filings that alleged misrepresentations in financial documents and false forward-looking statements. The percentage of filings alleging misrepresentations in financial documents was 88 percent in 2005 and it remained at a similar level (92 percent) during 2006. However, while the percentage of filings alleging false forward looking statements had increased last year (from 67 percent in 2004 to 82 percent in 2005), 2006 suggests a modest downward reversion with only 73 percent of cases containing such allegations.[14]

- To the extent that specific accounting allegations could be identified in complaints and/or press releases, the percent of such allegations increased in 2006. The percentage of complaints alleging specific accounting irregularities increased to 68 percent in 2006 from 44 percent in 2005. This trend continues to suggest that the litigation market is now more focused on the validity of financial results and accounting treatment of a firm's activities.

- "Other" accounting allegations increased markedly in 2006, comprising 63 percent of cases with accounting allegations compared with only 37 percent in 2005. Accounting for option issuance seems to be the most popular Other category this year, with 43 percent of cases containing Other allegations related to accounting for executive option issuance.

- No lawsuits were filed subsequent to bankruptcies in 2006 while companies sued in 8 out of the 178 lawsuits (4.5 percent) filed in 2005 had claimed bankruptcy by the time the complaints were filed.

**19**

---

[13] The classifications are based on first identified complaint. Additional allegations and defendants may be added in subsequent complaints and not captured in these analyses.

[14] Some filings are included in multiple classifications.

© 2007 by Cornerstone Research. All rights reserved.

CORNERSTONE RESEARCH

**Classification of Complaints** *continued*

**20**

Exhibit 14

### Allegation Box Score

| | 2005 | | 2006 | |
|---|---|---|---|---|
| | Number | Percentage of total filings | Number | Percentage of total filings |
| **General Characteristics** | | | | |
| 10b-5 claims | 165 | 93% | 97 | 88% |
| Section 11 claims | 16 | 9% | 13 | 12% |
| Section 12(2) claims | 9 | 5% | 10 | 9% |
| Underwriter defendant | 9 | 5% | 5 | 5% |
| Auditor defendant | 5 | 3% | 1 | 1% |
| **Allegations** | | | | |
| Misrepresentations in financial documents | 157 | 88% | 101 | 92% |
| False forward looking statements | 146 | 82% | 80 | 73% |
| GAAP violations | 78 | 44% | 75 | 68% |
| Insider trading | 80 | 45% | 42 | 38% |

| | Number | Percentage of cases with alleged GAAP violations | Number | Percentage of cases with alleged GAAP violations |
|---|---|---|---|---|
| **Specifics of Accounting Allegations** | | | | |
| Understatement of expenses | 20 | 26% | 36 | 48% |
| Revenue recognition | 41 | 53% | 27 | 36% |
| Overstatement of other assets [1] | 9 | 12% | 9 | 12% |
| Understatement of liabilities | 14 | 18% | 8 | 11% |
| Overstatement of accounts receivable | 16 | 21% | 6 | 8% |
| Overstatement of inventory | 12 | 15% | 4 | 5% |
| Acquisition accounting | 3 | 4% | 4 | 5% |
| Non-recurring items | 4 | 5% | 3 | 4% |
| Estimates | 8 | 10% | 1 | 1% |
| Derivatives/hedging | 5 | 6% | 0 | 0% |
| Other | 29 | 37% | 47 | 63% |

[1] Defined as all assets other than accounts receivable and inventory.

© 2007 by Cornerstone Research. All rights reserved.

**1:07CV00407 (EGS)**

CORNERSTONE RESEARCH

Cornerstone
Research
Publications

Post-Reform Act Securities Settlements: 2005 Review and Analysis
*Laura E. Simmons and Ellen M. Ryan*

Demystifying Financial Derivatives
*Rene M. Stulz*

Estimating Damages in Patent Infringement Cases: An Economic Perspective
*Michael C. Keeley*

Securities Reform: Implications for Damages
*William H. Beaver, James K. Malernee, and Cynthia L. Zollinger*

Market Maker Activity on Nasdaq: Implications for Trading Volume
*John F. Gould and Allan W. Kleidon*

Stock Trading Behavior and Damage Estimation in Securities Cases
*William H. Beaver, James K. Malernee, and Michael C. Keeley*

The Corporate Veil: When Is a Subsidiary Separate and Distinct From Its Parent?
*Ben C. Ball, Jr., Matthew S. Miller, and Christine S. Nelson*

Estimating Damages in Securities Fraud Cases
*William H. Beaver and James K. Malernee*

Bank Charter Values and Risk Taking
*Michael C. Keeley*

© 2007 by Cornerstone Research. All rights reserved.

**1:07CV00407 (EGS)**

CORNERSTONE RESEARCH

**Contact**

Please direct any questions or requests for additional information to:

*Alexander Aganin*

650.853.1660
aaganin@cornerstone.com

**Cornerstone
Research Offices**

**Boston**
699 Boylston Street, 5th Floor
Boston, MA 02116-2836
617.927.3000

**Los Angeles**
515 South Flower Street, Suite 2900
Los Angeles, CA 90071-2225
213.553.2500

**Menlo Park**
1000 El Camino Real, Suite 250
Menlo Park, CA 94025-4327
650.853.1660

**New York**
599 Lexington Avenue, 43rd Floor
New York, NY 10022-7642
212.605.5000

**San Francisco**
353 Sacramento Street, 19th Floor
San Francisco, CA 94111-3656
415.229.8100

**Washington**
1875 K Street, N.W., Suite 600
Washington, DC 20006-1251
202.912.8900

www.cornerstone.com
securities.cornerstone.com

© 2007 by Cornerstone Research. All Rights Reserved.
Cornerstone Research is a registered service mark of
Cornerstone Research, Inc. C logo and design is a
registered trademark of Cornerstone Research, Inc.

1:07CV00407 (EGS)

# EXHIBIT G

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **DISTRICT OF COLUMBIA** | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | Numerical Standing | |
| OVERALL CASELOAD STATISTICS | Filings* | 2,947 | 3,383 | 3,121 | 3,461 | 3,382 | 3,377 | U.S. | Circuit |
| | Terminations | 3,458 | 3,305 | 3,365 | 3,101 | 3,159 | 3,291 | | |
| | Pending | 4,114 | 4,634 | 4,422 | 4,656 | 4,338 | 4,151 | | |
| | % Change in Total Filings — Over Last Year | | -12.9 | | | | | 84 | - |
| | % Change in Total Filings — Over Earlier Years | | | -5.6 | -14.9 | -12.9 | -12.7 | 69 | - |
| | Number of Judgeships | 15 | 15 | 15 | 15 | 15 | 15 | | |
| | Vacant Judgeship Months** | .0 | .0 | .0 | 3.1 | 17.1 | 27.4 | | |
| ACTIONS PER JUDGESHIP | FILINGS — Total | 197 | 226 | 208 | 231 | 225 | 225 | 91 | - |
| | FILINGS — Civil | 159 | 180 | 163 | 184 | 179 | 197 | 86 | - |
| | FILINGS — Criminal Felony | 25 | 30 | 32 | 35 | 34 | 28 | 92 | - |
| | FILINGS — Supervised Release Hearings** | 13 | 16 | 13 | 12 | 12 | - | 73 | - |
| | Pending Cases | 274 | 309 | 295 | 310 | 289 | 277 | 80 | - |
| | Weighted Filings** | 239 | 272 | 261 | 280 | 271 | 284 | 88 | - |
| | Terminations | 231 | 220 | 224 | 207 | 211 | 219 | 88 | - |
| | Trials Completed | 7 | 10 | 15 | 15 | 12 | 12 | 93 | - |
| MEDIAN TIMES (months) | From Filing to Disposition — Criminal Felony | 14.4 | 12.9 | 12.8 | 10.2 | 9.6 | 7.7 | 90 | - |
| | From Filing to Disposition — Civil** | 10.2 | 10.8 | 10.3 | 10.3 | 10.5 | 9.8 | 56 | - |
| | From Filing to Trial** (Civil Only) | 37.0 | 35.0 | 27.4 | 25.0 | 29.0 | 24.0 | 74 | - |
| OTHER | Civil Cases Over 3 Years Old** — Number | 433 | 468 | 408 | 445 | 359 | 282 | | |
| | Civil Cases Over 3 Years Old** — Percentage | 15.1 | 14.1 | 12.8 | 12.7 | 11.1 | 8.6 | 83 | - |
| | Average Number of Felony Defendants Filed Per Case | 1.4 | 1.5 | 1.5 | 1.3 | 1.4 | 1.3 | | |
| | Jurors — Avg. Present for Jury Selection | 70.60 | 86.63 | 75.49 | 85.69 | 93.32 | 69.99 | | |
| | Jurors — Percent Not Selected or Challenged | 47.2 | 53.6 | 50.4 | 56.6 | 55.7 | 51.9 | | |

| **2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2382 | 22 | 35 | 491 | 28 | 21 | 135 | 228 | 209 | 42 | 514 | 61 | 596 |
| Criminal* | 367 | 1 | 106 | 12 | 63 | 78 | 20 | 10 | 2 | 13 | 5 | 26 | 31 |

\*  Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

**1:07CV00407 (EGS)**

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **CALIFORNIA NORTHERN** | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | Numerical Standing | |
| | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | 8,683 | 6,362 | 6,727 | 6,919 | 7,887 | 6,841 | U.S. | Circuit |
| | Terminations | 6,983 | 6,966 | 6,471 | 7,094 | 6,675 | 6,069 | | |
| | Pending | 8,157 | 6,557 | 7,267 | 7,567 | 7,958 | 6,928 | | |
| | % Change in Total Filings — Over Last Year | 36.5 | | | | | | 4 | 1 |
| | % Change in Total Filings — Over Earlier Years | | | 29.1 | 25.5 | 10.1 | 26.9 | 10 | 2 |
| | Number of Judgeships | 14 | 14 | 14 | 14 | 14 | 14 | | |
| | Vacant Judgeship Months** | .0 | .0 | .0 | 3.1 | 12.0 | 3.0 | | |
| ACTIONS PER JUDGESHIP | FILINGS — Total | 620 | 455 | 480 | 494 | 563 | 489 | 11 | 3 |
| | FILINGS — Civil | 558 | 390 | 413 | 424 | 510 | 439 | 6 | 2 |
| | FILINGS — Criminal Felony | 37 | 39 | 44 | 47 | 42 | 50 | 82 | 12 |
| | FILINGS — Supervised Release Hearings** | 25 | 26 | 23 | 23 | 11 | - | 36 | 12 |
| | Pending Cases | 583 | 468 | 519 | 541 | 568 | 495 | 12 | 2 |
| | Weighted Filings** | 621 | 543 | 581 | 631 | 598 | 610 | 5 | 2 |
| | Terminations | 499 | 498 | 462 | 507 | 477 | 434 | 28 | 5 |
| | Trials Completed | 8 | 10 | 10 | 11 | 11 | 11 | 91 | 14 |
| MEDIAN TIMES (months) | From Filing to Disposition — Criminal Felony | 11.2 | 12.6 | 11.1 | 11.7 | 11.8 | 10.1 | 75 | 11 |
| | From Filing to Disposition — Civil** | 7.4 | 9.8 | 8.2 | 10.6 | 9.5 | 9.1 | 11 | 3 |
| | From Filing to Trial** (Civil Only) | 25.0 | 28.0 | 22.5 | 30.3 | 23.5 | 22.7 | 41 | 5 |
| OTHER | Civil Cases Over 3 Years Old** — Number | 528 | 530 | 430 | 377 | 475 | 335 | | |
| | Civil Cases Over 3 Years Old** — Percentage | 7.3 | 9.5 | 6.9 | 5.7 | 6.7 | 5.6 | 60 | 7 |
| | Average Number of Felony Defendants Filed Per Case | 1.5 | 1.5 | 1.4 | 1.5 | 1.4 | 1.5 | | |
| | Jurors — Avg. Present for Jury Selection | 59.09 | 55.21 | 61.19 | 65.00 | 66.42 | 60.46 | | |
| | Jurors — Percent Not Selected or Challenged | 43.2 | 31.0 | 48.9 | 40.9 | 47.2 | 42.2 | | |

| 2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 7812 | 128 | 2118 | 1540 | 105 | 23 | 487 | 577 | 481 | 464 | 745 | 105 | 1039 |
| Criminal* | 507 | 16 | 58 | 134 | 70 | 89 | 18 | 28 | 8 | 9 | 15 | 27 | 35 |

\*  Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

**1:07CV00407 (EGS)**