UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

KENT H. ROBERTS,

Defendant,

and

UNITED STATES OF AMERICA,
450 Golden Gate Avenue, 11th Floor
San Francisco, CA 94102

Proposed Intervenor.

Civil Action No. 1:07CV00407 EGS

Judge:  Hon. Emmet G. Sullivan

---

**UNITED STATES' MOTION TO INTERVENE AND TO STAY DISCOVERY;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SAME**

---

The United States of America hereby moves the Court for (i) an order permitting it to

intervene in this case so that it can request an order staying discovery and (ii) an order temporarily

staying all discovery until the conclusion of the criminal case pending in the Northern District of

California, *United States v. Kent H. Roberts*, criminal case number CR 07–0100 MHP.  Pursuant to

Local Civil Rule 7(m), the undersigned conferred with all parties about this motion.  The plaintiff,

the Securities and Exchange Commission ("SEC"), does not take a position on the United States'

motion to intervene and to stay discovery.  The defendant has not yet taken a position on the

motion to intervene but has advised the United States that he opposes any stay of discovery.

The Court should stay civil discovery to prevent Roberts from gaining unfair access to

1

discovery beyond that allowed by the criminal discovery rules.  The discovery rules in criminal

cases are much more limited than those in civil cases.   For example, unlike the civil discovery

rules, the criminal discovery rules do not permit defendants to depose witnesses before trial.  The

criminal discovery rules embody important public policies, including the public's interest in a fair

and effective criminal justice system.  Recognizing the likelihood of harm to the United States'

and the public's substantial interest in law enforcement, courts have issued stays to prevent

criminal defendants from using civil discovery to circumvent the narrow criminal discovery rules.

Issuing a stay is particularly important where, as here, the subject matters of the civil and criminal

cases are the same.

In this case, the United States anticipates that Roberts will use the liberal civil discovery

rules to depose witnesses in the criminal case and to gain premature access to witness statements

and other information, all while shielding himself from reciprocal depositions by invoking his

Fifth Amendment privilege against self-incrimination.  If the Court allowed such discovery, it

would undermine the policies underlying criminal discovery and harm the criminal case.  While

the criminal case is pending, the Court should limit Roberts to the same discovery that applies to

any other criminal defendant.

A trial date has not been set, but the parties have told the district court in the Northern

District of California that they prefer to complete the trial before year's end.  Therefore, a stay of

discovery likely is needed for only seven months.

## STATEMENT OF FACTS

The allegations and facts at issue in the SEC's complaint and the criminal Indictment are virtually identical.

On February 28, 2007, the SEC filed its complaint, which alleges that the defendant Kent H. Roberts ("Roberts") "engaged in a fraudulent scheme to enrich himself and others by secretly changing the dates on which stock options awards had been granted to coincide with lower closing prices of McAfee's common stock, resulting in disguised 'in-the-money' option grants." Complaint at ¶1; see also ¶¶ 13 - 24. Roberts (the former General Counsel, Corporate Secretary, and Executive Vice-President at McAfee, Inc.) "falsified company documents . . . to make it appear that McAfee's Compensation Committee had approved the disguise option grants on the favorable dates that Roberts had chosen." Complaint at ¶ 1; see also ¶¶ 19-24. Roberts also "helped to prepare and signed McAfee's 2002 and 2003 proxy statements, filed with the Commission, which he knew, or was reckless in not knowing, contained false information and omitted material information concerning his option grant and grants to other McAfee officers, including, in particular, that Roberts had on more than one occasion circumvented McAfee's shareholder-approved options plan to improperly increase his potential stock-based compensation and the stock-based compensation of others." Complaint at ¶ 1; ¶¶ 25-37. The Complaint also alleges that "Roberts made false statements concerning the true grant dates and proper exercise prices for his own stock options in stock ownership reports he filed with the Commission." Complaint at ¶ 1.

Roberts filed his answer on May 3, 2007. A discovery schedule has not yet been set.

On February 27, 2007, a grand jury in the Northern District of California returned a seven-

count Indictment against Roberts. *See* Indictment, *United States v. Roberts,* CR 07–0100 MHP ("Indictment") (attached as Exhibit A). Roberts made his initial appearance on March 1, 2007, and he pleaded not guilty to all charges. The next status date is Monday, June 4, 2007, and the district court in San Francisco will set further dates then.

The Indictment charges Roberts with (a) mail fraud and aiding and abetting in the same, in violation of 18 U.S.C. § 1341, 1346 and 2 (Counts One and Two); (b) wire fraud and aiding and abetting in the same, in violation of 18 U.S.C. §§ 1343, 1346 and 2 (Count Three); (c) false SEC filings and aiding and abetting in the same, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (Counts Four, Five and Six); and (d) falsifying books, records, and accounts and aiding and abetting in the same, in violation of 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff, 17 C.F.R. § 240.13b2-1, and 18 U.S.C. § 2 (Count Seven).

The Indictment is very similar to the SEC's complaint. It charges the same scheme to defraud, and it details the same chronology of events, including the defendant's change to his February 2000 grant (Indictment at 17-20); his concealment of his altered stock option grant from his employer and the SEC (Indictment at 21-26); his change to others' stock option grants (Indictment at 27-30); and his false and misleading filings with the SEC (Indictment at 31). Inevitably, the same witnesses and documents will be the proof for both cases.

## ARGUMENT

I.    THE COURT SHOULD ALLOW THE UNITED STATES TO INTERVENE

The United States seeks to intervene for the limited purpose of obtaining a temporary stay of discovery to avoid prejudice to the criminal case and to protect the public's interest in effective law enforcement. Given the threat that civil discovery poses to the criminal proceedings, the

interests of justice support the United States' intervention.

    A.  <u>Intervention is Proper As a Matter of Right</u>

    Under Rule 24(a) (2) of the Federal Rules of Civil Procedure, intervention as of right is

mandated when:

> [T]he applicant claims an interest relating to the property or transaction which is the
> subject of the action and the applicant is so situated that disposition of the action may as a
> practical matter impair or impede the applicant's ability to protect that interest, unless the
> applicant's interest is adequately represented by existing parties.

    Courts generally construe Rule 24(a) liberally in favor of potential intervenors.  The D.C.

Circuit applies a four-part test to determine whether intervention as of right is appropriate:

> A motion to intervene as of right turns on four factors: (1) the
> timeliness of the motion; (2) whether the applicant "claims an
> interest relating to the property or transaction which is the subject of
> the action," Fed. R. Civ. P. 24(a); (3) whether "the applicant is so
> situated that the disposition of the action may as a practical matter
> impair or impede the applicant's ability to protect that interest," *id.*;
> and (4) whether "the applicant's interest is adequately represented by
> the existing parties."  *Id*.

*Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1074 (D.C. Cir. 1998) (reversing district

court's denial of a motion to intervene).  The United States meets all four criteria.

    First, this motion is timely.  Both the SEC and criminal cases began in February 2007, just

a few months ago.  The defendant filed his answer to the SEC Complaint two weeks ago.

Discovery has not yet begun in the civil action.  Indeed, the Court has yet to conduct even its

initial case management conference with the parties to discuss the parameters of discovery.  Thus,

the United States has raised its request at the appropriate time.  *See Smoke v. Norton*, 252 F.3d

468, 471 (D.C.Cir.2001).

    Second, the United States has a substantial interest in staying discovery in the civil case.

The criminal case is based on the same events and transactions in the civil case: the fraudulent scheme to backdate stock options grants. Courts have consistently permitted the United States to intervene when it is investigating and prosecuting parties to a pending civil action in order to protect the public interest in effective law enforcement. *See, e.g., United States v. Kordel*, 397 U.S. 1, 3-4 (1970); *In re Sealed Case*, 856 F.2d 268, 270-71 (D.C. Cir. 1988); *S.E.C. v. Dresser Industries., Inc.*, 628 F.2d 1368, 1376 (D.C. Cir. 1980); *S.E.C. v. Doody*, 186 F. Supp. 2d 379, 381 (S.D.N.Y. 2002). The Second Circuit has noted the government's "discernible interest in intervening in order to prevent discovery in the civil case from being used to circumvent the more limited scope of discovery in the criminal matter." *S.E.C. v. Chestman*, 861 F.2d 49, 50 (2d Cir. 1988). Such intervention is grounded in the strong public interest in effectively enforcing criminal laws. *See, e.g., Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 132-36 (1967) (permitting intervention as of right by state in antitrust proceedings because of public interest in effective competition); *S.E.C. v. Realty and Improvement Co.,* 310 U.S. 434, 458-60 (1940) (SEC should have been permitted to intervene in bankruptcy proceeding, the resolution of which might "defeat the public interests which the [SEC] was designated to represent"); *In re Sealed Case*, 856 F.2d 268, 270-71 (in civil action for insider trading, allowed Department of Justice to intervene and denied litigant's motion to compel discovery from the SEC for its separate investigation of the insider trading because of "[t]he public interest in safeguarding the integrity of the ongoing civil [SEC] and criminal investigation").

Third, permitting civil discovery would impair the United States' ability to protect its interests by allowing Roberts access to information beyond that allowed by the criminal discovery rules. For example, full civil discovery would allow Roberts to depose key prosecution witnesses

and compel detailed sworn statements before the criminal trial, and would allow him early access to witness statements.  That will inevitably injure the United States' and the public's substantial interests in effective law enforcement.  *See, e.g., Campbell v. Eastland*, 307 F.2d 478, 487 (5th Cir. 1962).

Finally, neither the SEC nor Roberts can fully share or protect the United States' unique interest in criminal law enforcement.  *See Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n.10 (1972) (Rule 24(a) is satisfied "if the applicant shows that representation of his interest 'may be' inadequate; and therefore the burden of making that showing should be treated as minimal"); *S.E.C v. Downs,* 1993 WL 22126, *11 (S.D.N.Y. 1993) (rejecting argument that SEC adequately represents the interests of the United States).  Indeed, the United States is the only party that can properly protect the public's interest in the vigorous enforcement of federal criminal laws and the fair and proper administration of the federal criminal justice system.

Under all four factors, the Court should permit the United States to intervene as of right.

B.  Alternatively, the Court Should Grant Permissive Intervention

The Federal Rules allow permissive intervention "when the applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b) (2).  The Rule further provides that "the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.*  Where, as in this case, substantial common questions of law and fact exist in the criminal case and the parallel civil case, intervention should be permitted.  *See, e.g., Board of Governors of Federal Reserve System v. Pharaon*, 140 F.R.D. 634, 638 (S.D.N.Y. 1991) (allowing state District Attorney to intervene in a federal civil action to seek a discovery stay); *First Merchants Enterprise, Inc. v. Shannon*, 1989

WL 25214, *2-3 (S.D.N.Y. 1989) (allowing United States Attorney to intervene in civil action).

Furthermore, courts routinely permit intervention where, as here, the United States intervenes for the purpose of protecting the public interest in allowing criminal prosecutions to proceed without impediment. *See, e.g., S.E.C. v. Control Metals Corp*., 57 F.R.D. 56, 57-58 (S.D.N.Y. 1972) (stay granted where civil discovery would interfere with related criminal proceeding); *see also In re Ivan F. Boesky Secs. Litig*., 128 F.R.D. 47, 51 (S.D.N.Y. 1989); *United States v. Hugo Key and Son, Inc.*, 672 F. Supp. 656, 657 (D.R.I. 1987). Intervention is particularly appropriate when the United States seeks to prevent civil discovery rules from being used to circumvent more limited criminal discovery provisions. *See Chestman*, 861 F.2d at 50.

For these reasons, the Court should permit the United States to intervene so that it can fulfill its public duty to protect the integrity of the prosecution of the criminal case.

## II.     THE COURT SHOULD STAY DISCOVERY UNTIL AFTER THE CRIMINAL TRIAL

The power to stay proceedings is incidental to the Court's inherent power to control disposition of its docket. *See Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936). In evaluating a motion to stay a civil case pending disposition of a parallel criminal case, "a judge should be sensitive to the difference in the rules of discovery in civil and criminal cases." *Campbell v. Eastland,* 307 F.2d 478, 487 (5th Cir.1962). "While the Federal Rules of Civil Procedure have provided a well-stocked battery of discovery procedures, the rules governing criminal discovery are far more restrictive. Separate policies and objectives support these different rules." *Id.*

Thus, for example, the civil discovery rules permit depositions as a matter of right without court permission, but the criminal discovery rules "permit[] depositions to be taken only by order of the court and then only in 'exceptional' situations." *United States v. Kelley*, 36 F.3d 1118, 1124

(D.C. Cir. 1994). Moreover, while depositions in criminal cases are not permitted solely for purposes of discovery, depositions are a "legitimate end of civil discovery." *Id.* at 1125. Similarly, the Federal Rules of Criminal Procedure do not authorize document requests, interrogatories, or requests for admission. *See, e.g., United States v. Conder*, 423 F.2d 904, 906 (6th Cir. 1971) (interrogatories prohibited in criminal cases).

The narrow criminal discovery rules protect the integrity of the criminal proceedings by, for example, protecting against the risk of perjury and manufactured evidence that might result from broad disclosure of the prosecution's case, and avoiding witness intimidation and unfair surprise.

> Traditionally, the narrow scope of discovery in criminal litigation is justified by three considerations, which are said to be peculiar to criminal law. First, there has been a fear that broad disclosure of the essentials of the prosecution's case would result in perjury and manufactured evidence. Second, it is supposed that revealing the identity of confidential government informants would create the opportunity for intimidation of prospective witnesses and would discourage the giving of information to the government. Finally, it is argued that since the self-incrimination privilege would effectively block any attempts to discover from the defendant, he would retain the opportunity to surprise the prosecution whereas the state would be unable to obtain additional facts. This procedural advantage over the prosecution is thought to be undesirable in light of the defendant's existing advantages.

*Founding Church of Scientology of Washington, D.C., Inc. v. Kelley*, 77 F.R.D. 378, 381 (D.D.C. 1977) ("*Founding Church of Scientology*") (*quoting* the "seminal opinion" of *Campbell v. Eastland*, 307 F.2d at 487 n.12.); *accord Nakash v. United States Department of Justice*, 708 F. Supp. 1354, 1366 (S.D.N.Y. 1988) (noting risk of perjury and manufactured evidence, witness intimidation, and unfair surprise).

Roberts should not be allowed to use liberal discovery rules "to avoid the restrictions on

criminal discovery and, thereby, obtain documents he might not otherwise be entitled to for use in his criminal action," particularly given that the criminal case involves the same issues, evidence and witnesses as the civil case. *Founding Church of Scientology,* 77 F.R.D. at 381; *accord Campbell*, 307 F.2d at 487. These are precisely the circumstances supporting a civil discovery stay. *See, e.g., Gordon v. Federal Deposit Insurance Corporation*, 427 F.2d 578, 579 (D.C. Cir. 1970) (remanding where district court failed to stay discovery in the civil action relating to the same financial transactions for which defendant was being prosecuted); *In Re Par Pharmaceutical Inc. Securities Litig.*, 133 F.R.D. 12, 13-14 (S.D.N.Y. 1990) ("the weight of authority in this Circuit indicates that courts will stay a civil proceeding where the criminal investigation has ripened into an indictment); *Integrated Generics v. Bowen,* 678 F. Supp. 1004, 1009 (E.D.N.Y. 1988) (the most prudent course is to stay a civil proceeding pending the outcome of the grand jury investigation "because the facts critical to both proceedings are closely related and may be identical"); *United States v. One 1964 Cadillac Coupe De Ville*, 41 F.R.D. 352, 353 (S.D.N.Y. 1966) (where both civil and criminal proceedings arise out of the same or related transactions, the government ordinarily is entitled to a stay of all discovery in the civil case until disposition of the criminal matter).

In evaluating whether to stay civil discovery, courts balance several factors: (A) the interests of the plaintiffs in proceeding expeditiously and the potential prejudice to the plaintiffs of a delay; (B) the burden imposed on the defendant and the defendant's need for information; (C) the court's convenience in managing its cases and interests of judicial economy; (D) the interests of non-parties; and (E) the interest of the public in the pending civil and criminal litigation. *See F.S.L.I.C. v. Molinaro*, 889 F.2d 900, 902-03 (9th Cir. 1989) (setting forth these factors); *see also*

*Gordon v. Federal Deposit Insurance Corporation*, 427 F.2d 578, 579 (D.C. Cir. 1970) (district court "must assess and balance the nature and substantiality of the injustices claimed on either side"); *United States v. Mellon Bank*, 545 F.2d 869, 873 (3rd Cir. 1976) (considering interests of judicial economy); *Integrated Generics*, 678 F. Supp. at 1009 (considering harm to plaintiff in upholding stay); *Founding Church of Scientology*, 77 F.R.D. at 381 (considering the defendant's need for information); *Campbell v. Eastland*, 307 F.2d at 487 (considering private interests in civil litigation and the public's interest in criminal prosecutions).

All of these factors favor a stay in this case.

A. Plaintiff's Interest Does Not Weigh Against A Stay

The SEC will not be prejudiced by staying civil discovery until the conclusion of the criminal case. While the SEC has not taken a position, any civil discovery that would occur during the pendency of the criminal case would be one-sided in favor of Roberts, who would invoke his Fifth Amendment privilege to prevent the SEC from taking his testimony. Thus, if civil discovery proceeds during the criminal case, then the United States will be denied discovery from the defense, but the defense will be permitted to cross-examine witnesses by taking depositions. Such one-sided discovery is fundamentally unfair to the SEC and to the United States. *See Founding Church of Scientology,* 77 F.R.D. at 380-81 (this "procedural advantage over the prosecution is thought to be undesirable") (citing *Campbell*, 307 F.2d at 487 n.12); *Belford Strategic Investment Fund, LLC v. United States*, 2005 WL 3278597, at *3 (N.D. Cal. 2005) ("Because of [the Fifth Amendment privilege], the prosecutor's preview of the criminal defendants' case may be limited, unlike the criminal defendants' glimpse at the prosecutor's case. . . . [T]hese imbalances suggest that not staying this case would prejudice the government in both parallel proceedings.").

B. Burden On the Defendant

Staying discovery will not unfairly burden Roberts.  By the conclusion of the criminal case,

Roberts will have access to complete testimony from every witness and all evidence and exhibits

(saving time and money), and he can conduct any additional discovery he needs to defend the civil

suit.  Roberts wants to pursue expedited civil discovery only to circumvent the criminal discovery

rules by cross-examining witnesses through civil depositions prior to the criminal trial.  This

interest is not a legitimate one, and the Court should reject it.  *See, e.g., Campbell*, 307 F.2d at 487.

C. Interests of Judicial Economy

Staying the case ultimately will benefit the Court and all parties because it will streamline

the issues in the civil case.  The availability of all transcripts and exhibits in the criminal case will

significantly curtail, if not obviate, the need for further costly discovery.  *See Volmar Distributors,*

*Inc. v. New York Post Co., Inc.,* 152 F.R.D. 36, 41 (S.D.N.Y. 1993) ("the availability of transcripts

and other evidence from the criminal trial may eliminate altogether the need for certain

depositions"); *Twenty First Century Corp. v. LaBianca*, 801 F. Supp. 1007, 1011 (E.D.N.Y. 1992)

(noting that stay "may streamline later discovery since transcripts from the criminal case will be

available to the civil parties").

Furthermore, if Roberts is convicted, he may be precluded from re-litigating in the civil

proceeding facts relating to his participation in the fraud, which will conserve judicial resources.

*See New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 86-87 (2d Cir. 2000).  In any event,

the criminal case should limit the issues before the Court in the civil case.  "[C]ommon factual

questions may be conclusively determined in the criminal action [that] would pare down the issues

to be determined in the civil case and serve the interests of judicial economy by narrowing the

12

focus of the action to the benefit of the litigants." *Bureerong v. Uvawas*, 167 F.R.D. 83, 87 (C.D. Cal. 1996); *see also In re Grand Jury Proceedings*, 995 F.2d 1013, 1018 n.11 (11th Cir. 1993) ("[a]lthough stays delay civil proceedings, they may prove useful as the criminal process may determine and narrow the remaining civil issues"); *United States v. Mellon Bank*, 545 F.2d at 872 ("it might well have been that resolution of the criminal case would moot, clarify, or otherwise affect various contentions in the civil case"). Indeed, a conviction would significantly increase the chances of a settlement in the civil case. *See Trustees of the Plumbers Pension Fund v. Transworld Mechanical, Inc.*, 886 F. Supp. 1134, 1140 (S.D.N.Y. 1995) ("resolution of the criminal case may increase the possibility of settlement of the civil case due to the high standard of proof required in the criminal prosecution").

Thus, far from inconveniencing the judicial system and impairing the system's ability to manage its cases, a discovery stay until the conclusion of the criminal trial will conserve judicial resources by streamlining the discovery, mooting civil issues, and possibly result in the settlement of the civil case.

### D.  Non-Parties' Interests Weigh In Favor Of A Stay

There are witnesses with potential culpability who are not party to the criminal case. "Courts often grant motions to stay on the grounds that the Fifth Amendment privileges of certain parties are implicated." *Bridgeport Harbor Place*, 269 F. Supp.2d at 9. For example, if civil discovery is not stayed, witnesses must choose whether to (a) waive their Fifth Amendment rights and submit to depositions or (b) invoke those rights and risk liability in the civil case. Courts have routinely granted stays of civil discovery to protect the Fifth Amendment interests of witnesses. *See Trustee of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp.

1134, 1139 (S.D.N.Y. 1995) (holding that interests of the party opposing stay "are trumped by defendants' interests in avoiding the quandary of choosing between waiving their Fifth Amendment rights or effectively forfeiting the civil case"); *Maloney v. Gordon*, 328 F.R.D.2d 508, 513 (D. Del. 2004) ("[i]f discovery moves forward, each defendant will be faced with the difficult choice between asserting his or her right against self-incrimination, thereby inviting prejudice in the civil case, or waiving those rights, thereby courting liability in the criminal case").  Indeed, it would be particularly unfair if witnesses are forced to choose between the Fifth Amendment and civil liability, while Roberts is allowed to pursue one-sided civil discovery in an effort to advance his defense in the criminal case.  A temporary stay – applying to both sides – would resolve the issue.

The United States also is a relevant non-party to the SEC case.  The United States has a legitimate and weighty interest "in the unhindered disposition of the extremely complex criminal case." *Bureerong*, 167 F.R.D. at 87.  Staying discovery is necessary to "protect the integrity of the Government's investigation and ensure that the Defendants will not use the civil discovery process to obtain discovery that is not authorized in a criminal case." *Id.* (internal quotation marks omitted).  Indeed, courts have routinely recognized that, "where both civil and criminal proceedings arise out of the same or related transactions, the government is ordinarily entitled to a stay of discovery in the civil action until disposition of the criminal matter." *United States v. One 1964 Cadillac Coupe DeVille*, 41 F.R.D. at 353; *see also Campbell*, 307 F.2d at 477 ("[a] litigant should not be allowed to make use of the liberal discovery procedures applicable to a civil suit as a dodge to avoid the restrictions of criminal discovery"); *see supra* pp. 9-10 (making this point).

The United States' interest in prosecuting this complex criminal case will be damaged

14

severely if the Court does not stay civil discovery. Roberts will be able to use the depositions afforded by civil discovery to cross-examine witnesses, to explore and formulate potential defense theories, and to tailor his testimony and argument in the criminal trial. This manipulation of the trial process is the very harm that the criminal discovery rules seek to avoid. *See Campbell*, 307 F.2d at 488 (holding that trial court erroneously denied stay and issued "an open invitation to [the parties] under criminal investigation to subvert the civil rules into a device for obtaining pre-trial discovery against the Government in criminal proceedings"). Moreover, the discovery would be entirely one-sided: defendant Roberts would be able to depose witnesses, but he would prohibit reciprocal discovery by invoking his Fifth Amendment rights.

E. The Public's Interest Weighs In Favor Of A Stay

The public's interest in a fair criminal justice system would be harmed if Roberts were allowed to take civil depositions of witnesses and thereby gain an advantage in the criminal case. Every criminal defendant is subject to the same rules of criminal procedure. Those rules do not allow defendants to depose the government's witnesses prior to trial. There is no just reason why Roberts should be given a right to broader discovery than criminal defendants in other cases. If the criminal defendants in this case were granted the right to depose witnesses prior to the criminal trial, then the public's faith in the fairness of our criminal justice system would be damaged. *See Rosenthal v. Giuliani*, 2001 WL 121944, at *2 (S.D.N.Y. 2001) ("[t]he public has an interest in ensuring the criminal discovery process is not subverted").

Moreover, courts have consistently recognized the priority accorded the public interest in law enforcement as "so necessary and wise that a trial judge should give substantial weight to it in balancing the policy against the right of a civil litigant to a reasonably prompt determination of his

civil claims and liabilities." *Campbell*, 307 F.2d at 487; *see also In re Ivan F. Boesky Secs. Litig.*, 128 F.R.D. at 49 ("public interest in the criminal case is entitled to precedence over the civil litigant") (emphasis omitted); *Benevolence Int'l. Fdn., Inc. v. Ashcroft*, 200 F. Supp. 2d 935, 941 (N.D. Ill. 2002) ("public interest in law enforcement outweighs [private litigant's] right to a reasonably prompt determination of its civil claims"); *Bridgeport Harbour Place I, LLC v. Ganim*, 269 F.Supp.2d 6, 10 (D. Conn. 2002) ("[t]he public interest will be served best by allowing the government's case to proceed without obstacles"); *Maloney*, 328 F.Supp.2d at 513 ("[t]he public's interest in the integrity of the criminal case is entitled to precedence over the civil litigant") (citation and internal quotation omitted); *Walsh Securities v. Christo Property Mgt.*, 7 F. Supp. 2d 523, 529 (D. N.J.) ("a stay in this case would benefit the public by allowing the government to conduct a complete, unimpeded investigation into potential criminal activity").

Courts routinely stay civil litigation that threatens to impede criminal investigations where an indictment has not yet been returned.[1]  The circumstances here are even more compelling because Robert has been indicted.  Roberts opposes a stay only so that he can use civil discovery to circumvent the criminal discovery rules.  Staying discovery in the civil case is necessary to preserve the public's interest in law enforcement, the integrity of the pending criminal proceedings, and the fairness of our criminal justice system.

For these reasons, the United States asks the Court to temporarily stay discovery in this

---

[1]  *See, e.g., Chestman*, 861 F.2d 49 (stay granted to avoid interference in insider trading investigation); *Campbell*, 307 F.2d 478 (tax fraud); *Bureerong*, 167 F.R.D. 83 (immigration fraud); *Raphael v. Aetna Casualty & Surety Co.*, 744 F. Supp. 71 (S.D.N.Y. 1990) (insurance fraud); *Pharaon*, 140 F.R.D. 634 (bank fraud); *In re Ivan F. Boesky Secs. Litig.*, 128 F.R.D. at 49 (insider trading); *Souza v. Shiltgen*, 1996 WL 241824 (N.D. Cal. May 6, 1996) (immigration fraud); *R.J.F. Fabrics, Inc. v. United States*, 651 F. Supp. 1437 (U.S. Ct. Int'l. Trade 1986) (customs violations).

action.

III.    THE EXTENT OF THE PROTECTIVE STAY SHOULD COVER ALL OF RULE 26

The United States seeks a stay of discovery to insure that Roberts -- the sole defendant in the SEC civil action and the criminal case -- obtains discovery only to the extent permitted by the criminal discovery rules and does not abuse the civil discovery rules to obtain information that he is not entitled to in the criminal case.  Thus, the Court should stay all civil discovery under Federal Rule of Civil Procedure 26 until 30 days after the disposition in the criminal case.

The Court also should stay Rule 26's disclosure requirements (and those in the applicable local rules).  Without such a stay, the SEC must identify, for example, "each individual likely to have discoverable information" and "the subjects of the information" pursuant to Fed. R. Civ. P. 26(a) (1) (A).   Disclosure of the "subjects of information" could, depending on the level of required detail, give Roberts information about a witness's prospective testimony in the criminal case beyond the information required by Federal Rule of Criminal Procedure 16(a)(2).  Rule 16(a)(2) does not authorize the discovery of statements made by government witnesses or prospective government witnesses except as provided in 18 U.S.C. § 3500.  *See* Fed. R. Crim. P. 16(a) (2).  18 U.S.C. § 3500 (the Jencks Act) provides that in criminal cases, the statements of government witnesses (such as witness testimony taken by the SEC or other witness interview notes available to the government) shall not be "the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case."

Thus, Rule 26 disclosure is inappropriate, particularly given that the public policy against premature disclosure of the United States' criminal case – in the criminal case itself – is so strong that courts are without power to order early production of witness statements.  S*ee, e.g., United*

17

*States v. Taylor*, 802 F.2d 1108, 1117-1118 (9th Cir. 1986) (the defense claimed error based on the government's failure to produce Jencks Act material as ordered by the magistrate judge; in affirming convictions, held that "the [magistrate's discovery] order was itself inconsistent with the express provision of the Jencks Act and therefore unenforceable").

Accordingly, the United States asks that the Court stay all discovery and disclosure requirements under Federal Rule of Civil Procedure 26.

**CONCLUSION**

For all of the reasons stated above, the United States asks the Court to allow it to intervene in this action and stay all discovery and disclosure requirements under Federal Rule of Civil Procedure 26 until thirty days after the disposition of the criminal case.  The United States separately submits a proposed order.

Respectfully submitted,

SCOTT N. SCHOOLS
United States Attorney


By:    _____/s_____
LAUREL BEELER (CA Bar No. 187656)
TIMOTHY J. LUCEY (CA Bar No. 172332)[2]
Assistant United States Attorneys
United States Attorney's Office
  Northern District of California
450 Golden Gate Avenue, 11th Floor
San Francisco, CA 94102
PH:  (415) 436-7200
FAX:  (415) 436-7234
E-mail:Laurel.Beeler@usdoj.gov
        Timothy.Lucey@usdoj.gov

Dated this 21st day of May 2007

---

[2]  D.C. Bar No. 453889 (inactive status).  The Local Rules of this Court as well as the District of Columbia do not appear to require Mr. Lucey to convert his D.C. bar license to active status, given that he is appearing as a government attorney in his capacity as an Assistant United States Attorney for the Northern District of California.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. 1:07CV00407 EGS |
| Plaintiff, | Judge:  Hon. Emmet G. Sullivan |
| v. | |
| KENT H. ROBERTS, | |
| Defendant. | |
| and | |
| UNITED STATES OF AMERICA, | |
| Intervenor. | |

### [PROPOSED] ORDER GRANTING INTERVENTION  AND STAY OF DISCOVERY

Pursuant to Federal Rule of Civil Procedure 24(a)(2) and (b)(2), and for the reasons set forth in the United States' motion, the United States' motion to intervene is granted.  The United States may intervene in this matter for the limited purpose of seeking a stay of discovery. Having considered the interests of the United States and the public in the pending criminal and civil litigation, the interests of and burdens on the defense in the civil case (including the extent to which the defendant's Fifth Amendment privilege is implicated), the interests of the Securities and Exchange Commission in proceeding with its case expeditiously, the interests of judicial economy, the potential prejudice from delay, and for the reasons set forth in the United States' moving papers, the United States' motion to stay discovery is granted.  All discovery and disclosure requirements under Federal Rule of Civil Procedure 26 (and all applicable local rules)

shall be temporarily stayed until thirty days following the disposition of the criminal case

pending in the Northern District of California, *United States v. Roberts*, CR 07–0100 MHP.

IT IS SO ORDERED.

Dated: _____          _____
                                EMMET G. SULLIVAN
                                United States District Judge

1  SCOTT N. SCHOOLS (SCBN 9990)
   United States Attorney
2

3                                                                *FILED*
                                                       07 FEB 27 PM 1: 46
4                                                       RICHARD W. WIEKING
                                                   NORTHERN DISTRICT OF CALIFORNIA

5                              E-filing

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION                    **MHP**

11  UNITED STATES OF AMERICA,    )  **CR 07   0100**

12            Plaintiff,          )   VIOLATIONS: 18 U.S.C. §§ 1341, 1343,
                                  )   1346 – Mail and Wire Fraud;
13       v.                       )   15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. §
                                  )   240.10b-5 – False SEC Filings;
14  KENT H. ROBERTS,              )   15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and
                                  )   78ff and 17 C.F.R. § 240.13b2-1 – Falsifying
15            Defendant.          )   Books, Records, and Accounts;
                                  )   18 U.S.C. § 2 – Aiding and Abetting
16                                )
                                  )
17  _____ )   SAN FRANCISCO VENUE

18                           I N D I C T M E N T

19  The Grand Jury charges:

20                          I. BACKGROUND

21       At all times relevant to this Indictment:

22  A.  The Company

23       1.      McAfee, Inc. was a Delaware corporation with its headquarters in Santa Clara,

24  California. Prior to June 2004, McAfee, Inc. was called Networks Associates, Inc., which was

25  also a Delaware corporation with its headquarters in Santa Clara, California. For purposes of this

26  indictment, the term "Network Associates" or "the company" will be used to refer to both

27  McAfee, Inc. and Networks Associates, Inc.

28       2.      Network Associates was a provider of computer security solutions designed to

    prevent intrusions on networks and protect computer systems from a variety of threats and

1   attacks.

2   3.      Network Associates was a publicly held corporation whose stock was registered
3   with the United States Securities and Exchange Commission (the "SEC") pursuant to Section
4   12(b) of the Securities and Exchange Act of 1934. Network Associates' shares originally traded
5   on the National Association of Securities Dealers Automated Quotation System ("NASDAQ")
6   under the symbol "NETA." On February 12, 2002, Network Associates' shares began trading on
7   the New York Stock Exchange ("NYSE") under the symbol "NET." After June 2004, its shares
8   began trading on the NYSE under the symbol "MFE." The NASDAQ and NYSE are national
9   securities exchanges that use the means and instrumentalities of interstate commerce and the
10  mails.

11  4.      As a public company, Network Associates was required to comply with
12  regulations of the SEC. Those regulations are designed to protect members of the investing
13  public by, among other things, ensuring that a company's financial information is accurately
14  recorded and disclosed to the public.

15  5.      Under SEC regulations, Network Associates and its officers also had a duty to:
16  (a) make and keep books, records and accounts that fairly and accurately reflected the
17  company's business transactions; (b) devise and maintain a system of internal accounting
18  controls sufficient to provide reasonable assurances that the company's transactions were
19  recorded as necessary to permit preparation of reliable financial statements; (c) file quarterly
20  reports (on Form 10-Q) and annual reports (on Form 10-K) with the SEC; and (d) file statements
21  of ownership (Forms 3, 4, and 5) which, among other things, reflect an officer's ownership of
22  Network Associates' securities.

23  6.      Network Associates' fiscal year ended on December 31. Network Associates
24  independent auditor was PricewaterhouseCoopers ("PwC").

25  B.  The Defendant.

26  7.      Defendant KENT H. ROBERTS was employed as a lawyer within the legal
27  department of Network Associates. On or about May 1, 1998, ROBERTS was hired by Network
28  Associates as the Director of Legal Affairs. On or about February 14, 2000, ROBERTS was

INDICTMENT                    -2-

1  promoted to Vice President, Legal Affairs. In or about 2001, ROBERTS became the General
2  Counsel and Secretary of Network Associates. ROBERTS' employment was terminated
3  effective May 30, 2006.

4      8.      ROBERTS was Network Associates' corporate compliance officer regarding SEC
5  reporting rules. Among other things, ROBERTS was responsible for assuring Network
6  Associates' compliance with various SEC reporting requirements, including the filing of SEC
7  forms (Forms 3, 4, and 5) which reflect an officer's ownership of Network Associates' securities.
8  In addition, as Secretary for the company, ROBERTS was responsible for creating and
9  maintaining the minutes of meetings of the Board of Directors of Network Associates (the
10  "Board"), including the minutes of meetings of the Compensation Committee of the Board.

11     9.      In or about 2002, ROBERTS became one of the three founding members of the
12  Ethics First Committee. The Ethics First Committee was designed in part to remedy past
13  internal control deficiencies which had led to financial restatements by Network Associates. The
14  Ethics First Committee was charged with investigating, among other things, any fraudulent
15  conduct reported by employees.

16     10.     ROBERTS was a lawyer licensed to practice law in Texas and Missouri. As an
17  employee and officer of Network Associates, and as a lawyer representing Network Associates,
18  ROBERTS owed both a fiduciary duty and a duty of loyalty to act in the best interests of
19  Network Associates and its shareholders, both financially and otherwise.

20  C. Stock Options And Relevant Accounting Rules.

21     11.     As ROBERTS knew, Network Associates used stock options to recruit and retain
22  qualified personnel. Those stock options gave employees the right to purchase Network
23  Associates' stock in the future at a set exercise or "strike" price.

24     12.     Network Associates' public filings represented that it accounted for its stock
25  option grants in accordance with generally accepted accounting principles ("GAAP"). GAAP
26  provided that a company was not required to record any compensation expenses for an employee
27  stock option grant where, among other things, the exercise price of the grant was equal to the
28  market price of the company's stock on the date of the grant. Such stock option grants are "at-

INDICTMENT                -3-

the-money" because they have no intrinsic value on the date of the grant. In contrast, a company was required to record a compensation expense for a stock option grant where the exercise price of the grant was less than the market price of the company's stock on the date of the grant. Such stock option grants are "in-the-money" because they have intrinsic value on the date of the grant. Likewise, a company was required to recognize a compensation expense if it repriced an existing stock option grant.

13.    ROBERTS knew that Network Associates would incur a compensation expense if it granted in-the-money stock options or repriced an existing stock option grant with a more favorable exercise price.

## II. THE SCHEME TO DEFRAUD

14.    Beginning in or about 2000 and continuing to in or about 2006, within the Northern District of California, and elsewhere, defendant KENT H. ROBERTS and others, knowingly and with the intent to defraud, devised and intended to devise a scheme and artifice to defraud Network Associates, its Board, its shareholders, its auditors, the public, and the SEC as to a material matter, to obtain money and property for themselves and others by means of materially false and fraudulent pretenses, representations, and promises, and to deprive Network Associates and its shareholders of their intangible right to his honest services.

15.    It was part of the scheme and artifice to defraud that ROBERTS and others, directly and indirectly:

a.    made, and caused to be made, fraudulent changes to an existing stock option grant so as to reduce the exercise price of that grant without proper approval and without the knowledge of Network Associates' management or Board;

b.    concealed and failed to disclose the fraudulent changes to the existing stock option grant;

c.    made, and caused to be made, a false entry in Board meeting minutes that purported to reflect a grant date for a stock option grant when the closing price of Network Associates' stock was relatively low, when in fact the Board did not intend to make the grant effective on that date;

INDICTMENT                                    -4-

1     d.  made, and caused to be made, fraudulent entries into Network Associates'

2 books and records;

3     e.  filed, and caused to be filed, materially false and misleading filings with

4 the SEC.

5   16.  The object and purpose of the scheme to defraud were to grant ROBERTS and

6 others valuable in-the-money stock options while hiding the true nature and value of the stock

7 option grants from Network Associates, its Board, its shareholders, its auditors, the public, and

8 the SEC and while avoiding the recognition of a compensation expense in Network Associates'

9 financial statements.

10   A. Roberts' Fraudulent Change To His February 2000 Promotion Grant.

11   17.  It was part of the scheme and artifice to defraud that, beginning in or about 2000,

12 ROBERTS fraudulently granted himself extra compensation by causing the grant date for his

13 stock option grant to be changed in Network Associates' books and records so that the exercise

14 price of the grant would be lower and so that it appeared that the grant was made on the new

15 fabricated grant date.

16   18.  In connection with ROBERTS' promotion to Vice President of Legal Affairs, the

17 Board granted Roberts the option to purchase 20,000 shares of Network Associates' stock. The

18 Board approved the grant on July 13, 2000. The Board minutes from the July 13, 2000 meeting

19 stated that the grant date for ROBERTS' promotion grant was February 14, 2000, which was the

20 date his promotion became effective. The strike price for the grant was $29.62, the closing price

21 for Network Associates' stock on February 14, 2000. The options would vest over a four year

22 period. They would expire after ten years.

23   19.  Network Associates used a computer system called "Transcentive" to record

24 stock option grants to employees, including the number of options issued to each employee, the

25 grant date for each grant, and the exercise price for each grant. The Transcentive system was

26 also used to generate reports relating to stock options for financial reporting purposes.

27   20.  In late 2000, after the Board approved the February 2000 promotion grant,

28 ROBERTS was concerned that the grant was "underwater," that is, the $29.62 exercise price of

INDICTMENT       -5-

1   the stock option grant was more than the market price for Network Associates' stock. According
2   to ROBERTS, he caused Network Associates' then-Controller to change the grant date and
3   exercise price for the grant in the Transcentive system so that the exercise price would be lower.
4   In particular, he caused the grant date to be changed to April 14, 2000, and he caused the
5   exercise price to be changed to $19.75, which was the closing price of Network Associates'
6   stock on the new, fabricated grant date.

7       B.   Roberts' Fraudulent Concealment Of His Altered Stock Option Grant.

8       21.    It was further part of the scheme and artifice to defraud that, beginning in or about
9   2000 and continuing to in or about May 2006, ROBERTS fraudulently concealed and failed to
10  disclose the fraudulent change he caused to be made to his February 2000 promotion grant.

11      22.    Beginning in or about February 2002, after ROBERTS caused the then-Controller
12  to alter his February 2000 promotion grant, ROBERTS began an investigation into allegations
13  that the same then-Controller had, among other things, caused the exercise price for stock
14  options granted to certain consultants to be lowered within the Transcentive system. As a result
15  of the investigation, ROBERTS recommended, and Network Associates' management agreed, to
16  remove the then-Controller from his position in the finance department.

17      23.    Beginning in or about March 2002, Network Associates retained Deloitte &
18  Touche ("D&T") to conduct an internal audit of Network Associates' stock option granting
19  practices. As ROBERTS knew, D&T determined that Network Associates was required to
20  record a compensation expense because of the then-Controller's conduct relating to stock
21  options. D&T did not discover the fraudulent changes to ROBERTS' February 2000 promotion
22  grant. As ROBERTS knew, the results of the D&T internal audit were provided to PwC, the
23  company's independent auditor.

24      24.    On or about April 30, 2002, ROBERTS participated in a conference call with the
25  SEC. ROBERTS described his investigation into the then-Controller's conduct with respect to
26  stock options, the decision to remove the then-Controller from his position in the finance
27  department, and the compensation expense that Network Associates would take for the stock
28  options that the then-Controller repriced within the Transcentive system.

INDICTMENT                    -6-

25.    ROBERTS concealed and failed to disclose to Network Associates' management, its Board, D&T, PwC, and others that the then-Controller – who had been removed from his position in the finance department for his conduct relating to stock options and who had caused Network Associates to report a compensation expense as a result of that conduct – had changed the exercise price and grant date of ROBERTS' February 2000 promotion grant.

26.    In May 2006, Network Associates' finance department discovered the fraudulent change to ROBERTS' February 2000 promotion grant. Network Associates terminated ROBERTS' employment shortly thereafter.

C.    Roberts' Fraudulent Change To The Then-CEO's January 2002 Stock Option Grant.

27.    It was further part of the scheme and artifice to defraud that in or about 2002, ROBERTS made a false entry in Board meeting minutes that purported to reflect a grant date for a stock option grant to the then-Chief Executive Officer ("CEO") and Chairman of Network Associates when the closing price of Network Associates' stock was relatively low, when in fact the Board did not intend to make the grant effective on that date.

28.    On January 15, 2002, the Compensation Committee for Network Associates' Board met and granted to the then-CEO the option to purchase 420,000 shares of Network Associates' stock, among other things. As ROBERTS knew, the Board intended for the grant to be made on January 15, 2002 and for the exercise price for the grant to be the closing price of Network Associates' stock on January 15, which was $27.19.

29.    On January 16, 2002, ROBERTS decided to price the then-CEO's stock option grant at the closing price of Network Associates' stock on January 16, 2002, which was $25.43. The stock option grant was then entered into the Transcentive system with a grant date of January 16, 2002 and an exercise price of $25.43.

30.    ROBERTS then prepared minutes of the January 15, 2002 meeting of the Compensation Committee of Network Associates' Board that included the following false description of the stock option grant to the then-CEO: "The Committee directed that [the then-CEO] be granted an additional stock option for 420,000 shares on January 16, 2002 at the closing price on that date."

INDICTMENT                                    -7-

1    D.  The False And Misleading Filings With The SEC.

2        31.    It was further part of the scheme and artifice to defraud that ROBERTS made and

3    caused to be made false and misleading filings with the SEC, including the following:

4            a.    On or about January 10, 2002, Network Associates filed a Form 3 with the

5    SEC that, among other things, reported that ROBERTS was granted the option to purchase

6    20,000 shares of Network Associates' stock with an exercise price of $19.75 per share.

7            b.    On or about May 10, 2002, Network Associates filed a Form 4 with the

8    SEC that, among other things, reported that the then-CEO was granted the option to purchase

9    420,000 shares of Network Associates' stock with an exercise price of $25.43 per share.

10           c.    On or about May 15, 2002, Network Associates filed a Form 10-Q with

11    the SEC for the fiscal quarter ended March 31, 2002 that, among other things, reported

12    compensation expenses associated with stock option grants and the then-Controller's conduct,

13    but failed to disclose Roberts' conduct and compensation expenses in connection with other

14    stock option grants, including Roberts' February 2000 grant and the then-CEO's January 2002

15    grant.

16    COUNTS ONE AND TWO:  18 U.S.C. §§ 1341, 1346 and 2 (Mail Fraud; Deprivation Of Right

17    To Honest Services; Aiding And Abetting)

18        32.    Paragraphs 1 through 31 are realleged as if fully set forth here.

19        33.    Beginning in or about 2000, and continuing up to in or about May 2006, within

20    the Northern District of California and elsewhere, for the purpose of executing a scheme and

21    artifice to defraud as to a material matter, to obtain money and property for himself and others by

22    means of materially false and fraudulent pretenses, representations, and promises, and the

23    concealment of material facts, and to deprive his employer Network Associates and its

24    shareholders of their intangible right to his honest services, defendant

25                        KENT H. ROBERTS

26    did knowingly cause the following items to be delivered by a private and commercial interstate

27    carrier and U.S. mail according to the direction thereon:

28

INDICTMENT                    -8-

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| ONE | January 9, 2002 | SEC Form 3 sent from Santa Clara, California to Washington D.C. reporting grant to Roberts of option to purchase 20,000 shares of Network Associates' stock with an exercise price of $19.75 per share. |
| TWO | May 9, 2002 | SEC Form 4 sent from Santa Clara, California to Washington, D.C. reporting grant to then-CEO of option to purchase 420,000 shares of Network Associates' stock with an exercise price of $25.43. |

All in violation of Title 18, United States Code, Sections 1341, 1346, and 2.

COUNTS THREE:  18 U.S.C. §§ 1343, 1346 and 2 (Wire Fraud; Deprivation Of Right To Honest Services; Aiding And Abetting)

34.    Paragraphs 1 through 31 are realleged as if fully set forth here.

35.    Beginning in or about 2000, and continuing up to in or about May 2006, within the Northern District of California and elsewhere, for the purpose of executing a scheme and artifice to defraud as to a material matter, to obtain money and property for himself and others by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts, and to deprive his employer Network Associates and its shareholders of their intangible right to his honest services, defendant

KENT H. ROBERTS

did knowingly transmit and cause to be transmitted, by means of a wire communication, certain signs, signals, and sounds, that is:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| THREE | April 30, 2002 | Interstate telephone conference call with the SEC including participants in Palo Alto, California and Washington, D.C. |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

///
///
///
///

INDICTMENT                    -9-

1 | COUNTS FOUR THROUGH SIX: 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, 18

2 | U.S.C. § 2 (False SEC Filings; Aiding And Abetting)

3 |     36.    Paragraphs 1 through 31 are realleged as if fully set forth here.

4 |     37.    On or about the dates set forth below, in the Northern District of California and

5 | elsewhere, defendant

6 | KENT H. ROBERTS

7 | did knowingly and willfully make and cause to be made materially false and misleading

8 | statements and omissions in the following reports and documents required to be filed with the

9 | SEC under the Securities and Exchange Act of 1934 and the rules and regulations promulgated

10 | thereunder:

| Counts | Approximate Date of Filing | SEC Filing |
|--------|---------------------------|------------|
| FOUR | January 10, 2002 | SEC Form 3 reporting grant to Roberts of option to purchase 20,000 shares of Network Associates' stock with an exercise price of $19.75 per share, when in fact the exercise price should have been $29.62. |
| FIVE | May 10, 2002 | SEC Form 4 reporting grant to then-CEO of option to purchase 420,000 shares of Network Associates' stock with an exercise price of $25.43, when in fact the exercise price should have been $27.19. |
| SIX | May 15, 2002 | Form 10-Q for the fiscal quarter ended March 31, 2002 that, among other things, reported compensation expenses associated with stock option grants and the then-Controller's conduct, but failed to disclose Roberts' conduct and compensation expenses in connection with other stock option grants, including Roberts' February 2000 grant and the then-CEO's January 2002 grant. |

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

///

///

///

///

INDICTMENT                      -10-

1 COUNT SEVEN: 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and 78ff, 17 C.F.R. § 240.13b2-1, and

2 18 U.S.C. § 2 (Falsifying Books, Records, and Accounts; Aiding And Abetting)

3        38.      Paragraphs 1 through 31 are realleged as if fully set forth here.

4        39.      On or about and between January 2002 and June 2002, in the Northern District of

5 California and elsewhere, defendant

6                                    KENT H. ROBERTS

7 did knowingly and willfully, directly and indirectly, falsify and cause to be falsified books,

8 records, and accounts of Network Associates as to a material matter.

9        All in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and

10 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-1; and Title 18, United States

11 Code, Section 2.

12 DATED:   February 27, 2007                          A TRUE BILL

13

14                                                      _____

                                                        FOREPERSON

15 SCOTT N. SCHOOLS
   United States Attorney
16

17

18 MARK L. KROTOSKI
   Chief, Criminal Division
19

20

21 (Approved as to form: _____ )

                         AUSA Christopher J. Steskal
22                       AUSA Timothy Lucey

23

24

25

26

27

28

INDICTMENT                        -11-