# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE
COMMISSION,

          Plaintiff,

   v.

KENT H. ROBERTS,

          Defendant.

:
:
:
:
:
:

CASE NUMBER 1:07CV00407 (EGS)

## DEFENDANT'S OPPOSITION TO MOTION TO INTERVENE AND TO STAY DISCOVERY

## TABLE OF CONTENTS

PAGE

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

   I.    Introduction................................................................................................. 1

   II.   Relevant Background Facts ......................................................................... 2

   III.  Argument .................................................................................................... 3

         A.    The Court Should Deny the DOJ's Motion to Intervene ........................... 3

         B.    The Court Should Reject the DOJ's Motion to Stay Discovery ................. 3

              1.    A Motion to Stay is Inappropriate When the Government Initiated Both Actions ................................................................. 4

              2.    The Government Fails to Cite Case Law that Applies Here .......... 6

              3.    All of the Factors Considered by Courts Weigh in Favor of Denying the Government's Motion to Stay ................................... 8

                    a.    The DOJ Has Failed to Make a Specific Showing of Prejudice ...................................................................... 9

                    b.    Allowing Discovery to Continue Will Not Prejudice the SEC ........................................................................ 11

                    c.    A Stay Will Severely Prejudice Mr. Roberts ................... 11

                    d.    A Delay in Civil Discovery Will Inconvenience the Court ................................................................................ 12

                    e.    A Stay Will Inconvenience Non-Parties ......................... 13

                    f.    The Public Interest Favors Denial of the Stay ................. 14

   IV.  Conclusion ................................................................................................ 15

## TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Applied Materials, Inc. v. Semiconductor Spares, Inc.*
No. C95-20129 RMW, 1995 WL 261451 (N.D. Cal. Apr. 26, 1995) ..................................... 12

*Belford Strategic Inv. Fund, LLC v. United States*
No. C-04-4309 VRW, 2005 WL 3278597 (N.D. Cal. Nov. 7, 2005)........................................ 6

*Benevolence Int'l Found., Inc., v. Ashcroft*
200 F. Supp. 2d 935 (N.D. Ill. 2002) ........................................................................................ 6

*Bridgeport Harbor Place I, LLC v. Ganim*
269 F. Supp. 2d 6 (D. Conn. 2002) .......................................................................................... 13

*Bureerong v. Uvawas, et al.*
167 F.R.D. 83 (C.D. Cal. 1996) ................................................................................................. 7

*Campbell v. Eastland*
307 F.2d 478 (5th Cir. 1962) ..................................................................................................... 6

*Fed. Sav. Loan Ins. Corp. v. Molinaro*
889 F.2d 899 (9th Cir. 1989) ..................................................................................................... 8

*Fedorenko v. United States*
449 U.S. 490 (1981) .................................................................................................................. 12

*Founding Church of Scientology of Washington, D. C., Inc. v. Kelley*
77 F.R.D. 378 (D.D.C. 1977)...................................................................................................... 7

*FTC v. J.K. Publ'ns, Inc.*
99 F. Supp. 2d 1176 (C.D. Cal. 2000) ..................................................................................... 13

*Gordon v. Fed. Deposit Ins. Corp.*
427 F.2d 578 (D.C. Cir. 1970) ................................................................................................... 8

*Horn v. District of Columbia*
210 F.R.D. 13 (D.D.C. 2002)...................................................................................................... 9

*IBM Corp. v. Brown*
857 F. Supp. 1384 (C.D. Cal. 1994) ........................................................................................ 13

*Integrated Generics, Inc. v. Bowen*
678 F. Supp. 1004 (E.D.N.Y. 1988) .......................................................................................... 6

*Maloney v. Gordon*
328 F. Supp. 2d 508 (D. Del. 2004)..................................................................................... 7, 13

*Nakash v. United States Dep't. of Justice*
708 F. Supp. 1354 (S.D.N.Y. 1988) .......................................................................................... 7

*New York v. Hill*
528 U.S. 110 (2000) .................................................................................................................. 12

TABLE OF AUTHORITIES
(CONTINUED)

PAGE

*Nowaczyk v. Matingas*
146 F.R.D. 169 (N.D. Ill. 1993) ........................................................ 12

*In re Par Pharm., Inc. Sec. Litig.*
133 F.R.D. 12 (S.D.N.Y. 1990) .......................................................... 7

*R.J.F. Fabrics, Inc. v. United States*
651 F. Supp. 1437 (Ct. Int'l Trade 1986) ........................................... 7

*In re Ramu Corp.*
903 F.2d 312 (5th Cir. 1990) ............................................................. 9

*Raphael v. Aetna Cas. and Sur. Co.*
744 F. Supp. 71 (S.D.N.Y. 1990) ...................................................... 6

*Rosenthal v. Giuliani*
No. 98 Civ. 8408 (SWK), 2001 WL 121944 (S.D.N.Y. Feb. 9, 2001) ...................................... 7

*S.W. Marine, Inc. v. Triple A Mach. Shop, Inc.*
720 F. Supp. 805 (N.D. Cal. 1989) .................................................. 12

*SEC v. Dresser Indus., Inc.*
628 F.2d 1368 (D.C. Cir. 1980) ........................................................ 3

*SEC v. Kornman*
No. 3:04-CV-1803-L, 2006 WL 1506954 (N.D. Tex. May 31, 2006) ...................................... 5

*SEC v. Oakford Corp.*
181 F.R.D. 269 (S.D.N.Y. 1998) ...................................................... 5

*SEC v. Reyes, et al.*
Civ. Act. No. 06-04435 (N.D. Cal 2006) ........................................... 6

*SEC v. Saad*
229 F.R.D. 90 (S.D.N.Y. 2005) ..................................................... 5, 6

*SEC v. Sandifur*
No. C05-1631 C, 2006 WL 3692611 (W.D. Wash. Dec 11, 2006) .................................... 4, 5

*SEC v. Yuen*
No. 03 Civ 4376, slip op. (C.D. Cal. 2003) ................................... 3, 5, 14

*Sibron v. New York*
392 U.S. 40 (1968) .......................................................................... 12

*Souza v. Schiltgen*
No. C-95-3997 MHP, 1996 WL 241824 (N.D. Cal. May 6, 1996) ........................................ 6

*Trs. of Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*
886 F. Supp. 1134 (S.D.N.Y. 1995) ............................................... 7, 13

*Twenty First Century Corp. v. LaBianca*
801 F. Supp. 1007 (E.D.N.Y. 1992) .................................................. 7

TABLE OF AUTHORITIES
(CONTINUED)

PAGE

*United States v. Private Sanitation Indus. Assoc. of Nassau/Sufflok, Inc.*
  811 F. Supp. 802 (E.D.N.Y. 1992) ........................................................................... 13

*United States v. Gieger Transfer Sys.*
  174 F.R.D. 382 (S.D. Miss. 1997) ...................................................................... 4, 5, 9

*United States v. Phillip*
  948 F.2d 241(6th Cir. 1991) ................................................................................ 10

*United States, ex rel. Westrick v. Second Chance*
  Civ. A. No. 04-280 (RWR), 2007 WL 1020808 (D.D.C. March 31, 2007) ............................. 8

*Volmar Dist., Inc. v. The New York Post Co., Inc.*
  152 F.R.D. 36 (S.D.N.Y. 1993) .............................................................................. 7

*Walsh Sec., Inc. v. Cristo Prop. Mgmt, Ltd.*
  7 F. Supp. 2d 523 (D.N.J 1998) ............................................................................. 7

*Weil v. Markowitz*
  829 F.2d 166 (D.C. Cir. 1987) ............................................................................... 3

## MEMORANDUM OF POINTS AND AUTHORITIES

I.    **INTRODUCTION**

On February 27, 2007, the Securities and Exchange Commission ("SEC") and the

Department of Justice ("DOJ") filed civil and criminal charges against defendant Kent Roberts.

Now the Government seeks to stay the SEC's civil case to gain a tactical advantage in its pursuit

of Mr. Roberts by denying him the opportunity to adequately defend himself.  Under well-

established case law – which the Government fails to mention in its moving papers – the

Government is not entitled to stay discovery because it initiated both the DOJ and SEC actions at

the same time.  The courts have repeatedly recognized that the Government cannot cry foul and

obtain a stay when the Government created the conflict between the civil and criminal cases.

It is no secret that the SEC and DOJ are working together to jointly prosecute stock

option backdating investigations.  As the SEC's press release announcing the charges against Mr.

Roberts makes clear, this case is yet another example of their collaboration.  (Declaration of Neal

J. Stephens attached hereto ("Stephens Decl.") ¶ 2, Ex. A (SEC Lit. Release No. 20020 dated

February 28, 2007.))  In fact, the DOJ actually delayed indicting Mr. Roberts so that its

indictment would be released in coordination with the SEC's enforcement action.  (*Id.* ¶ 3, Ex. B

(THE RECORDER, p. 1, Feb. 15, 2007.))  The motivation for coordinating the timing of the actions

is obvious – the Government wanted to maximize the amount of pro-Government publicity

related to the announcement of its charges against Mr. Roberts.  *Id.*

Now, however, after the fanfare has died down and Mr. Roberts confronts the important

task of defending himself and clearing his name, the Government seeks to change course and

prevent Mr. Roberts from conducting discovery in the civil case.  The Government's intention,

as it acknowledges in its moving papers, is to stay discovery in the SEC's civil case, obtain a

conviction in the criminal case and then use the criminal conviction as collateral estoppel in the

civil case.  (United States Mot. to Intervene and Stay Discovery and Memorandum of Points and Authorities in Support of Same ("Mot.") at 12) ("[I]f Roberts is convicted, he may be precluded from re-litigating in the civil proceeding facts relating to his participation in the fraud, which will conserve judicial resources.")  Thus, with a "one-two" punch and a media blitz, the Government seeks to destroy Mr. Roberts' reputation, convict him in the criminal case, and then collaterally estop him in the SEC's civil case – all without ever giving Mr. Roberts the opportunity to conduct discovery and fully defend himself.  The Government's coordinated strategy is fundamentally unfair and cannot be tolerated.[1]

## II.    RELEVANT BACKGROUND FACTS

On May 30, 2006, McAfee, Inc. ("McAfee") announced that it had fired Mr. Roberts and had retained independent counsel to assist in its review of its stock option granting practices. (Stephens Decl. ¶ 4, Ex. C (May 30, 2006 Press Release.))  On June 9, 2006, McAfee filed a Form 8-K announcing that it had received a subpoena from the SEC pursuant to a formal order of investigation related to the Company's stock option practices.  (*Id*. ¶ 5, Ex. D (June 9, 2006 8-K.))  McAfee also announced that it intended to cooperate with the SEC.  *Id.*

On or around August 15, 2006, McAfee received a grand jury subpoena from the DOJ relating to the Company's termination of Mr. Roberts, his options-related activities, and McAfee's internal investigation regarding its stock options program.  McAfee noted that it was continuing to fully cooperate with the DOJ.  (*Id*. ¶ 6, Ex. E (August 15, 2006 8-K.))

---

[1] As a threshold matter, Mr. Roberts contends that the SEC action should be transferred to San Francisco and this motion should be decided by the District Judge handling the criminal case in San Francisco.  (*See* Def.'s Mot. to Transfer Venue filed May 21, 2007.)  As the DOJ concedes, the indictment it filed with the Northern District of California is very similar to the SEC's complaint filed with this Court.  The indictment charges "the same scheme to defraud, and it details the same chronology of events."  (Mot. at 4.)  The DOJ also admits that "[i]nevitably, the same witnesses and documents will be the proof for both cases."  (*Id.*)  Whether or not the action is transferred, however, the motion to stay should be denied.

On February 27, 2007, after months of conducting parallel investigations, the SEC and

DOJ filed simultaneous actions charging Mr. Roberts with fraud based upon the same nucleus of

facts.  (*Id*. ¶ 7, Ex. F (Indictment.))  Trial is currently set for February 5, 2008.

## III.   ARGUMENT

### A.   The Court Should Deny the DOJ's Motion to Intervene

Though the Court does have discretion in considering a motion to intervene, the only

reason the DOJ seeks to intervene in this matter is to attempt to stay discovery in a case that the

Government itself initiated.  As will be developed further below, the Government has no basis to

justify the requested stay.  As a result, the Court should deny the DOJ's motion to intervene.

(*See id*. ¶ 8, as Ex. G attaching *SEC v. Yuen*, No. 03 Civ 4376, slip op. at 13:26-14:2 (C.D. Cal.

2003) (denying motion to intervene because the court had denied the motion to stay and the

Government's sole purpose for intervention was to request a stay.)

### B.   The Court Should Reject the DOJ's Motion to Stay Discovery

A total stay of civil discovery pending the outcome of related criminal matters is an

extraordinary remedy appropriate only in extraordinary circumstances.  *See Weil v. Markowitz*,

829 F.2d 166, 174 n.17 (D.C. Cir. 1987).  Unless the Government can demonstrate substantial

prejudice, simultaneous parallel civil and criminal proceedings are unobjectionable under our

jurisprudence.  *See SEC v. Dresser Indus., Inc.* 628 F.2d 1368, 1374 (D.C. Cir. 1980).

Here, the Government cannot meet its burden of showing extraordinary circumstances for

three reasons.  First, numerous courts have denied motions for a stay on the exact facts before

this Court – where the DOJ sought a stay involving parallel actions initiated by the DOJ and the

SEC.  Second, the cases that the Government does cite do not apply here because they either:  (a)

relate to a situation where the criminal defendant initiated a civil case as a vehicle to conduct

discovery to defend the criminal case, (b) a private litigant initiated the civil case, or (c) the

criminal defendant sought the stay.  None of those cases are relevant here because the Government is the entity requesting the stay in this case.  Third, the factors cited by the courts in determining whether to grant a stay weigh in favor of denying the stay.

**1.    A Motion to Stay Is Inappropriate When the Government Initiated Both Actions**

The Government's brief fails to cite – let alone address – all of the recent cases where courts have consistently denied the Government's request for a stay of discovery where the SEC and DOJ initiated both cases at issue.  These cases illustrate the well-established principle that the one factor that almost inevitably results in a denial of a motion for a stay is where the Government has created the conflict between the civil and criminal cases by filing them simultaneously.  *United States v. Gieger Transfer Sys.*, 174 F.R.D. 382, 385 (S.D. Miss. 1997).

The recent trend is exemplified by the court's opinion in *SEC v. Sandifur*, 2006 WL 3692611, *2 (W.D. Wash. 2006).  In *Sandifur,* the SEC filed a civil complaint alleging securities fraud only four days after the DOJ filed an indictment reciting similar facts.  *Id.* at *1.  In denying the DOJ's motion to stay the depositions of several witnesses, the court found that the DOJ had failed to show any real prejudice that would result from the simultaneous progression of both the civil discovery and the criminal case and that the defendants, in the face of serious civil charges, had a strong interest in a timely resolution of the case.  *Id*. at *3.  The court emphasized the recent trend in denying the DOJ's requests for a stay where the Government initiated both the civil and criminal proceedings:

> Although courts have been receptive to Government stay requests in civil cases brought by parties other than the Government, results in recent years have been markedly different when the Government itself brings a civil lawsuit simultaneous with a criminal proceeding.  **Courts regularly deny stays when civil regulators have worked directly in concert with the criminal prosecutors during the investigation and the Government has used parallel proceedings to its advantage.**

*Id.* at *2 (emphasis added) (citing *SEC v. Kornman*, No. 3:04 Civ. 1803, 2006 WL 1506954 (N.D. Tex. 2006); *SEC v. Saad*, 229 F.R.D. 90 (S.D.N.Y. 2005); *Yuen*, No. 03 Civ. 4376, slip op. at 5, 11-13 (attached to Stephens Decl. ¶ 8, Ex. G)); *see also, SEC v. Oakford Corp.,* 181 F.R.D. 269, 273 (S.D.N.Y. 1998) (using the federal courts as a forum for filing serious civil accusations that one has no intention of pursuing until a parallel criminal case is completed is a misuse of the processes of federal courts).

The court in *Sandifur* also rejected the Government's primary argument in this matter – i.e., that allowing the civil discovery process to continue would allow the defendant to obtain discovery that is not authorized in the criminal case.  In rejecting this argument, the Court in *Sandifur* stated that "[h]ad the Government thought this was a serious problem, it could have easily avoided it by waiting until after the criminal matter was resolved to institute civil proceedings."  *Id.* at *3; *see also Yuen*, No. 03 Civ. 4376, slip op. at 13:4-21 (Stephens Decl. ¶ 8, Ex. G) (denying stay in parallel SEC and DOJ proceedings and noting that though allowing civil discovery to progress might provide the defendants with broader discovery than they otherwise would be able to obtain, "this [was] a consequence of the Government's choice to proceed first with the civil case."); *Gieger*, 174 F.R.D. at 385 ("[T]he mere relationship between criminal and civil proceedings, and the resulting prospect that discovery in the civil case could prejudice the criminal proceeding, does not establish the requisite good cause for a stay.") (citations omitted).

The irony in allowing the Government to stay discovery in a case it initiated was best captured by the Court in *Saad*:

> It is bewildering enough that Congress has decreed that, even though someone facing the potentially ruinous financial penalties of an SEC civil complaint should be accorded substantial discovery in order to defend herself, the same defendant facing the even more severe penalties of a criminal action should barely receive any discovery at all.  **But it is stranger still that the U.S.**

> **Attorney's Office, having closely coordinated with the SEC in bringing simultaneous civil and criminal actions against some hapless defendant, should then wish to be relieved of the consequences that will flow if the two actions proceed simultaneously.**

229 F.R.D. at 91.  (emphasis added).

In addition, the DOJ recently briefed and lost this very same issue in another stock options backdating case in San Francisco, *SEC v. Reyes, et al.*, Civ. Act. No. 06-04435 (N.D. Cal 2006).  In *Reyes*, just like in this case, the SEC and DOJ filed simultaneous civil and criminal charges alleging similar violations of securities laws based on alleged stock option backdating. When the DOJ moved for a stay of discovery in the SEC action based on the same reasons it set forth here, Judge Charles R. Breyer denied the stay and allowed the cases to proceed simultaneously.  (Stephens Decl. ¶ 9, Ex. H.)

### 2.    The Government Fails to Cite Case Law that Applies Here

The Government's brief is littered with cases that do not apply to the facts of this case. For example, in its argument regarding granting the stay, the Government cites numerous cases where criminal defendants or private litigants – *not* the Government – initiated civil proceedings independent of the criminal investigation or indictment.  (*See* Mot. at 8-16 (citing *Campbell v. Eastland,* 307 F.2d 478, 488-489 (5th Cir. 1962) (granting stay in civil suit brought by criminal defendant in a related matter); *Belford Strategic Inv. Fund, LLC v. United States*, 2005 WL 3278597, *5 (N.D. Cal. 2005) (same); *Benevolence Int'l Found., Inc., v. Ashcroft*, 200 F. Supp. 2d 935, 941 (N.D. Ill. 2002) (same); *Souza v. Schiltgen*, 1996 WL 241824, *3 (N.D. Cal. 1996) (granting motion to stay civil case brought by a plaintiff who was the subject of a criminal investigation); *Raphael v. Aetna Cas. and Sur. Co.*, 744 F. Supp. 71, 75 (S.D.N.Y. 1990) (granting FBI's motion to quash subpoena in a civil case where the plaintiff was a criminal defendant in a related proceeding); *Integrated Generics, Inc. v. Bowen*, 678 F. Supp. 1004, 1009

(E.D.N.Y. 1988) (granting defendants' motion to stay where plaintiff in the civil suit was the target of an ongoing grand jury investigation); *Nakash v. United States Dep't. of Justice*, 708 F. Supp. 1354, 1366 (S.D.N.Y. 1988) (limiting discovery in a civil suit brought by target of a grand jury investigation to that which will not interfere with the related criminal proceedings); *R.J.F. Fabrics, Inc. v. United States*, 651 F. Supp. 1437, 1440-41 (Ct. Int'l Trade 1986) (granting defendant's motion to stay where plaintiff in the civil suit was a criminal defendant in related criminal proceeding); *Founding Church of Scientology of Washington, D. C., Inc. v. Kelley*, 77 F.R.D. 378, 381 (D.D.C. 1977) (denying motion to compel discovery brought by a plaintiff who was the subject of an ongoing criminal investigation); *see also Maloney v. Gordon*, 328 F. Supp. 2d 508, 514 (D. Del. 2004) (granting stay where private plaintiff initiated civil suit); *Rosenthal v. Giuliani*, 2001 WL 121944, *2 (S.D.N.Y. 2001) (same); *Bureerong v. Uvawas, et al.*, 167 F.R.D. 83, 87 (C.D. Cal. 1996) (granting motion to stay civil case brought by private plaintiff against defendants who were also indicted in a related criminal proceeding); *Twenty First Century Corp. v. LaBianca*, 801 F. Supp. 1007, 1010-11 (E.D.N.Y. 1992) (granting stay where private plaintiff initiated civil suit)).  None of these cases relates to a scenario where the Government initiated both the civil and criminal cases.  They all involve a situation where a non-government entity – the criminal defendant, a target of a grand jury investigation or a private plaintiff initiated the civil litigation.

The Government also relies on several cases where the *defendants* in the civil case moved for a stay arguing that a failure to grant a stay would compromise the defendants' Fifth Amendment rights.  (*See* Mot. (citing *Walsh Sec., Inc. v. Cristo Prop. Mgmt, Ltd.*, 7 F. Supp. 2d 523, 526 (D.N.J 1998); *Trs. of Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1138 (S.D.N.Y. 1995); *Volmar Dist., Inc. v. The New York Post*

*Co., Inc.*, 152 F.R.D. 36, 39-41 (S.D.N.Y. 1993); *In re Par Pharm., Inc. Sec. Litig.*, 133 F.R.D.

12, 13 (S.D.N.Y. 1990); *see also Gordon v. Fed. Deposit Ins. Corp.*, 427 F.2d 578, 580 (D.C.

Cir. Mar. 30, 1970).)  In these cases, a stay was justified by the need to protect the constitutional

rights of the defendants.  No such issue has been raised by Mr. Roberts here.

 None of these cases apply to the factual scenario at hand – where the SEC and DOJ

coordinate parallel-track proceedings, yet have no intention of pursuing the cases in a manner

that allows the defendant a fair opportunity to defend himself.  Simply stated, if the Government

did not want to litigate two cases simultaneously, it should not have elected to file charges in

both cases at the same time.

 **3.**  **All of the Factors Considered by Courts Weigh in Favor of Denying the Government's Motion to Stay**

 The DOJ cites to factors outlined in *Fed. Sav. Loan Ins. Corp. v. Molinaro* to support its

claim that a stay is appropriate here.  889 F.2d 899, 902-03 (9th Cir. 1989).  However, as will be

shown below, none of the factors listed in *Molinaro* warrants a stay in this case.  Under

*Molinaro*, a court generally will consider:  (a) the interest of the plaintiffs in proceeding

expeditiously with this litigation or any particular aspect of it, and the potential prejudice to

plaintiffs of delay; (b) the burden that any particular aspect of the proceedings may impose on

the defendant; (c) the convenience of the court in managing its cases and the efficient use of

judicial resources; (d) the interests of non-parties; and (e) the interest of the public in pending

civil and criminal litigation.  *See id.*; *see also United States, ex rel. Westrick v. Second Chance*,

Civ. A. No. 04-280 (RWR), 2007 WL 1020808, *2 (D.D.C. March 31, 2007) ("Courts have

considered whether the issues in the civil action are related to the issues in the criminal

investigation; the convenience of the courts in the civil and criminal matters; what hardship or

inequality the parties would face if required to move forward on the civil case while the criminal

case was proceeding; and whether the duration of the requested stay is within reasonable limits.")

**a.     The DOJ Has Failed to Make a Specific Showing of Prejudice**

Many courts have recognized that the Government must make a specific showing of prejudice when seeking a stay.  "[T]he mere relationship between criminal and civil proceedings, and the resulting prospect that discovery in the civil case could prejudice the criminal proceeding, does not establish the requisite good cause for a stay."  *Gieger,* 174 F.R.D. at 385; *Horn v. District of Columbia*, 210 F.R.D. 13, 15 (D.D.C. 2002) (same); *see also In re Ramu Corp.*, 903 F.2d 312, 320 (5th Cir. 1990) ("Since any relationship between criminal and civil cases raises the prospect of civil discovery abuse that can prejudice the criminal case, good cause requires more than the mere possibility of prejudice.")  Thus, the Government is at least required to make a "specific showing of the harm it will suffer without a stay and why other methods of protecting its interests are insufficient."  *In re Ramu Corp.*, 903 F.2d at 320.

Here, the Government fails to identify any specific prejudice that would follow from parallel discovery under the facts in this case.  For example, the Government fails to identify what type of information Mr. Roberts might seek in discovery and how that information might harm the Government.  Instead, the Government makes the blanket assertion, without any explanation, that allowing civil discovery to go forward would necessarily prejudice the criminal case.

In addition, the Government's fear concerning the circumvention of the criminal discovery rules is unwarranted.  In its brief, the Government states, without any analysis of the facts of this case, that denying Mr. Roberts discovery is justified by the fear of:  (1) perjury and manufactured evidence; (2) creating opportunities for intimidation of Government informants; and (3) surprises by the defendant.  (*See* Mot. at 9).  None of these concerns exist here.

First, the Government has not provided any explanation regarding how denying the stay will lead to perjury or manufactured evidence. The Government has already deposed and interviewed its key witnesses and has subpoenaed the documents it thinks are relevant to prove its case. Thus, there is no risk of manufactured evidence. To the contrary, denying the stay will permit Mr. Roberts to seek to discover information which, to date, only the Government has been able to pursue.

Second, the Government cannot demonstrate that allowing discovery to proceed will result in witness intimidation. This is not an organized crime or narcotics prosecution in which a criminal organization seeks to discover the identity of confidential informants. This is a white collar case; Mr. Roberts is a peaceful, professional man with no history of violence, and the Government has no confidential informants.

Third, the Government cannot legitimately claim that it could be surprised by any new facts revealed as a result of allowing discovery in the SEC case, given that two agencies of the Government have already pursued extensive investigations and have enjoyed the cooperation of McAfee and key witnesses in these investigations. The only surprises will result from shining light on evidence that the Government chose to overlook because that evidence exonerates Mr. Roberts. The Government, however, should not shy away from learning exculpatory information given that the Government would be required to disclose that information if it were in the Government's possession. In other words, the Court should not reward the Government with a stay where the Government may have failed to collect exculpatory information because the Government should have no interest in prosecuting innocent defendants or denying defendants access to exculpatory information. Justice will be served by allowing discovery to proceed because the truth-seeking process will have been enhanced by the discovery. *See, e.g.*, *United*

*States v. Phillip*, 948 F.2d 241, 255 (6th Cir. 1991) (Merrit, J. dissenting) (discovery rules – both civil and criminal – are intended to enhance the truth-seeking process).

> **b.    Allowing Discovery to Continue Will Not Prejudice the SEC**

The DOJ argues that the SEC "will not be prejudiced by staying civil discovery;" however, the DOJ fails to meet its burden of establishing how *allowing* civil discovery would prejudice the SEC in any way. In fact, the Government acknowledges that the SEC has an interest in proceeding expeditiously. (*See* Proposed Order at p. 1:6-7.) The idea that it would be somehow "unfair" to the SEC to allow discovery to go forward rings hollow given that the SEC has had unilateral access to all relevant documents and witnesses in this case for over a year.

> **c.    A Stay Will Severely Prejudice Mr. Roberts**

Mr. Roberts, on the other hand, will be severely prejudiced by a stay of this case. As a civil defendant, Mr. Roberts is entitled to discovery to defend himself against the case brought by the SEC. While the SEC and DOJ have obtained extensive discovery for use in the criminal and civil cases, Mr. Roberts has not been able to issue document requests and deposition subpoenas to investigate the facts. Further, it appears that the Government wants to use the stay to permanently preclude Mr. Roberts from discovering information he is entitled to receive under the civil discovery rules. (*See* Mot. at 12-13 ("Furthermore, if Roberts is convicted, he may be precluded from re-litigating in the civil proceeding facts relating to his participation in the fraud, which will conserve judicial resources.")) In other words, the Government seeks to permanently prevent Mr. Roberts from conducting discovery to defend himself against the charges by attempting to obtain a criminal conviction and then wants to use that conviction offensively via collateral estoppel in the SEC case.

Such tactics obviously prejudice Mr. Roberts – particularly since the possibility exists that Government may not have received exculpatory information from McAfee during its

investigation.  McAfee has publicly announced that it terminated Mr. Roberts and that it would fully cooperate with the Government's investigation.  (Stephens Decl. at ¶ 4, Ex. C (May 30, 2006 Press Release); ¶ 5, Ex. D (June 9, 2006 8-K); ¶ 6, Ex. E (August 15, 2006 8-K.))  As a result, McAfee has no interest in providing information to the Government that might exonerate Mr. Roberts because doing so would undermine McAfee's decision to terminate Mr. Roberts.  There is no logical reason why Mr. Roberts should not be able to seek exculpatory information through discovery.

In addition, courts have consistently recognized that delays hinder the functioning of the judicial system; here, delay will no doubt also harm Mr. Roberts' defense.  The passage of time is prejudicial because witnesses can relocate and memories can fade.  *See Applied Materials, Inc. v. Semiconductor Spares, Inc.*, 1995 WL 261451, *2 (N.D. Cal. 1995).  "Delay can lead to a less accurate outcome as witnesses become unavailable and memories fade."  *New York v. Hill*, 528 U.S. 110, 117 (2000); *see also S.W. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 809 (N.D. Cal. 1989).  "It of course is never easy to demonstrate the existence of statements or events that occurred long ago."  *Fedorenko v. United States*, 449 U.S. 490, 525 n.14 (1981) (Blackmun, J., concurring).  Therefore, "litigation is better conducted when the dispute is fresh and additional facts may, if necessary, be taken without a substantial risk" of fading memories or unavailable witnesses.  *Sibron v. New York*, 392 U.S. 40, 57 (1968).  Here, the events in question date back to 2000.  There is no doubt that Mr. Roberts' ability to vindicate himself in a timely way will be compromised if the Government's request for a stay is granted – particularly since the Government has enjoyed the exclusive right to investigate this matter over the past year.

### d.    A Delay in Civil Discovery Will Inconvenience the Court

Courts have long recognized that they have a strong "interest in moving the cases on its docket to an expeditious conclusion."  *Nowaczyk v. Matingas*, 146 F.R.D. 169, 175 (N.D. Ill.

1993); *see also United States v. Private Sanitation Indus. Assoc. of Nassau/Sufflok, Inc.*, 811 F. Supp. 802, 808 (E.D.N.Y. 1992) ("convenience of the courts is best served when motions to stay proceedings are discouraged.").  A stay would disrupt the Court's calendar by indefinitely postponing trial while the parties await the outcome of the criminal case.  *See IBM Corp. v. Brown*, 857 F. Supp. 1384, 1392 (C.D. Cal. 1994); *see also FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1197 (C.D. Cal. 2000) (same).  Indeed, "a policy of issuing stays solely because a litigant is defending simultaneous multiple suits would threaten to become a constant source of delay and interference with judicial administration." *IBM*, 857 F. Supp. at 1392.

### e.    A Stay Will Inconvenience Non-Parties

The Government vaguely argues that allowing this case to proceed would inconvenience non-parties because it somehow implicates their Fifth Amendment rights.  Here, however, Mr. Roberts is the only defendant in both cases.  The Government has not identified any other individual who would invoke his or her Fifth Amendment right if discovery were to proceed in the SEC matter.  In addition, none of the cases cited by the Government involves the Fifth Amendment rights of witnesses; rather, they relate to the Fifth Amendment rights of *defendants* in pending criminal proceedings.  (*See* Mot. at 13-14 (citing *Trs. of Plumbers,* 886 F. Supp. at 1138 (defendants in criminal case moved for a stay out of concern for their Fifth Amendment rights); *Maloney,* 328 F. Supp. 2d at 510-11 (criminal defendants moved for stay as to civil discovery directed to them, but requested that all other discovery proceed normally); *Bridgeport Harbor Place I, LLC v. Ganim*, 269 F. Supp. 2d 6, 11 (D. Conn. 2002) (granting stay in part because of criminal defendant's Fifth Amendment rights)).  Here, the Government got to choose its opposing party and it only chose one, Mr. Roberts.  No one else has been indicted and there is

no indication that any non-party's Fifth Amendment rights are at issue; therefore, this factor does not support a stay.[2]

### f.    The Public Interest Favors Denial of the Stay

The Government has also failed to meet its burden to show that the public interest would be harmed by denying the stay.  To the contrary, it is in the public interest to allow both cases to go forward.  According to the Government, the public has an interest in "a fair criminal justice system" and "there is no just reason why Roberts should be given a right to broader discovery than criminal defendants in other cases."  (Mot. at 15.)  The applicable case law and the facts do not support the Government's approach.  First, it is the Government, not Mr. Roberts, who has the burden of establishing why Mr. Roberts' rights to discovery should be stayed.  In addition, there is no harm to the public interest in allowing broader discovery than otherwise would be available to a criminal defendant who was also charged by the SEC.  *Yuen*, at 13 (attached to Stephens Decl. at ¶ 8, Ex. G.)

Further, the fairness of our criminal justice system requires considering the circumstances at hand.  As much as the Government would like to treat Mr. Roberts like any other criminal defendant – and thereby limit his rights to discovery – the facts do not support that approach. Contrary to what the Government argues, Mr. Roberts is not like every other criminal defendant because the Government made a decision to pursue him in two highly publicized cases at the same time per the SEC and DOJ's joint strategy.  Yet, the Government now wants to deny Mr. Roberts information – the same information afforded to every other civil defendant of SEC actions – as a direct consequence of the Government's strategy.  Here, it appears that the

---

[2]  In its moving papers, the Government claims that DOJ is a "relevant non-party" to this case. (Mot. at 14).  For the reasons stated above in Sections B(1) and B(3)(a), DOJ fails to demonstrate that a stay is appropriate here.

Government is not interested in a "fair" criminal justice system, but rather, in gaining a tactical advantage.  Such an approach cannot be in the public interest.

## IV.    CONCLUSION

This Court should deny the DOJ's motion to intervene and its request to stay discovery in this case.  The Government elected to file both the criminal and civil cases at the same time.  The case law demonstrates that it is improper for the Government to file serious civil accusations that it has no intention of pursuing until the conclusion of the criminal case.  The Government has not come forward with any relevant authority to the contrary nor has it been able to demonstrate any prejudice.  Accordingly, Mr. Roberts respectfully requests that the DOJ's motion be denied in its entirety.

Dated: June 13, 2007                              Respectfully submitted,

                                                  COOLEY GODWARD KRONISH LLP
                                                  Michael J. Klisch (DC Bar No. 429711)
                                                  1200 19th Street, NW
                                                  5th Floor
                                                  Washington, DC 20036
                                                  (202) 842-7800

                                                  COOLEY GODWARD KRONISH LLP
                                                  Stephen C. Neal (CA Bar No. 170083)
                                                  William S. Freeman (CA Bar No. 82002)
                                                  Neal J. Stephens (CA Bar No. 152071)
                                                  Shannon M. Eagan (CA Bar No. 212830)
                                                  Einat Sandman (CA Bar No. 234776)
                                                  Five Palo Alto Square
                                                  3000 El Camino Real
                                                  Palo Alto, CA 94306
                                                  (650) 843-5000


                                                  By:_____/s/_____
                                                      Michael J. Klisch (DC Bar No. 429711)

                                                  Attorneys for Defendant
                                                  KENT H. ROBERTS

753755/PA

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| | : CASE NUMBER 1:07CV00407 (EGS) |
| v. | : |
| KENT H. ROBERTS, | : |
| Defendant. | : |

## <u>DECLARATION OF NEAL J. STEPHENS IN OPPOSITION TO THE UNITED STATES' MOTION TO INTERVENE AND TO STAY DISCOVERY</u>

I, Neal J. Stephens, declare as follows:

1.      I am an attorney licensed to practice law in the State of California and a member of the law firm of Cooley Godward Kronish LLP, counsel of record for defendant Kent H. Roberts ("Roberts" or the "Defendant").  The following facts are based on personal knowledge or on information and belief based upon my review of documents and sources I believe to be trustworthy.

2.      Attached hereto as Exhibit A is a true and correct copy of the Securities and Exchange Commission's Litigation Release No. 20020, dated February 28, 2007, titled "SEC Charges Former General Counsel of McAfee, Inc. for Fraudulently Re-Pricing Option Grants."

3.      Attached hereto as Exhibit B is a true and correct copy of an article issued by THE RECORDER on February 15, 2007, titled "SEC Blamed for Delay in McAfee Indictment."

4.      Attached hereto as Exhibit C is a true and correct copy of a press release issued by the McAfee, Incorporated on May 30, 2006, titled "McAfee, Inc. Announces Departure of General Counsel."

5.      Attached hereto as Exhibit D is a true and correct copy of McAfee, Inc.'s Form 8-K for the period ended June 7, 2006, filed with the SEC on June 9, 2006.

6.      Attached hereto as Exhibit E is a true and correct copy of McAfee, Inc.'s Form 8-K for the period ended August 15, 2006, filed with the SEC on August 18, 2006.

7.      Attached hereto as Exhibit F is a true and correct copy of the Indictment filed against Kent Roberts in the Northern District of California, Case No. CR 07-0100 MHP.

8.      Attached hereto as Exhibit G is a true and correct copy of a Memorandum of Decision Denying the DOJ's Motion to Intervene in *SEC v. Yuen*, No. 03 CIV 4376, slip op. (C.D. Cal. 2003).

/ / /

/ / /

**9.**    Attached hereto as Exhibit H is a true and correct copy of a Minute Order, dated October 4, 2006, issued by Judge Charles R. Breyer of the Northern District Court of California.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 13, 2007, at Palo Alto, California.

/s/ Neal J. Stephens
Neal J. Stephens

# EXHIBIT A



**U.S. Securities and Exchange Commission**

**U.S. SECURITIES AND EXCHANGE COMMISSION**

Litigation Release No. 20020 / February 28, 2007

Accounting and Auditing Release No. 2567 / February 28, 2007

*SEC v. Kent H. Roberts*, United States District Court for the District of Columbia, Civil Action No. 07-CV-00407 (D.D.C. February 28, 2007)

**SEC Charges Former General Counsel of McAfee, Inc. for Fraudulently Re-Pricing Option Grants**

The Securities and Exchange Commission today charged Kent H. Roberts, the former General Counsel and Corporate Secretary of McAfee, Inc., with securities fraud for wrongfully re-pricing McAfee stock option grants awarded to him and others in an effort to secretly increase the value of the grants. The Commission's complaint alleges that Roberts, secretly and without authorization, changed the grant date of a February 2000 grant made to him in order to take advantage of McAfee's then-declining stock price, which increased the potential value of his option grant by approximately $197,500. Roberts concealed his fraudulent re-pricing by filing false stock ownership reports with the Commission, and by failing to properly disclose in a McAfee proxy statement, which he signed, that the grant had been illicitly re-priced to confer a potential benefit of approximately $197,500 on Roberts.

The complaint also alleges that in 2002, Roberts, in his capacity as secretary of the compensation committee of McAfee's board of directors, falsified the minutes of a compensation committee meeting, and directed the company to issue a 420,000 share option grant to McAfee's chief executive a day later than the committee had directed. By re-dating the grant to a day after the committee's intended grant date, Roberts gave the chief executive a potential benefit of approximately $739,200, due to an intervening decline in McAfee's stock price. Roberts later signed a company proxy statement that misleadingly described the chief executive's option grants, and failed to disclose that the CEO had received an extra $739,200 of potential value due to the unauthorized re-pricing.

Roberts was terminated from his positions at McAfee, Inc. in May 2006, after he confessed his option re-pricing to members of McAfee's board of directors. Roberts did so as McAfee was conducting an internal investigation into option granting practices.

Roberts is charged with violating Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 thereunder, the antifraud provisions; with violating Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder, for circumventing internal controls; and with violating Section 16(a) of the Exchange Act, and Rule 16a-3 thereunder, regarding disclosures of stock ownership by public company officers. He is also charged with violating, and aiding and abetting violations by McAfee, Section 14(a) of the Exchange Act and Rules 14a-3 and 14a-9 thereunder for proxy statement disclosure violations. The Commission is seeking

injunctive relief, disgorgement, and money penalties against Roberts, in addition to a permanent bar to prohibit Roberts from serving as an officer or director of a public company.

The Commission acknowledges the assistance of the United States Attorney's Office for the Northern District of California, which conducted its own separate, parallel investigation.

The Commission's investigation in this matter is continuing.

➤ SEC Complaint in this matter

_http://www.sec.gov/litigation/litreleases/2007/lr20020.htm_

# EXHIBIT B

AR8OO 00027 FO5XX
COOLEY GODWARD LLP
LIBRARY 2
101 CALIFORNIA ST 5TH FL
SAN FRANCISCO CA 94111-580
15909 REC 07/25/07

2813

# THE RECORDER

131ST YEAR  NO. 32

www.callaw.com

$2.00

THURSDAY, FEBRUARY 15, 2007

ALM

## Stop Lookin' at Me

Justice Anthony Kennedy blasted efforts to put cameras into the U.S. Supreme Court. Would his colleagues become media hounds?

*Page 3*

## Fast Track

Heller attorney Stephen Thau helped a biotech purchase drug in a quick tender offer worth $40 million together with Page





# SEC lawyers in D.C. blamed for McAfee prosecution delay

By Justin Scheck
RECORDER STAFF WRITER

Thanks to cross-country coordination efforts between two federal agencies, the first reports over the past two months — including several this week — have said an indictment is imminent for actions relating to a stock options grant he received in 2000.

Silicon Valley lawyer to come under government scrutiny for stock options problems is getting one more reprieve before being indicted.

While it has been clear for nine months that Kent Roberts, the former general counsel of McAfee Inc., is in trouble, there's been a string of delays in his case. The latest, said people with knowledge of the case, is because the Washington, D.C.-based SEC lawyers want to file civil charges at the same time — and they're not ready yet.

Roberts was fired by the company in May after its own investigation found options improprieties. Since then, he has become the focus of a federal criminal inquiry. Press reports over the past two months — including several this week — have said an indictment is imminent for actions relating to a stock options grant he received in 2000.

Stephen Neal, the Cooley Godward Kronish partner representing Roberts, wouldn't say whether he expects his client to be charged.

The SEC typically seeks to coordinate its charges with those filed by criminal prosecutors, said attorneys working on options



**Christopher Steskal**

The prosecutor's departure is not what's holding up an indictment of Kent Roberts.

investigations.

Speaking generally about options cases — but not about McAfee specifically — ex-federal prosecutor Jeffrey Bornstein said the government "is in part motivated by how things are perceived publicly. So there

is this motivation to have a joint press conference."

Bornstein, who left the San Francisco U.S. attorney's office in 2005 to join Kirkpatrick & Lockhart Preston Gates Ellis, said there's often concern within the SEC that, if its civil charges follow on the tail of the indictment, they'll be ignored by the public.

"From the defense perspective, it's so they get the maximum prejudicial publicity that they can," he said.

McAfee has a rich history of legal problems.

The company's former CFO was charged in 2004 with scheming to inflate revenues, and faces a criminal trial in March. And ear-

See McAFEE page 8

# McAFEE

Continued from page 1

ly last year, McAfee agreed to pay a $50 million fine to the SEC for manipulating its books.

The latter case was investigated by a team of SEC lawyers based in Washington, D.C. — a sore point for local SEC lawyers, said people familiar with the situation — and they continued to probe the company when its options problems came to light. Reached Wednesday, one of the D.C. lawyers, Paul Lane, said he's not permitted to speak to the press.

But others familiar with the case said the D.C. team coordinated closely with the San Francisco U.S. attorney's office in the early stages of the investigation. And — as *The Recorder* first reported in December — they concluded last fall that there was enough evidence to move forward with an indictment of Roberts, even as they continued their investigation of other aspects of the company's options issues.

Soon after, the U.S. attorney's office experienced a first delay: Christopher Steskal, the lawyer who had been handling the case, announced that he'd be leaving for private practice.

Reached Tuesday, Steskal wouldn't comment on any options probes, including McAfee, nor would the spokesman for the office.

After assigning another prosecutor to the case, the office continued its investigation of Roberts, and earlier this month they seemed ready to charge Roberts.

It's unclear exactly why the SEC isn't ready. Kathleen Bisaccia, the former enforcement chief for the agency's San Francisco office — and now a private investigator at Kroll — said several aspects of joint investigations can lead to delays.

For example, she said, the SEC can't file charges without a vote by its commissioners, and that can take time.

But, Bisaccia added, it's not always the SEC that is lagging. "The usual scenario is the other way around," she said, with prosecutors being forced to ask the SEC to wait for them.

So far, the only options backdating case to move through the courts has been the prosecution of two former Brocade Communications executives. And the fireworks there have been a direct result of the SEC-DOJ coordination.

In that case, San Francisco federal Judge Charles Breyer has refused to take the common step of staying the SEC civil case until the criminal prosecution is done. That created a frazzle of legal issues straddling both proceedings, including a recent blowup over witnesses who gave testimony to the SEC and prosecutors under a temporary immunity agreement but, when subpoenaed by defense lawyers, invoked the Fifth Amendment.

Richard Marmaro, the Skadden, Arps, Slate, Meagher & Flom partner representing ex-Brocade CEO Gregory Reyes, says the close coordination abuses the government's immunity power, and argues that the agencies should act more independently.

But he doesn't expect that to happen. "They can turn these things for maximum publicity, and that's what they do," he said.

*Reporter Justin Scheck's e-mail address is jscheck@alm.com.*



# EXHIBIT C



## McAfee, Inc. Announces Departure of General Counsel

SANTA CLARA, Calif., May 30 /PRNewswire-FirstCall/ McAfee, Inc. (NYSE: MFE), today announced that its Board of Directors has terminated the employment of its General Counsel, Kent Roberts. The Company had previously disclosed that it is reviewing prior practices in connection with grants of employee stock options.

In connection with that review, the Company became aware of one episode involving the General Counsel in 2000 that was improper. As a result, the Board has terminated his employment. The Audit Committee is continuing the review of other option granting practices and has retained independent counsel to assist it in that effort. The Company has had communications on the subject of option grants with staff of both the Securities & Exchange Commission and the Justice Department.

## About McAfee, Inc.

McAfee, Inc., headquartered in Santa Clara, California and the global leader in Intrusion Prevention and Security Risk Management, delivers proactive and proven solutions and services that secure systems and networks around the world. With its unmatched security expertise and commitment to innovation, McAfee empowers home users, businesses, the public sector, and service providers with the ability to block attacks, prevent disruptions, and continuously track and improve their security. www.mcafee.com.

NOTE: McAfee and Foundstone are either registered trademarks or trademarks of McAfee, Inc. and/or its affiliates in the US and/or other countries. The color red in connection with security is distinctive of McAfee brand products. All other registered and unregistered trademarks in this document are the sole property of their respective owners.

SOURCE McAfee, Inc.

Rate this page



# EXHIBIT D



# Form 8-K

## McAfee, Inc. - MFE

Filed: June 09, 2006 (period: June 07, 2006)

Report of unscheduled material events or corporate changes.

# Table of Contents

Item 8.01.  Other Events.
SIGNATURES

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
# FORM 8-K
### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of
### The Securities Exchange Act of 1934

Date of Report: June 9, 2006 (June 7, 2006)
(Date of earliest event reported)

# McAFEE, INC.

(Exact Name of Registrant as specified in Charter)

| **Delaware** | **Commission File No.:** | 77-0316593 |
|---|---|---|
| (State or other Jurisdiction of incorporation) | 0-20558 | (I.R.S. Employer Identification No.) |

**3965 Freedom Circle**
**Santa Clara, California 95054**
(Address of Principal Executive Offices, including zip code)
**(408) 346-3832**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01. Other Events.**

On June 7, 2006 McAfee, Inc. (the "Company") received a document subpoena pursuant to a formal order of investigation related to the Company's stock option practices. The Company intends to cooperate with the SEC.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**MCAFEE, INC.**

Date: June 9, 2006

By:   /s/ Eric F. Brown
        Eric F. Brown
        Chief Operating Officer and Chief
        Financial Officer

Created by 10KWizard    www.10KWizard.comSource: McAfee, Inc., 8-K, June 09, 2006

# EXHIBIT E



# Form 8-K

## McAfee, Inc. - MFE

Filed: August 18, 2006 (period: August 15, 2006)

Report of unscheduled material events or corporate changes.

# Table of Contents

Item 8.01   Other Events.
SIGNATURES

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549
# FORM 8-K
### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of
### The Securities Exchange Act of 1934

Date of Report: August 15, 2006
(Date of earliest event reported)

# McAFEE, INC.

(Exact Name of Registrant as specified in Charter)

| **Delaware** | **Commission File No.:** | **77-0316593** |
|---|---|---|
| (State or other Jurisdiction of incorporation) | 001-31216 | (I.R.S. Employer Identification No.) |

**3965 Freedom Circle**
**Santa Clara, California 95054**
(Address of Principal Executive Offices, including zip code)
**(408) 346-3832**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01 Other Events.**

    McAfee, Inc. (the "Company") has received a grand jury subpoena from the U.S. Attorney's Office for the Northern District of California relating to the Company's previously disclosed termination of the employment of Kent Roberts, the Company's former general counsel, his options-related activities, and the Company's previously announced investigation. The Company is continuing to fully cooperate with the U.S. Attorney's Office.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**MCAFEE, INC.**

Date: August 18, 2006                    By:   /s/ Eric F. Brown
_____

Eric F. Brown
Chief Operating Officer and Chief
Financial Officer

Created by 10KWizard     www.10KWizard.comSource: McAfee, Inc., 8-K, August 18, 2006

# EXHIBIT F

1  SCOTT N. SCHOOLS (SCBN 9990)
   United States Attorney
2
                                                          *FILED*
3                                                    07 FEB 27 PM 1:46
4                                                    RICHARD W. WIEKING
                                                     CLERK, U.S. DISTRICT COURT
5                                                    NORTHERN DISTRICT OF CALIFORNIA

                              E-filing
6

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION                        MHP

11  UNITED STATES OF AMERICA        CR 07    0100
                                    )
12          Plaintiff,              )    VIOLATIONS: 18 U.S.C. §§ 1341, 1343,
                                    )    1346 – Mail and Wire Fraud;
13      v.                          )    15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. §
                                    )    240.10b-5 – False SEC Filings;
14  KENT H. ROBERTS,                )    15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and
                                    )    78ff and 17 C.F.R. § 240.13b2-1 – Falsifying
15          Defendant.              )    Books, Records, and Accounts;
                                    )    18 U.S.C. § 2 – Aiding and Abetting
16  _____ )
                                    )    SAN FRANCISCO VENUE
17

18                      I N D I C T M E N T

19  The Grand Jury charges:

20                      I. BACKGROUND

21      At all times relevant to this Indictment:

22  A.  The Company

23      1.      McAfee, Inc. was a Delaware corporation with its headquarters in Santa Clara,

24  California. Prior to June 2004, McAfee, Inc. was called Networks Associates, Inc., which was

25  also a Delaware corporation with its headquarters in Santa Clara, California. For purposes of this

26  indictment, the term "Network Associates" or "the company" will be used to refer to both

27  McAfee, Inc. and Networks Associates, Inc.

28      2.      Network Associates was a provider of computer security solutions designed to

    prevent intrusions on networks and protect computer systems from a variety of threats and



1   attacks.

2        3.    Network Associates was a publicly held corporation whose stock was registered

3   with the United States Securities and Exchange Commission (the "SEC") pursuant to Section

4   12(b) of the Securities and Exchange Act of 1934. Network Associates' shares originally traded

5   on the National Association of Securities Dealers Automated Quotation System ("NASDAQ")

6   under the symbol "NETA." On February 12, 2002, Network Associates' shares began trading on

7   the New York Stock Exchange ("NYSE") under the symbol "NET." After June 2004, its shares

8   began trading on the NYSE under the symbol "MFE." The NASDAQ and NYSE are national

9   securities exchanges that use the means and instrumentalities of interstate commerce and the

10   mails.

11        4.    As a public company, Network Associates was required to comply with

12   regulations of the SEC. Those regulations are designed to protect members of the investing

13   public by, among other things, ensuring that a company's financial information is accurately

14   recorded and disclosed to the public.

15        5.    Under SEC regulations, Network Associates and its officers also had a duty to:

16   (a) make and keep books, records and accounts that fairly and accurately reflected the

17   company's business transactions; (b) devise and maintain a system of internal accounting

18   controls sufficient to provide reasonable assurances that the company's transactions were

19   recorded as necessary to permit preparation of reliable financial statements; (c) file quarterly

20   reports (on Form 10-Q) and annual reports (on Form 10-K) with the SEC; and (d) file statements

21   of ownership (Forms 3, 4, and 5) which, among other things, reflect an officer's ownership of

22   Network Associates' securities.

23        6.    Network Associates' fiscal year ended on December 31. Network Associates

24   independent auditor was PricewaterhouseCoopers ("PwC").

25   B. The Defendant.

26        7.    Defendant KENT H. ROBERTS was employed as a lawyer within the legal

27   department of Network Associates. On or about May 1, 1998, ROBERTS was hired by Network

28   Associates as the Director of Legal Affairs. On or about February 14, 2000, ROBERTS was

INDICTMENT              -2-

1  promoted to Vice President, Legal Affairs. In or about 2001, ROBERTS became the General

2  Counsel and Secretary of Network Associates. ROBERTS' employment was terminated

3  effective May 30, 2006.

4      8.    ROBERTS was Network Associates' corporate compliance officer regarding SEC

5  reporting rules. Among other things, ROBERTS was responsible for assuring Network

6  Associates' compliance with various SEC reporting requirements, including the filing of SEC

7  forms (Forms 3, 4, and 5) which reflect an officer's ownership of Network Associates' securities.

8  In addition, as Secretary for the company, ROBERTS was responsible for creating and

9  maintaining the minutes of meetings of the Board of Directors of Network Associates (the

10 "Board"), including the minutes of meetings of the Compensation Committee of the Board.

11     9.    In or about 2002, ROBERTS became one of the three founding members of the

12 Ethics First Committee. The Ethics First Committee was designed in part to remedy past

13 internal control deficiencies which had led to financial restatements by Network Associates. The

14 Ethics First Committee was charged with investigating, among other things, any fraudulent

15 conduct reported by employees.

16     10.    ROBERTS was a lawyer licensed to practice law in Texas and Missouri. As an

17 employee and officer of Network Associates, and as a lawyer representing Network Associates,

18 ROBERTS owed both a fiduciary duty and a duty of loyalty to act in the best interests of

19 Network Associates and its shareholders, both financially and otherwise.

20     C. Stock Options And Relevant Accounting Rules.

21     11.    As ROBERTS knew, Network Associates used stock options to recruit and retain

22 qualified personnel. Those stock options gave employees the right to purchase Network

23 Associates' stock in the future at a set exercise or "strike" price.

24     12.    Network Associates' public filings represented that it accounted for its stock

25 option grants in accordance with generally accepted accounting principles ("GAAP"). GAAP

26 provided that a company was not required to record any compensation expenses for an employee

27 stock option grant where, among other things, the exercise price of the grant was equal to the

28 market price of the company's stock on the date of the grant. Such stock option grants are "at-

INDICTMENT                    -3-

1  the-money" because they have no intrinsic value on the date of the grant. In contrast, a company

2  was required to record a compensation expense for a stock option grant where the exercise price

3  of the grant was less than the market price of the company's stock on the date of the grant. Such

4  stock option grants are "in-the-money" because they have intrinsic value on the date of the grant.

5  Likewise, a company was required to recognize a compensation expense if it repriced an existing

6  stock option grant.

7       13.     ROBERTS knew that Network Associates would incur a compensation expense if

8  it granted in-the-money stock options or repriced an existing stock option grant with a more

9  favorable exercise price.

10              II.  <u>THE SCHEME TO DEFRAUD</u>

11       14.     Beginning in or about 2000 and continuing to in or about 2006, within the

12  Northern District of California, and elsewhere, defendant KENT H. ROBERTS and others,

13  knowingly and with the intent to defraud, devised and intended to devise a scheme and artifice to

14  defraud Network Associates, its Board, its shareholders, its auditors, the public, and the SEC as

15  to a material matter, to obtain money and property for themselves and others by means of

16  materially false and fraudulent pretenses, representations, and promises, and to deprive Network

17  Associates and its shareholders of their intangible right to his honest services.

18       15.     It was part of the scheme and artifice to defraud that ROBERTS and others,

19  directly and indirectly:

20           a.     made, and caused to be made, fraudulent changes to an existing stock

21  option grant so as to reduce the exercise price of that grant without proper approval and without

22  the knowledge of Network Associates' management or Board;

23           b.     concealed and failed to disclose the fraudulent changes to the existing

24  stock option grant;

25           c.     made, and caused to be made, a false entry in Board meeting minutes that

26  purported to reflect a grant date for a stock option grant when the closing price of Network

27  Associates' stock was relatively low, when in fact the Board did not intend to make the grant

28  effective on that date;

INDICTMENT                   -4-

1            d.      made, and caused to be made, fraudulent entries into Network Associates'

2 books and records;

3            e.      filed, and caused to be filed, materially false and misleading filings with

4 the SEC.

5      16.      The object and purpose of the scheme to defraud were to grant ROBERTS and

6 others valuable in-the-money stock options while hiding the true nature and value of the stock

7 option grants from Network Associates, its Board, its shareholders, its auditors, the public, and

8 the SEC and while avoiding the recognition of a compensation expense in Network Associates'

9 financial statements.

10    A.   Roberts' Fraudulent Change To His February 2000 Promotion Grant.

11      17.      It was part of the scheme and artifice to defraud that, beginning in or about 2000,

12 ROBERTS fraudulently granted himself extra compensation by causing the grant date for his

13 stock option grant to be changed in Network Associates' books and records so that the exercise

14 price of the grant would be lower and so that it appeared that the grant was made on the new

15 fabricated grant date.

16      18.      In connection with ROBERTS' promotion to Vice President of Legal Affairs, the

17 Board granted Roberts the option to purchase 20,000 shares of Network Associates' stock. The

18 Board approved the grant on July 13, 2000. The Board minutes from the July 13, 2000 meeting

19 stated that the grant date for ROBERTS' promotion grant was February 14, 2000, which was the

20 date his promotion became effective. The strike price for the grant was $29.62, the closing price

21 for Network Associates' stock on February 14, 2000. The options would vest over a four year

22 period. They would expire after ten years.

23      19.      Network Associates used a computer system called "Transcentive" to record

24 stock option grants to employees, including the number of options issued to each employee, the

25 grant date for each grant, and the exercise price for each grant. The Transcentive system was

26 also used to generate reports relating to stock options for financial reporting purposes.

27      20.      In late 2000, after the Board approved the February 2000 promotion grant,

28 ROBERTS was concerned that the grant was "underwater," that is, the $29.62 exercise price of

INDICTMENT                 -5-

1   the stock option grant was more than the market price for Network Associates' stock. According

2   to ROBERTS, he caused Network Associates' then-Controller to change the grant date and

3   exercise price for the grant in the Transcentive system so that the exercise price would be lower.

4   In particular, he caused the grant date to be changed to April 14, 2000, and he caused the

5   exercise price to be changed to $19.75, which was the closing price of Network Associates'

6   stock on the new, fabricated grant date.

7       B. Roberts' Fraudulent Concealment Of His Altered Stock Option Grant.

8           21.    It was further part of the scheme and artifice to defraud that, beginning in or about

9   2000 and continuing to in or about May 2006, ROBERTS fraudulently concealed and failed to

10  disclose the fraudulent change he caused to be made to his February 2000 promotion grant.

11          22.    Beginning in or about February 2002, after ROBERTS caused the then-Controller

12  to alter his February 2000 promotion grant, ROBERTS began an investigation into allegations

13  that the same then-Controller had, among other things, caused the exercise price for stock

14  options granted to certain consultants to be lowered within the Transcentive system. As a result

15  of the investigation, ROBERTS recommended, and Network Associates' management agreed, to

16  remove the then-Controller from his position in the finance department.

17          23.    Beginning in or about March 2002, Network Associates retained Deloitte &

18  Touche ("D&T") to conduct an internal audit of Network Associates' stock option granting

19  practices. As ROBERTS knew, D&T determined that Network Associates was required to

20  record a compensation expense because of the then-Controller's conduct relating to stock

21  options. D&T did not discover the fraudulent changes to ROBERTS' February 2000 promotion

22  grant. As ROBERTS knew, the results of the D&T internal audit were provided to PwC, the

23  company's independent auditor.

24          24.    On or about April 30, 2002, ROBERTS participated in a conference call with the

25  SEC. ROBERTS described his investigation into the then-Controller's conduct with respect to

26  stock options, the decision to remove the then-Controller from his position in the finance

27  department, and the compensation expense that Network Associates would take for the stock

28  options that the then-Controller repriced within the Transcentive system.

INDICTMENT                          -6-

1        25.    ROBERTS concealed and failed to disclose to Network Associates' management,

2    its Board, D&T, PwC, and others that the then-Controller – who had been removed from his

3    position in the finance department for his conduct relating to stock options and who had caused

4    Network Associates to report a compensation expense as a result of that conduct – had changed

5    the exercise price and grant date of ROBERTS' February 2000 promotion grant.

6        26.    In May 2006, Network Associates' finance department discovered the fraudulent

7    change to ROBERTS' February 2000 promotion grant.  Network Associates terminated

8    ROBERTS' employment shortly thereafter.

9        C.  Roberts' Fraudulent Change To The Then-CEO's January 2002 Stock Option Grant.

10       27.    It was further part of the scheme and artifice to defraud that in or about 2002,

11   ROBERTS made a false entry in Board meeting minutes that purported to reflect a grant date for

12   a stock option grant to the then-Chief Executive Officer ("CEO") and Chairman of Network

13   Associates when the closing price of Network Associates' stock was relatively low, when in fact

14   the Board did not intend to make the grant effective on that date.

15       28.    On January 15, 2002, the Compensation Committee for Network Associates'

16   Board met and granted to the then-CEO the option to purchase 420,000 shares of Network

17   Associates' stock, among other things.  As ROBERTS knew, the Board intended for the grant to

18   be made on January 15, 2002 and for the exercise price for the grant to be the closing price of

19   Network Associates' stock on January 15, which was $27.19.

20       29.    On January 16, 2002, ROBERTS decided to price the then-CEO's stock option

21   grant at the closing price of Network Associates' stock on January 16, 2002, which was $25.43.

22   The stock option grant was then entered into the Transcentive system with a grant date of

23   January 16, 2002 and an exercise price of $25.43.

24       30.    ROBERTS then prepared minutes of the January 15, 2002 meeting of the

25   Compensation Committee of Network Associates' Board that included the following false

26   description of the stock option grant to the then-CEO: "The Committee directed that [the then-

27   CEO] be granted an additional stock option for 420,000 shares on January 16, 2002 at the

28   closing price on that date."

INDICTMENT                  -7-

D. The False And Misleading Filings With The SEC.

31.     It was further part of the scheme and artifice to defraud that ROBERTS made and caused to be made false and misleading filings with the SEC, including the following:

a.      On or about January 10, 2002, Network Associates filed a Form 3 with the SEC that, among other things, reported that ROBERTS was granted the option to purchase 20,000 shares of Network Associates' stock with an exercise price of $19.75 per share.

b.      On or about May 10, 2002, Network Associates filed a Form 4 with the SEC that, among other things, reported that the then-CEO was granted the option to purchase 420,000 shares of Network Associates' stock with an exercise price of $25.43 per share.

c.      On or about May 15, 2002, Network Associates filed a Form 10-Q with the SEC for the fiscal quarter ended March 31, 2002 that, among other things, reported compensation expenses associated with stock option grants and the then-Controller's conduct, but failed to disclose Roberts' conduct and compensation expenses in connection with other stock option grants, including Roberts' February 2000 grant and the then-CEO's January 2002 grant.

COUNTS ONE AND TWO:  18 U.S.C. §§ 1341, 1346 and 2 (Mail Fraud; Deprivation Of Right To Honest Services; Aiding And Abetting)

32.     Paragraphs 1 through 31 are realleged as if fully set forth here.

33.     Beginning in or about 2000, and continuing up to in or about May 2006, within the Northern District of California and elsewhere, for the purpose of executing a scheme and artifice to defraud as to a material matter, to obtain money and property for himself and others by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts, and to deprive his employer Network Associates and its shareholders of their intangible right to his honest services, defendant

KENT H. ROBERTS

did knowingly cause the following items to be delivered by a private and commercial interstate carrier and U.S. mail according to the direction thereon:

INDICTMENT                                   -8-

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| ONE | January 9, 2002 | SEC Form 3 sent from Santa Clara, California to Washington D.C. reporting grant to Roberts of option to purchase 20,000 shares of Network Associates' stock with an exercise price of $19.75 per share. |
| TWO | May 9, 2002 | SEC Form 4 sent from Santa Clara, California to Washington, D.C. reporting grant to then-CEO of option to purchase 420,000 shares of Network Associates' stock with an exercise price of $25.43. |

All in violation of Title 18, United States Code, Sections 1341, 1346, and 2.

COUNTS THREE:  18 U.S.C. §§ 1343, 1346 and 2 (Wire Fraud; Deprivation Of Right To Honest Services; Aiding And Abetting)

34.    Paragraphs 1 through 31 are realleged as if fully set forth here.

35.    Beginning in or about 2000, and continuing up to in or about May 2006, within the Northern District of California and elsewhere, for the purpose of executing a scheme and artifice to defraud as to a material matter, to obtain money and property for himself and others by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts, and to deprive his employer Network Associates and its shareholders of their intangible right to his honest services, defendant

KENT H. ROBERTS

did knowingly transmit and cause to be transmitted, by means of a wire communication, certain signs, signals, and sounds, that is:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| THREE | April 30, 2002 | Interstate telephone conference call with the SEC including participants in Palo Alto, California and Washington, D.C. |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

///

///

///

///

INDICTMENT                                   -9-

1 COUNTS FOUR THROUGH SIX: 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, 18

2 U.S.C. § 2 (False SEC Filings; Aiding And Abetting)

3       36.    Paragraphs 1 through 31 are realleged as if fully set forth here.

4       37.    On or about the dates set forth below, in the Northern District of California and

5 elsewhere, defendant

6                KENT H. ROBERTS

7 did knowingly and willfully make and cause to be made materially false and misleading

8 statements and omissions in the following reports and documents required to be filed with the

9 SEC under the Securities and Exchange Act of 1934 and the rules and regulations promulgated

10 thereunder:

| Count | Approximate Date of Filing | SEC Filing |
|---|---|---|
| FOUR | January 10, 2002 | SEC Form 3 reporting grant to Roberts of option to purchase 20,000 shares of Network Associates' stock with an exercise price of $19.75 per share, when in fact the exercise price should have been $29.62. |
| FIVE | May 10, 2002 | SEC Form 4 reporting grant to then-CEO of option to purchase 420,000 shares of Network Associates' stock with an exercise price of $25.43, when in fact the exercise price should have been $27.19. |
| SIX | May 15, 2002 | Form 10-Q for the fiscal quarter ended March 31, 2002 that, among other things, reported compensation expenses associated with stock option grants and the then-Controller's conduct, but failed to disclose Roberts' conduct and compensation expenses in connection with other stock option grants, including Roberts' February 2000 grant and the then-CEO's January 2002 grant. |

      All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code

of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

///

///

///

///

INDICTMENT                     -10-

1    COUNT SEVEN: 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and 78ff, 17 C.F.R. § 240.13b2-1, and

2    18 U.S.C. § 2 (Falsifying Books, Records, and Accounts; Aiding And Abetting)

3          38.    Paragraphs 1 through 31 are realleged as if fully set forth here.

4          39.    On or about and between January 2002 and June 2002, in the Northern District of

5    California and elsewhere, defendant

6                              KENT H. ROBERTS

7    did knowingly and willfully, directly and indirectly, falsify and cause to be falsified books,

8    records, and accounts of Network Associates as to a material matter.

9          All in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and

10   78ff; Title 17, Code of Federal Regulations, Section 240.13b2-1; and Title 18, United States

11   Code, Section 2.

12   DATED:   February 27, 2007                         A TRUE BILL

13

14                                                      _____
                                                        FOREPERSON

15   SCOTT N. SCHOOLS
     United States Attorney
16

17

18   MARK L. KROTOSKI
     Chief, Criminal Division
19

20

21   (Approved as to form: _____ )
                            AUSA Christopher J. Steskal
22                          AUSA Timothy Lucey

23

24

25

26

27

28

INDICTMENT                              -11-

# EXHIBIT G



Priority \
Send \
Enter \
Closed \
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | CASE No. CV 03-4376 MRP (PLAx) |
| | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | MEMORANDUM OF DECISION RE: GOVERNMENT'S MOTION TO |
| HENRY C. YUEN and ELSIE M. LEUNG, | ) ) | INTERVENE AND STAY CIVIL DISCOVERY  (\S-\) |
| Defendants. | ) ) ) | |

On October 6, 2003, the Government filed a Motion to Intervene and Stay Civil Discovery.  On October 20, 2003, this Court heard oral argument and took the matter under submission.

### BACKGROUND

This case is one of several based on alleged overstatements of revenue by Gemstar-TV Guide International, Inc. ("Gemstar") in the period beginning in 1999 and continuing through the third quarter of 2002. Here, the Securities and Exchange Commission (SEC) has brought several claims against former Gemstar officers Henry C. Yuen and Elsie M. Leung. The SEC's Amended Complaint outlines a variety of mechanisms



1   that Gemstar, allegedly with participation by Yuen and Leung, used to

2   inflate its reported revenue. The Defendants are expected to respond

3   to the Amended Complaint by the end of October, and trial is set for

4   August 31, 2004.

5       The United States Attorney's Office, the FBI, and the SEC are

6   also investigating potential criminal conduct by Gemstar and its

7   representatives. The Government expects that any criminal

8   indictment(s) resulting from the criminal investigation will be filed

9   by March 2004.

10      After lengthy preliminary proceedings between the parties,[1]

11  discovery was scheduled to begin in this case on October 7, 2003. The

12  Government asserts that the discovery materials that the SEC will be

13  required to produce are directly related to the Government's criminal

14  investigation, and that the criminal investigation will be impeded if

15  civil discovery is permitted to go forward. The Government filed this

16  motion seeking to intervene and have civil discovery suspended until

17  March 2004, or until the resolution of the criminal case(s) against

18  either or both of the Defendants if they are indicted by March 2004.

19

20                              **ANALYSIS**

21      Two issues are presented for decision: 1) whether the stay should

22  be granted, and 2) whether intervention is appropriate. This Court is

23  _____

24      [1] In addition to this case, the Defendants are also involved in

25  *Yuen and Leung v. SEC* (CV 03-2219), in which they are seeking the
    release of cash payments from Gemstar that are being held in escrow by

26  the SEC during its investigation of their involvement, and in *SEC v.
    Gemstar* (CV 03-3124), in which Yuen and Leung intervened. In this

27  latter case, the Court issued an order construing the Sarbanes-Oxley
    Act to allow the SEC to put payments Gemstar made to the Defendants in

28  escrow.

1 | not persuaded of the necessity of either the stay or intervention,

2 | thus, for the reasons explained below, both aspects of the

3 | Government's Motion are **DENIED**.

4 | I.    **STAY**

5 |      This Court is not constitutionally required to stay civil

6 | discovery pending resolution of the criminal case. *Federal Savings and*

7 | *Loan Ins. Corp. v. Molinaro*, 889 F.2d 899, 902 (9th Cir 1989); *Keating*

8 | *v. Office of Thrift Supervision*, 45 F.3d 322, 324 (9th Cir. 1996)

9 | (noting that simultaneous civil and criminal proceedings are

10 | "unobjectionable"). However, a court has "the inherent power, in its

11 | discretion, to stay civil proceedings 'when the interests of justice

12 | seem[] to require such action.'" *Keating*, 45 F.3d at 324 (quoting

13 | *United States v. Kordel*, 397 U.S. 1, 12 (1970)), *cited in Malee*

14 | *Bureerong et al. v. Tavee Uvawas et al.*, 167 F.R.D. 83, 87 (C.D. Cal.

15 | 1996).

16 |      The decision whether to stay civil proceedings pending resolution

17 | of criminal charges should be made "in light of the particular

18 | circumstances and competing interests involved in the case." *Federal*

19 | *Sav. & Loan Ins. Corp.*, 889 F.2d at 902. This Court should consider

20 | five factors (the "*Keating* factors") in deciding whether to stay a

21 | civil case pending criminal proceedings: 1) the interest of the

22 | plaintiffs in proceeding expeditiously with this litigation or any

23 | particular aspect of it, and the potential prejudice to plaintiffs of

24 | a delay; 2) the burden which any particular aspect of the proceedings

25 | may impose on defendants, 3) the convenience of the court in the

26 | management of its cases, and the efficient use of judicial resources,

27 | 4) the interests of persons or entities not parties to the civil

28 | litigation and 5) the interest of the public in the pending civil and

1   criminal litigation. *Id.* at 902-03, *cited in Malee Bureerong*, 16

2   F.R.D. at 87; *Keating*, 45 F.3d at 324-2.

3        Evaluation of the *Keating* factors demonstrates that a stay is

4   inappropriate in this case:

5        **1. Plaintiff's Interests**

6        The *Keating* test anticipates that delay in resolving civil

7   litigation could harm or prejudice the plaintiffs, and requires this

8   Court to consider these possible harms. In this case the SEC asserts

9   that not only will it not be harmed by a less expeditious resolution

10  to this action, but that the delay would actually serve their

11  interests.

12       The SEC claims that it has an interest in "the fair and efficient

13  administration of justice in criminal proceedings to enforce the

14  federal securities laws" that is equal to its interest in having this

15  action proceed. (SEC Response, 2). As is discussed in more detail

16  below, this Court is not convinced that a stay is necessary to allow

17  the criminal investigation to proceed. It does not appear that any

18  significant SEC interest in the criminal proceedings will actually be

19  harmed by denying the Government's requested stay.

20       The SEC also argues that unless the stay is granted civil

21  discovery will be slowed by the potential that some witnesses will

22  assert their Fifth Amendment privilege and refuse to testify. As the

23  SEC has already received extensive evidence in this case, presumably

24  from many of the witnesses who would be subject of discovery

25  depositions, this Court is not convinced that the SEC's case would

26  suffer if those witnesses chose to begin asserting their Fifth

27  Amendment privilege at this stage. The Court also finds no reason to

28

1   delay the depositions of other witnesses who are not planning to

2   assert privilege.

3       The *Keating* test asks whether the Plaintiff's interests would be

4   harmed by the delay associated with a stay. This Court is confident

5   that civil discovery can proceed in an orderly fashion in this case

6   despite the concurrent criminal investigation and is equally convinced

7   that a stay is unnecessary to serve the interests of the criminal

8   investigation.

9       **2. Burden on Defendants**

10          a) <u>Defendants' Position</u>

11      The Defendants claim that delay of this action would severely

12  prejudice them for three reasons. First, they have been under SEC

13  investigation for over a year and are anxious to vindicate themselves.

14  (Opp. 10-11). Second, tens of millions of dollars of the Defendants'

15  assets are frozen pending resolution of the SEC's claims against them.

16  (Opp. 11-12). Finally, other civil actions against the Defendants

17  depend on the SEC's Complaint and the Defendants believe that delaying

18  discovery in this case will prejudice their positions in those cases

19  as well. (Opp., 12).

20          1) *Vindication*

21      The Government suggests that the vindication that the Defendants

22  desire will be "well nigh impossible" until the criminal investigation

23  is resolved. (Reply, 10). This may be true, but the Defendants do not

24  propose delaying the criminal investigation. It is reasonable to

25  believe that any forthcoming vindication will come sooner if the cases

26  proceed concurrently than if the civil discovery is stayed. Denying

27  the stay thus serves any potential interest the Defendants' have in

28  seeing their names cleared.

1            2) *Frozen Assets*

2        The SEC and the Government both contest the Defendants' claim

3   that the stay would harm their interests by lengthening the time their

4   assets would remain frozen. Calling the frozen asset argument a "red

5   herring", the SEC noted that the argument would only carry weight if

6   the Defendants were willing to proceed to trial, because the assets

7   would be unfrozen only at the conclusion of the civil case. (SEC

8   Response, 4).   The SEC suggests that although the Defendants are

9   willing to proceed to discovery, the Defendants, or at least Yuen (who

10  has already invoked his Fifth Amendment privilege), are very unlikely

11  to be willing to proceed with trial. Likewise, the Government argues

12  that merely beginning discovery will not lead to the release of the

13  Defendants' assets. (Reply, 10).

14        It is difficult to imagine how a trial following a stay of

15  discovery would not occur later than a trial that is not proceeded by

16  a stay. Delaying the civil case until the criminal cases have been

17  completed on indictments that may not be issued until March will

18  certainly take longer than proceeding with the case as scheduled. It

19  is therefore difficult to see how the Defendants' assets would not be

20  eligible for release more quickly if the case were allowed to proceed.

21        The Government/SEC argument that denying the stay will not

22  necessarily result in an earlier trial assumes flexibility in

23  scheduling that this Court does not intend to demonstrate.   The August

24  31, 2004 trial date that was established in this Court's September 24,

25  2003 Minute Order is the date on which this Court plans to proceed. If

26  possible, this Court would like to conclude this action even earlier.

27  Denying the stay serves the interest of concluding the civil trial

28

1  quickly, and thus serves the Defendants' interest in speeding the

2  arrival of the date on which their assets may be eligible for release.

3             3) *Other Civil Cases*

4      This Court recognizes that the Defendants face other civil cases

5  that are derived from the SEC's Complaint. Quick resolution of the SEC

6  case would serve the interest of the Defendants in speeding the

7  resolution of those cases as well.

8            b. Government/SEC Arguments

9      Despite the Defendants' assertions that delay will cause them

10  prejudice, the Government and SEC argue that a stay would actually

11  help them. The SEC suggests that a stay would mean that the Defendants

12  do not have to spend resources to defend both civil and criminal

13  actions, (SEC Response, 2). The Government and the SEC both argue that

14  a stay would prevent the Defendants from potentially having to assert

15  their Fifth Amendment privilege against self incrimination in the

16  civil proceedings (SEC Response, 2-3).

17            1) *Defending Two Actions*

18      It is not clear to this Court why the SEC believes that the

19  Defendants would have no need to defend two actions if a stay were

20  granted. Unless the SEC has just used its investigation as a vehicle

21  for discovery in the criminal case, the civil action will presumably

22  have to be defended regardless of whether the stay is granted.

23  Although some issues may be resolved in the criminal action that would

24  not need to be relitigated in the civil action, there is no certainty

25  that this would occur. Using this argument as a basis for granting a

26  stay would require this Court to presume that a criminal action would

27  resolve some issues against the Defendants that would not need to be

28  relitigated because of the lower burden of proof in the civil case;

1  that is not a presumption this Court has adequate information to

2  reach.

3                    *2) Fifth Amendment Privilege*

4      The Government and the SEC both express concern that the

5  Defendants will invoke their Fifth Amendment privilege against self-

6  incrimination and refuse to testify until criminal charges are

7  resolved. (Motion, 10; SEC Response, 3). The SEC argues that a stay

8  would benefit the Defendants by allowing them to testify freely in the

9  civil proceedings once the criminal claims have been resolved. (SEC

10  Response, 3).

11      The Defendants did not respond to this contention, other than to

12  argue that there is no chance that they would surprise the prosecution

13  by pursuing discovery while asserting the Fifth Amendment against

14  discovery requests because the SEC and DOJ will be coordinating their

15  efforts. (Opp., 9). The Defendants did not deny that they might

16  exercise their right to assert privilege at some point in the civil

17  litigation and it is true that delaying civil discovery might obviate

18  the need for them to do so. Proceeding with the civil case as

19  scheduled would require the Defendants to make potentially difficult

20  choices regarding assertion of their Fifth Amendment privileges.

21  Granting the stay would protect the Defendants from having to make

22  this choice.

23             c. <u>Balancing the Arguments</u>

24      Although granting a stay might save the Defendants from difficult

25  choices regarding their Fifth Amendment privileges, this benefit is

26  insufficient to outweigh the burden that the delay would create. This

27  case can be contrasted with  *Malee Bureerong*, where Judge Collins

28  found that the potential harm to the Defendants was not severe because

1   the stay would last only three or four months; the stay that the

2   Government requests here is much longer. *See* 167 F.R.D. at 87. In

3   *Malee Bureerong*, the Defendants had already been indicted and their

4   trial date established when the Government requested a stay. *Id.* In

5   this case the Government is asking this Court to wait five months to

6   see if the Defendants will be indicted, and if they are, to postpone

7   discovery indefinitely until they are tried. The Government's request

8   in this case places a much greater burden on Defendants, and this is

9   not outweighed by any benefit that the delay may provide them. This

10  factor weighs against granting a stay.

11      **3. Convenience of the Court**

12      There may be some judicial efficiencies involved in hearing a

13  criminal case prior to the related civil case. *Malee Bureerong*, 167

14  F.R.D. at 87 (noting that because the criminal action may resolve some

15  common factual questions the civil case could be focused and narrowed

16  by staying civil discovery until the completion of the criminal case).

17  The Government and SEC note that granting the stay may relieve this

18  Court of the burden of supervising discovery and deciding motions

19  because many of the relevant issues may be resolved by the criminal

20  case. (SEC Response, 3; Reply, 9). As is noted above, these

21  efficiencies presume that some issues in the criminal trial will be

22  resolved against the Defendants. This is not as simple a conclusion to

23  reach as the Government argues. It depends on law and facts not yet

24  before the Court.

25      This Court also has a strong interest in maintaining its case

26  schedule and proceeding through its docket. It is quite prepared to

27  supervise discovery, hold an August trial, and decide this case by

28  early Fall. Effective management of this Court's docket requires the

1  Court to usher cases through the civil process quickly and fairly.

2  This is an interest that would definitely be harmed by granting a

3  stay.

4       This Court also recognizes that other civil cases depend to some

5  degree on the resolution of this case. Proceeding with discovery as

6  scheduled thus serves the convenience of this Court and other courts

7  considering actions that are related to this one.

8       **4. Interests of Third Persons or Entities**

9       The SEC notes that class action plaintiffs may have an interest

10  in any criminal action. (SEC Response, 3). However, the class action

11  plaintiffs presumably also have an interest in the quick resolution of

12  the civil action, because their cases rely heavily on the SEC's

13  Complaint. (Opp., 12). The SEC also suggests that witnesses will be

14  relieved of the burden of repeatedly testifying in multiple

15  proceedings if the criminal proceedings resolve this case. (SEC

16  Response, 3). However, witnesses might also benefit from efficiencies

17  of overlapping civil and criminal discovery. The interests of third

18  parties are inconclusive and do not weigh heavily towards either side

19  of the determination of whether a stay is appropriate.

20       **5. Interest of the Public**

21       The Government asserts that it has a strong interest in ensuring

22  that the Defendants cannot use civil discovery rules to hamper the

23  grand jury investigation and to circumvent criminal discovery rules.

24  (Motion, 8).   This is an interest that Courts, including this one,

25  take seriously. *E.g., Malee Bureerong*, 167 F.R.D. at 87 ("[T]he

26  interests of the Government in protecting its criminal investigation

27  are clearly the paramount concern here.")

28

1    The Government cites to three concerns leading it to argue that a

2 stay is in the public interest: 1) the possibility of perjury or the

3 manufacture of evidence, 2) the potential for witness intimidation,

4 and 3) the potential that Defendants will use civil discovery to

5 obtain documents that it would not otherwise be able to obtain for use

6 in their potential criminal suits. (Motion, 9).

7    The Defendants respond convincingly to the first two of these

8 arguments, but less so to the third:

9        a. Possibility of Perjury/Manufacture of Evidence

10   The Defendants note that because extensive SEC investigation has

11 already occurred, there is little opportunity for perjury or

12 manufacture of evidence. (Opp. 8). The SEC has gathered at least 525

13 boxes of documents and has conducted many depositions – including

14 eight days with Defendant Leung – and this evidence is now preserved.

15 Id. The Defendants also note that because they are no longer Gemstar

16 employees, it would be particularly difficult for them to manufacture

17 evidence. Id.

18   The Government responds that the discovery gathered in the

19 criminal case will not necessarily replicate that from the civil case,

20 and that the Defendants will thus have new opportunities to tailor

21 their testimony based on testimony previously given by others. (Reply,

22 6). It is true, however, that Defendant Leung's eight days of

23 deposition testimony are locked-in at this point – it would be very

24 difficult for her to tell a different story during criminal discovery

25 and not face the possibility of perjury charges. (Opp., 8). The

26 Government presumes that Defendant Yuen will invoke his Fifth

27 Amendment privilege during civil discovery, so he will have no

28 opportunity to perjure himself either. (Reply, 10). Although the scope

1 of the criminal investigation may be somewhat different from the SEC's

2 civil investigation, both concern the same transactions and events.

3 Thus the possibility of perjury or manufactured evidence is not as

4 great as the Government would ask the Court to believe.

5                   b. Potential for Witness Intimidation

6       The Defendants also deny that there is a possibility that

7 Government witnesses will be intimidated if civil discovery is allowed

8 to proceed. They note that the Gemstar employees and other actors who

9 might serve as witnesses are already well known to the Defendants, and

10 thus that civil discovery will not uncover confidential witnesses.

11 (Opp., 9). They also point out that no evidence has been presented to

12 suggest that they have any inclination to intimidate witnesses. (Id.).

13 The Government responds only generically - reasserting that civil

14 discovery should be stayed to minimize the possibility that the

15 Defendants will intimidate or unduly influence potential witnesses.

16 (Reply, 6). As the Government has not demonstrated that civil

17 discovery will uncover witnesses previously unknown to the Defendants

18 or that there is any cause for concern that the Defendants will

19 intimidate or attempt to influence them, this Court is not persuaded

20 that allowing civil discovery to proceed will measurably increase the

21 likelihood that witnesses will be intimidated.

22                 c. Potential for Broader Discovery

23       The Defendants' response to the Governments' third contention -

24 that the Defendants will use civil discovery to obtain evidence they

25 could not obtain under criminal discovery rules - is less convincing.

26 The Defendants suggest that because the DOJ and SEC will probably

27 continue to coordinate their efforts, any civil discovery will not be

28 a surprise to criminal investigators. (Opp., 9). Although this

1   coordination is likely to occur, it does not negate the fact that the

2   Defendants will be allowed discovery of a broader scope if the stay is

3   not granted.

4       The Defendants' contention that the documents and testimony in

5   the SEC's possession will necessarily be deemed material to their

6   defense and discoverable is not adequately supported. (Opp., 6). This

7   Court recognizes that the scope of discovery allowed under the civil

8   rules is broader than that allowed under the criminal rules, but is

9   not prepared to speculate further on the potential scope of discovery

10  or use of evidence.

11      The Government's interest in law enforcement is clearly an

12  important one, but this Court is not convinced that such an interest

13  will be prejudiced by proceeding with civil discovery in this case.

14  This Court is not persuaded that allowing discovery to proceed on

15  schedule will increase the likelihood of perjury, manufactured

16  evidence, or intimidation of witnesses. It will probably provide the

17  Defendants with broader discovery than they would otherwise be able to

18  obtain, but this is a consequence of the Government's choice to

19  proceed first with the civil case. This Court is not convinced that

20  the public interest will be harmed by the Defendants' access to

21  discovery.

22      The balance of the *Keating* factors indicate that this is not a

23  case where a stay would be appropriate.. The Government's request to

24  stay discovery is **DENIED**.

25  **II.  INTERVENTION**

26      As it appears that the Government asked to intervene for the sole

27  purpose of requesting a stay, and because this Court has denied the

28

1  stay that was requested, the Government's Motion to Intervene is

2  **DENIED**, without prejudice to a later showing of more urgent necessity.

3                                  **CONCLUSION**

4       Based upon the *Keating* factors outlined above, and in light of

5  the conclusions reached in the preceding discussion, the Government's

6  Motion to Intervene and Stay Civil Discovery is hereby **DENIED** in its

7  entirety.

8

9  IT IS SO ORDERED

10

11  DATED: *October 27, 2003*                    *Mariana R. Pfaelzer*

12                                              Honorable Mariana R. Pfaelzer
                                                United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THE HONORABLE CHARLES R. BREYER
Courtroom Clerk: **Barbara Espinoza**

**CRIMINAL PRETRIAL MINUTES**

Date: **October 4, 2006**

Reporter **Juanita Gonzalez**

**Case No: CR- 06-0556- CRB**

DEFT: **GREGORY REYES, STEPHANIE JENSEN**
    (X)Present ()Not Pres ( )In Custody

AUSA: **Chris Steskal**

DEF ATTY: Richard Marmaro, Jan Nielsen Little

**REASON FOR HEARING**   Status Conference

  D's Motion for Order Permitting Issuance of Rule 17(c) Subpoenas

**RESULT**   The Court grants D's Motion - orders signed in open court.  Jury trial dates set.

Counsel are to workout motion dates.  The Court grants US Attorney's Motion to Intervene and

denies Motion to Stay Discovery with the stipulation that the U.S. Attorney's Office may be present

at deposition but is not to participate (filed under C-06-4435CRB).

Time excluded from 10/04/20066 through 5/15/2007

Motions (if any) to be filed no later than _____
Motions to be noticed to be heard no later than _____ otherwise, they will be deemed to
be waived.

**Case Continued to** May 15, 2007 @ 2:30 p.m.   **for**  Pre Trial Conference
             June 11, 2007 @ 8:30 a.m.   **for**  Jury Selection
             June 18, 2007 @ 8:30 a.m.   **for**  Jury Trial

**JUDGMENT**_____

_____

Notes:_____

_____

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

    v.

KENT H. ROBERTS,

        Defendant.

---

:
:
:
:
:
:

CASE NUMBER 1:07CV00407 (EGS)

**[PROPOSED] ORDER DENYING THE UNITED STATES' MOTION TO INTERVENE
AND TO STAY DISCOVERY**

**WHEREAS**, the United States has moved this Court for an order permitting it to intervene in this case so that it can request an order staying discovery until the conclusion of a related pending criminal case;

**WHEREAS**, Defendant Kent Roberts has timely opposed the Unites States' motion to intervene and to stay discovery; and

**WHEREAS,** the Court has fully considered the papers and oral argument, if any, submitted by counsel and finds that the United States has failed to provide relevant authority in support of its motion or to demonstrate that substantial prejudice would result from simultaneous civil and criminal proceedings; and a stay would severely prejudice Defendant;

**IT IS HEREBY ORDERED THAT:**

(1)     The United States' motion to intervene and to stay discovery is denied.


Dated: _____, 2007          _____

                                                              Emmet G. Sullivan
                                                     United States District Judge

## NAMES OF PERSONS TO BE SERVED WITH PROPOSED ORDER UPON ENTRY

PURSUANT TO Local Civil Rule of Procedure 7(k), listed below are the names and addresses of all attorneys entitled to be notified of the proposed order's entry.

William S. Freeman
COOLEY GODWARD KRONISH LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306
wfreeman@cooley.com

Michael J. Klisch
COOLEY GODWARD KRONISH LLP
1200 19th Street, NW
5th Floor
Washington, DC 20036
mklisch@cooley.com

Stephen L. Cohen
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C.  20549-4030
cohens@sec.gov

Laurel Beeler
Timothy J. Lucey
UNITED STATES ATTORNEY'S OFFICE
Northern District of California
450 Golden Gate Avenue, 11th Floor
San Francisco, CA 94102
laurel.beeler@usdoj.gov